Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

George R. Howard (*pro hac vice* pending)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80077 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al.*,** | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

# DECLARATION OF ALAN TANTLEFF IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Alan Tantleff, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that:

1. I am a Senior Managing Director, a senior leader in the Real Estate Restructuring practice and the leader of the Hospitality, Gaming, and Leisure industry practice of FTI Consulting, Inc. ("***FTI***"), a leading global business advisory firm with over 50 offices worldwide and over 5,000 professionals, where I specialize in, among other things, workouts and financial restructurings of lodging, hospitality, and commercial real estate businesses.

2. I have more than 30 years of experience in real estate investment and development. Prior to joining FTI, I served as a Managing Director at Hotel Asset Value Enhancement, a

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

boutique asset management and advisory practice dedicated to the hospitality industry. I have also worked at BlackRock Financial Services and held senior management positions at Jones Lang LaSalle, Granite Partners (Savills), The Prudential Insurance Company of America, and Sands Casino in Atlantic City.

3. I hold a Bachelor of Science in Hotel Management from Cornell University and a Master of Science in Real Estate Investment and Development from New York University. I am a licensed real estate broker in The State of New York, a Certified Insolvency and Restructuring Advisor, and a Certified Turnaround Professional.

4. On September 28, 2026, FTI was retained as financial advisor for American Hospitality Properties REIT, Inc. ("***REIT I***") and American Hospitality Properties REIT II, Inc. ("***REIT II***"), corporations organized under Delaware law (together with their Debtor affiliates, as defined below, the "***Company***"). That same day, I was retained as chief restructuring officer ("***CRO***") for the Company. In my capacity as CRO, I am familiar with the Company's business affairs, day-to-day operations, and financial condition.

5. On the date hereof (the "***Petition Date***"), each of the above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "***Court***"), thereby commencing these chapter 11 cases (the "***Chapter 11 Cases***").

6. The Debtors have filed certain motions seeking limited "first day" relief (collectively, the "***First Day Pleadings***") contemporaneously with this Declaration to maintain the status quo and minimize possible adverse effects of these Chapter 11 Cases on the Debtors' businesses and operations while they pursue their goal of obtaining debtor-in-possession ("***DIP***")

financing and pursue a path forward in these Chapter 11 Cases. I have reviewed the First Day Pleadings and believe that the emergency relief requested is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders resulting from the filing of these Chapter 11 Cases.

7. I am authorized to submit this declaration (this "***Declaration***") on behalf of the Debtors. I am over twenty-one years of age, and, if called upon to testify, I would testify competently to the facts and opinions set forth herein. All facts and opinions set forth in this Declaration are based upon: (i) my knowledge of the Debtors' real estate investment activities, business and financial affairs, and books and records; (ii) information I learned from my review of relevant documents, including unaudited financial documents; (iii) information supplied to me or verified by other members of the Company's management and its third-party advisors; and/or (iv) my experience and knowledge generally. Unless otherwise indicated, any financial information contained in this Declaration is presented on a consolidated basis and is subject to change. The information contained herein is true and correct as of the date of this Declaration.

8. These Chapter 11 Cases are the result of years of mismanagement by the Company's co-founders, Phoenix American Hospitality, LLC ("***PAH***") and its CEO, William Lee "Perch" Nelson ("***Perch***"), who also served as CEO of REIT I and REIT II until May 2026. Through PAH, acting as external manager to certain Company entities, Perch depleted Company assets, damaged key relationships by refusing to pay fees owed to the Company's franchisors and defaulting under franchise agreements, and engaged in conduct that resulted in an enforcement action from the Securities and Exchange Commission (the "***SEC***") and final judgments against both PAH and Perch. Compounding these issues, the Company also faces a pending summary judgment motion seeking as much as $4.3 million from its subsidiaries and REIT I under a ground

lease, as well as shareholder litigation arising from PAH and Perch's conduct described in the SEC enforcement action. Since taking control in May 2026, the Company's new leadership has worked with its advisors to limit this damage. However, the harm caused by Perch and PAH has left the Company with severe liquidity constraints and no option other than filing these Chapter 11 Cases to preserve enterprise value. The Debtors intend to focus their efforts in the early stages of these cases to find DIP financing to provide the liquidity needed for ongoing operations and to support a comprehensive restructuring process.

9. This Declaration is organized into six parts. Part I provides background on the Company, its business and real estate investment activities, and its corporate structure. Part II describes the misconduct by Perch and PAH that has significantly contributed to the decline of the Company's businesses and operations. Part III describes the Company's capital structure. Part IV outlines the events leading to these Chapter 11 Cases. Part V describes the Debtors' need for Chapter 11 relief. Part VI and **Exhibit A** summarize the relief requested in and the factual bases supporting the First Day Pleadings.

## I. THE COMPANY'S BUSINESS

### A. The Company's History

10. REIT I and REIT II are non-traded Delaware corporations, headquartered in Dallas, Texas, formed to engage primarily in the acquisition and management of premium branded hotels and other real estate-related assets secured by or related to hotel properties in the United States. The Debtors own a portfolio of interests in eleven hotels across the country. Since May 2026, a new President and new directors have led the Company.

