Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

George R. Howard (admitted *pro hac vice*)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al.*,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

# EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING ON THE MOTION, AND (IV) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 10:30 A.M. (CENTRAL TIME) ON OCTOBER 13, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON OCTOBER 13, 2026, AT 10:30 A.M. (CENTRAL TIME) IN COURTROOM #1, FLOOR 14, UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, 1100 COMMERCE STREET, DALLAS, TX 75242.**

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-650-479-3207. VIDEO COMMUNICATION WILL BE BY USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE JERNIGAN'S HOME PAGE. THE MEETING CODE IS 2304 154 2638. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JERNIGAN'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") file this motion (this "***Motion***") and in support respectfully submit the following:

## PRELIMINARY STATEMENT

1. As described more fully in the First Day Declaration (as defined below),[2] the Debtors commenced these Chapter 11 Cases to obtain a breathing spell from the consequences of years of mismanagement by the Company's co-founders, stabilize their corporate governance and operations, restore the confidence of their franchisors and other key counterparties, pursue debtor-in-possession financing, and preserve and maximize the value of their estates. To accomplish these goals, the Debtors require immediate access to cash on hand, a certain of which is alleged to constitute collateral securing certain of the Debtors' prepetition secured loan facilities.

2. Without the ability to access Cash Collateral (as defined below), even for a limited time, the Debtors will not be able to continue operating their businesses and will likely be forced

[2] Capitalized terms used but not immediately defined herein shall have the meanings set forth in the First Day Declaration or elsewhere in this Motion, as applicable.

to pivot to a liquidation, resulting in immediate and irreparable harm to the Debtors and their estates and a loss of value for all the Debtors' stakeholders.

3. The Debtors are actively pursuing debtor-in-possession financing to provide a source of funding for their ongoing operations but have not found a committed source of financing to date. In the interim, the Debtors must pay approximately $543,665.40 to fund employee payroll and insurance to maintain their operations and expect to have additional expenditures required in the next few weeks.[3] Accordingly, the Debtors' use of Cash Collateral is necessary to bridge the Debtors to that financing. The Debtors are continuing to negotiate the terms of the Interim Order (as defined below) with counsel for the Special Servicer (as defined below), acting on behalf of the Secured Lenders (as defined below). At present there is not an agreement with the Special Servicer regarding the terms of the Interim Order attached but the Debtors hope to present an agreed revised form of Interim Order at the hearing on this Motion.

## JURISDICTION AND VENUE

4. The United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

[3] Additional information regarding the payment of funds for employee wages and insurance is available in the *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition and Postpetition Wages to Hotel Employees; (B) Continue Their Prepetition Hotel Insurance Coverage; (C) Pay Other Hotel Expenses; and (II) Granting Related Relief* filed at Docket No. 43 (the "***Hotel Operations Motion***").

6. The statutory bases for the relief requested herein are sections 105, 361, 362(d), 363(e), 503(b), and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Bankruptcy Rules 2002, 4001, 6004, and 9014, rules 1001-1(b) and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "***N.D. Tex. L.B.R.***"), and the Procedures for Complex Cases in the Northern District of Texas (the "***Complex Case Procedures***").

**EMERGENCY CONSIDERATION**

7. In accordance with the N.D. Tex. L.B.R. and Complex Case Procedures, the Debtors request emergency consideration of this Motion. The Debtors submit that emergency relief in connection with this Motion is essential to the success of these Chapter 11 Cases. As discussed in detail below and in the First Day Declaration (as defined below), any delay in granting the relief requested could cause immediate and irreparable harm to the Debtors. As such, the Debtors believe that emergency consideration is necessary and appropriate.

**BACKGROUND**

8. American Hospitality Properties REIT, Inc. ("***REIT I***") and American Hospitality Properties REIT II, Inc. ("***REIT II***") (collectively, the "***AHP Entities***," and together with their Debtor and non-Debtor affiliates, the "***Company***") are Delaware-incorporated, non-traded companies formed to engage primarily in the acquisition of premium branded hotels and other real estate-related assets either secured by or related to hotel properties in the United States. The AHP Entities own a portfolio of hospitality assets across the country, including properties affiliated with the Marriott and Hilton hotel brands.

9. The AHP Entities were founded by William Lee "Perch" Nelson ("***Mr. Nelson***") and Phoenix American Hospitality, LLC ("***PAH***"), a Dallas-based hospitality investment, asset management, and hotel operations company. PAH, which remains led by Mr. Nelson as its Chief

Executive Officer, serves as the external property manager for certain of the Company's entities in which the AHP Entities hold ownership interests. Prior to the commencement of these Chapter 11 Cases, the Company generated revenue primarily through the ownership of its hotel properties and related hospitality businesses.

10. On October 4, 2026 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the Petition Date, no request for the appointment of a trustee or examiner has been made and no official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

11. Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Amended Declaration of Alan Tantleff in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 20] (the "***First Day Declaration***"), which is incorporated herein by reference.

## RELIEF REQUESTED

12. The Debtors seek entry of an interim order (the "***Interim Order***"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "***Final Order***," and together with the Interim Order, the "***Cash Collateral Orders***"), (i) authorizing the Debtors to use cash collateral (as defined in section 363(a) of the Bankruptcy Code, "***Cash Collateral***"), (ii) granting adequate protection, solely to the extent provided in the Cash Collateral Orders, to the Secured Lenders, (iii) scheduling a final hearing (the "***Final Hearing***") to consider approval of this Motion on a final basis and entry of the Final Order, and (iv) granting related relief.

## THE DEBTORS HAVE AN IMMEDIATE NEED FOR USE OF CASH COLLATERAL

13. The Debtors require immediate access to liquidity to ensure a successful transition into chapter 11, preserve the value of the Debtors' assets, and maximize the value of the Debtors' estates for the benefit of all stakeholders. Without prompt access to Cash Collateral, the Debtors would be forced to abruptly liquidate, severely damaging the value of their estates. Further, absent access to Cash Collateral, the Debtors would be unable to, among other things, fund the operating expenses of their hotel properties, fund payroll and related benefits, and necessary insurance for their properties. Such a result would likely result in a liquidation, causing immediate and irreparable harm to the Debtors' estates, creditors, including the Secured Lenders, and other stakeholders.

## CONCISE STATEMENT OF MATERIAL TERMS OF THE INTERIM ORDER

14. In accordance with Bankruptcy Rules 4001(b)–(d) and Paragraphs 10 and 13 of the Complex Case Procedures, the below chart summarizes the significant terms of the Interim Order:[4]

[4] The summaries contained in this Motion are qualified in their entirety by the provisions of the Interim Order. To the extent anything in this Motion is inconsistent with the Interim Order, the terms of the Interim Order shall control. Capitalized terms used but not otherwise defined in this summary chart shall have the meanings set forth in the Interim Order.