11. The Company was founded by Perch and PAH. Perch founded PAH and serves as its CEO. Until May 2026, Perch was also the CEO of each of REIT I and REIT II and a director on each entity's board of directors (each, the "***Board***"). PAH was the external manager for certain

of the Company entities until September 30, 2026, when it was removed as manager following a reorganization of the Company's corporate structure.

12. PAH and Perch formed REIT I on August 13, 2018. Nearly five years later, on March 10, 2023, they formed a second corporation, REIT II. Both companies had the same purpose: acquiring and managing premium branded hotels in the United States.

### B. The Company's General Business Activities and Real Estate Investment Activities

13. To date, REIT I and REIT II have each issued stock in an initial offering under Regulation A of the Securities Act of 1933 (the "***Securities Act***"), under offering statements that the SEC qualified on February 5, 2021, and September 25, 2023, respectively. REIT I also invested an aggregate of $1,565,000 in an affiliated company, PAH Charlotte, LLC ("***PAH Charlotte***"). That investment was used to acquire a preferred equity interest in PAH Charlotte that provides for a 12% per year distribution (the "***Preferred Interest***"). However, REIT I ceased holding this Preferred Interest in January 2024.

### C. The Company's Organizational Structure

#### a) Debtor Entities

14. The organizational structure of the Company and the Non-Debtor Entities (defined below) consists of 22 entities, including REIT I and REIT II. The Company is comprised of sixteen entities, which are Debtors in these Chapter 11 Cases. Contemporaneously with filing these Chapter 11 Cases, the Debtors have filed the *Emergency Motion for Entry of an Order (I) Enforcing and Confirming, or Alternatively, Extending the Automatic Stay with Respect to*

*Certain Non-Debtor Entities; and (II) Granting Related Relief* [Docket No. 5] with respect to six non-debtor entities (the "***Non-Debtor Entities***").[2]

**b) Non-Debtor Entities**

15. AHP FT Wayne Inn, LLC and AHP FT Wayne Suites, LLC (together, the "***Ft. Wayne Borrowers***") are Delaware limited liability companies that own hotel properties located in Fort Wayne, Indiana. The Ft. Wayne Borrowers are wholly-owned subsidiaries of APIP-C Borrower, LLC, a Delaware limited liability company ("***APIP-C Borrower***"). The Ft. Wayne Borrowers are borrowers under that certain Loan Agreement dated August 16, 2018, with Société Générale (the "***Lender***"), pursuant to which the Lender extended credit in an aggregate principal amount of up to $15.8 million (the "***Loan***"). In connection with the Loan, Perch and American Hospitality Properties Fund III, LLC ("***AHP Fund III***"), a Delaware private real estate investment fund sponsored by PAH executed recourse guaranties in favor of the Lender pursuant to which they guaranteed certain obligations of the Ft. Wayne Borrowers (the "***Recourse Guaranty***"). The Loan contains extensive cross-default, cross-collateralization, and springing recourse provisions. Among other things, certain bankruptcy-related events may trigger recourse liability and permit the Lender to accelerate the Loan and exercise remedies against the collateral securing the Loan.

16. The Ft. Wayne Borrowers entered into leases with APIP-C Ft. Wayne Inn Master Tenant, LLC, and APIP-C Ft. Wayne Suites Master Tenant, LLC (the "***Master Tenant Entities***") pursuant to which the Master Tenant Entities leased the hotel properties from the Ft. Wayne Borrowers and operated the hotel properties. The Master Tenant Entities are wholly-owned subsidiaries of APIP-C OperCo, LLC, a Delaware limited liability company ("***APIP-C OperCo***").

---

[2] A simplified organization chart of the Company is attached as **<u>Exhibit B</u>** of this Declaration.

APIP-C OperCo, the Ft. Wayne Borrowers, AIP-C Borrower, and the Master Tenant Entities make up the Non-Debtor Entities.[3]

17. In 2023, it is believed that Perch sought to wind down American Hospitality Properties Fund I, LLC ("***AHP Fund I***") and AHP Fund III. Ultimately, Perch, as (i) manager of AHP Fund I and AHP Fund III and (ii) CEO and director of REIT I, determined to have REIT I acquire the assets of AHP Fund I and AHP Fund III. At the time of the transaction, REIT I did not have any independent directors, and there is no record of which we are aware of an independent approval process of such related party transaction authorized by Perch on behalf of AHP Fund I, AHP Fund III, and REIT I.

18. REIT I, a Debtor in these Chapter 11 Cases, entered into a Sale Purchase Agreement, dated May 31, 2023, (the "***Purchase Agreement***") pursuant to which it was to acquire an 80% equity interest in each of APIP-C OperCo, LLC and APIP-C Borrower (the "***80% Interests***"). However, at some point the parties to the Purchase Agreement realized that transfer of the 80% Interests to REIT I would be deemed a transfer that was not a "Permitted Transfer" under the Loan and trigger an "Event of Default" under the Loan, absent the Lender's consent, which was not obtained. However, a transfer of the 80% Interests to Perch appears to have been a "Permitted Transfer" that would not cause an "Event of Default" under the Loan. Consequently, an Assignment and Assumption of Sale-Purchase Agreement, dated June 1, 2023, was entered between REIT I and Perch pursuant to which REIT I assigned its rights under the Purchase Agreement to Perch. Perch ultimately acquired the 80% Interests and continues to hold legal title to the 80% Interests. To fund Perch's acquisition of the 80% Interests, Perch, as CEO