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | All parties set forth below allege an interest in the Cash Collateral:<br>• Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of Deutsche Mortgage & Asset Receiving Corporation, CD 2017-CD6 Mortgage Trust Commercial Mortgage Pass Through Certificates, Series 2017-CD6 (the "***AHP Lender***"), as holder of the AHP Loans; and<br>• Wells Fargo Bank, National Association, as Trustee, for the benefit of the registered holders of UBS Commercial Mortgage Trust 2018-C11, Commercial Mortgage Pass-Through Certificates, Series 2018-C11 (the "***PAH Lender***"), as holder of the PAH Loan, each acting through Argentic Investment Management, LLC, as special servicer (the "***Special Servicer***").<br>• It is possible that other parties have an interest in the Debtors' cash and the Debtors continue to investigate other potential interests. | Interim Order ¶¶ D–F |
| **Amount of Cash Collateral and Purposes for Use of Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii);*<br><br>*Complex Case Procedures ¶ 10* | Authority to use Cash Collateral on an interim basis only in the amounts and only for the purposes specified in the Budget, including payment of wages, salaries, benefits, and other compensation of employees, insurance premiums, and funding of the Carve-Out Reserves, subject to Permitted Variances of ten percent (10%) for any individual line item and five percent (5%) for aggregate disbursements, in each case on a cumulative basis. The Debtors may pay fees owed to the U.S. Trustee without regard to the Budget. | Interim Order ¶ 2 |
| **Stipulations to Prepetition Liens and Claims**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)*<br><br>*Complex Case Procedures ¶¶ 10, 14* | The Interim Order does not contain any stipulations by the Debtors. | N/A |
| **Effect of Stipulations/Challenge**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)* | The Interim Order does not contain any stipulations by the Debtors. | N/A |

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Adequate Protection and Professional Fees and Expenses**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iv)*<br><br>*Complex Case Procedures ¶ 14* | <u>Replacement Liens</u>: Solely to the extent of any actual diminution in value of the Secured Lenders' alleged interests as of the Petition Date in their alleged respective collateral resulting from the use of Cash Collateral, the imposition of the automatic stay, or otherwise, the Secured Lenders will be granted valid, perfected, and enforceable postpetition replacement liens in all property of either the AHP Debtors or the PAH Debtor that benefited from the use of such Secured Lender's Cash Collateral, subject and subordinate to the Carve-Out and any Prior Senior Liens. The Replacement Liens secure only the amount of such actual diminution, are automatically perfected as of the Petition Date, and do not prime the liens of any taxing authority.<br><br><u>Section 507(b) Claim</u>: To the extent the Replacement Liens are insufficient, each Secured Lender will be granted an allowed superpriority claim under section 507(b) of the Bankruptcy Code solely against either the AHP Debtors or the PAH Debtor that benefited from the use of such Secured Lender's Cash Collateral, and not against any other Debtor, in an amount not to exceed the actual diminution, senior to all administrative expenses except fees owed to the U.S. Trustee and the Carve-Out, and subject and subordinate only to the Carve-Out.<br><br><u>Reporting</u>: Starting on October 20, 2026, and bi-weekly thereafter, the Debtors shall deliver to the Special Servicer a report of actual receipts and expenditures for the preceding calendar week compared to the Budget, with an explanation of any variances above the Budget and the Permitted Variances. The Debtors shall also provide, within three business days of a written request, other financial information reasonably requested by the Special Servicer or a Secured Lender, including STR reports, hotel management reports, franchisor correspondence relating to the Properties, and information required under the Loan Documents.<br><br><u>Inspections</u>: The Debtors shall reasonably cooperate with inspections of the Properties, and the Special Servicer may, upon reasonable notice, inspect the Properties and review the Debtors' books and records during reasonable business hours. | Interim Order ¶¶ 3–6, 9–12 |
| **Limitation of the Court's Power and/or Discretion**<br><br>*Complex Case Procedures ¶ 10* | The Interim Order does not contain any provisions that specifically limit the Court's authority to enter future orders in the Debtors' Chapter 11 Cases. | N/A |
| **Budget**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Complex Case Procedures ¶ 12* | The use of Cash Collateral is subject to the Budget attached to the Interim Order as <u>**Exhibit A**</u>, which may be amended or modified only with the express prior written consent of the applicable Secured Lender, subject to the Permitted Variances. | Interim Order ¶ 2 |

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Carve-Out**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)* | The Interim Order provides a "Carve-Out" for (i) fees of the Clerk of the Court and the U.S. Trustee, (ii) fees and expenses of up to $25,000 of a chapter 7 trustee under section 726(b) of the Bankruptcy Code, (iii) Allowed Professional Fees of Debtor Professionals incurred at any time before or on the first business day after delivery of a Carve-Out Trigger Notice (the Pre-Trigger Amount), (iv) Allowed Professional Fees of Committee Professionals up to $25,000, and (v) Allowed Professional Fees of Debtor Professionals incurred thereafter up to $100,000 (the Post-Trigger Amount). Upon delivery of a Carve-Out Trigger Notice, the Debtors shall fund the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve in a segregated account held in trust, and any excess in the Post-Carve-Out Trigger Notice Reserve will be distributed to the applicable Secured Lenders. | Interim Order ¶¶ 7–8 |
| **Postpetition Liens on Unencumbered Assets**<br><br>*Fed R. Bankr. P. 4001(b)(1)(B)* | The Replacement Liens attach to all property of either the AHP Debtors or the PAH Debtor that benefited from the use of such Secured Lender's Cash Collateral, whether acquired before or after the Petition Date, excluding causes of action under sections 544, 545, 547, 548, 549, 550, 551, 552, 553, or 558 of the Bankruptcy Code (or otherwise arising principally under the Bankruptcy Code) and the proceeds thereof. | Interim Order ¶ 3 |
| **Milestones**<br><br>*Complex Case Procedures ¶ 10* | The Interim Order does not contain any milestones for these Chapter 11 Cases. | N/A |
| **Termination Date/Remedies**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br><br>*Complex Case Procedures ¶¶ 10, 14* | The Debtors' authority to use Cash Collateral under the Interim Order terminates upon notice from the applicable Secured Lender of the earliest to occur of a Termination Event. | Interim Order ¶¶ 8, 13, 15 |