[3] For the avoidance of doubt, the Non-Debtor Entities include: APIP-C Borrower, LLC, AHP FT Wayne Inn, LLC, AHP FT Wayne Suites, LLC, APIP-C OperCo, LLC, APIP-C Ft. Wayne Inn Master Tenant, LLC, and APIP-C Ft. Wayne Suites Master Tenant, LLC.

and a director of REIT I, determined to have REIT I loan to Perch approximately $9.4 million dollars. At the time of such loan, REIT I did not have any independent directors, and there is no record of which we are aware of an independent approval process of such related party transaction authorized by Perch on behalf of REIT I.

19. AHP Fund III held the remaining 20% equity interests in each of APIP-C OperCo and APIP-C Borrower. In January 2024, AHP Fund III merged into REIT I. As a result, REIT I succeeded to AHP Fund III's 20% equity interest in the Non-Debtor Entities and assumed AHP Fund III's obligations under the Recourse Guaranty, rendering REIT I jointly and severally liable for certain obligations arising under the Loan. On January 29, 2025, Perch submitted a request for the Lender's consent to transfer the 80% Interests from Perch to REIT I. As of the Petition Date, the Company is not aware that the required consent has been obtained.

20. Perch and REIT I also executed an Assignment of Certain Economic Interests, effective as of March 31, 2025 (the "***Assignment***"), which purported to assign Perch's economic interests in the APIP-C OperCo and APIP-C Borrower to REIT I without triggering the broader transfer restrictions or obligations under the Loan that would accompany a full assignment of the underlying membership interests. Despite its objective, the Assignment did not transfer the membership interests themselves and left the existing ownership structure undisturbed. Nevertheless, the Assignment reflects the parties' intent to create a structure under which REIT I would be the economic beneficiary of the interests in the Non-Debtor Entities while Perch retained legal title to those interests.

21. Perch and REIT I executed an Exchangeable Promissory Note Agreement on December 19, 2025, to be effective as of June 1, 2023 (the "***Note***"), under which Perch acknowledged that REIT I had loaned him approximately $9.4 million to fund his purchase of the

80% Interests. The Note was structured to, among other things, facilitate the eventual transfer of Perch's equity interest to REIT I upon either the termination of the Loan or the Lender's consent to the transfer. Upon the occurrence of either condition, title to the interests would automatically transfer to REIT I upon its delivery of written notice to Perch. Accordingly, Perch's role is limited to holding legal title temporarily until the Loan can be refinanced and the ownership transferred directly to REIT I as originally contemplated.

22. REIT I's existing ownership interests and contractual rights that would permit it to acquire the remaining equity interests in the Non-Debtor Entities upon a refinancing of the Loan constitute valuable property of the Debtors' estates.

## II. PERCH MISCONDUCT

### A. The SEC Action

23. On June 21, 2024, PAH received a subpoena from the SEC requesting the production of certain documents relating to an SEC investigation of PAH and related entities, including REIT I and REIT II. According to public disclosures, the investigation concerned, among other topics, certain of REIT I and REIT II's business operations, marketing statements and business projections.

24. On June 4, 2026, nearly two years after the SEC opened its investigation against PAH, the SEC pursued an enforcement action against both PAH and Perch alleging several violations of securities law (the "***SEC Action***").

25. The SEC Action alleged that from March 2022 through July 2024, PAH and Perch raised approximately $86 million from over 2,000 retail investors through deceptive conduct, including untrue statements regarding the assets held by, and the profitability of, REIT I and REIT II. PAH, through Perch, raised this money while claiming that REIT I owned as many as eleven hotels. Additionally, each of REIT I and REIT II issued disclosures in offering statements

on Form 1-A under the Securities Act signed by Perch (the "***Offering Statements***") which stated to investors that any conflicting transactions would be approved by an "independent representative."

26. In reality, according to the SEC complaint, REIT I only owned the Preferred Interest in PAH Charlotte until January 2024. The SEC also alleged that PAH, through Perch, made untrue statements that REIT I and REIT II paid regular profit distributions of up to 12% per year to investors, when neither company was profitable and distributions were funded primarily by returns of investor capital. Additionally, neither REIT I nor REIT II had any independent directors on the Board during this two-year period to approve any conflicting transactions, and there is no record of an "independent representative" being appointed to address conflicts of interest, notwithstanding disclosures in the Offering Statements stating otherwise.

27. By engaging in this conduct, PAH and Perch were accused of violating Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act of 1934 (the "***Exchange Act***"), and Rule 10b-5 thereunder.

28. On June 5, 2026, the day after the SEC filed suit, Judge Jane J. Boyle of the United States District Court for the Northern District of Texas, Dallas Division, entered final judgments against PAH and Perch, to which each had consented without admitting the SEC's allegations. The final judgments permanently enjoin PAH and Perch from violating the anti-fraud provisions of the Securities Act and Exchange Act. Perch is also prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act for five years following entry of the final judgment. Perch and PAH are also required to pay civil penalties of $118,225 and $591,127, respectively, pursuant to the terms of the payment schedule set forth in the final judgments.