4925-7495-4200v.1

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Termination Events**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br>*Complex Case Procedures ¶ 10* | Termination Events include: (i) conversion to chapter 7 or dismissal of any Debtor's case; (ii) appointment of a trustee or an examiner with expanded powers; (iii) entry of an order granting any party other than a Secured Lender a senior or equal lien without the applicable Secured Lender's consent, including any order approving debtor in possession financing secured by the Properties or other Prepetition Collateral; (iv) entry of an order modifying, reversing, staying, or vacating the Interim Order without the applicable Secured Lender's consent; (v) entry of an order granting any party other than the Special Servicer or a Secured Lender stay relief affecting asserted liens on the Properties or other alleged collateral; (vi) an Event of Default uncured five business days after written notice; and (vii) the expiration of thirty days after entry of the Interim Order unless extended by agreement with the applicable Secured Lender. Events of Default include failure to perform under the Interim Order (including unauthorized use of Cash Collateral and failure to provide required reporting), any person obtaining an order permitting use of Cash Collateral in which a Secured Lender asserts an interest without the Special Servicer's or applicable Secured Lender's consent, and the Replacement Liens ceasing to be valid and perfected. | Interim Order ¶¶ 15–16 |
| **Waiver/Modification of Automatic Stay**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br>*Complex Case Procedures ¶¶ 10, 14* | The Interim Order does not contain a provision modifying the automatic stay. | N/A |
| **Provisions Limiting the Rights of Parties in Interest** | The adequate protection granted to the Secured Lenders and the Carve-Out survive conversion, dismissal, appointment of a trustee, and confirmation of a plan, and are unaffected by any later reversal or modification of the Interim Order as to obligations incurred before notice thereof. | Interim Order ¶¶ 13–14, 17–18 |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi)*<br>*Complex Case Procedures ¶ 13* | The Interim Order does not grant liens on avoidance actions. | N/A |
| **Section 506(c) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)(x)*<br>*Complex Case Procedures ¶ 13* | The Interim Order does not contain a waiver of Section 506(c) of the Bankruptcy Code. | N/A |

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Section 552(b) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Complex Case Procedures ¶ 13* | The Interim Order does not contain a waiver of Section 552(b) of the Bankruptcy Code. | N/A |
| **Marshaling Provision**<br>*Complex Case Procedures ¶ 13* | The Interim Order does not contain a waiver of the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral. | N/A |

## DEBTORS' PREPETITION CAPITAL STRUCTURE

15. As described in the First Day Declaration, the Debtors' capital structure consists of three debt tranches with aggregate principal facility amounts of approximately $98.95 million, of which approximately $83.15 million was borrowed directly by Debtor entities and $15.8 million was borrowed by Non-Debtor Entities and is guaranteed in part by REIT I. The Debtors' significant funded debt obligations include:

| Facility | Maturity | Loan Amount |
|---|---|---|
| The DB Facility | August 6, 2027 | $65 million |
| The Rialto Facility | May 6, 2028 | $18.15 million |
| The SocGen Facility[5] | September 2028 | $15.8 million |

16. The Rialto Facility. On May 8, 2018, Debtor PAH Charlotte, LLC ("***PAH Charlotte***"), as borrower, and Rialto Mortgage Finance, LLC ("***Rialto***"), as lender, entered into that certain loan agreement (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, and together with all related loan and security documents, the "***Rialto Loan Documents***," and the facility thereunder, the "***Rialto Facility***"). The Rialto

5 REIT I is a guarantor to this facility, but the borrowers thereunder, AHP Ft Wayne Inn, LLC and AHP Ft Wayne Suites, LLC, are not Debtors. See paragraph 18 below for more information.

Facility was made to finance the DoubleTree by Hilton Charlotte Airport, a 173-room hotel property located in Charlotte, North Carolina. The principal facility amount is $18.15 million, bearing interest at a fixed rate of 5.40% per year and maturing on May 6, 2028. The Rialto Facility is asserted to be secured by a purported first priority security instrument encumbering the property, an assignment of leases, and a cash management arrangement under which all Rents are deposited into a Clearing Account at Wells Fargo Bank, National Association that is asserted to be subject to a Deposit Account Control Agreement and Rialto's sole dominion and control, and are swept into a Cash Management Account upon a Cash Management Trigger Event (which includes any Event of Default or Bankruptcy Action of the borrower or guarantor), in each case as such capitalized terms are defined in the Rialto Loan Documents. The PAH Lender asserts that PAH Charlotte pledged to Rialto, and granted a security interest in, all monies deposited in the Clearing Account and the Cash Management Account. The Rialto Facility was initially guaranteed by Mr. Nelson, PAH, and American Hospitality Properties Fund III, LLC ("***AHP Fund III***"), which obligations of AHP Fund III succeeded to REIT I when AHP Fund III merged into REIT I in 2024.

17. <u>The DB Facility</u>. On July 14, 2017, Debtors AHP LP7 Ft Myers, LLC, AHP LP7 Bentonville, LLC, AHP LP7 CY Baton Rouge, LLC, AHP LP7 RI Baton Rouge, LLC, AHP LP7 Jonesboro, LLC, AHP LP7 Fayetteville, LLC, and AHP LP7 Metairie, LLC, as borrowers, entered into that certain loan agreement with Deutsche Bank AG, New York Branch ("***Deutsche Bank***"), as lender (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, and together with all related loan and security documents, the "***DB Loan Documents***," and the facility thereunder, the "***DB Facility***"). The proceeds of the DB Facility were used to acquire a portfolio of seven hotel properties located across Arkansas, Louisiana, and Florida. The principal facility amount is $65 million, bearing interest at a fixed rate of 4.71% per year and maturing on

August 6, 2027. The DB Facility is asserted to be secured by purported first priority mortgages on each of the seven portfolio properties, together with assignments of leases and rents. In addition, the AHP Lender asserts that each borrower under the DB Facility pledged to Deutsche Bank, and granted a security interest in, all Gross Revenue and all monies held in the Clearing Account, the Deposit Account, and related Accounts (but excluding the borrowers' operating accounts), and that funds in the Clearing Account are swept into the Deposit Account under Deutsche Bank's sole control during a Trigger Period, in each case as such capitalized terms are defined in the DB Loan Documents. The DB Facility was initially guaranteed by Mr. Nelson and AHP Fund III, which obligations of AHP Fund III succeeded to REIT I when AHP Fund III merged into REIT I in 2024.

18. The loans under the Rialto Facility (the "***PAH Loan***") and the DB Facility (the "***AHP Loans***," and together with the PAH Loan, the "***Loans***") are currently held, respectively, by Wells Fargo Bank, National Association, as Trustee, for the benefit of the registered holders of UBS Commercial Mortgage Trust 2018-C11, Commercial Mortgage Pass-Through Certificates, Series 2018-C11 (the "***PAH Lender***"), and Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of Deutsche Mortgage & Asset Receiving Corporation, CD 2017-CD6 Mortgage Trust Commercial Mortgage Pass Through Certificates, Series 2017-CD6 (the "***AHP Lender***," and together with the PAH Lender, the "***Secured Lenders***"). Argentic Investment Management, LLC acts as special servicer for each of the Secured Lenders (the "***Special Servicer***"). The Rialto Loan Documents and the DB Loan Documents are collectively referred to herein as the "***Loan Documents***." The Special Servicer asserts that the Loans are secured by liens on substantially all of the assets of PAH Charlotte (the "***PAH Debtor***") and the Debtor borrowers under the DB Facility (the "***AHP Debtors***"), including their hotel



4925-7495-4200v.1

properties (the "***Properties***"), Gross Revenue, Rents, accounts, the Clearing Account, the Deposit Account, and reserve and other cash management accounts, and the proceeds thereof (the "***Prepetition Collateral***"). The Debtors have not stipulated to the validity, extent, perfection, priority, or enforceability of any such lien, or whether any particular account or funds constitute Cash Collateral.