**B. Financial Irregularities**

29. In August 2026, the Company engaged FTI to conduct a forensic audit of the Company's financial affairs. This audit has uncovered deeply troubling financial irregularities, revealing that Perch directed Axis-Key, REIT I's transfer agent, to issue approximately $4.5 million worth of REIT I common stock in August 2025 to an entity controlled by Perch. The Company initially believed the shares were issued as payment for purported "management fees." But REIT I and REIT II's corporate and financial records contain no record of such an issuance. Perch is understood to have collected approximately $40,000 in dividends from those shares from September 2025 through May 2026, further eroding REIT I and REIT II's assets.

**C. Franchise Agreements and Hotel Mismanagement**

30. Some of the Company entities are parties to certain hotel management agreements for each of the properties for which there is an accompanying franchise agreement. There are eleven hotel management agreements that are believed to be substantially similar. REIT I, PAH, and Perch are each guarantors.

31. One such hotel management agreement was entered into between PAH Charlotte, as owner, and PAH Management, LLC, as manager ("***PAHM***"), dated July 1, 2023 (the "***DoubleTree Charlotte Hotel Management Agreement***"), for the DoubleTree Hotel located in Charlotte, North Carolina. The initial term of the agreement is ten years, with an automatic five-year extension, unless the owner provides timely written notice of non-renewal. PAHM is owned and controlled by PAH. There is no record of the DoubleTree Charlotte Hotel Management Agreement, or any of the hotel management agreements with the Company's subsidiaries and PAHM, being approved by an independent director or an "independent representative" despite Perch controlling the Company, its subsidiaries, and PAHM.

32. Perch and PAH have mismanaged these hotels by failing to pay fees owed to franchisors such that the majority of the Companies' hotels are in default. In addition, Perch has sought to cut costs at these hotels to his benefit and at the expense of these hotels' profits by having PAH and PAHM stop paying franchise fees, which pursuant to the hotel management agreements, PAHM was to pay, overleveraging each of these hotels, and understaffing PAHM.

33. In September 2026, Marriott International, Inc. ("***Marriott***") issued written Notices of Default to four hotel franchisees managed by PAHM. The defaults all arise from non-payment of franchise fees, reimbursable charges, and accrued interest under certain franchise agreements.

34. The four properties and their respective outstanding amounts are:

| Debtor Entity | Location | Amount Owed |
|---|---|---|
| AHP LP7 Bentonville, LLC | Aloft by Marriot Rogers, Arkansas | $659,092.31 |
| AHP LP7 Metairie, LLC | TownePlace Suites by Marriott Harahan, Louisiana | $432,313.84 |
| AHP LP7 Fayetteville, LLC | TownePlace Suites by Marriott Springdale, Arkansas | $236,165.97 |
| AHP LP7 RI Baton Rouge, LLC | Residence Inn by Marriott Baton Rouge, Louisiana | $222,585.64 |

35. In each case, Marriott had previously sent a Notice of Breach on August 6, 2026, demanding full payment by September 5, 2026, which has not been paid to date. Pursuant to the applicable hotel management agreements, PAHM, as hotel manager, was obligated to pay franchise fees and its failure to do so constitutes negligence.

36. Each Notice of Default warns that if full payment of the outstanding amount is not received by October 17, 2026 or October 19, 2026 (depending on the property), then Marriott reserves the right to suspend the hotel's participation in its reservation system and/or terminate the franchise agreement, as early as October 31, 2026. Termination would trigger an obligation to pay

liquidated damages and require de-identification of the hotel as a Marriott system property. This would negatively impact the ability to generate revenues from the hotels since they wouldn't have access to the reservation system.

37. The notices also invoke guaranties, under which REIT I and Perch are jointly and severally liable for immediate payment of all amounts due. Marriott expressly reserves all other rights and remedies under both the franchise agreements and guaranties and states that forbearance from taking immediate action does not constitute a waiver.

38. Despite the Board's direction to pay Marriott's franchise fees, Perch and PAHM failed to do so. As a result, six out of the eight Marriot hotels are in the "redzone," which means that these hotels fall far below brand average and are at risk of becoming in default thereby compounding the damage caused by the four existing defaults for PAHM's failure to pay franchise fees. PAHM's failure to properly manage the properties under the franchise agreements is destroying value daily as franchisor relationships are damaged, capital expenditures are not made, and the reputations of the hotels are adversely impacted. Due to the management structure set up by Perch and PAH and the hotel management agreements that are the result of self-interested transactions negotiated by Perch on behalf of REIT I and REIT II with himself on behalf of PAHM, REIT I and REIT II were left with limited options to remove PAHM and Perch as hotel manager.

### D. New Management Takes Over

39. In connection with the SEC Action and the ultimate settlement between the Company and the SEC, REIT I and REIT II obtained new management after Perch's departure on May 20, 2026 (the "***New Independent Directors***").