19. The SocGen Facility. Non-Debtor Entities AHP Ft Wayne Inn, LLC and AHP Ft Wayne Suites, LLC are borrowers under that certain loan agreement, dated as of August 16, 2018, with Société Générale, as lender (the "***SocGen Facility***"), and now believed to be serviced by a special servicer, Midland Loan Services, a division of PNC Bank, National Association, as the master servicer of the loan on behalf of the current lender, Wells Fargo Bank, National Association, as Trustee for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C13, Commercial Mortgage Pass-Through Certificates, Series 2018-C13. The SocGen Facility has a principal facility amount of $15.8 million, bearing interest at a fixed rate of 4.740% annually and maturing in September 2028. The SocGen Facility is asserted to be secured by purported first priority deeds of trust, assignments of leases and rents, and security agreements encumbering the Hilton Garden Inn Fort Wayne and Homewood Suites Fort Wayne. Although the SocGen Facility includes cash management arrangements and a Cash Collateral Subaccount, any asserted security interest in rents and cash management accounts is granted only by the non-Debtor borrowers in their own rents and accounts. REIT I, as successor to AHP Fund III, is a guarantor of certain recourse obligations with respect to the SocGen Facility. Because the borrowers under the SocGen Facility are not Debtors and no Debtor has pledged cash under the SocGen Facility, it is believed that Société Générale does not hold an interest in the Debtors' Cash Collateral.

## BASIS FOR RELIEF REQUESTED

### A. The Debtors' Request to Use Cash Collateral and Proposed Adequate Protection Is Appropriate.

20. Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). As noted above, the Debtors are continuing to negotiate the terms of the Interim Order with counsel for the Special Servicer on behalf of the Secured Lenders and hope to present an agreed form of order, and the Debtors submit that the use of Cash Collateral on the terms set forth in the Interim Order is warranted, appropriate, and in compliance with the applicable provisions of the Bankruptcy Code.

21. Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66

(15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

22. The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

**1. The Proposed Adequate Protection for the Secured Lenders Is Sufficient.**

23. Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Further, section 362(d)(1) provides for adequate protection of interests in property due to the imposition of the automatic stay. *See* 11 U.S.C. § 362(d)(1).

24. The Bankruptcy Code does not expressly define "adequate protection." Section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of adequate protection, such as granting replacement liens and administrative claims, but courts ultimately decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Energy Partners, Ltd.*, 409 B.R. 211, 236 (Bankr. S.D. Tex. 2009) (*citing In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *In re Mathis*, 64 B.R. 279, 284 (N.D. Tex. 1986); *In re Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380, 1397 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (1988); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).

25. In exchange for the Debtors' use of Cash Collateral pursuant to the Interim Order, the Debtors have proposed to provide adequate protection to the Secured Lenders, including in the form of (i) Replacement Liens and the Section 507(b) Claim (each as defined in the Interim Order) (in each case, solely to the extent of any actual diminution in value of their alleged respective interests in the Prepetition Collateral, including Cash Collateral), (ii) inspection rights with respect to the Properties, (iii) certain reporting and information obligations, and (iv) other covenants, including compliance with the Budget and cash management requirements, all as set forth in the Interim Order. In order to adequately protect the Secured Lenders against the diminution in value of their alleged respective interests in the Prepetition Collateral, including Cash Collateral, the Replacement Liens attach to all property of either the AHP Debtors or the PAH Debtor that benefited from the use of such Secured Lender's Cash Collateral, other than avoidance actions and the proceeds thereof. The Debtors believe that such provision is reasonable in light of the fact that through the use of cash, there may be diminution in value, and granting a replacement lien on such property will protect the Secured Lenders' interests.

26. Courts in this district and others have approved similar adequate protection packages in recent chapter 11 cases. *See, e.g.*, *In re Wiser Solutions, Inc.*, No. 26-80002-swe11 (Apr. 28, 2026) (Bankr. N.D. Tex.) (granting prepetition secured parties, as adequate protection for any diminution in value of their interests in prepetition collateral, replacement liens on all DIP collateral, superpriority claims under section 507(b), and other protections); *In re Buckingham Senior Living Community, Inc.*, No. 25-80595-mvl11 (Nov. 19, 2025) (Bankr. N.D. Tex.) (approving adequate protection in the form of, among other things, replacement and supplemental liens, superpriority administrative expense claims pursuant to section 507(b), and financial reporting); *In re Groff Tractor Mid Atlantic, LLC*, No. 25-90010-elm11 (Oct. 28, 2025) (Bankr.

N.D. Tex.) (approving adequate protection in the form of, among other things, replacement liens, superpriority administrative expense claims pursuant to section 507(b), payment of fees and expenses, and reporting). Similar relief is appropriate here.

27. As described above, and as set forth in the Interim Order, the Debtors propose to provide the Secured Lenders with several forms of adequate protection (collectively, the "***Adequate Protection***").

28. The Debtors respectfully submit that the proposed Adequate Protection is sufficient to protect the Secured Lenders from any diminution in value to alleged Cash Collateral. Considering the foregoing, the Debtors submit that the proposed Adequate Protection to be provided for the benefit of the Secured Lenders is appropriate. The Debtors' proposed Adequate Protection is not only necessary to protect the Secured Lenders against any diminution in value of their alleged respective interests in the Prepetition Collateral, including Cash Collateral but is also fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of their estates and all parties in interest.

29. Any party that asserts an interest in Cash Collateral is also adequately protected because the proposed uses of Cash Collateral for employee wages and benefits, insurance premiums, utilities, payments to vendors and suppliers, and other ordinary-course operating expenses of the Debtors' hotels benefits such party's alleged collateral, and accordingly no such party is entitled to additional adequate protection. Section 506(c) of the Bankruptcy Code allows for a surcharge "from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving. . . such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). Such expenses can be recovered if: "(1) the expenditure was

necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses." *In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015) (citing *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir.1991)).

30. To the extent any party asserts an interest in Cash Collateral and does not consent to its use, the Debtors believe that the Cash Collateral being spent is to preserve such party's alleged collateral, including expenses necessary to operate the Debtors' hotels, such as employee wages, insurance premiums, and other operating costs, and would be surchargeable against such party's alleged collateral pursuant to section 506(c) of the Bankruptcy Code such that no additional adequate protection is required. Without these necessary payments, the Debtors' hotel operations would likely cease, as they would be unable to retain employees needed to perform essential operational functions or maintain the insurance coverage required for each hotel, and the value of the hotel would decline after shut-down. Shut-down would also put franchise agreements with Hilton and Marriott at further risk. As a result, the Debtors believe that parties with interests in the Cash Collateral are adequately protected pursuant to section 506(c) of the Bankruptcy Code.