40. Paul Adams was appointed as an independent director of the Board of REIT I.

41. Mary Pfeifer was appointed as an independent director of the Board of REIT II.

42. Joseph Reardon was appointed as President and a director of the Board of each of REIT I and REIT II.

43. Following the appointment of the new President and new Board members, Jay Anderson resigned from his prior roles at each of REIT I and REIT II as executive vice president, controller, and director of the Board. Immediately following his resignation, Anderson entered into consulting agreements with each of REIT I and REIT II where Anderson, among other things, provides REIT I and REIT II with accounting and financial reporting services for a one-year period. The consulting agreement automatically renews for an additional one-year period on May 20, 2027, unless terminated according to the contract terms.

44. When the New Independent Directors were appointed, it was not until later that the complexity and severity of the prior mismanagement and governance failures were fully understood.

45. A chart summarizing the current governance at REIT I and REIT II is as follows:

| Name | Position(s) | Entity |
|---|---|---|
| Joseph Reardon | President & Director | REIT I and REIT II |
| Paul Adams | Director | REIT I |
| Mary Pfeifer | Director | REIT II |

**E. Amendments to LLC Agreements to Effect the Removal of PAH as Manager**

46. On September 30, 2026, the Board of each of REIT I and REIT II authorized the amendment and restatement of the limited liability company agreements of the Company's operating subsidiaries in order to remove PAH as the manager of each entity, thereby eliminating Perch's and PAH's governance and control of those subsidiaries. For most of the subsidiaries, the applicable members accomplished this directly by amending the applicable limited liability

company agreement. With respect to two of the Debtors, AHP REIT Port B LLC ("***Port B***") and Lakemore-Phoenix Investment Platform B, LLC ("***LPIP B***"), the amendment of each of their respective limited liability company agreements was effected via merger in accordance with Section 18-209 of the Delaware Limited Liability Company Act, with the limited liability company agreement of each surviving entity amended and restated in accordance with Section 18-209(f).

47. Two new entities were formed to implement those mergers. First, REIT I and REIT II formed AHP Port B Merger Sub, LLC ("***Merger Sub 1***"), which was owned 50% by REIT I and 50% by REIT II. Merger Sub 1 then merged with and into Port B, with Port B surviving. Following the consummation of the first merger, Port B formed AHP Platform B Merger Sub, LLC ("***Meger Sub 2***") as a wholly owned subsidiary. Merger Sub 2 then merged with and into LPIP B, with LPIP B surviving.

48. Following the adoption of each entity's amended and restated limited liability company agreement (including via merger as set forth above), PAH was removed as manager of each applicable entity.

49. In addition, Perch was removed as an officer of each of the Company's subsidiaries, and new officers were appointed. The removal of Perch and PAH from governance and management positions across the Company's subsidiaries has provided the Company with the ability to govern and operate its business effectively going forward.

## III. CAPITAL STRUCTURE

50. The Debtors' capital structure consists of three debt tranches – the SocGen Facility, the Rialto Facility, and the DB Facility (each as defined below).

| Facility | Maturity | Loan Amount |
|---|---|---|
| The SocGen Facility[4] | September 2028 | $15.8 million |
| The Rialto Facility | May 6, 2028 | $18.15 million |
| The DB Facility | August 6, 2027 | $65 million |

### A. SocGen Facility

51. AHP FT Wayne Inn, LLC and AHP FT Wayne Suites, LLC, each Non-Debtor Entities in these Chapter 11 Cases, are borrowers under that certain loan agreement, dated as of August 16, 2018, with Société Générale as lender (the "***SocGen Facility***"). The SocGen Facility was entered into in connection with the acquisition of Hilton Garden Inn Fort Wayne and Homewood Suites Fort Wayne (collectively, the "***Fort Wayne Properties***"), located in Fort Wayne, Indiana. The Fort Wayne Properties are operated under certain Hilton franchise agreements.

52. The SocGen Facility is secured by first priority deeds of trust, assignments of leases and rents, and security agreements encumbering each of the two Fort Wayne Properties. The SocGen Facility was initially guaranteed by Perch and AHP Fund III, who have both executed a Guaranty of Recourse Obligations for the benefit of the lender. However, when AHP Fund III merged into REIT I in 2024, these obligations also succeeded to REIT I.

53. The principal facility amount is $15.8 million, allocated between the Hilton Garden Inn Fort Wayne ($8.9 million) and the Homewood Suites Fort Wayne ($6.9 million). The SocGen Facility bears interest at a fixed rate of 4.740% annually, with a maturity date in September 2028.

[4] REIT I is a guarantor to this facility, but the Ft. Wayne Borrowers are not Debtors. *See* Part I.C above for more information.

**B. The Rialto Facility**

54. On May 8, 2018, PAH Charlotte, as borrower, and Rialto Mortgage Finance, LLC, as lender, entered into that certain loan agreement (the "***Rialto Facility***"). PAH Charlotte is a Debtor in these Chapter 11 Cases. The Rialto Facility was made to finance the DoubleTree by Hilton Charlotte Airport, a 173-room hotel property located in Charlotte, North Carolina, which is operated under a Hilton franchise agreement and managed by PAHM.

55. The Rialto Facility is secured by a first priority security instrument encumbering the property. The Rialto Facility was initially guaranteed by Perch, PAH, and AHP Fund III, who have executed a Guaranty of Recourse Obligations for the benefit of the lender. However, when AHP Fund III merged into REIT I in 2024, these obligations also succeeded to REIT I.