**B. The Carve-Out is Appropriate**

31. The Debtors have proposed that the Prepetition Collateral, the Secured Lenders' asserted liens, the Replacement Liens, and the Section 507(b) Claim shall be subject and subordinate to certain fees and expenses, including (a) fees owing to the Clerk of the Court and the U.S. Trustee under 28 U.S.C. § 1930(a); (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) Allowed Professional Fees of Debtor Professionals (each as defined in the Interim Order) incurred at any time before or on the first business day following delivery of a Carve-Out Trigger Notice (as defined in the Interim Order); (d) Allowed Professional Fees of Committee Professionals (as defined in the Interim Order) up to a maximum of $25,000; and (e) Allowed Professional Fees of Professional Persons

(as defined in the Interim Order) incurred thereafter, in an aggregate amount not to exceed $100,000 (collectively, the "***Carve-Out***"). Upon delivery of a Carve-Out Trigger Notice, the Debtors will fund the Carve-Out Reserves (as defined in the Interim Order) in a segregated account held in trust exclusively to pay such Allowed Professional Fees. *See* Interim Order, ¶¶ 7–8.

32. The Carve-Out is similar to other similar arrangements made for professional fees that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. *See In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. at 694 (noting that a carve out "is often incorporated into a cash collateral order agreed to by the debtor and the secured lender"); *In re Lil' Things, Inc.*, 243 B.R. 278, 280 (N.D. Tex. 2000) (referencing bankruptcy court order acknowledging that carve outs for attorneys' fees are "a normal and enforceable provision in a cash collateral stipulation").

33. Without the Carve-Out, the Debtors' professionals would be financing these cases for the benefit of its lenders who are benefiting from the bankruptcy process. *See In re Ames Dep't Stores Inc.*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out provides limited protection against the possibility of administrative insolvency by ensuring that assets remain available for the payment of statutory and professional fees.

**C. Interim Relief Should Be Granted**

34. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than fourteen days after the service of such motion. Upon request, however, the Court is authorized to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral where, as here, interim relief is "necessary to avoid

immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2).

35. In evaluating requests for interim relief, courts generally apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40. Courts in this district routinely authorize debtors to use cash collateral on an interim basis to prevent immediate and irreparable harm to their estates. *See, e.g.*, *In re Wiser Solutions, Inc.*, No. 26-80002-swe11 (Apr. 28, 2026) (Bankr. N.D. Tex.); *In re Buckingham Senior Living Community, Inc.*, No. 25-80595-mvl11 (Nov. 19, 2025) (Bankr. N.D. Tex.); *In re Groff Tractor Mid Atlantic, LLC*, No. 25-90010-elm11 (Oct. 28, 2025) (Bankr. N.D. Tex.).

36. The Debtors, in consultation with their financial advisor, FTI Consulting, Inc., reviewed and analyzed the Debtors' projected cash needs and prepared a projection (as may be amended or modified with the express prior written consent of the applicable Secured Lender, and as attached to the Interim Order as **Exhibit A**, the "***Budget***") outlining the Debtors' postpetition cash needs sought to be authorized on an interim basis. Without access to Cash Collateral, the Debtors would be forced to hastily liquidate, unnecessarily destroying estate value, to the direct detriment of the Debtors' estates and all stakeholders, including the Secured Lenders.

## REQUEST FOR IMMEDIATE RELIEF

37. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed herein and in the First Day Declaration and Cash Collateral Declaration, authorizing the Debtors to use the Cash Collateral and grant the Adequate Protection to the Secured Lenders as set forth in the Interim Order, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors. Failure to receive such authorization and other relief during the

first twenty-one days of these Chapter 11 Cases could impact the Debtors' ability to focus on preserving and maximizing the value of the Debtors' estates at this important juncture. The requested relief is necessary to ensure a successful transition into chapter 11, preserve the ongoing value of the Debtors' estates, and maximize value for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## REQUEST FOR FINAL HEARING

38. Pursuant to Bankruptcy Rules 4001(b)(2), the Debtors request that the Court set a date for a final hearing to consider this Motion that is as soon as practicable, and in no event after 21 days after the filing of this Motion and fix the time and date prior to the final hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

39. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

40. Unless specifically provided herein, and notwithstanding any actions taken hereunder, nothing in this Motion shall constitute, nor is it intended to constitute (a) an implication or admission as to the validity, priority, enforceability, or perfection of any claim, lien, security interest in, or other encumbrances against the Debtors and the property of their estates; (b) an impairment or waiver of the Debtors' or any other party in interest's rights to contest or dispute any such claim, lien, or interest; (c) a promise or requirement to pay any prepetition claim or interest; (d) an implication or admission that any particular claim or interest is of a type specified

or defined in this Motion or any proposed order; (e) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

## **NOTICE**

41. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Special Servicer; (c) William Lee "Perch" Nelson; (d) Phoenix American Hospitality, LLC; (e) the holders of the Debtors' 20 largest unsecured claims (on a consolidated basis); (f) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; and (i) all other applicable government agencies to the extent required by the Bankruptcy Rules or the N.D. Tex. L.B.R. In light of the nature of the relief requested in this Motion, the Debtors submit that no further notice is necessary.

## **NO PRIOR REQUEST**

42. No prior motion for the relief requested herein has been made to this Court or any other court.

# PRAYER

The Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and grant them such other and further relief to which the Debtors may be justly entitled.

Dated: October 10, 2026
Dallas, Texas

*/s/ Bradley R. Foxman*
**VINSON & ELKINS LLP**
Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**CERTIFICATE OF SERVICE**

I certify that on October 10, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Bradley R. Foxman*
One of Counsel

# **EXHIBIT A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al*.,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[6] | § | **Re: Dkt. No. ___** |

**FIRST INTERIM ORDER**
**(I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,**
**(II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A**
**FINAL HEARING ON THE MOTION, AND (IV) GRANTING RELATED RELIEF**

Upon the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing on the Motion, and (IV) Granting Related Relief* (the "***Cash Collateral Motion***")[7] filed by the above-captioned debtors and debtors in possession (the "***Debtors***"), including Debtors AHP

[6] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

[7] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Cash Collateral Motion.

LP7 Fayetteville, LLC; AHP LP7 Bentonville, LLC; AHP LP7 Jonesboro, LLC; AHP LP7 CY Baton Rouge, LLC; AHP LP7 RI Baton Rouge, LLC; AHP LP7 Metairie, LLC; AHP LP7 Ft Myers, LLC (collectively, the "***AHP Debtors***") and PAH Charlotte LLC (the "***PAH Debtor***"), for entry of this interim order (this "***Interim Order***"); and upon the proceedings held before this Court and good and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS:**

A. On October 4, 2026 (the "***Petition Date***"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are now operating their businesses and managing their properties as debtors in possession pursuant to § 1107(a) of title 11 of the United States Code (the "***Bankruptcy Code***").[8] No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed. By order entered October 5, 2026 [Docket. No. 15], the Debtors' chapter 11 cases are being jointly administered for procedural purposes only under Case No. 26-80071 (SGJ).

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these Chapter 11 Cases and the Cash Collateral Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. As supported by the *Amended Declaration of Alan Tantleff in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 20] (the "**First Day Declaration**"), an immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their businesses. Without such funds, the Debtors will not be able to pay their direct operating expenses, including wages, salaries, benefits, and other compensation owed to employees, and premiums and other amounts due under the Debtors' insurance policies, and obtain goods and

---

[8] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

services needed to carry on their businesses during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates. At this time, the Debtors' ability to use Cash Collateral is vital to the confidence of the Debtors' employees, guests, vendors, and suppliers of goods and services, to the continuation of the insurance coverage required to protect the Properties (as defined below) and the Debtors' estates, and to the preservation and maintenance of the going concern value of the Debtors' estates.