56. The principal facility amount is $18.15 million and bears an interest at a fixed rate of 5.40% per year. The Rialto Facility matures on May 6, 2028.

**C. The DB Facility**

57. On July 14, 2017, AHP LP7 FT Meyers, LLC, AHP LP7 Bentonville, LLC, AHP LP7 CY Baton Rouge, LLC, AHP LP7 RI Baton Rouge, LLC, AHP LP7 Jonesboro, LLC, AHP LP7 Fayetteville, LLC, and AHP LP7 Metairie, LLC are each Debtor-borrowers under that certain loan agreement with Deutsche Bank AG, New York Branch (the "***DB Facility***"). The proceeds of the DB Facility were used to acquire a portfolio of seven hotel properties located across Arkansas, Louisiana, and Florida.

58. The DB Facility is secured by first priority mortgages on each of the seven portfolio properties, together with assignments of leases and rents. The DB Facility was initially guaranteed by Perch and AHP Fund III, who have executed a Guaranty of Recourse Obligations for the benefit of the lender. However, when AHP Fund III merged into REIT I in 2024, these obligations also succeeded to REIT I.

59. The principal facility amount is $65 million with a fixed interest rate at 4.71% per year. The DB Facility matures on August 6, 2027.

## IV. EVENTS LEADING TO THE CHAPTER 11 CASES

### A. The Spirit Litigation

60. AHP Master Lease, LLC ("***AHP Master Lease***"), a Company subsidiary, is the original tenant under a ground lease dated March 28, 2019 (as amended, the "***Ground Lease***") with Spirit Realty, LP ("***Spirit***") as landlord. The Ground Lease covers the real property and improvements located in Cape Canaveral, Florida, which operate as the Residence Inn by Marriott Cape Canaveral Cocoa Beach. When AHP Master Lease and Spirit entered into the Ground Lease, AHP Fund III and PAH executed an Unconditional Guaranty of Payment and Performance (the "***Guaranty***") guaranteeing, on a joint-and-several basis, "the punctual and complete payment and/or performance when due of all obligations of the Tenant" under the Ground Lease and related documents. Another Company subsidiary, AHP RI Cape Canaveral, LLC ("***AHP RI Cape Canaveral***"), is the current tenant. In January 2024, AHP Fund III merged into REIT I. As AHP Fund III's successor, REIT I later executed a Consent and Affirmation of Guarantor, expressly reaffirming the Guaranty.

61. Subsequently, the parties executed that certain Lease Forbearance and Rent Deferral Agreement, dated June 1, 2020, as amended by amendments dated March 31, 2021, and March 1, 2022, which deferred certain rental payments and established alternative payment schedules. In connection with the June 1, 2020 Lease Forbearance and Rent Deferral Agreement, AHP Fund III and PAH ratified and reaffirmed the Guaranty. With Spirit's consent, AHP Master Lease assigned the Ground Lease to AHP RI Cape Canaveral on January 24, 2025. REIT I, as successor to AHP Fund III, and PAH executed a Consent and Affirmation expressly reaffirming the Guaranty.

62. On December 31, 2025, Spirit filed its original petition styled *Spirit Realty, LP v. AHP Master Lease, LLC, et al.*, Cause No. DC-25-23718, pending in the 191st Judicial District Court of Dallas County, Texas (the "***Spirit Litigation***"). The Spirit Litigation asserts three counts: (1) breach of the Ground Lease against AHP Master Lease and AHP RI Cape Canaveral for failure to pay rent starting September 1, 2025; (2) breach of the Guaranty against REIT I and PAH on a joint-and-several basis; and (3) unjust enrichment. The petition sought damages of not less than $2,497,593.56, plus late fees, interest, future rent, and attorneys' fees and costs. On June 23, 2026, Spirit filed a motion for final summary judgment against all defendants, asserting that the defendants owe not less than $4,328,847.48 in unpaid rent, late charges, default interest, and other amounts, plus attorneys' fees and costs.

**B. Shareholder Litigation**

63. The Company also faces litigation that threatens the further depletion of its assets. In September 2026, certain shareholders filed lawsuits against PAH, Perch, REIT I, and REIT II (collectively, the "***Shareholder Litigation***"). The core allegations in the Shareholder Litigation are the same: both cases use the SEC Action's final judgment as a basis to claim, among other things, that certain shareholders were fraudulently induced to purchase securities based on PAH and Perch's false and material representations. Because the Shareholder Litigation is based on the SEC Action, the Company believes that similar claims are likely forthcoming and threaten the Company's future.

## V. THE COMPANY'S NEED FOR CHAPTER 11 RELIEF

64. Since taking office in May 2026, the Company's new leadership has been confronted by a former manager that remained in place at the Company's subsidiaries, an unrecorded $4.5 million stock issuance to an entity Perch controls, franchise defaults at the majority of the Company's hotels, and lawsuits from Spirit and from shareholders and continued

difficulty obtaining records that would enable the companies to file tax returns and compile audited financial statements (or engage an independent auditor). Perch and PAH's mismanagement of Company assets has left the Debtors facing significant liquidity constraints.