D. The AHP Debtors respectively own the following properties (the "***AHP Properties***"):

| Debtor | Property |
|---|---|
| AHP LP7 Fayetteville, LLC | TownePlace Suites Fayetteville |
| AHP LP7 Bentonville, LLC | aloft Rogers Bentonville |
| AHP LP7 Jonesboro, LLC | Fairfield Inn & Suites Jonesboro |
| AHP LP7 CY Baton Rouge, LLC | Courtyard Baton Rouge Siegen Lane |
| AHP LP7 RI Baton Rouge, LLC | Residence Inn Baton Rouge Siegen Lane |
| AHP LP7 Metairie, LLC | TownePlace Suites New Orleans Metairie |
| AHP LP7 Ft Myers, LLC | Hampton Inn & Suites Ft. Myers Beach |

The AHP Lender (as defined below) asserts that each of the AHP Properties is encumbered by a *Mortgage, Assignment of Leases and Rents and Security Agreement* to secure repayment of two promissory notes, issued in the amounts of $25,000,000 and $40,000,000 (the "***AHP Loans***"), upon the terms set forth in the promissory notes and the accompanying loan agreement, mortgages, and other loan and security documents (collectively, "***AHP Loan Documents***"). The AHP Lender further asserts that each AHP Debtor is jointly and severally liable for the entire amount of each AHP Loan, and that each AHP Property secures repayment of each of the AHP Loans in their entirety. The AHP Lender asserts that the AHP Loans are held by Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of Deutsche Mortgage & Asset Receiving

Corporation, CD 2017-CD6 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-CD6 (the "***AHP Lender***").

E. In addition, the PAH Debtor owns the property known as the Doubletree Charlotte Airport (the "***PAH Property***" and, with the AHP Properties, the "***Properties***"). The PAH Lender (as defined below) asserts that the PAH Property is encumbered by a *Mortgage, Assignment of Leases and Rents and Security Agreement* to secure repayment of a promissory note in the amount of $18,150,000 (the "***PAH Loan***" and, with the AHP Loans, the "***Loans***"), upon the terms set forth in the promissory note and the accompanying loan agreement, mortgages, and other loan and security documents (collectively, "***PAH Loan Documents***" and, with the AHP Loan Documents, the "***Loan Documents***"). The PAH Lender asserts that the PAH Loan is held by Wells Fargo Bank, National Association, as Trustee, for the benefit of the registered holders of UBS Commercial Mortgage Trust 2018-C11, Commercial Mortgage Pass-Through Certificates, Series 2018-C11 (the "***PAH Lender***" and, with the AHP Lender, the "***Secured Lenders***").

F. Argentic Investment Management, LLC, acting as special servicer for Argentic Services Company LP (as successor-in-interest to LNR Partners LLC), acting as Special Servicer for each of the Secured Lenders (the "***Special Servicer***") asserts that the respective Debtors' obligations under the AHP Loans and the PAH Loan are secured by valid, binding, and enforceable liens on and security interests in substantially all of the applicable AHP Debtors' and PAH Debtor's assets, including the Properties and all Gross Revenue, Rents, room revenues, accounts, accounts receivable, deposit accounts, the Clearing Account, the Deposit Account (each as defined in the applicable Loan Documents), and all reserve and other cash management accounts (as described in the applicable Loan Documents), and the proceeds thereof (the "***Prepetition Collateral***"), and further asserts that all cash and cash equivalents of the AHP Debtors and the

PAH Debtor, wherever held, constitute "cash collateral" of the respective Secured Lenders within the meaning of section 363(a) of the Bankruptcy Code. As used in this Order, "***Cash Collateral***" means any cash and cash equivalents of the Debtors, to the extent such cash and cash equivalents constitute "cash collateral" of the Secured Lenders or other parties within the meaning of section 363(a) of the Bankruptcy Code. The Special Servicer further asserts that, under Section 6.1 of the applicable loan agreement included in the Loan Documents, Gross Revenue received by the AHP Debtors or the PAH Debtor or their manager is deemed collateral for the respective Loans, held in trust for the benefit of the respective Secured Lenders, and may not be commingled with other funds. The Debtors have not stipulated to, and this Order does not determine, the validity, extent, perfection, priority, or enforceability of any lien, claim, or security interest asserted in the Prepetition Collateral, the Cash Collateral, or whether any particular account or funds constitute Cash Collateral.

G. The Debtors have requested immediate entry of this Order pursuant to Rule 4001(b)(2) and (c)(2) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"). The authority granted herein to allow the Debtors to obtain the use of Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Order is in the Debtors' best interest of their estates, and their creditors as its implementation will, among other things, allow the Debtors to continue operations during the pendency of these cases.

**THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** as follows:

1. Except as modified herein, the findings contained in this Interim Order are adopted herein as if fully restated herein.

2. Authorization to Use Cash Collateral. The Debtors are hereby authorized, subject to the protections and consideration described in this Order, to use Cash Collateral on an interim basis only in the amounts and only for the purposes specified in the Budget attached hereto as Exhibit A and incorporated herein (as the same may be amended or modified with the express prior written consent of the applicable Secured Lender, the "***Budget***") and shall not, except to the extent permitted in the following sentence, exceed the aggregate amount of the total cash outflows shown on the Budget. Except as otherwise agreed to in writing by the Special Servicer, the Debtors shall not permit: (i) the cumulative total for any individual line item to exceed the projected disbursements for such line item by a variance greater than ten percent (10%) from the amounts set forth in the Budget, and (ii) the cumulative total for all actual disbursements made to exceed the cumulative total for all projected disbursements by a variance of greater than five percent (5%) from the amounts set forth in the Budget (together, the "***Permitted Variances***"). Without limiting the foregoing, the purposes for which Cash Collateral may be used in accordance with the Budget include (i) the payment of wages, salaries, benefits, payroll taxes, and other compensation of employees who staff and operate the Properties, (ii) the payment of premiums and other amounts due under the Debtors' insurance policies, (iii) the payment of goods and services needed to carry on their businesses, and (iv) the funding the funding of the Carve-Out Reserves in accordance with paragraph 8 of this Interim Order. Notwithstanding the foregoing, the Debtors are authorized to use Cash Collateral to pay any fees owed to the Office of the United States Trustee without regard to any amount set forth in the Budget.