65. Making matters worse, Perch and PAH have failed to file certain disclosures required by the SEC for REIT I and REIT II, including audited financial statements, depriving creditors and stakeholders of critical financial transparency. Under Perch's control, REIT I has not filed any required annual or semi-annual disclosures since year-end 2021, and REIT II has not filed any required annual or semi-annual disclosures since year-end 2023. Additionally, independent financial audits of REIT I and REIT II have not been completed since year-end 2021 and year-end 2023, respectively. This sustained failure to comply with federal securities reporting obligations, coupled with the broader financial mismanagement, has materially contributed to the circumstances necessitating the commencement of these Chapter 11 Cases.

66. PAH was removed as external manager to REIT I and REIT II and Perch resigned as an officer and director of both companies in mid-2026, as part of a negotiated settlement with the SEC. However, that settlement was structured to avoid triggering defaults under certain loan and franchise agreements and allowed PAH and Perch to remain in place as the manager of REIT I and REIT II's subsidiaries.

67. Although the corporate reorganization has finally removed Perch and PAH from managing the subsidiaries' day-to-day operations, the mismanagement of PAH and Perch have created significant issues the Company must resolve, such as defaults under the franchise agreements and potential cross-defaults under its funded debt obligations. Further exemplifying the damage Perch and PAH have caused the Company is the issuance of approximately $4.5

million worth of REIT I common stock in August 2025 to an entity controlled by Perch, which was only uncovered after the Company engaged FTI to conduct a forensic audit.

68. At the same time, many of the Company entities face mounting litigation exposure on multiple fronts. REIT I, AHP Master Lease, and AHP RI Cape Canaveral are currently defending against the Ground Lease dispute brought by Spirit and a potential adverse judgment of as much as $4.3 million if the judgment is adverse, as well as multiple stockholder lawsuits that have been filed against the Company in just the past several weeks.

69. In response, the Company has taken proactive steps to mitigate these issues. In addition to retaining FTI as financial advisor, on September 21, 2026, the Company engaged V&E, which has served as the Company's outside corporate counsel since July 2025, as restructuring counsel to assist with evaluating strategic alternatives targeted at, among other things, preserving key stakeholder relationships and stabilizing corporate governance. The Company has also engaged LD Realty Capital, LLC ("***LD Capital***") on September 28, 2026, to act as the non-exclusive DIP financing arranger for the sourcing and arrangement of debtor-in-possession financing in connection with these Chapter 11 Cases.

70. During these Chapter 11 Cases, the Company, intends to continue a two-week process to obtain DIP financing or identify cash collateral that can be used to provide much-needed capital for the Company's ongoing business operations and support a restructuring process that will enable the Company to continue negotiations with Spirit and hopefully reach a resolution under the Ground Lease. Additionally, the Company believes the bankruptcy forum will provide the necessary time to meaningfully address the Shareholder Litigation in a manner that does not disrupt the Company's ongoing operations. Failure to obtain such financing may force the Debtors to convert these cases to Chapter 7.

71. Consistent with their goal of obtaining DIP financing, the Debtors have filed the *Emergency Motion for Entry of an Order (I) Enforcing and Confirming, or Alternatively, Extending the Automatic Stay with Respect to Certain Non-Debtor Entities; and (II) Granting Related Relief* [Docket No. 5] (the "***Automatic Stay Extension Motion***") in order to maintain the status quo and facilitate a smooth entry into these Chapter 11 Cases.

72. As discussed in detail earlier in this Declaration, Perch and APH's mismanagement and self-dealing resulted in REIT I's co-liability for the debts of the Ft. Wayne Borrowers, which are Non-Debtor Entities. This liability to REIT I occurred after Perch and PAH agreed that AHP Fund III would execute recourse guarantees to secure the $15.8 million Loan to guarantee the obligations of the Ft. Wayne Borrowers. Ultimately, through Perch's self-dealing, REIT I acquired AHP Fund III's assets and obligations, which has resulted in REIT I now owning the economic interests in the Ft. Wayne Borrowers. Although Perch currently holds the legal title, in recognition of his obligations to REIT I after it succeeded AHP Fund III, Perch agreed to structure the Note so that the legal title to the equity interests of the Non-Debtor Entities will be transferred to REIT I upon the refinancing or termination of the Loan. However, REIT I is also jointly and severally liable under the Recourse Guaranty for certain obligations arising under the Loan, and any event of default against the Non-Debtor Entities would likely result in liability for REIT I. Additionally, the Loan's cross-default and springing recourse provisions under the Loan, likely mean that any exercise of remedies against the Non-Debtor Entities could trigger additional liability for REIT I.

73. Accordingly, to preserve the Debtors' value in the Non-Debtor Entities, the Debtors are seeking an extension of the automatic stay to these Non-Debtor Entities for a modest period of 30 days solely to maintain the status quo, avoid triggering any potential events of default under

the Loan, and provide them time to obtain DIP financing which may allow them to realize both the economic and legal title to the interests in the Non-Debtor Entities, which they are rightfully entitled to. As discussed in the Automatic Stay Extension Motion, any delay in granting the relief requested will likely cause immediate and irreparable harm to the Debtors, including the potential loss of their current economic interests in the Non-Debtor Entities.