3. Replacement Liens. As adequate protection for, but only to the extent of any actual diminution in the value of the interest of the respective Secured Lenders as of the Petition Date in their respective collateral resulting from the use of Cash Collateral pursuant to 11 U.S.C. § 363(c),

the imposition of the automatic stay under 11 U.S.C. § 362(a), or otherwise, the Secured Lenders are hereby granted valid, perfected liens and enforceable postpetition replacement liens and security interests (the "***Replacement Liens***"), in each case, subject and subordinate to the Carve-Out (as defined below) and any Prior Senior Liens (as defined below), in all property, whether acquired before or after the Petition Date, of either (i) the AHP Debtors or (ii) the PAH Debtor, who benefited from the use of such Cash Collateral; *provided*, *however*, that such Replacement Liens shall not encumber causes of action held by the Debtors' estates under §§ 544, 545, 547, 548, 549, 550, 551, 552, 553, or 558 (or otherwise arising principally under the Bankruptcy Code), or the proceeds thereof; *provided*, *further*, that the Replacement Liens shall secure only the amount of such actual diminution and shall not secure any other claim, damages, or amounts. "***Prior Senior Liens***" means (a) valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or (b) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and the proceeds, products, rents, and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise.

4. Automatic Perfection. The adequate protection liens granted herein are valid, enforceable and perfected liens, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, lease, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be required to effect such perfection. The Debtors and the Secured Lenders are hereby authorized, but not required, to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction or take any other action to validate and perfect the liens and security interests granted hereunder. A certified copy of this

Interim Order may, in the discretion of each Secured Lender, be filed with or recorded in any filing or recording office in addition to or in lieu of such financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and recording.

5. Taxing Authorities. Nothing herein shall be construed to prime the liens of any taxing authority.

6. Section 507(b) Claim. As further adequate protection, each Secured Lender is hereby granted pursuant to § 507(b) an allowed superpriority claim solely against either (i) the AHP Debtors or (ii) the PAH Debtor, that benefited from the use of Cash Collateral, and not against any other Debtor, in an amount not to exceed such actual diminution (the "***Section 507(b) Claim***") if and to the extent the Replacement Liens are insufficient to provide adequate protection against the actual diminution, if any, in value of such Secured Lender's interest in any collateral resulting from the use of Cash Collateral. The priority of the Section 507(b) Claim shall be senior in priority of payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, except fees owed to the Office of the United States Trustee and the Carve-Out; *provided*, *however*, that the Section 507(b) Claim shall be subject and subordinate only to the Carve-Out.

7. Carve-Out. Notwithstanding anything to the contrary in this Interim Order, the Prepetition Collateral, the liens and security interests of the Secured Lenders under the AHP Loan Documents and the PAH Loan Documents, the Replacement Liens, and the Section 507(b) Claim

shall each be subject and subordinate to the payment of the Carve-Out. As used in this Interim Order, the "***Carve-Out***" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under § 726(b) (without regard to the Carve-Out Trigger Notice); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") including counsel, financial advisors, investment bankers, and claims and noticing agents, at any time before or on the first business day following delivery by the Special Servicer of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the "***Pre-Trigger Amount***"); and (iv) Allowed Professional Fees of any official committee appointed in these Chapter 11 Cases (a "***Committee***") pursuant to §§ 328 and 1103 of the Bankruptcy Code up to a maximum of $25,000 (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***"), including counsel and one financial advisor; and (v) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $100,000 incurred after the first business day following delivery by the Special Servicer of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (v), the "***Post-Trigger Amount***").

8. Carve-Out Trigger Notice; Carve-Out Reserves. For purposes of this Interim Order, "***Carve-Out Trigger Notice***" means a written notice delivered by email (or other electronic means) by Special Servicer to the Debtors, their lead restructuring counsel, the Office of the United

States Trustee, and counsel to any Committee, which notice may be delivered only following the occurrence and during the continuation of an Event of Default or a Termination Event (each as defined below), stating that the Post-Trigger Amount has been invoked. On the day on which a Carve-Out Trigger Notice is delivered (the "***Termination Declaration Date***"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available Cash Collateral to fund (i) a reserve in an amount equal to the then-unpaid amounts of the Allowed Professional Fees of Debtor Professionals incurred through the Termination Declaration Date, not to exceed the Pre-Trigger Amount (the "***Pre-Carve-Out Trigger Notice Reserve***"), and (ii) a reserve in an amount equal to the Post-Trigger Amount (the "***Post-Carve-Out Trigger Notice Reserve***" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "***Carve-Out Reserves***"), in each case prior to any and all other claims. The Debtors shall deposit and hold the Carve-Out Reserves in a segregated account in trust exclusively to pay such Allowed Professional Fees. Notwithstanding the occurrence of a Termination Event, the Debtors shall be authorized to use Cash Collateral to fund the Carve-Out Reserves, and the Secured Lenders shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Reserves. Any amounts remaining in the Pre-Carve-Out Trigger Notice Reserve after payment in full of all obligations described therein shall be applied to fund the Post-Carve-Out Trigger Notice Reserve, and any amounts remaining in the Post-Carve-Out Trigger Notice Reserve after payment in full of all obligations described therein shall be distributed to the applicable Secured Lenders in accordance with their respective rights and priorities as of the Termination Declaration Date.

9. Cash Collateral Accounts. All cash of the AHP Debtors and the PAH Debtor and all Gross Revenue and other collections of such Debtors after the Petition Date shall continue to be deposited into the Debtors' account ending 1566 for AHP Debtors and Debtors' account ending

5802 for PAH Debtor or shall otherwise be deposited in separate debtor in possession accounts maintained solely for such Debtors (the "***Cash Management Accounts***"), and shall not be commingled with the cash or receipts of any other Debtor or non-debtor except as expressly permitted by this Interim Order. Nothing herein shall constitute a determination or admission that any Cash Management Account, or any funds deposited therein, constitutes Cash Collateral or is subject to any valid lien or security interest.

10. Reporting. Starting on October 20, 2026, and continuing on a bi-weekly basis thereafter, the Debtors shall deliver to the Special Servicer a detailed report of actual receipts and expenditures for the immediately preceding calendar week as compared to the corresponding amounts and line items set forth in the Budget, together with an explanation of any variances above the projected amounts set forth in the Budget and the Permitted Variances. Except as otherwise agreed by the Special Servicer or a Secured Lender, the Debtors shall not be permitted to make any disbursement except for the purposes, and in the amounts, expressly authorized in this Interim Order and in the Budget.

11. Information Rights. The Debtors shall, within three (3) business days after receipt of any written request, promptly provide to Special Servicer or a Secured Lender all other financial information reasonably requested by Special Servicer or a Secured Lender or their counsel, including copies of any STR reports, hotel management reports, and franchisor correspondence relating to the Properties, and all information that is required to be provided by the Debtors to the Secured Lenders under the Loan Documents.

12. Inspections. During the pendency of this Interim Order, the Debtors shall reasonably cooperate with Special Servicer and the Secured Lenders and their agents in all inspections of the Properties whether to review their condition or for appraisal purposes. At all

times, Special Servicer and its agents shall be entitled, upon reasonable notice, to inspect the Properties and review the Debtors' books and records during reasonable business hours.