74. After careful consideration of available alternatives, the Company, in consultation with V&E and FTI, concluded that commencing these Chapter 11 Cases is a necessary and appropriate measure to provide the Company with a breathing spell as the Company addresses the myriad issues confronting the business, and allow the Company to: (i) raise needed liquidity, (ii) stabilize its corporate governance and operations; (iii) restore the confidence of its franchisors and other key contract counterparties; (iv) address the ongoing Ground Lease dispute with Spirit; (v) address the pending Shareholder Litigation comprehensively and efficiently through the bankruptcy process; and (vi) preserve the Company's value for the benefit of all stakeholders.

## VI. FIRST DAY PLEADINGS

75. Contemporaneously with this Declaration, the Debtors have filed limited First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of the Chapter 11 Cases, and provide the Debtors with sufficient runway to obtain DIP financing. I have reviewed each of the First Day Pleadings and I believe that the relief requested is necessary to allow the Debtors to enter these Chapter 11 Cases with minimal disruption. The Debtors are seeking entry of orders approving the relief requested in each of the First Day Pleadings as soon as possible. Absent the Court granting the relief requested by the Debtors in their First Day Pleadings on an emergency basis, I believe that the Debtors will suffer immediate and irreparable harm.

76. A description of the relief requested and the facts and opinions supporting each of the First Day Pleadings is detailed in **<u>Exhibit A.</u>**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 4, 2026

*/s/ Alan Tantleff*
Alan Tantleff

# EXHIBIT A

## Evidentiary Support for First Day Pleadings[1]

[1] Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the *Declaration of Alan Tantleff in Support of Chapter 11 Petitions and First Day Pleadings* and/or the applicable First Day Pleadings.

## I. Administrative Motions

### A. Emergency Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "*Joint Administration Motion*")

1. In the Joint Administration Motion, the Debtors request entry of an order consolidating administration of these Chapter 11 Cases for procedural purposes only. Many of the filings and orders in these Chapter 11 Cases will affect all Debtors. I also expect that any discussions between the Office of the United States Trustee for the Northern District of Texas (the "***U.S. Trustee***") and the Debtors and/or other parties in interest, including creditors, will affect all Debtors. If each Debtor's case were administered independently, there would be many duplicative pleadings, overlapping service, and duplicative creditor meetings with the U.S. Trustee. This unnecessary duplication of identical documents would be wasteful of the resources of the Debtors' estates, as well as the resources of this Court and of other parties in interest.

2. I understand that joint administration will permit the Clerk of the Court to use a single general docket for all of the Debtors' Chapter 11 Cases and to combine notices to creditors and other parties in interest by ensuring that all parties in interest will be able to review one docket to stay apprised of the various matters before the Court regarding all of the Debtors' Chapter 11 Cases. Moreover, I understand that supervision of the administrative aspects of the Debtors' Chapter 11 Cases by the U.S. Trustee will be simplified through joint administration. Therefore, joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

3. I do not believe that joint administration will give rise to any conflict of interest among the Debtors' estates because the Debtors will continue as separate and distinct legal entities,

will continue to maintain separate books and records, and will provide information as required in the consolidated monthly operating reports on a Debtor-by-Debtor basis. Based on the administrative duplication that separate administration would cause, I believe any delay in granting the relief requested in the Joint Administration Motion would hinder the Debtors' operations and cause immediate and irreparable harm, since an immediate and orderly transition into chapter 11 is critical to the viability of their operations and the success of these Chapter 11 Cases.

4. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Joint Administration Motion be approved.

### B. Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of 20 Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information; (II) Approving Form and Manner of Notice of Commencement; and (III) Granting Related Relief (the "*Consolidated Creditor Matrix Motion*")

5. The Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to (a) file a consolidated creditor matrix in lieu of submitting separate mailing matrices for each Debtor, (b) file a consolidated list of the Debtors' 20 largest unsecured creditors in lieu of filing separate lists for each Debtor, and (c) redact certain personal identification information; (ii) approving the form and manner of the notice of commencement of these Chapter 11 Cases; and (iii) granting related relief.

6. Given the affiliated nature of the Debtors and the fact that they share a number of creditors in common, I believe that preparing separate matrices for each Debtor would be an unnecessarily burdensome task and could result in duplicate mailings. Moreover, the Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notice, as applicable, and other documents in these Chapter 11 Cases.

7. I believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with requisite notice and other documents filed in these Chapter 11 Cases.

8. Because the top 20 lists of the Debtors could overlap, and certain Debtors may have fewer than 20 significant unsecured creditors, I believe that filing separate Top 20 Lists for each Debtor would be of limited utility. I believe that a single consolidated list of their top 20 unsecured creditors in these Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. In addition, the exercise of compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the Debtors' limited time and resources.

9. I also submit that cause exists to authorize the Debtors to redact address information of employees from the creditor matrix and the list of equity holders because such information could be used to perpetrate identity theft or to harm employees. Instead, the Debtors will provide an unredacted version of the creditor matrix to the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, and the Court.

10. Therefore, on behalf of the Debtors, I respectfully request the authority to file a consolidated Creditor Matrix and a consolidated list of the Debtors' 20 largest unsecured creditors for all of the Debtors on the lead case docket, with sensitive information, such as address information of employees and address information for the list of equity holders, redacted.

# EXHIBIT B

**Simplified Organization Chart**

# American Hospitality Properties - Org Chart