13. Survival. Except as expressly provided in this Interim Order, and notwithstanding the occurrence of a Termination Event (hereinafter defined) or the termination otherwise of the Debtors' authority to use Cash Collateral, the Carve-Out, the adequate protection and all other rights and remedies of the Secured Lenders and the Debtors granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of these Chapter 11 Cases to a case under chapter 7, dismissing any of these Chapter 11 Cases, appointing a chapter 7 or chapter 11 trustee or by any other act or omission, nor shall the Carve-Out, the adequate protection, or any of the other rights and remedies of the Secured Lenders or the Debtors granted by the provisions of this Interim Order be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in these Chapter 11 Cases. If an order converting or dismissing any of these Chapter 11 Cases is at any time entered, such order shall provide that (i) the Carve-Out shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order, (ii) the adequate protection granted to the Secured Lenders pursuant to this Interim Order, including the Replacement Liens and the Section 507(b) Claim, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until any and all adequate protection obligations shall have been paid and satisfied in full notwithstanding such dismissal, and any court of competent jurisdiction may enforce the claims, liens and security interests or replacement security interests.

14. Effect of Modification. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (a) the Carve-Out, (b) the validity of any adequate protection obligations incurred prior

to the actual receipt of written notice by the Secured Lenders of the effective date of such reversal, stay, modification or vacation or (c) the validity or enforceability of any security interest, lien or priority authorized or created hereby or pursuant to this Interim Order with respect to any adequate protection obligations. Notwithstanding any such reversal, stay, modification or vacation, any adequate protection obligations incurred by the Debtors to the Secured Lenders prior to the actual receipt of written notice by the Secured Lenders of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the provisions of this Interim Order.

15. Termination Events. The use of Cash Collateral under this Interim Order shall terminate upon notice from the applicable Secured Lender to the Debtors of the earliest to occur of: (i) conversion to chapter 7 or dismissal of any Debtor's case; (ii) the appointment of a trustee or an examiner with expanded powers in any Debtor's case; (iii) the entry of any order granting any party other than a Secured Lender a lien on or security interest senior or equal in right of priority to any lien or security interest of such Secured Lender in any property of the AHP Debtors' or PAH Debtor's estates without the express prior written consent of the applicable Secured Lender, including any order approving debtor in possession financing secured by any of the Properties or other Prepetition Collateral; (iv) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Interim Order without the express prior written consent of the applicable Secured Lender, which consent shall not be implied from any action, inaction, course of conduct or acquiescence by the Special Servicer or a Secured Lender; (v) the entry of any order granting any party other than the Special Servicer or a Secured Lender relief from the automatic stay to the extent it affects the liens on the Properties or other collateral; (vi) the occurrence of any Event of Default by the Debtors under the terms of this Interim Order which remains uncured five (5) business days after the receipt of written notice from Special

Servicer or a Secured Lender; and (vii) the expiration of thirty (30) days after entry of this Interim Order unless extended by agreement with the applicable Secured Lender (any of the foregoing, a "***Termination Event***").

16. Events of Default. The occurrence of any one or more of the following events shall constitute an "***Event of Default***" hereunder: (i) the Debtors fail to timely and punctually perform any of their obligations in strict accordance with the terms hereof or otherwise defaults hereunder or breaches any provision hereof, including (a) the use and expense of disbursement of Cash Collateral except as expressly permitted hereunder and in the Budget; (b) the failure to provide any report, document, or information to Special Servicer or a Secured Lender as required hereby; (ii) any person or entity obtains an order permitting the use of Cash Collateral without the Special Servicer's or the applicable Secured Lender's written consent in its sole discretion; or (iii) the Replacement Liens granted to the Secured Lenders pursuant to this Interim Order cease to be valid and perfected liens having the priority provided in this Interim Order, save and except tax liens that may prime such liens.

17. Reservation of Rights. The grant of adequate protection to the Secured Lenders is without prejudice to (i) Special Servicer's or the Secured Lenders' right to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and (ii) the right of any other party in interest to contest any such modification. Nothing contained in this Interim Order shall be deemed or construed to be an admission that any Secured Lender is adequately protected. Nothing contained in this Interim Order shall be deemed or construed to be an admission or finding by the Debtors or the Court as to the amount, validity, extent, perfection, priority, or enforceability of any claim, lien, or security interest asserted by any Secured Lender or any other party, or as to whether any account, cash, or other property constitutes

Cash Collateral, and the Debtors and all other parties in interest reserve all rights to challenge the same. Moreover, except as otherwise expressly set forth in this Interim Order, nothing contained herein shall be construed to limit in any way any right by any Secured Lender, including the right to seek relief from the automatic stay, to object to any proposed debtor in possession financing, to seek any other relief in these cases or any related adversary proceeding not directly inconsistent with this Interim Order, or to assert any rights under any guaranty against a non-Debtor, including any guaranty against Phoenix American Hospitality, LLC, and W.L. Nelson, and any rights against any non-Debtor entity, all of which are expressly reserved.

18. Binding Effect. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Special Servicer, the Secured Lenders, and the Debtors. However, nothing herein shall prevent any Secured Lender from seeking any form of relief under the Bankruptcy Code.

19. Final Hearing; Objections. A final hearing (the "***Final Hearing***") to consider the Cash Collateral Motion will be held on _______________, 2026, at __:00 am/pm prevailing Central Time before the Honorable Stacey G. C. Jernigan in the United States Bankruptcy Court for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242. Any objections to the relief requested in the Cash Collateral Motion on a final basis shall be filed and served so as to be actually received no later than _____________, 2026, at [TIME] prevailing Central Time.

20. Notice of Final Hearing. The Debtors shall, within two (2) business days after entry of this Interim Order, mail copies of this Interim Order and a notice of the Final Hearing to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) counsel to Special Servicer; (iii) counsel to William Lee "Perch" Nelson; (iv) counsel to Phoenix American Hospitality, LLC; (v) the Debtors' 20 largest unsecured creditors as set forth in the list filed by the

Debtors in these cases; (vi) all known holders of liens on, or equipment leasing interests in, the Debtors' assets; (vii) all applicable government agencies to the extent required by the Bankruptcy Rules or local rules of this Court; and (viii) all parties requesting notice in these cases.

21. Immediate Effect. Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

22. The Court shall retain jurisdiction to interpret, implement and enforce this Interim Order.

**# # # END OF ORDER # # #**

**Order submitted by:**

**VINSON & ELKINS LLP**

Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR**
**THE DEBTORS AND DEBTORS IN POSSESSION**

**<u>Exhibit A</u>**
**Budget**

| Budget | Amount |
|---|---|
| Payroll Cycle Ending October 4, 2026 | $391,000.00 |
| Payroll Cycle Ending October 18, 2026 (estimated by hours) | $391,000.00 |
| October Insurance Payment | $152,231.73 |
| November Insurance Payment | $152,231.73 |
| AHP RI Cape Canaveral, LLC October Food and Beverage | $20,846.61 |
| PAH Charlotte LLC October Food and Beverage Payment | $20,146.62 |
| Lakemore-Phoenix Investment Platform B, LLC October Food and Beverage | $20,846.61 |
| **Total Budget** | **$1,148,303.30** |