Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

George R. Howard (admitted *pro hac vice*)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al.*,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

# EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) CONTINUING PROTECTIONS OF THE AUTOMATIC STAY WITH RESPECT TO CERTAIN NON-DEBTOR ENTITIES; AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 2:00 P.M. (CENTRAL TIME) ON NOVEMBER 2, 2026.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON NOVEMBER 2, 2026, AT 2:00 P.M. (CENTRAL TIME) IN COURTROOM #1, FLOOR 14, UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, 1100 COMMERCE STREET, DALLAS, TX 75242.**

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-650-479-3207. VIDEO COMMUNICATION WILL BE BY USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE JERNIGAN'S HOME PAGE. THE MEETING CODE IS 2304 154 2638. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JERNIGAN'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***"), file this motion (the "***Motion***") and in support respectfully submit the following:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the Northern District of Texas (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a) and 362 of title 11 of the United States Code (the "***Bankruptcy Code***"), Bankruptcy Rules 4001, and 9014, rule 4001-1(f) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the

Northern District of Texas (the "***N.D. Tex. L.B.R.***"), and Section B.8(k) of the Procedures for Complex Cases in the Northern District of Texas (the "***Complex Case Procedures***").

## EMERGENCY CONSIDERATION

4. In accordance with the N.D. Tex. L.B.R. and Complex Case Procedures, the Debtors request emergency consideration of this Motion on or before November 4, 2026. The Debtors submit that emergency relief in connection with this Motion is essential to the success of these Chapter 11 Cases (as defined below). As discussed in detail below, any delay in granting the relief requested could cause immediate and irreparable harm to the Debtors if the Stay Order (as defined below), previously entered by the Court at the Debtors' first day hearing, is allowed to expire. As such, the Debtors believe that emergency consideration is necessary and request that this Motion be heard at a setting on November 2, 2026. Given the Court's availability for hearing times, the Debtors request that the Motion be heard on one day less than the ordered 14-days' notice so that the Court may consider the requested relief before expiration of the Stay Order and thereby avoid any lapse in the protections currently in place.

## BACKGROUND

### A. The Debtors

5. American Hospitality Properties REIT, Inc. ("***REIT I***") and American Hospitality Properties REIT II, Inc. ("***REIT II***") (collectively, the "***AHP Entities***," and together with their Debtor and non-Debtor affiliates, the "***Company***") are Delaware-incorporated, non-traded companies formed to engage primarily in the acquisition of premium branded hotels and other real estate-related assets either secured by or related to hotel properties in the United States. The AHP Entities own a portfolio of hospitality assets across the country, including properties affiliated with the Marriott and Hilton hotel brands.

6. The AHP Entities were founded by William Lee "Perch" Nelson ("***Mr. Nelson***") and Phoenix American Hospitality, LLC ("***PAH***"), a Dallas-based hospitality investment, asset management, and hotel operations company. PAH, which remains led by Mr. Nelson as its Chief Executive Officer, serves as the external property manager for certain of the Company's entities in which the AHP Entities hold ownership interests. Prior to the commencement of these Chapter 11 Cases, the Company generated revenue primarily through the ownership of its hotel properties and related hospitality businesses.

7. On October 4, 2026 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no request for the appointment of a trustee or examiner has been made and no official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

8. Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Amended Declaration of Alan Tantleff in Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. No. 20] and the *Declaration of Alan Tantleff in Support of Additional First Day Motions* [Dkt. No. 53] (together, the "***Declarations***"), which are incorporated herein by reference.[2]

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meaning set forth in the Declarations.

**B. The Non-Debtor Entities**

9. AHP FT Wayne Inn, LLC and AHP FT Wayne Suites, LLC (together, the "***Ft. Wayne Borrowers***") are Delaware limited liability companies that own hotel properties located in Fort Wayne, Indiana, which are among the most valuable assets associated with the Debtors' estates. The Ft. Wayne Borrowers are wholly-owned subsidiaries of APIP-C Borrower, LLC, a Delaware limited liability company ("***APIP-C Borrower***"). The Ft. Wayne Borrowers are borrowers under that certain Loan Agreement dated August 16, 2018 with Société Générale, pursuant to which credit was extended in an aggregate principal amount of up to $15.8 million (the "***Loan***").[3] The Loan is now believed to be serviced by Midland Loan Services, a division of PNC Bank, National Association, as master servicer (the "***Servicer***"), on behalf of Wells Fargo Bank, National Association, as Trustee for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C13, Commercial Mortgage Pass-Through Certificates, Series 2018-C13. In connection with the Loan, Mr. Nelson and American Hospitality Properties Fund III, LLC ("***AHP Fund III***"), a Delaware private real estate investment fund sponsored by PAH, executed recourse guaranties in favor of the Servicer and Loan parties pursuant to which they guaranteed certain obligations of the Ft. Wayne Borrowers (the "***Recourse Guaranty***").[4] The Loan contains extensive cross-default, cross-collateralization, and springing recourse provisions. Among other things, certain bankruptcy-related events may trigger recourse liability and permit the Servicer to accelerate the Loan and exercise remedies against the collateral securing the Loan.

10. The Ft. Wayne Borrowers entered into leases with APIP-C Ft. Wayne Inn Master Tenant, LLC, and APIP-C Ft. Wayne Suites Master Tenant, LLC (the "***Master Tenant Entities***")

---

[3] *See* Appendix I.

[4] *See* Appendix II.

pursuant to which the Master Tenant Entities leased the hotel properties from the Ft. Wayne Borrowers and operated the hotel properties. The Master Tenant Entities are wholly-owned subsidiaries of APIP-C OperCo, LLC, a Delaware limited liability company ("***APIP-C OperCo***" and together, with the Ft. Wayne Borrowers, APIP-C Borrower, and the Master Tenant Entities the "***Non-Debtor Entities***").[5]

11. In 2023, it is believed that Mr. Nelson sought to wind down American Hospitality Properties Fund I, LLC ("***AHP Fund I***") and AHP Fund III. Ultimately, Mr. Nelson, as (i) manager of AHP Fund III and AHP Fund I and (ii) CEO and director of REIT I, determined to have REIT I acquire the assets of AHP Fund I and AHP Fund III. At the time of the transaction, REIT I did not have any independent directors, and there is no record of which the Debtors are aware of an independent approval process of such related party transaction authorized by Mr. Nelson on behalf of APH Fund I, AHP Fund III and REIT I.

12. REIT I, a Debtor in these Chapter 11 Cases, entered into a Sale-Purchase Agreement, dated May 31, 2023, (the "***Purchase Agreement***")[6] pursuant to which it was to acquire an 80% equity interest in each of APIP-C OperCo, LLC and APIP-C Borrower (the "***80% Interests***"). However, at some point the parties to the Purchase Agreement realized that transfer of the 80% Interests to REIT I would be deemed a transfer that was not a "Permitted Transfer" under the Loan and thus an "Event of Default" under the Loan, unless the Servicer consented to the transfer, which has not been obtained. However, a transfer of the 80% Interests to Mr. Nelson appears to have been a "Permitted Transfer" that would not cause an

---

[5] For the avoidance of doubt, the Non-Debtor Entities include: APIP-C Borrower, LLC, AHP FT Wayne Inn, LLC, AHP FT Wayne Suites, LLC, APIP-C OperCo, LLC, APIP-C Ft. Wayne Inn Master Tenant, LLC, and APIP-C Ft. Wayne Suites Master Tenant, LLC.

[6] *See* Appendix III.

"Event of Default" under the Loan. Consequently, an Assignment and Assumption of Sale-Purchase Agreement,[7] dated June 1, 2023, was entered into between REIT I and Mr. Nelson pursuant to which REIT I assigned its rights under the Purchase Agreement to Mr. Nelson. Mr. Nelson ultimately acquired the 80% Interests and continues to hold legal title to the 80% Interests. To fund Mr. Nelson's acquisition of the 80% Interests, Mr. Nelson, as CEO and a director of REIT I, determined to have REIT I loan to Mr. Nelson approximately $9.4 million. At the time of such loan, REIT I did not have any independent directors, and there is no record of which the Debtors are aware of an independent approval process of such related party transaction authorized by Mr. Nelson on behalf of REIT I.

13. On January 29, 2025, Mr. Nelson submitted a request for the Servicer's consent to transfer the 80% Interests from Mr. Nelson to REIT I. As of the date of this Motion, the Company is not aware that the required consent has been obtained.

14. AHP Fund III held the remaining 20% equity interests in each of APIP-C OperCo and APIP-C Borrower. In January 2024, AHP Fund III merged into REIT I. As a result, REIT I succeeded to AHP Fund III's 20% equity interest in the Non-Debtor Entities and assumed AHP Fund III's obligations under the Recourse Guaranty, rendering REIT I jointly and severally liable for certain obligations arising under the Loan.

15. Mr. Nelson and REIT I also executed an Assignment of Certain Economic Interests, effective as of March 31, 2025 (the "***Assignment***"),[8] which purported to assign Mr. Nelson's economic interests in the APIP-C OperCo and APIP-C Borrower to REIT I without triggering the broader transfer restrictions or obligations under the Loan that would accompany a full assignment

---

[7] *See* Appendix IV.

[8] *See* Appendix V.

of the underlying membership interests. Despite its objective, the Assignment did not transfer the membership interests themselves and left the existing ownership structure undisturbed. Nevertheless, the Assignment reflects the parties' intent to create a structure under which REIT I would be the economic beneficiary of the interests in the Non-Debtor Entities while Mr. Nelson retained legal title to those interests.

16. Mr. Nelson and REIT I executed an Exchangeable Promissory Note Agreement on December 19, 2025, to be effective as of June 1, 2023 (the "***Note***"),[9] under which Mr. Nelson acknowledged that REIT I had loaned him approximately $9.4 million to fund his purchase of the 80% Interests. The Note was structured to, among other things, facilitate the eventual transfer of Mr. Nelson's equity interest to REIT I upon either the termination of the Loan or the Servicer's consent to the transfer. Upon the occurrence of either condition, title to the interests would automatically transfer to REIT I upon its delivery of written notice to Mr. Nelson. Accordingly, Mr. Nelson's role is limited to holding legal title temporarily until the Loan can be refinanced and the ownership transferred directly to REIT I as originally contemplated.

17. REIT I's existing ownership interests and contractual rights that would permit it to acquire the remaining equity interests in the Non-Debtor Entities upon a refinancing of the Loan constitute valuable property of the Debtors' estates.

18. On the Petition Date, the Debtors filed the *Emergency Motion for Entry of an Order (I) Enforcing and Confirming or, Alternatively, Extending the Automatic Stay with Respect to Certain Non-Debtor Entities; and (II) Granting Related Relief* [Dkt. No. 5], which initially sought substantially the same relief as the Debtors seek herein. On October 5, 2026, the Court entered the *Order (I) Enforcing and Confirming or, Alternatively, Extending the Protections of the*

[9] *See* Appendix VI.

*Automatic Stay with Respect to Certain Non-Debtor Entities; and (II) Granting Related Relief* [Dkt. No. 18] (the "***Stay Order***"). In doing so, the Court confirmed that the protections of the automatic stay applied to the Non-Debtor Entities because the Debtors' economic interests in the Non-Debtor Entities constitute property of the estate and that the stay should be extended to the Non-Debtor Entities due to the substantial identity of interests between the Debtors and the Non-Debtor Entities and the risk that actions taken against the Non-Debtor Entities could impair the Debtors' restructuring efforts. [*See* Dkt. No. 32 at pgs. 29–30]

**RELIEF REQUESTED**

19. By this Motion, the Debtors seek entry of an order (the "***Order***"), substantially in the form attached hereto as **Exhibit A**: (i) continuing the protections of the automatic stay with respect to certain non-Debtor entities; and (ii) granting related relief.

20. As set forth in detail below, the Debtors' interests in the Non-Debtor Entities constitute property of the estate and are therefore entitled to the protections of the automatic stay. Alternatively, unusual circumstances are present which warrant extension of the automatic stay: the Debtors and the Non-Debtor Entities share a substantial identity of interests and any action against the Non-Debtor Entities would directly impair the Debtors' restructuring efforts. Accordingly, the Debtors seek an order, pursuant to sections 105(a) and 362 of the Bankruptcy Code, continuing the protections of the Stay Order previously entered, to the Non-Debtor Entities, for an additional 30 days of these Chapter 11 Cases (subject to further requests for extension) to further maintain stability and preserve the value of the Debtors' estates while the Debtors continue their efforts to obtain debtor-in-possession financing and evaluate all other strategic alternatives to maximize value for their stakeholders.

## BASIS FOR RELIEF REQUESTED

### A. The Non-Debtor Entities Are Entitled to the Protections of the Automatic Stay

21. The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986). Its purpose is to give the debtor a "breathing spell" from creditors and to protect creditors by preventing a race for the debtor's assets. *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1182 (5th Cir. 1986); *In re Cowin*, 864 F.3d 344, 352 (5th Cir. 2017) (same).

22. Section 362(a) of the Bankruptcy Code imposes an automatic stay that, by its terms, applies to actions against the debtor and property of the estate. Section 362(a)(1) stays the commencement or continuation of proceedings against the debtor and generally is limited to the debtor itself. Section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1), (3).

23. "Property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This definition is to be construed broadly. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983). Courts have found that a wide variety of interests of the debtor qualify as property of the estate. *See, e.g.*, *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252 (3d Cir. 2006) (insurance policies were estate property); *Whetzal v. Alderson*, 32 F.3d 1302 (8th Cir. 1994) (causes of action were estate property); *Windstream Holdings, Inc. v. Charter Commc'ns Inc. (In re Windstream Holdings, Inc.)*, 634 F. Supp. 3d 99, 112-14 (S.D.N.Y. 2022) (recognizing customer contracts and goodwill as property of the estate), aff'd, 2024 WL 3195997 (2d Cir. June 24, 2024).

24. The Court previously held that "a very strong argument can be made that the automatic stay is implicated here in that there are property interests of the [D]ebtor implicated

under [section] 541," and that "in these unique facts there could be deemed to be interference with property of the estate if actions were taken towards these properties." [Dkt. No. 32 at pgs. 29–30]. Consistent with the Court's ruling, REIT I's interests in the Non-Debtor Entities fall squarely within the broad definition of "property of the estate." Through the series of transactions described above, REIT I obtained the economic and beneficial rights associated with the 80% Interests, with Mr. Nelson retaining record title solely because a direct transfer would not have constituted a "Permitted Transfer" under the Loan. Regardless of Mr. Nelson's continued status as record holder, the documentary record confirms that REIT I, rather than Mr. Nelson, is the economic beneficiary.

25. REIT I also possesses a direct ownership interest in the Non-Debtor Entities. In January 2024, REIT I succeeded to AHP Fund III's 20% ownership interest. Accordingly, REIT I holds both a direct and undisputed 20% ownership interest and the equitable and beneficial rights associated with the 80% Interests, together representing the full economic value of the Non-Debtor Entities.

26. As the Court recognized when it entered the Stay Order initially, these interests still constitute property of the estate under section 541. [*See* Dkt. No. 32 at pg. 29]. If the protection of the automatic stay is lost, parties may seek to exercise remedies against the Non-Debtor Entities, which in turn would likely result in impairment of value of the Debtors' estate property. Accordingly, the Court should continue to confirm that the protections of the automatic stay apply to the Non-Debtor Entities to preserve their value for the benefit of all stakeholders.

## B. The Bankruptcy Code Authorizes Protection of Estate Property and Extension of the Automatic Stay in Appropriate Circumstances

27. To the extent the Court determines that the interests in the Non-Debtor Entities are not property of the Debtors' estates, the Court should alternatively extend the stay to the Non-Debtor

Entities for an additional 30 days to preserve the status quo while the Debtors pursue debtor-in-possession financing and continue evaluating alternative strategies to maximize value for their stakeholders in these Chapter 11 Cases.

28. The legislative history of section 362 of the Bankruptcy Code indicates that Congress intended for the scope of the automatic stay to be sweeping, in order to effect its protective purpose. "The automatic stay is one of the most important protections provided by the bankruptcy laws," and ***"the [b]ankruptcy [c]ourts must have the power to enjoin actions not covered by the automatic stay, in order that the bankruptcy case may proceed unembarrassed by multiple litigation***." H.R. Rep. No. 95-595, at 12, 340 (1977). Extension of the automatic stay to otherwise unprotected actions allows the debtor to pursue its reorganization efforts free from the disruption of piecemeal litigation and collection activities. *Id.*

29. While the automatic stay does not, by its express terms, extend to actions against non-debtor parties, courts have long recognized that sections 362(a) and 105(a) permit bankruptcy courts to extend the protections of the automatic stay to non-debtor parties where necessary to protect the debtor and its reorganization. *ReliantEnergy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 825 (5th Cir. 2003). This authority derives from the broad equitable powers granted to the bankruptcy court under section 105(a) and serves as a critical tool for preserving estate assets and facilitating successful reorganizations.

30. Section 105(a) of the Bankruptcy Code provides:

> "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

31. The Supreme Court has confirmed the broad scope of the bankruptcy court's equitable powers under section 105(a). In *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995), the Court recognized that the bankruptcy court's jurisdiction extends to proceedings that might be "related to" the bankruptcy estate, and that the court's equitable powers must be exercised to further the purposes of the Bankruptcy Code, including the efficient and expeditious facilitation of successful reorganizations. Section 105(a) grants the bankruptcy court broad equitable powers to fashion relief necessary to effectuate the purposes of the Bankruptcy Code.

**C. Fifth Circuit Authority Permits Extension of the Stay Where Unusual Circumstances Exist**

32. In granting the Stay Order the Court also noted that, "under Fifth Circuit guidance such as the *Zale* case, both unusual, exceptional circumstances [are present] here, as well as clearly adverse impacts on the estate." [Dkt. No. 32 at pg. 30]. The test for extending the stay to non-debtors is whether "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *ReliantEnergy Servs., Inc.*, 349 F.3d at 825 (quoting *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)) (noting that extension of the automatic stay to a non-debtor party is warranted where a contract imposes joint liability between a non-debtor party and debtor, and thus an identity of interests exists).

33. The Fifth Circuit has recognized that temporary extensions of the automatic stay during the pendency of a bankruptcy case may be permissible where there are "unusual circumstances" present. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995). "These circumstances include 1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and 2) when the third-party action will have an adverse impact on the debtor's ability to accomplish

reorganization. When ***either*** of these circumstances occur, an injunction may be warranted." *Id.* (emphasis added).

34. Bankruptcy courts in this District have repeatedly applied *Zale* to grant temporary extensions of the automatic stay protecting non-debtor guarantors. *See In re Seatco, Inc.*, 257 B.R. 469, 477 (Bankr. N.D. Tex. 2001) (applying *Zale* and granting temporary stay extension); *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 117 (Bankr. N.D. Tex. 2002) (approving temporary stay extension under *Zale*); *Neutra, Ltd. v. Terry (In re Acis Capital Mgmt., L.P.)*, 604 B.R. 484, 525 (N.D. Tex. 2019) (confirming that bankruptcy judges in this district have approved temporary extensions of the automatic stay under *Zale* on multiple occasions).

35. Likewise, courts also extend the automatic stay to actions that "could interfere with the reorganization of the debtor" or "would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish the debtor's ability to formulate a plan of reorganization." *In re W.R. Grace & Co.*, 115 F. App'x 565, 570 (3d Cir. 2004) (quoting *A.H. Robins*, 828 F.2d at 1025 and *In re Johns-Manville*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983)); *see also Carway v. Progressive Cnty. Mut. Ins. Co.*, 183 B.R. 769, 775 (S.D. Tex. 1995); *In re McConathy*, No. 90-13449, 2021 Bankr. LEXIS 1569, at *10, 2021 WL 2405734, *4 (Bankr. W.D. La. June 14, 2021) ("It is widely recognized that actions involving non-debtors that would have an 'adverse impact' upon the property of the estate are subject to the automatic stay under [Bankruptcy Code] § 362(a)(3).").

**D. Unusual Circumstances Exist Here and Warrant Further Extension of the Stay**

36. As was previously held by the Court at the Debtors' first day hearing in connection with the Stay Order, both of the factors the Fifth Circuit identified in *Zale* are present here—REIT I and the Non-Debtor Entities share a substantial identity of interest such that any claim or action against the Non-Debtor Entities would essentially be a claim or action against REIT I. Moreover,

litigation or collection efforts against the Non-Debtor Entities would materially impair the Debtors' restructuring efforts.

37. First, REIT I's economic stake in and contractual ties to the Non-Debtor Entities create a significant unity of interests between them. This is not a case where a debtor merely has indemnification obligations to a third party. REIT I is the economic owner and beneficiary of 100% of the Non-Debtor Entities. Specifically, while REIT I currently holds a 20% ownership interest in the Non-Debtor Entities, REIT I receives all economic benefits and interests associated with the 80% Interests, and has contractual rights to obtain the legal title as to the 80% Interests upon refinancing or Servicer consent.

38. Further, REIT I is jointly and severally liable under the Recourse Guaranty for certain obligations arising under the Loan, making any action against the Non-Debtor Entities effectively an action against REIT I. Moreover, the Loan's cross-default and springing recourse provisions mean that any exercise of remedies against the Non-Debtor Entities could trigger additional liability for REIT I. This is precisely the type of identity of interests contemplated by *A.H. Robins*, *ReliantEnergy*, and *Zale*.

39. Second, litigation or collection efforts against the Non-Debtor Entities would materially impair the Debtors' restructuring efforts. REIT I's ownership interests, contractual rights under the Note and Assignment, and contingent obligations under the Recourse Guaranty are all property of the estate. Any effort to pursue remedies against the Non-Debtor Entities therefore directly affects estate property and constitutes an attempt to exercise control over interests belonging to REIT I within the meaning of section 362(a)(3) of the Bankruptcy Code.

40. Further, the Debtors are actively pursuing necessary debtor-in-possession financing and are of the opinion that the value of the Ft. Wayne assets and REIT I's corresponding interests

in the Non-Debtor Entities will be a critical and material component of any potential debtor-in-possession financing. Any enforcement action could affect the value of the Ft. Wayne assets and likely impair the Debtors' ability to monetize or restructure those assets which could undermine the Debtors' ability to secure debtor-in-possession financing needed to reorganize.

41. The Debtors commenced these Chapter 11 Cases following significant governance and operational challenges, including, but not limited to, years of reported misconduct by their former CEO and external manager, an SEC enforcement action, franchise defaults across the portfolio, and a wave of shareholder suits. The Debtors require an opportunity to stabilize operations, preserve value, restore stakeholder confidence, and execute on their restructuring strategy. Allowing creditors to pursue entities that REIT I economically owns and whose obligations REIT I guarantees would enable those creditors to accomplish indirectly what the Bankruptcy Code prohibits them from doing directly.

42. Notably, the Supreme Court's decision in *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024) does not compel a different result. The Debtors do not seek a release, discharge, or permanent injunction protecting non-debtors from liability. They seek only temporary relief preserving the status quo during these Chapter 11 Cases. Courts considering similar requests after Purdue have continued to recognize the availability of targeted, temporary relief under sections 362(a) and 105(a). *See In re Parlement Techs*., Inc., No. 24-10755 (CTG), 2024 WL 3417084, at *1 (Bankr. D. Del. July 15, 2024); *In re Coast to Coast Leasing*, LLC, 661 B.R. 621, 626 (Bankr. N.D. Ill. 2024).

**E. Continuation of the Relief Provided Under the Stay Order is Necessary**

43. Since entry of the Stay Order, the Debtors and their advisors have focused on stabilizing the Debtors' operations and businesses in these Chapter 11 Cases. The Debtors and their advisors continue to pursue debtor-in-possession financing and are actively engaged with

several parties who have executed non-disclosure agreements. In parallel, the Debtors and their advisors continue to evaluate all potential paths to maximize the value of their estates for the benefit of all stakeholders, such as asset sales and other alternatives.

44. As discussed above, continued protection of the automatic stay to the Non-Debtor Entities is necessary to preserve the Debtors' interests in the Ft. Wayne assets. The Ft. Wayne Borrowers own hotel properties that are among the most valuable assets that belong to the Debtors' estates. Any exercise of remedies against the Non-Debtor Entities could give rise to additional liability for REIT I and impair the value associated with the Ft. Wayne assets at a critical juncture in these Chapter 11 Cases. Moreover, the Debtors believe that the value represented by the Ft. Wayne assets and REIT I's corresponding interests in the Non-Debtor Entities is a significant asset of the Debtors' estates and preserving this value is important for the benefit of not just the Debtors, but also their stakeholders.

45. Consistent with the Stay Order, the requested relief is narrowly tailored to preserve the status quo and the Debtors are seeking only an additional 30 days (subject to requests for further extensions) to continue protecting the value associated with the Ft. Wayne assets while their efforts to maximize value remain ongoing. The proposed additional extension of the stay will not prejudice stakeholders of the Non-Debtor Entities, who will receive the benefit of preserving the status quo of the Non-Debtor Entities' operations through the automatic stay, rather than the potential disruption if third parties were allowed to take action against the Non-Debtor Entities. Further, the terms of the proposed Order will expire automatically 30 days from its entry unless the Debtors provide at least 14-days' notice of any further requests for extensions of the automatic stay.

### F. The Relief Is Properly Sought by Motion and Does Not Require an Adversary Proceeding or Satisfaction of the Traditional Injunction Factors

46. A request to determine the scope, applicability, or enforcement of the automatic stay is properly presented by motion as a contested matter under Bankruptcy Rules 4001 and 9014. The Debtors' principal request is a determination that actions against the Non-Debtor Entities constitute acts to exercise control over estate property within the meaning of section 362(a)(3) and therefore are subject to the existing automatic stay that arose upon the commencement of these Chapter 11 Cases. By this request, the Debtors do not seek to impose a new, stand-alone injunction. Rather they ask the Court to confirm the reach of the automatic stay.

47. Alternatively, the Debtors seek a temporary, further extension of the protections of the automatic stay for 30 days pursuant to sections 362(a) and 105(a). Courts in this District have granted such extensions by motion where "unusual circumstances" exist. *See In re ER of Texas, LLC*, No. 26-40606 (MXM) (Bankr. N.D. Tex. May 13, 2026) (finding that relief "constitutes an extension of the automatic stay under § 362(a), and not the issuance of a stand-alone injunction under § 105(a) requiring satisfaction of the traditional preliminary injunction factors") (citing *Reliant Energy Servs., Inc.*, 349 F.3d at 825; *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142 (5th Cir. 1987); *A.H. Robins Co.*, 788 F.2d at 994; *In re Zale Corp.*, 62 F.3d at 746; *Arnold v. Garlock, Inc.*, 278 F.3d 426 (5th Cir. 2001); *In re Chesnutt*, 2007 WL 4561304 (Bankr. N.D. Tex. 2007) (extending stay based on "unusual circumstances" test, without imposing the four-factor preliminary injunction analysis); *In re Seatco, Inc.*, 257 B.R. at 469; *In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. at 109).

48. The Debtors acknowledge the recent decision in *In re Genesis Healthcare, Inc.*, 2026 WL 1194759 (N.D. Tex. May 1, 2026), which vacated an order extending the automatic stay to non-debtors. The *Genesis* court held that, under *Zale*, an order temporarily preventing claims

against non-debtors requires an adversary proceeding and findings on the four preliminary injunction factors, and that a finding of "unusual circumstances" establishes only the court's power to act and does not eliminate the procedural protections required for injunctive relief. *Id.* at *6–7, *9. However, *Genesis* is distinguishable from the facts at hand here.

49. First, the relief requested in *Genesis* was not a determination that the automatic stay applied to property of the estate. Rather, the debtors requested extension of the stay to a broad group of non-debtor parties, including certain employees, officers, directors, independent physicians, indemnified parties, and other affiliated entities. Here, the Court has confirmed that remedies pursued against the Non-Debtor entities directly implicate REIT I's interests and therefore fall within the scope of the automatic stay. [See Dkt. No. 32 at pgs. 29–32].

50. Second, the relief granted in *Genesis* barred claims against non-debtor parties for the duration of the chapter 11 cases and through the effective date of the plan. Here, the Debtors are seeking an additional 30 day extension of the stay to continue preserving the status quo. Consistent with the original Stay Order, the requested extension of the automatic stay is temporary, narrowly tailored, and directed solely at preventing actions that could disrupt the Debtors' efforts to secure financing or find alternative pathways that may be implemented in these Chapter 11 Cases to maximize value. Absent further order of the Court, the requested additional extension will expire automatically after 30 days, at which point creditors will remain free to pursue any claims they may have against the Non-Debtor Entities.

51. Third, Fifth Circuit's decision in *Zale* recognizes the distinction between matters that require the procedural protections of an adversary proceeding and those that may be brought through a contested motion. The *Zale* court explained that "[c]ontested matters are 'subject to the less elaborate procedures specified in Bankruptcy Rule 9014'" and that such proceedings are

"generally designed for the adjudication of simple issues, often on an expedited basis." *Zale*, 62 F.3d at 763. That principle supports proceeding by contested motion here, where the Debtors request narrow, time-sensitive relief of the type that Rule 9014 is designed to address. Moreover, the *Genesis* court stated that its opinion "does not purport to describe every error or to prescribe every step of analysis the Bankruptcy Court must take if considering a similar temporary injunction on remand" and only that the Bankruptcy Court "should hew to the law set forth in *Zale* and the procedures for adversary proceedings." *Genesis*, 2026 WL 1194759, at *9. Accordingly, *Genesis* leaves intact the distinction recognized in *Zale* between contested matters and adversary proceedings.

52. In ruling on the Stay Order at the Debtors' first day hearing, the Court's remarks further confirm that the relief granted under the Stay Order is distinguishable from the relief at issue in *Genesis*. [*See* Dkt. No. 32 at pg. 30 (stating that "it clearly needs to be mentioned that this is nothing like *Genesis* or what we see in so many other cases. […] all of these factors militate in favor of granting this motion.")]. Continuation of the Stay Order for an additional 30 days warrants the same treatment. The requested relief would not extend the protections of the automatic stay to Mr. Nelson or PAH; rather, it would continue the existing relief affecting the Servicer for only an additional 30 days, subject to any party's ability to seek termination of such relief. Moreover, any further extension would require that the Debtors to return to this Court upon advance notice to any affected parties.

53. For the reasons set forth above, the requested extension of the Stay Order may be adjudicated through this contested matter without the commencement of an adversary proceeding. Absent such relief, litigation, enforcement actions, and other creditor remedies directed at the

Non-Debtor Entities could diminish the value of estate property and divert the Debtors' attention and resources at a critical stage of these Chapter 11 Cases.

## RESERVATION OF RIGHTS

54. For the avoidance of doubt, nothing in this Motion is intended to be, nor should it be construed as (i) an implication or admission as to the validity or priority of any claim or lien against the Debtors, (ii) an impairment or waiver of the Debtors' or any other party in interest's rights to contest or dispute any such claim or lien, (iii) a promise or requirement to pay any claim, (iv) an implication or admission that any particular claim is of a type specified or defined in the Motion or any proposed order, or (v) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## NOTICE

55. Notice of this Motion has been provided to: (a) Mr. Nelson; (b) Phoenix American Hospitality, LLC; (c) counsel to the Servicer; (d) the U.S. Trustee (e) the Debtors' 20 largest unsecured creditors (on a consolidated basis); (f) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; and (i) all other applicable government agencies to the extent required by the Bankruptcy Rules or the N.D. Tex. L.B.R. In light of the nature of the relief requested in this Motion, the Debtors submit that no further notice is necessary.

## NO PRIOR REQUEST

56. No prior motion for the relief requested herein has been made to this Court or any other court.

**PRAYER**

The Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, and grant them such other and further relief to which the Debtors may be justly entitled.

Dated: October 20, 2026
Dallas, Texas

*/s/ Bradley R. Foxman*

**VINSON & ELKINS LLP**

Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**CERTIFICATE OF SERVICE**

I certify that on October 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Bradley R. Foxman*
One of Counsel

**CERTIFICATE OF CONFERENCE**

I certify that on October 19, 2026, one of counsel for the Debtors conferred with counsel for the Servicer via telephone regarding the relief requested in this Motion, who indicated that they are still evaluating their position with respect to this Motion.

*/s/ Bradley R. Foxman*
One of Counsel

# **EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al.*,** | § | |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |
| | § | **Re: Dkt. No. ___** |

**ORDER (I) CONTINUING THE PROTECTIONS OF THE AUTOMATIC STAY WITH RESPECT TO CERTAIN NON-DEBTOR ENTITIES; AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") for entry of an order (this "***Order***") (i) continuing the protections of the automatic stay with respect to certain non-Debtor entities; and

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

(ii) granting related relief, all as more fully set forth in the Motion and in the Declarations; and the Court having jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and other parties in interest; and the Court having found that proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary; and the Court having found that good and sufficient cause exists for the granting of the relief requested in the Motion after considering the Motion and all of the proceedings before the Court in connection with the Motion, it is HEREBY ORDERED THAT:

1. The protections of the automatic stay of Bankruptcy Code Section 362(a), are hereby confirmed as applicable to, or alternatively, extended to the Non-Debtor Entities for an additional 30 days in these Chapter 11 Cases. Without limiting the foregoing, no party shall take any action to accelerate the Loan, foreclose on the Ft. Wayne properties, enforce the Loan's cross-default, cross-collateralization, or springing recourse provisions, or otherwise exercise remedies against the Non-Debtor Entities.

2. Without limiting the foregoing, all entities are stayed from:

a. the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Non-Debtor Entities that was or could have been commenced before the date hereof, or to recover a claim against the Non-Debtor Entities that arose before the date hereof;

b. the enforcement, against the Non-Debtor Entities or against their property, of a judgment obtained prior to the date hereof;

c. any act to obtain possession of property of the Non-Debtor Entities or of property from the Non-Debtor Entities or to exercise control over property of the Non-Debtor Entities;

d. any act to create, perfect, or enforce any lien against property of the Non-Debtor Entities;

e. any act to create, perfect, or enforce against property of the Non-Debtor Entities any lien to the extent that such lien secures a claim that arose before the date hereof;

f. any act to collect, assess, or recover a claim against the Non-Debtor Entities that arose prior to the date hereof;

g. the setoff of any debt owing to the Non-Debtor Entities that arose prior to the date hereof against any claim against the Non-Debtor Entities.

3. This Order shall expire 30 days from the date hereof unless extended by further order of the Court.

4. Nothing in this Order shall prejudice the rights of any creditor to file a proof of claim in these Chapter 11 Cases, to participate in the plan process, or to seek modification or termination of this Order upon proper notice and hearing.

5. The Debtors shall serve any motion to extend, renew, or otherwise continue the stay granted by this Order, together with notice of the hearing thereon, on each Non-Debtor Entity (or its counsel) not less than 14 days prior to any hearing on such motion, and each Non-Debtor Entity shall have the right to appear and be heard in opposition to, or otherwise with respect to, any such motion.

6. All statutes of limitations, statutes of repose, time periods for service of process, deadlines for amendment of pleadings, deadlines to respond to discovery, deadlines to perfect or enforce liens, and any other procedural or substantive deadlines applicable to any claim, action, or proceeding stayed by this Order shall be TOLLED and SUSPENDED with respect to the Non-Debtor Entities for the duration of the stay extension granted herein, and for a period of

30 days after the expiration, modification, or termination of such stay, so that the Non-Debtor Entities shall not suffer any loss of rights or remedies by reason of compliance with this Order.

7. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

8. Notwithstanding the relief granted herein or actions taken hereunder, nothing contained in the Motion or this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an implication or admission as to the validity or priority of any claim or lien against the Debtors, a waiver of the Debtors', or any party in interest's, rights to subsequently dispute such claim or lien, a promise or requirement to pay any claim, an implication or admission that any particular claim is of a type specified or defined in the Motion or any proposed order, a waiver of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law, or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

9. The Court retains exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**# # # END OF ORDER # # #**

**Order submitted by:**

**VINSON & ELKINS LLP**

Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR**
**THE DEBTORS AND DEBTORS IN POSSESSION**

# APPENDIX I

## Loan Agreement

---

# LOAN AGREEMENT

Dated as of August 16, 2018

By and Among

**Borrowers (as defined herein)**

And

**SOCIETE GENERALE**,
as Lender

---

# TABLE OF CONTENTS

Page


1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION ..... 1
   1.1 Specific Definitions ..... 1
   1.2 Index of Other Definitions ..... 28
   1.3 Principles of Construction ..... 30

2. GENERAL LOAN TERMS ..... 30
   2.1 The Loan ..... 31
   2.2 Interest; Monthly Payments ..... 31
      2.2.1 Generally ..... 31
      2.2.2 Default Rate ..... 31
      2.2.3 Taxes ..... 31
      2.2.4 Increased Costs ..... 35
      2.2.5 New Payment Date ..... 35
   2.3 Loan Repayment ..... 36
      2.3.1 Repayment ..... 36
      2.3.2 Mandatory Prepayments ..... 36
      2.3.3 Voluntary Prepayments/Defeasance ..... 37
      2.3.4 Optional Prepayments ..... 40
   2.4 Release of Properties ..... 40
      2.4.1 Release on Defeasance ..... 40
      2.4.2 Sale of Properties ..... 40
      2.4.3 Release on Payment in Full ..... 42
      2.4.4 Release of Properties to Cure Default ..... 42
   2.5 Payments and Computations ..... 43
      2.5.1 Making of Payments ..... 43
      2.5.2 Computations ..... 44
      2.5.3 Late Payment Charge ..... 44

3. CASH MANAGEMENT AND RESERVES ..... 44
   3.1 Cash Management Arrangements ..... 44
   3.2 Required Repairs ..... 44
      3.2.1 Completion of Required Repairs ..... 44
      3.2.2 Required Repairs Reserves ..... 45
   3.3 Taxes and Insurance ..... 45
   3.4 Capital/FF&E Expense Reserves ..... 46
   3.5 Intentionally Omitted ..... 47
   3.6 Casualty/Condemnation Subaccount ..... 47
   3.7 Security Deposits ..... 47
   3.8 Cash Collateral Subaccount ..... 47
   3.9 Grant of Security Interest; Application of Funds ..... 48
   3.10 Property Cash Flow Allocation ..... 48
   3.11 PIP Reserve. ..... 50
      3.11.1 Deposit of PIP Funds ..... 50

Page

3.11.2 Release of PIP Funds ..... 51
3.12 Low Debt Service Cure Reserve. ..... 51
3.12.1 Cash Deposits of Low Debt Service Cure Deposit ..... 51
3.12.2 Release of Cash Deposits of Low Debt Service Cure Deposit. ..... 51
3.13 Intentionally left blank. ..... 52
3.14 Letters of Credit ..... 52

4. REPRESENTATIONS AND WARRANTIES ..... 53
4.1 Organization; Special Purpose ..... 53
4.2 Proceedings; Enforceability ..... 53
4.3 No Conflicts ..... 54
4.4 Litigation ..... 54
4.5 Agreements ..... 54
4.6 Title ..... 54
4.7 No Bankruptcy Filing ..... 55
4.8 Full and Accurate Disclosure ..... 55
4.9 Tax Filings ..... 56
4.10 ERISA; No Plan Assets ..... 56
4.11 Compliance ..... 56
4.12 Major Contracts ..... 57
4.13 Federal Reserve Regulations; Investment Company Act; Bank Holding Company ..... 57
4.14 Easements; Utilities and Public Access ..... 58
4.15 Physical Condition ..... 58
4.16 Leases ..... 58
4.17 Fraudulent Transfer ..... 59
4.18 Ownership of Borrower ..... 59
4.19 Purchase Options ..... 60
4.20 Management Agreement ..... 60
4.21 Hazardous Substances ..... 60
4.22 Name; Principal Place of Business ..... 61
4.23 Other Debt ..... 61
4.24 Assignments of Leases and Rents ..... 61
4.25 Insurance ..... 61
4.26 FIRPTA ..... 61
4.27 Fiscal Year ..... 61
4.28 Intellectual Property/Websites ..... 62
4.29 Operations Agreements ..... 62
4.30 Illegal Activity ..... 62
4.31 Patriot Act; Foreign Corrupt Practices Act; Anti-Money Laundering ..... 62
4.32 Franchise Agreement ..... 62
4.33 Master Lease. ..... 63

5. COVENANTS ..... 63
5.1 Existence ..... 63
5.2 Taxes and Other Charges ..... 63

Page


5.3 Access to Properties ..... 64
5.4 Repairs; Maintenance and Compliance; Alterations ..... 64
5.4.1 Repairs; Maintenance and Compliance ..... 64
5.4.2 Alterations ..... 65
5.5 Performance of Other Agreements ..... 65
5.6 Cooperate in Legal Proceedings ..... 65
5.7 Further Assurances ..... 65
5.8 Environmental Matters ..... 66
5.8.1 Hazardous Substances ..... 66
5.8.2 Environmental Monitoring ..... 66
5.8.3 O & M Program ..... 68
5.9 Title to the Properties ..... 68
5.10 Leases ..... 68
5.10.1 Generally ..... 68
5.10.2 Additional Covenants With Respect to Leases ..... 68
5.11 Estoppel Statement ..... 69
5.12 Property Management ..... 69
5.12.1 Management Agreement ..... 69
5.12.2 Termination of Manager ..... 70
5.13 Special Purpose Bankruptcy Remote Entity ..... 70
5.14 Assumption in Non-Consolidation Opinion ..... 71
5.15 Change in Business or Operation of Properties ..... 71
5.16 Debt Cancellation ..... 71
5.17 Affiliate Transactions ..... 71
5.18 Zoning ..... 71
5.19 No Joint Assessment ..... 71
5.20 Principal Place of Business ..... 71
5.21 Change of Name, Identity or Structure ..... 71
5.22 Indebtedness ..... 72
5.23 License; Intellectual Property; Website ..... 72
5.23.1 Licenses ..... 72
5.23.2 Intellectual Property ..... 72
5.23.3 Website ..... 72
5.24 Compliance with Restrictive Covenants ..... 72
5.25 ERISA ..... 73
5.26 Prohibited Transfers ..... 73
5.26.1 Generally ..... 73
5.26.2 Transfer and Assumption ..... 73
5.27 Liens ..... 76
5.28 Dissolution ..... 77
5.29 Expenses ..... 77
5.30 Indemnity ..... 78
5.31 Patriot Act Compliance; Anti-Money Laundering Laws ..... 79
5.32 Approval of Major Contracts ..... 80
5.34 Hotel Covenants. ..... 81

Page


6. NOTICES AND REPORTING ........ 83
- 6.1 Notices ........ 83
- 6.2 Borrower Notices and Deliveries ........ 84
- 6.3 Financial Reporting ........ 84
  - 6.3.1 Bookkeeping ........ 85
  - 6.3.2 Annual Reports ........ 85
  - 6.3.3 Monthly/Quarterly Reports ........ 85
  - 6.3.4 Other Reports ........ 86
  - 6.3.5 Annual Budget ........ 87
  - 6.3.6 Additional Operating Expenses ........ 87
  - 6.3.7 Breach ........ 88
- 6.4 Hotel Account ........ 88
- 6.1 Reporting Generally ........ 88

7. INSURANCE; CASUALTY; AND CONDEMNATION ........ 89
- 7.1 Insurance ........ 89
  - 7.1.1 Coverage ........ 89
  - 7.1.2 Policies ........ 91
- 7.2 Casualty ........ 92
  - 7.2.1 Notice; Restoration ........ 93
  - 7.2.2 Settlement of Proceeds ........ 93
- 7.3 Condemnation ........ 93
  - 7.3.1 Notice; Restoration ........ 93
  - 7.3.2 Collection of Award ........ 94
- 7.4 Application of Proceeds or Award ........ 94
  - 7.4.1 Application to Restoration ........ 94
  - 7.4.2 Application to Debt ........ 95
  - 7.4.3 Procedure for Application to Restoration ........ 95

8. DEFAULTS ........ 96
- 8.1 Events of Default ........ 96
- 8.2 Remedies ........ 99
  - 8.2.1 Acceleration ........ 99
  - 8.2.2 Remedies Cumulative ........ 99
  - 8.2.3 Severance ........ 100
  - 8.2.4 Delay ........ 100
  - 8.2.5 Lender’s Right to Perform ........ 101

9. SPECIAL PROVISIONS ........ 101
- 9.1 Sale of Mortgage and Securitization ........ 101
- 9.2 Securitization Indemnification ........ 104
- 9.3 Severance of Loan ........ 107
- 9.4 Costs and Expenses ........ 108

10. MISCELLANEOUS ........ 108
- 10.1 Exculpation ........ 108

Page

10.2 Brokers and Financial Advisors ... 113
10.3 Retention of Servicer ... 114
10.4 Survival; Successors and Assigns ... 114
10.5 Lender's Discretion; Rating Agency Review Waiver ... 114
10.6 Governing Law ... 115
10.7 Modification, Waiver in Writing ... 116
10.8 Trial by Jury ... 117
10.9 Headings/Schedules ... 117
10.10 Severability ... 117
10.11 Preferences ... 117
10.12 Waiver of Notice ... 118
10.13 Remedies of Borrower ... 118
10.14 Prior Agreements ... 118
10.15 Offsets, Counterclaims and Defenses ... 118
10.16 Publicity ... 118
10.17 No Usury ... 119
10.18 Conflict; Construction of Documents; Reliance ... 119
10.19 No Joint Venture or Partnership; No Third Party Beneficiaries ... 119
10.20 Yield Maintenance Premium ... 120
10.21 Assignments and Participations ... 120
10.22 Intentionally Left Blank ... 121
10.23 Waiver of Marshalling of Assets ... 121
10.24 Joint and Several ... 121
10.25 Creation of Security Interest ... 121
10.26 Certain Additional Rights of Lender ... 121
10.27 Acknowledgement and Consent to Bail-In of EEA Financial Institutions ... 122
10.28 Set-Off ... 123
10.29 Negation of Implied Right to Cure Events of Default ... 124
10.30 Registered Obligations ... 124
10.31 Counterparts ... 124
10.32 Cross Default; Cross Collateralization ... 124
10.33 Contribution Among Borrowers ... 125

Exhibit A Location of Properties
Exhibit B Allocated Loan Amounts
Exhibit C-1 Form of U.S. Tax Compliance Certificate (1)
Exhibit C-2 Form of U.S. Tax Compliance Certificate (2)
Exhibit C-3 Form of U.S. Tax Compliance Certificate (3)
Exhibit C-4 Form of U.S. Tax Compliance Certificate (4)

Schedule 1 Required Repairs
Schedule 2 Exceptions to Representations and Warranties
Schedule 3 Rent Roll

Page

| | |
|---|---|
| Schedule 4 | Organization of Borrower |
| Schedule 5 | Definition of Special Purpose Bankruptcy Remote Entity |
| Schedule 6 | Secondary Market Transaction Information |
| Schedule 7 | Intellectual Property/Websites |
| Schedule 8 | REA |
| Schedule 9 | PIP and PIP Budget |

# LOAN AGREEMENT

**LOAN AGREEMENT** dated as of August 16, 2018 (as the same may be modified, supplemented, amended or otherwise changed, this "Agreement") by and among **AHP FT WAYNE INN, LLC**, a Delaware limited liability company ("Hilton Borrower"), and **AHP FT WAYNE SUITES, LLC**, a Delaware limited liability company ("Homewood Borrower") (each a "Borrower" and collectively together with their respective permitted successors and assigns, "Borrowers"), and **SOCIETE GENERALE** (together with its successors and assigns, "Lender").

## 1. DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**1.1 Specific Definitions**. The following terms have the meanings set forth below:

"Acceptable Related Guarantor" shall mean a Person (i) that satisfies the conditions set forth in clauses (1) through (4) of the defined term "Qualified Transferees", (ii) that (a) with respect to a Person that is not a natural person, was formed in and maintains its principal place of business in, and is subject to service in, the United States or Canada, or (b) with respect to a natural person, is a citizen of, maintains his/her primary residence in, and is subject to service in, the United States or Canada, (iii) has all or substantially all of its (his/her) assets in the United States or Canada, (iv) who, together with the existing Guarantor, satisfies the financial covenants required under the Guaranty and (v) who owns a direct or indirect interest in Borrower.

"Acceptable Replacement Guarantor" shall mean one or more Persons that satisfy the criteria set forth in clauses (1) through (4) of the defined term "Qualified Transferees" for whom Lender shall have received a credit check reasonably acceptable to Lender and whose identity, experience, financial condition and creditworthiness, including net worth and liquidity, is acceptable to Lender in Lender's sole discretion (provided that (x) if such Person has at least five (5) years' experience in owning properties similar to the Properties and has owned at least ten (10) such properties, then Lender shall not withhold its consent solely with respect to the experience of such Person, and (y) if such Person satisfies the net worth and liquidity covenants set forth in the Guaranty, then Lender shall not withhold its consent solely with respect to the financial condition of such Person), and for which Lender has received a Rating Comfort Letter from each applicable Rating Agency and, in each case, (i) either Controls Borrowers or owns a direct or indirect interest in Borrowers or any Master Lessee (or is acting as a director or officer of any Master Lessee) and (ii) except as expressly set forth above, is otherwise reasonably acceptable to Lender in all respects.

"Affiliate" shall mean as to any Person, any other Person that (i) directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such Person; or (ii) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person; or (iii) which directly or indirectly is a general partner, controlling shareholder, managing member, officer, director, trustee or employee of such Person.

"Allocated Loan Amount" shall mean with respect to each Property, the amount set forth with respect to such Property on Exhibit B hereto.

"Amortization Commencement Date" shall mean the Payment Date occurring in October, 2021.

"Anti-Corruption Laws" shall mean any laws, rules and regulations of any of any Governmental Authority applicable to Borrower, Guarantor or any of their direct or indirect members, partners or owners concerning bribery or corruption, including the United Stated Foreign Corrupt Properties Act of 1997 (15 U.S.C.§8 78d Jan/et seq.).

"Anti-Money Laundering Laws" shall mean any laws, rules and regulations of any Governmental Authority applicable from time to time to Borrower, Guarantor or any of their direct or indirect partners, members or owners related to money laundering or terrorist financing.

"Applicable Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Approved Bank" shall mean a bank or other financial institution, the long-term unsecured debt rating of which are at least "A" by S&P, Fitch and DBRS and "A2" by Moody's and the short-term unsecured debt ratings of which are at least "A-1" by S&P, "F1" by Fitch, "R-1" by DBRS and "P-1" by Moody's.

"Approved Capital/FF&E Expenses" shall mean the cost of Capital Expenses and/or FF&E Expenses incurred by any Borrower or any Master Lessee and either (i) included in the Approved Annual Budget, (ii) approved by Lender, which approval shall not be unreasonably withheld, conditioned or delayed, or (iii) is required pursuant to any Franchise Agreement or Replacement Franchise Agreement.

"Approved Operating Expenses" shall mean during a Cash Management Period, operating expenses incurred by a Borrower or a Master Lessee that (i) are included in the Approved Operating Budget for the Property owned by such Borrower (or leased by such Master Lessee) for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to such Property, (iii) are other similar operating expenses that are non-discretionary in nature, (iv) are Emergency Expenditures or (v) are approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, that Approved Operating Expenses shall not include fees payable to Manager under the applicable Management Agreement in excess of three percent (3.0%) of the Rents with respect to any calendar month. Approved Operating Expenses shall also include all franchise fees and expenses incurred in connection with any Franchise Agreement.

"Approved Operating Expense Variance" shall mean operating expenses (i) for non-discretionary items (e.g., real estate taxes, electric, gas, oil, water, sewer or other utility service to the Property or increases or adjustments to payments for unionized employees pursuant to a collective bargaining agreement), to the extent there is an unanticipated increase in such non-discretionary item beyond what is set forth for such item in the then-current Approved Operating Budget, or (ii) any single operating expense that (A) exceeds the amount set forth for such expense in the Approved Operating Budget by less than 10% and (B) would not cause the aggregate amount expended on operating expenses in the relevant calendar year to exceed the aggregate amount allocated to operating expenses in the Approved Operating Budget for such calendar year by more than 10%.

"Available Cash" shall mean as of each Payment Date during the continuance of Cash Management Period, the amount of Rents, if any, remaining in the Deposit Account after the application of all of the payments required under clauses (i) through (viii) of Section 3.10(a) hereof.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"Bankruptcy Proceeding" shall mean with respect to any Person, (i) consenting in writing to the appointment of a conservator, receiver, trustee, custodian or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to it or of or relating to all, or substantially all, of its property, or for the winding-up or liquidation of its affairs, (ii) admitting in writing its inability to pay its debts generally as they become due or (iii) filing a petition, or otherwise instituting, or consenting in writing to the institution against it or, proceedings to take advantage of any law relating to bankruptcy, insolvency or reorganization or the relief of debtors under any federal, state or foreign bankruptcy, insolvency, receivership or similar law.

"Borrower Party(ies)" shall mean, individually or collectively, as context may require, Borrower(s) and Master Lessee(s).

"Business Day" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

"Calculation Date" shall mean the last day of each calendar quarter during the Term.

"Capital Expenses" shall mean expenses that are capital in nature or required under GAAP to be capitalized.

"Cash Management Period" shall commence upon Lender giving notice to the Clearing Bank of the occurrence of any of the following: (i) the Stated Maturity Date, (ii) an Event of Default, (iii) the commencement of a Low Debt Service Period (a "DSCR Cash Management Period"), (iv) upon Lender's good faith determination that the PIP Funds on deposit in the PIP Reserve Subaccount are less than the estimated costs to complete the PIP Work in accordance with the PIP and Borrower has not deposited with Lender such funds as are necessary to cause the PIP Funds on deposit in the PIP Reserve Subaccount to equal the PIP Shortfall Deposit Amount within ten (10) Business Days of Lender notifying Borrower of such determination pursuant to clause (x) of Section 3.11.1(b) hereof (it being understood that Lender's good faith determination of the estimated costs to complete the PIP Work shall be based upon estimates and documentation from contractors and/or other service or materials providers, certified as being true, correct and complete by an officer of Borrower, to perform and complete such PIP (which estimates and documentation shall be updated and recertified by Borrower (in the same manner as above) upon Lender's reasonable request as any PIP Work progresses), (v) upon the occurrence of a PIP being required (other than a PIP in effect on the date hereof) by the Franchisor and Borrower has not deposited with Lender an amount equal to the PIP Deposit Amount with respect to such PIP within ten (10)

Business Days of such PIP being required by such Franchisor pursuant to clause (x) of Section 3.11.1(c) hereof, (vi) if any Franchise Agreement is surrendered, cancelled, terminated or expires; or (vii) the date that is twelve (12) calendar months prior to the stated expiration of any Franchise Agreement; and shall end upon Lender giving notice to the Clearing Bank that the sweeping of funds into the Deposit Account may cease, which notice Lender shall only be required to give if (1) with respect to the matters described in clauses (i) through and including (vii) above, the Loan and all other obligations under the Loan Documents have been repaid in full or (2) if the Stated Maturity Date has not occurred and (A) with respect to the matters described in clause (ii) above, such Event of Default has been cured and no other Event of Default has occurred and is continuing or (B) with respect to the matter described in clause (iii) above, the Low Debt Service Period has ended pursuant to the terms hereof, or (C) with respect to the matter described in clauses (iv) and (v) above, an amount equal to the PIP Deposit Amount is on deposit in the PIP Reserve Subaccount, or (E) with respect to a Cash Management Period continuing pursuant to clauses (vi) and (vii) above, the Franchise Sweep Termination Conditions have been satisfied and an amount equal to the PIP Deposit Amount is on deposit in the PIP Reserve Subaccount; provided that, in the event that a Cash Management Period is continuing with respect to clause (vi) only with respect to one Property (or one group of Properties flagged by the same or affiliated Franchisor), one time during the term of the Loan, such Cash Management Period shall end upon the earlier to occur of (x) the satisfaction of the Franchise Sweep Termination Conditions and the date that an amount equal to the PIP Deposit Amount is on deposit in the PIP Reserve Subaccount, and (y) the date that $15,000 per room of the applicable Property has been swept into the PIP Reserve Subaccount during the continuance of the Cash Management Period in question.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Applicable Taxes or branch profits Applicable Taxes.

"Control" shall mean with respect to any Person, either (i) ownership directly or indirectly of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and Common Control shall have correlative meanings.

"Debt" shall mean the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

"Debt Service" shall mean with respect to any particular period, scheduled Principal and interest payments due under the Note in such period (but assuming, only for the purpose of calculating the Debt Service Coverage Ratio, that the Amortization Commencement Date has already occurred).

"Debt Service Coverage Ratio" shall mean as of any date, the ratio calculated by Lender (which such calculation shall be conclusive absent manifest error) of (i) the Underwritten Net Cash

Flow as of the most recently completed calendar month to (ii) the Debt Service with respect to such period.

"Default" shall mean the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" shall mean a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) four percent (4%) above the Interest Rate, compounded monthly.

"Defeasance Collateral" shall mean U.S. Obligations, which provide payments (i) on or prior to, but as close as possible to, all Payment Dates and other scheduled payment dates, if any, under the Note after the Defeasance Date and up to and including the Stated Maturity Date, and (ii) in amounts equal to or greater than the Scheduled Defeasance Payments.

"Defeasance Percentage" shall mean the percentage derived by dividing, (i) in the case of an initial Partial Defeasance, the original principal amount of the Defeased Note by the original principal amount of the Note or (ii) in the case of a subsequent Defeasance, the amount of the subsequent Defeased Note by the original principal amount of its corresponding Undefeased Note.

"Deposit Bank" shall mean Wells Fargo Bank, National Association, or such other bank or depository selected by Lender in its discretion.

"Eligibility Requirements" shall mean, with respect to any Person, that such Person (A) has total assets (in name or under management) in excess of $150,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity or net worth in excess of $50,000,000, in each case excluding the Properties, and (B) is regularly engaged in the business of making or owning commercial real estate mortgage similar to the Properties or directly or indirectly owning or operating "first-class" hotel real estate properties similar to the Properties, as evidenced by financial statements and other information reasonably satisfactory to Lender.

"Eligible Account" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (i) an account or accounts (or subaccounts thereof) (A) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (B) if a Securitization has occurred, as to which Lender has received a Rating Comfort Letter from each of the applicable Rating Agencies with respect to holding funds in such account, or (ii) a segregated trust account or accounts (or subaccounts thereof) maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(b), having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authorities. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution" shall mean a depository institution insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's and F-1+ by Fitch, in the case of accounts in which

funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least (i) "AA" by S&P, (ii) "AA" and/or "F1+" (for securities) and/or "AAAmmf" (for money market funds), by Fitch and (iii) "Aa2" by Moody's; provided, however, for purposes of the Deposit Bank, the definition of Eligible Institution shall have the meaning set forth in the Deposit Account Agreement; provided, further, however, Wells Fargo Bank, N.A. shall be deemed an "Eligible Institution" provided that, as of any date of determination, the ratings ascribed to it by the Rating Agencies do not decrease below the ratings in effect as of the Closing Date.

"Emergency Expenditures" shall mean the incurrence of expenses that were necessary in order to (A) avoid imminent bodily injury, harm or damage to individuals or any Property, (B) avoid the suspension of any necessary service to any Property, or (C) comply with Legal Requirements, and, in each such case, with respect to which it would be impractical, in a Borrower's reasonable judgment, under the circumstances, to obtain Lender's prior written consent; provided that such Borrower shall give Lender notice of such Emergency Expenditures as soon as practicable and provided that at no time may management fees payable to Manager be considered an Emergency Expenditure.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) which is a member of the same controlled group of corporations or group of trades or businesses under common control with Borrower or Guarantor, or is treated as a single employer together with Borrower or Guarantor under Section 414 of the Code or Title IV of ERISA.

"Excluded Taxes" shall mean any of the following Applicable Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender, (a) Applicable Taxes imposed on or measured by net income (however denominated), franchise Applicable Taxes, and branch profits Applicable Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Applicable Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Applicable Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or (ii) such Lender changes its lending office, (c) Applicable Taxes attributable to such Lender's failure to comply with Section 2.2.3(c) and (d) any withholding Applicable Taxes imposed under FATCA.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FF&E" shall mean fixtures, furnishings, equipment, furniture, and other items of tangible personal property now or hereafter located in or on the Properties or the Improvements or used in connection with the use, occupancy, operation and maintenance of all or any part of the hotels located on the Properties, other than stocks of food and other supplies held for consumption in normal operation but including, without limitation, appliances, machinery, equipment, signs, artwork, office furnishings and equipment, guest room furnishings, and specialized equipment for kitchens, laundries, bars, restaurants, public rooms, health and recreational facilities, linens, dishware, all partitions, screens, awnings, shades, blinds, floor coverings, hall and lobby equipment, heating, lighting, plumbing, ventilating, refrigerating, incinerating, elevators, escalators, air conditioning and communication plants or systems with appurtenant fixtures, vacuum cleaning systems, call or beeper systems, security systems, sprinkler systems and other fire prevention and extinguishing apparatus and materials; reservation system computer and related equipment; all equipment, manual, mechanical or motorized, for the construction, maintenance, repair and cleaning of, parking areas, walks, underground ways, truck ways, driveways, common areas, roadways, highways and streets; and the Vehicles (as defined in the Uniform System of Accounts for the Lodging Industry, current edition).

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

"Force Majeure Delay" shall mean a delay due to strikes, lockouts, labor disputes, inability to obtain materials generally in the market, failure of power or other necessary utilities, acts of G*d, governmental restrictions, regulations or controls, enemy or hostile governmental actions, terrorist acts, civil commotion, insurrection, revolution, sabotage or fire or other casualty or other event or circumstance beyond the reasonable control of Borrower; provided, that, Borrower's lack of funds in and of itself shall not be deemed a cause beyond the control of Borrower and in no event shall a Force Majeure Delay and provided, further, that any extension or extensions of any deadline or time period set forth in the Loan Documents on account of Force Majeure Delay shall not exceed ninety (90) days in the aggregate.

"Foreign Lender" shall mean any Lender that is not a U.S. Person.

"Franchise Agreement" shall mean, individually and/or collectively, as the context may require, the Hilton Franchise Agreement and the Homewood Franchise Agreement, in each case as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement or any similar agreement entered into by and between Borrower and a Franchisor in accordance with the terms of the Loan Documents, pursuant to which Borrower has the right to operate the hotel on the Property under a name and/or hotel system controlled by Franchisor.

"Franchise Sweep Termination Conditions" shall mean the following conditions with respect to the applicable individual Property: (i) a Replacement Franchise Agreement from a Qualified Franchisor from a Qualified Brand that satisfies the terms and provisions of this Agreement and covers the entirety of such Property has been duly executed and delivered by the Franchisor for the benefit of Borrower or Master Lessee as licensor or franchisor, which such Replacement Franchise Agreement is in full force and effect, (ii) such Replacement Franchise Agreement has an initial term (i.e., exclusive of extension or renewal options) of no less than ten

(10) years, and (iii) the provisions of Section 5.34 have been satisfied (including the delivery of a comfort letter from the Franchisor as required pursuant to the terms thereof).

"Franchisor" shall mean, individually or collectively as the context requires, Hilton Franchisor, and Homewood Franchisor, or any other franchisor engaged pursuant to a Franchise Agreement entered into in accordance with the terms and conditions of the Loan Documents.

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Government Lists" shall mean (i) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrowers in writing is now included in "Government Lists", (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce, the United Nations, the European Union, any European Union member state, the United Kingdom or any other Governmental Authority or (iv) any similar lists maintained pursuant to any Executive Order of the President of the United States of America that Lender notified Borrowers in writing is now included in "Government Lists".

"Governmental Authority" shall mean any court, board, agency, department, committee, commission, central bank, office or authority of any nature whatsoever (including any political subdivision or instrumentality thereof) for any governmental or quasi-governmental unit (whether federal, state, commonwealth, county, district, municipal, city, parish, provincial or otherwise) (whether of the government of the United States or any other nation) now or hereafter in existence (including any supra-national bodies such as the European Union or the European Central Bank and any intergovernmental organizations such as the United Nations).

"Guarantor" shall mean, collectively or individually as he context may require, William L. Nelson, an individual, and American Hospitality Properties Fund III LLC, a Delaware limited liability company, or any other Person that now or hereafter guarantees any of Borrowers' obligations hereunder or any other Loan Document.

"Hilton Franchise Agreement" shall mean that certain Franchise Agreement, dated as of August 16, 2018, between Hilton Master Lessee and any current Hilton Franchisor or any Replacement Franchise Agreement or similar agreement entered into by and between Hilton Master Lessee and a Franchisor in accordance with the terms of the Loan Documents, in each case, pursuant to which Borrower has the right to operate the hotel located on the Hilton Property under a name and/or hotel system controlled by such Franchisor.

"Hilton Franchisor" shall mean Hilton Franchise Holding LLC, a Delaware limited liability company.

"Hilton Master Lease" shall mean that certain Master Lease, dated as of the date hereof, by and between Hilton Borrower and Master Lessee.

"Hilton Master Lessee" shall mean APIP-C Ft. Wayne Inn Master Tenant, LLC, a Delaware limited liability company.

"Hilton Property" shall mean the real property described on Exhibit A-1.

"Homewood Franchise Agreement" shall mean that certain Franchise Agreement, dated as of August 16, 2018, between Homewood Master Lessee and any current Homewood Franchisor or any Replacement Franchise Agreement or similar agreement entered into by and between Homewood Master Lessee and a Franchisor in accordance with the terms of the Loan Documents, in each case, pursuant to which Borrower has the right to operate the hotel located on Homewood Property under a name and/or hotel system controlled by such Franchisor.

"Homewood Franchisor" shall mean Hilton Franchise Holding LLC, a Delaware limited liability company.

"Homewood Master Lease" shall mean that certain Master Lease, dated as of the date hereof, by and between Homewood Borrower and Homewood Master Lessee.

"Homewood Master Lessee" shall mean APIP-C Ft. Wayne Suites Master Tenant, LLC, a Delaware limited liability company.

"Homewood Property" shall mean the real property described on Exhibit A-2.

"Hotel Revenues" shall mean, with respect to any of the Properties, revenues from the rental of rooms, guest suites, conference and banquet rooms, food and beverage facilities, health clubs, spas or other amenities, telephone services, laundry, vending, television and parking.

"Hotel Taxes" shall mean federal, state and municipal excise, occupancy, sales and use taxes collected by or on behalf of Borrower, Master Lessee or Manager directly from customers, patrons or guests of the Property as part of, or based on, the sales price of any goods, services or other items, such as gross receipts, room, admission, cabaret or equivalent taxes and required to be paid to a Governmental Authority.

"Hotel Transactions" shall mean, collectively, (i) occupancy arrangements for customary hotel transactions in the ordinary course of the Borrowers' or Master Lessees' business conducted at any hotel located at the Properties, including nightly rentals (or licensing) of individual hotel rooms or suites, banquet room use and food and beverage services and (ii) informational or guest services which are terminable on one month's notice or less without cause and without penalty or premium, including co-marketing, promotional services and outsourced services.

"Indemnified Taxes" shall mean Applicable Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any Loan Document.

"Interest Period" shall mean (i) the period from the date hereof through the first day thereafter that is the last day of a calendar month and (ii) each period thereafter from the 1st day of each calendar month through the last day of each such calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end

on the Maturity Date. Notwithstanding the foregoing, if Lender exercises its right to change the Payment Date to a New Payment Date in accordance with Section 2.2.5 hereof, then from and after such election, each Interest Period shall be the period from the New Payment Date in each calendar month through the day in the next succeeding calendar month immediately preceding the New Payment Date in such calendar month.

"Interest Rate" shall mean a rate of interest equal to 4.740% per annum (or, when applicable pursuant to this Agreement or any other Loan Document, the Default Rate).

"Inventory" shall have the meaning given in the UCC, and including items which would be entered on a balance sheet under the line items for "Inventories" or "china, glassware, silver, linen and uniforms" under USALI.

"Key Principal(s)" shall mean (i) William L. Nelson, a natural person, or (ii) from and after a Permitted Transfer in accordance with clause (ix) of the definition of Permitted Transfer, a Replacement Key Principal.

"Lease Termination Payments" shall mean (i) all fees, penalties, commissions or other payments made to any Borrower in connection with or relating to the rejection, buy-out, termination, surrender or cancellation of any Lease (including in connection with any Bankruptcy Proceeding), (ii) any security deposits or proceeds of letters of credit held by any Borrower in lieu of cash security deposits, which such Borrower is permitted to retain pursuant to the applicable provisions of any Lease and (iii) any payments made to any Borrower relating to unamortized tenant improvements and leasing commissions under any Lease.

"Leases" shall mean all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, a Property or the Improvements relating thereto, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder. As used herein, the term "Leases" shall not include Hotel Transactions.

"Legal Requirements" shall mean statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including those regarding fire, health, handicapped access, sanitation, ecological, historic, zoning, environmental protection, wetlands and building laws and the Americans with Disabilities Act of 1990, Pub. L. No. 89-670, 104 Stat. 327 (1990), as amended, and all regulations promulgated pursuant thereto) affecting any Borrower, Guarantor, Manager, any Loan Document or all or part of any Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to any Borrower, at any time in force affecting all or part of any Property.

"Letter of Credit" shall mean an irrevocable, unconditional, transferable (without payment of any transfer fee by the transferring or transferee beneficiary thereof), clean sight draft letter of credit acceptable to Lender in its reasonable discretion (either an evergreen letter of credit or one which does not expire until at least thirty (30) Business Days after the Stated Maturity Date or

payment of the subject obligation or completion of the subject activity for which such Letter of Credit was provided) in favor of Lender and entitling Lender to draw thereon, in whole or in part, in New York, New York or such other domestic location approved by Lender or pursuant to procedures of the issuing bank provided that such issuing bank allows for draws (including partial draws by facsimile), issued by a domestic Approved Bank or the U.S. agency or branch of a foreign Approved Bank, to an applicant/obligor that is not the Borrower. Any Letter of Credit delivered to Lender in connection with the Loan shall, in addition to any other requirements set forth herein, be subject to the terms and conditions set forth in Section 3.14 hereof.

"Lien" shall mean any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of any Property or any interest therein, or any direct or indirect interest in any Borrower or Sole Member, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Liquor License Cooperation Agreement" shall mean those certain Cooperation Agreements Regarding Liquor License, dated as of even date herewith, among Manager, Borrowers and Lender.

"Loan Documents" shall mean this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof: (i) the Promissory Note or Promissory Notes made by Borrowers to Lender in the aggregate principal amount equal to the Loan (the "Note"), (ii) each Deed of Trust, Assignment of Leases and Rents and Security Agreement made by a Borrower to a trustee, as the case may be, in favor of Lender which covers the Property owned by such Borrower (collectively, the "Mortgages"), (iii) each Assignment of Leases and Rents from a Borrower to Lender (collectively, the "Assignments of Leases and Rents"), (iv) each Assignment of Agreements, Licenses, Permits and Contracts from a Borrower to Lender, (v) each Deposit Account Control Agreement (collectively, the "Clearing Account Agreements") among each Borrower, Lender and the Clearing Banks, (vi) the Cash Management Agreement (the "Deposit Account Agreement") among Borrowers, Lender, Manager and the Deposit Bank, (vii) the Guaranty of Recourse Obligations made by Guarantor (the "Guaranty"), and (viii) the Liquor License Cooperation Agreements; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time (including pursuant to Section 9.3 hereof).

"Low Debt Service Period" shall commence if the Debt Service Coverage Ratio is less than 1.20:1.00 for two (2) consecutive Calculation Dates and shall end if the Properties have achieved a Debt Service Coverage Ratio of at least 1.20:1.00 for two (2) consecutive Calculation Dates, in each case as determined by Lender. In order to avoid the commencement of a Low Debt Service Period hereunder, Borrower may deposit with Lender (at any time and from time to time) cash to be held and disbursed in accordance with the provisions of Section 3.12 hereof, which is in an amount that equals or exceeds the product of (x) six (6), and (y) (I) prior to the Amortization

Commencement Date, the Monthly Interest Payment Amount and (II) from and after the Amortization Commencement Date, the Monthly Debt Service Payment Amount (the "Low Debt Service Cure Deposit"), such Low Debt Service Cure Deposit to include any additional amounts required to be deposited pursuant to Section 3.12 hereof. In lieu of making a cash deposit equal to the Low Debt Service Cure Deposit, Borrower may (at any time and from time to time) deliver to Lender a Letter of Credit with a face amount equal to the applicable Low Debt Service Cure Deposit, which Letter of Credit shall be held and applied in accordance with the provisions of Section 3.12 hereof. For the avoidance of doubt, nothing contained herein shall give Borrower the right to voluntarily prepay any portion of the Loan to cure a Low Debt Service Period. For the avoidance of doubt, if, following the Amortization Commencement Date, the Debt Service Coverage Ratio continues to be less than 1.20:1.00, in order to continue to avoid the commencement of a Low Debt Service Period, Borrowers shall be required to deposit (or post an additional Letter of Credit with a face amount equal to) the amount by which six (6) times the Monthly Debt Service Payment Amount exceeds the previously deposited Low Debt Service Cure Deposit, and such amount in the aggregate shall constitute the "Low Debt Service Cure Deposit" for all purposes hereof.

"Major Contract" shall mean (i) any management, brokerage, franchise or leasing agreement (other than Leases, the Master Lease Documents, the Franchise Agreements, Replacement Franchise Agreements, Management Agreements and Replacement Management Agreements), (ii) any Hotel Transaction relating to future room reservations, which agreement (x) has a term of more than thirty (30) days and (y) covers more than 30 rooms (unless cancellable on thirty (30) days or less notice without requiring the payment of a termination fee or payments of any kind) or (iii) any cleaning, maintenance, service or other contract or agreement of any kind (other than Leases, the Master Lease Documents, the Franchise Agreements, Replacement Franchise Agreements, Management Agreements and Replacement Management Agreements) of a material nature (materiality for these purposes to mean contracts which extend beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind), and pursuant to which Borrower or Master Lessee has an aggregate payment obligation (under such individual contact) of $100,000 or more), in either case entered into by Borrower or Master Lessee and relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

"Management Agreement" shall mean each of the management agreements dated as of the date hereof, entered into by the applicable Master Lessee for each of the Properties and Manager, pursuant to which Manager is to manage the Property owned by such Borrower, or any Replacement Management Agreement, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.12 hereof.

"Manager" shall mean PAH Management, LLC, a Delaware limited liability company, or any Qualified Manager or other successor, assignee or replacement manager appointed by a Borrower or a Master Lessee in accordance with Section 5.12 hereof.

"Master Lease" shall mean each of the Hilton Master Lease and the Homewood Master Lease.

"Master Lease Call Option Letter" shall mean those certain Understanding to Sell Letters,

dated as of the date hereof, among Borrowers and Master Lessee, as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with this Agreement.

"Master Lease Put Option Letter" shall mean those certain Understanding to Sell Letters, dated as of the date hereof, among Borrowers and Master Lessee, as the same may be further amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with this Agreement.

"Master Lease Documents" shall mean the Master Lease, the Master Lease Put Option Letter and the Master Lease Call Option Letter. For the avoidance of doubt, all of the Master Lease Documents in effect on the Closing Date are approved by Lender.

"Master Lessee" shall mean each of Hilton Master Lessee and Homewood Master Lessee, individually and collectively, as the context may require.

"Material Adverse Effect" shall mean any event, condition or change that has a material adverse effect on (a) the value, use or operation of a Property, (b) the financial condition of a Borrower (including, without limitation, gross revenues) and/or Guarantor, as applicable, taken as a whole, (c) the ability of Borrowers, Manager and/or Guarantor, as applicable, to perform under the Loan Documents in a manner which could reasonably be expected to impair the value of Lender's security for the Loan or (d) the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Documents or the rights, interests and remedies of Lender under any Loan Document, in each case as determined by Lender in its reasonable discretion.

"Material Alteration" shall mean any alteration affecting structural elements of a Property the cost of which exceeds, at any given time, two percent (2%) of the Allocated Loan Amount for the applicable Property; provided, however, that in no event shall (i) [intentionally left blank], (ii) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, (iii) alterations performed as part of a Restoration, constitute a Material Alteration, or (iv) any PIPs.

"Maturity Date" shall mean the date on which the final payment of principal of the Note (or the Defeased Note, if applicable) becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

"Monthly Operating Expense Budgeted Amount" shall mean, with respect to each Property, the monthly amount set forth in the Approved Operating Budget for the Property to which such amount relates, incurred or to be incurred for or as of the calendar month in which such Payment Date occurs (provided, however, that the Monthly Operating Expense Budgeted Amount shall not include fees payable to Manager under the applicable Management Agreement in excess of three percent (3.0%) of the Rents with respect to any calendar month).

"Net Operating Income" shall mean for any period, the Underwritten Net Cash Flow of the Properties for such period determined by Lender in its sole and absolute discretion in accordance with Lender's then current underwriting standards for loans of this type and the then current

underwriting standards of the Rating Agencies (including adjustments for market vacancy, bankrupt tenants, leasing costs and capital items).

"NRSRO" shall mean any credit rating agency that has elected to be treated as a nationally recognized statistical rating organization for purposes of Section 15E of the Exchange Act, without regard to whether or not such credit rating agency has been engaged by Lender or its designees in connection with, or in anticipation of, a Securitization.

"Officer's Certificate" shall mean a certificate delivered to Lender by a Borrower which is signed by a senior executive officer of Borrowers.

"Operating Expenses" shall mean, for any period, without duplication, all expenses actually paid or payable by Borrowers and Master Lessees during such period in connection with the operation, management, maintenance, repair and use of the Properties, determined on an accrual basis, and, except to the extent otherwise provided in this definition, in accordance with an Acceptable Accounting Method and the Uniform System of Accounts for the Lodging Industry, current edition. Operating Expenses specifically shall include (i) all expenses incurred in the immediately preceding twelve (12) month period based on quarterly financial statements delivered to Lender in accordance with Section 6.3.3 hereof, (ii) all payments required to be made pursuant to any Operations Agreements, (iii) property management fees in an amount equal to the management fees actually paid under the Management Agreements, (iv) administrative, payroll, security and general expenses for the Properties, (v) the cost of utilities, inventories and fixed asset supplies consumed in the operation of the Properties, (vi) a reasonable reserve for uncollectible accounts, (vii) costs and fees of Independent professionals (including, without limitation, legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services required or permitted hereunder, (viii) cost of attendance by employees at training and manpower development programs, (ix) association dues, (x) computer processing charges, (xi) operational equipment and other lease payments, (xii) Taxes and Other Charges (other than income taxes or Other Charges in the nature of income taxes) and insurance premiums and (xiii) all underwritten reserves required by Lender hereunder (without duplication). Operating Expenses shall also include all franchise fees and expenses incurred in connection with any Franchise Agreement. Notwithstanding the foregoing, Operating Expenses shall not include (1) depreciation or amortization, (2) income taxes or Other Charges in the nature of income taxes, (3) any expenses (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with the making of the Loan or the sale, exchange, transfer, financing or refinancing of all or any portion of the Properties or in connection with the recovery of Insurance Proceeds or Awards which are applied to prepay the Note, (4) Capital Expenditures (including items relating to the PIP that are capital in nature), in connection with the Properties, (5) Debt Service, and (6) any item of expense which would otherwise be considered within Operating Expenses pursuant to the provisions above but is paid directly by any Tenant.

"Operations Agreements" shall mean the REA, and any other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of a Property, together with all amendments, modifications or supplements thereto.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including governmental charges and claims, vault charges and license fees for the use of vaults, chutes and similar areas adjoining any Property, now or hereafter levied or assessed or imposed against any Property or any part thereof.

"Other Connection Taxes" shall mean Applicable Taxes imposed as a result of a present or former connection between a Lender and the jurisdiction imposing such Applicable Tax (other than connections arising from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

"Patriot Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws

"Patriot Act Offense" shall mean any violation of the criminal laws of any Governmental Authority, or that would be a criminal violation if committed within the jurisdiction of the United States of America, any of the several states or any Governmental Authority, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

"PACE Loan" shall mean (i) any "Property-Assessed Clean Energy loan" or (ii) any other indebtedness, without regard to the name given to such indebtedness, which is (a) incurred for improvements to any Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (b) repaid through multi-year assessments against such Property.

"Payment Date" shall mean the 1st day of each calendar month or, upon Lender's exercise of its right to change the Payment Date in accordance with Section 2.2.5 hereof, the New Payment Date (in either case, if such day is not a Business Day, the Payment Date shall be the first Business Day thereafter). The first Payment Date hereunder shall be October 1, 2018.

"Permitted Encumbrances" shall mean, collectively, (i) the Liens and security interests created by the Loan Documents, (ii) all Liens, encumbrances and other matters disclosed in the Title Insurance Policies (including Liens disclosed in the title commitment for which Lender has either received affirmative coverage or for which the title insurance company has received adequate protections to remove such items as exceptions in the Title Insurance Policy and such item was so removed), (iii) Liens, if any, for Taxes or Other Charges imposed by any Governmental Authority not yet due or delinquent, (iv) any workers', mechanics' or other similar Liens on a Property provided that any such Lien is bonded or discharged within sixty (60) days after a Borrower first receives written notice of such Lien or which is being contested in good faith in accordance with the requirements of Section 5.27, (v) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's reasonable discretion and (vi) all non-

monetary easements, right-of-ways, restrictions and other similar non-monetary encumbrances entered into after the date hereof in the ordinary course of business that are either (1) subordinate to the Lien of the Mortgages and which do not, individually or in the aggregate, materially and adversely affect (a) the ability of any Borrower to pay any of its obligations to any Person as and when due, (b) the marketability of title to the Property affected by such encumbrance, (c) the fair market value of the Property affected by such encumbrance or (d) the use or operation of the Property affected by such encumbrance, or (2) are otherwise approved by Lender in writing.

"Permitted Prepayment Date" shall mean the Payment Date that occurs in May, 2028.

"Permitted Transfers" shall mean:

(i) a Lease entered into in accordance with the Loan Documents; or

(ii) Hotel Transactions; or

(iii) a Permitted Encumbrance; or

(iv) a Transfer and Assumption pursuant to Section 5.26.2 hereof or release of a Property in accordance with, and pursuant to, Section 2.4 hereof; or

(v) any Transfer in respect of, or of a direct or indirect interest in, any Person listed on a nationally or internationally recognized stock exchange or stock quotation system; or

(vi) provided no Event of Default shall then exist, a Transfer of any direct or indirect interest in any Borrower or any Master Lessee related to or in connection with the estate planning of such transferor to (1) an immediate family member of such interest holder (or to partnerships or limited liability companies Controlled solely by one or more of such family members) or (2) a trust established for the benefit of such immediate family member, provided that:

(A) if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower or any Master Lessee to an amount which equals or exceeds ten percent (10%) (provided such transferee and its Affiliates did not own ten percent (10%) or more immediately prior to such Transfer), (x) Borrowers shall provide to Lender twenty (20) days prior written notice thereof and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower or any Master Lessee, shall be a Qualified Transferee;

(B) such Transfer shall not otherwise result in a change of Control of any Borrower or any Master Lessee and the Properties shall continue to be managed by a Qualified Manager;

(C) each Borrower and each Master Lessee shall continue to be a Special Purpose Bankruptcy Remote Entity; and

(D) if such Transfer shall cause the transferee together with its Affiliates to acquire or to increase its direct or indirect interest in any Borrower or any Master Lessee to an amount which equals or exceeds forty-nine percent (49%) (provided such transferee and its Affiliates did not own forty-nine percent (49%) or more immediately prior to such Transfer), to the extent that Lender determines that the pairings in the most recently delivered non-consolidation opinion with respect to the Loan no longer apply or that an additional pairing(s) is needed to cover the transferee or any other Person not included in the most recently delivered non-consolidation opinion, Borrowers shall deliver to Lender a non-consolidation opinion in form and substance reasonably satisfactory to Lender and satisfactory to the applicable Rating Agencies; or

(vii) a Transfer of any direct or indirect interest in any Borrower or any Master Lessee that occurs by devise or bequest or by operation of law upon the death of a natural person that was the holder of such interest, provided that:

(A) if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in any Borrower or any Master Lessee to an amount which equals or exceeds ten percent (10%) (provided such transferee and its Affiliates did not own ten percent (10%) or more immediately prior to such Transfer) or to acquire direct or indirect Control of Borrower or Master Lessee, (x) Borrowers shall (or shall cause the applicable Master Lessee to) provide Lender with notice of such Transfer not less than thirty (30) days after the date of such Transfer and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower or Master Lessee shall be a Qualified Transferee;

(B) Borrowers shall (or shall cause the applicable Master Lessee to) give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than sixty (60) days after the date of such Transfer;

(C) each Borrower and each Master Lessee shall continue to be a Special Purpose Bankruptcy Remote Entity;

(D) if such Transfer results in a change of Control of any Borrower or any Master Lessee to a Person other than (x) Key Principal (directly or indirectly) or (y) the estate of Key Principal (during the pendency of the settlement by the estate of Key Principal and if such Transfer occurs as a result of the death of Key Principal) (the "Key Principal Estate"): if such Transfer occurs (1) prior to the occurrence of a Securitization, such Transfer is approved by Lender in writing within thirty (30) days after any such Transfer, which approval shall not be unreasonably withheld or (2) from and after a Securitization, Borrowers shall deliver a Rating Comfort Letter from each applicable Rating Agency within ninety (90) days after any such Transfer (or such longer time as may reasonably be necessary for Borrowers to obtain the Rating Comfort Letters, provided Borrowers are diligently pursuing same); and

(E) if such Transfer shall cause (x) a change of Control of any Borrower or any Master Lessee, or (y) the transferee together with its Affiliates to acquire or to increase its direct or indirect interest in any Borrower or any Master Lessee, to an amount which equals or exceeds forty-nine percent (49%) (provided such transferee and its Affiliates did not own forty-nine percent (49%) or more immediately prior to such Transfer), then, to the extent that Lender determines that the pairings in the most recently delivered non-consolidation opinion with respect to the Loan no longer apply or that an additional pairing(s) is needed to cover the transferee or any other Person not included in the most recently delivered non-consolidation opinion, Borrowers shall deliver to Lender a non-consolidation opinion in form and substance reasonably satisfactory to Lender and the applicable Rating Agencies within thirty (30) days of Lender's request for such non-consolidation opinion; or

(viii) provided that no Event of Default shall then exist, a Transfer of an interest in any Borrower or any Master Lessee, to any Person provided that:

(A) such Transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of any Borrower or any Master Lessee to acquire or to increase its direct or indirect interest in any Borrower to an amount which equals or exceeds 49% (provided such transferee and its Affiliates did not own forty-nine percent (49%) or more immediately prior to such Transfer) or (y) result in any Borrower or any Master Lessee no longer being Controlled by Key Principal;

(B) if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in any Borrower or any Master Lessee to an amount which equals or exceeds ten percent (10%) (provided such transferee and its Affiliates did not own ten percent (10%) or more immediately prior to such Transfer), (x) Borrowers shall provide to Lender thirty (30) days prior written notice thereof and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in any Borrower or any Master Lessee, shall be a Qualified Transferee;

(C) after giving effect to such Transfer, Key Principal shall continue to Control the day to day operations of each Borrower and each Master Lessee, and shall continue to own, at least three percent (3.0%) of all equity interests (direct or indirect) of each Borrower or each Master Lessee; and

(D) each Borrower and each Master Lessee shall continue to be a Special Purpose Bankruptcy Remote Entity; or

(ix) provided that no Event of Default shall then be continuing, a Transfer of direct or indirect interests in (x) Borrower in accordance with (i) Section 7.7, Section 9.2 and/or Section 11.9 of that certain Limited Liability Company Agreement of APIP-C OperCo, LLC, dated as of the date hereof (the "JV Agreement") by and among AHP PHX USB 3 LLC, a Delaware limited liability company ("Aspect Member"),

American Hospitality Properties Fund III, LLC, a Delaware limited liability company ("PHX"), as a member, and Phoenix American Hospitality, LLC, a Delaware limited liability company ("PAH LLC"), as the initial non-member manager, or (ii) Section 7.04 and/or Section 9.03 of that certain Limited Liability Company Agreement of APIP-C Borrower, LLC, dated as of the date hereof, by and among AIP CB IV Ltd., a Cayman Islands exempted company, as a member, PHX, as a member, and PAH LLC, as the initial non-member manager, or (y) Master Lessee in connection with the exercise of rights and remedies under Section 7.7, Section 9.2 and/or Section 11.9 of the JV Agreement, provided that in either such case the following conditions are satisfied:

(A) if such Transfer would cause the transferee, together with its Affiliates, to acquire or to increase its direct or indirect interest in Borrower or any Master Lessee to an amount which equals or exceeds ten percent (10%) (provided such transferee and its Affiliates did not own ten percent (10%) or more immediately prior to such Transfer), (x) Borrowers shall provide to Lender twenty (20) days prior written notice thereof and (y) such transferee, and all other Persons that shall then become an owner of ten percent (10%) or more of an indirect interest in Borrower or any Master Lessee, shall be a Qualified Transferee;

(B) from and after such Transfer, (x) Aspect Member and/or one or more Affiliates of Aspect Member shall continue to own at least fifty one percent (51%) of all equity interests (direct or indirect) of Borrowers and shall maintain voting rights that are substantially similar to or greater than the rights granted to Aspect Member under the JV Agreements, as it exists as of the Closing Date and (y) Borrowers shall be Controlled by either the initial Key Principal hereunder or a Replacement Key Principal;

(C) Each Borrower and each Master Lessee shall continue to be a Special Purpose Bankruptcy Remote Entity;

(D) the Properties shall continue to be managed by a Qualified Manager or by a property manager reasonably acceptable to Lender and acceptable to the applicable Rating Agencies;

(E) if, as a result of such Transfer, one or more Guarantors no longer has a direct or indirect interest in Borrowers (or if such Guarantor(s) Controlled Borrowers prior to such Transfer, no longer Controls Borrowers), one or more Approved Replacement Guarantors shall execute and deliver to Lender, prior to the date of such Transfer, a guaranty of recourse obligations (in substantially identical form as the guaranty of recourse obligations delivered to Lender by Guarantor on the date hereof); and

(F) if such Transfer shall cause the transferee together with its Affiliates to acquire or to increase its direct or indirect interest in any Borrower or any Master Lessee to an amount which equals or exceeds forty-nine percent (49%) (provided such transferee and its Affiliates did not own forty-nine percent (49%) or more immediately prior to such Transfer), to the extent that Lender determines that

the pairings in the most recently delivered non-consolidation opinion with respect to the Loan no longer apply or that an additional pairing(s) is needed to cover the transferee or any other Person not included in the most recently delivered non-consolidation opinion, Borrowers shall deliver to Lender a non-consolidation opinion in form and substance reasonably satisfactory to Lender and satisfactory to the applicable Rating Agencies.

For purposes of clause (vi) above, "immediate family member" shall mean a sibling, family trust, family limited partnership, parent, spouse, child (or step-child), grandchild or other lineal descendant of the interest holder.

As used in clauses (vi) through (ix), "Transfer" shall mean the sale or conveyance of such interests (and not the encumbrance or pledge of such interests).

If any Transfer will result in Guarantor no longer owning a direct or indirect equity interest in any Master Lessee (or, as applicable following a Transfer and Assumption in any Borrower) (or otherwise receiving consideration to act as Guarantor), Guarantor shall (in connection with such Transfer) be replaced with an Acceptable Replacement Guarantor or another replacement guarantor acceptable to Lender in its reasonable discretion. Such replacement guarantor(s) shall as a condition to such Transfer execute and deliver a guaranty of recourse obligations (in substantially the form as the Guaranty delivered to Lender by Guarantor on the date hereof) on or prior to the date of such Permitted Transfer (or, in the case of a Permitted Transfer described in clause (vii), within thirty (30) days after the date of such Permitted Transfer), pursuant to which, in each case, such replacement guarantor(s) agree(s) to be liable under each such guaranty of recourse obligations from and after the date of such Permitted Transfer; whereupon Guarantor being replaced shall be released from any further liability under the Loan Documents to which it is a party from and after the date of such Transfer and such replacement guarantor(s) shall be a "Guarantor" for all purposes from and after the date of such Transfer. In connection with any Transfer, including any Transfer and Assumption, in the event that Guarantor is not obligated to maintain a minimum net worth and minimum amount of liquid assets under the Guaranty and such Acceptable Replacement Guarantor is not an individual, then the replacement guaranty of recourse obligations delivered to Lender by such Acceptable Replacement Guarantor shall also include ongoing covenants regarding net worth and liquidity reasonably satisfactory to Lender.

Notwithstanding anything to the contrary, no Transfer shall be a Permitted Transfer unless such Transfer is made in compliance with the Franchise Agreement.

"Person" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Physical Conditions Reports" shall mean collectively, (i) that certain Property Condition Report, prepared by Partner Engineering and Science, Inc. as Project No. 18-210661.1 and dated as of April 2, 2018, and (ii) certain Property Condition Report, prepared by Partner Engineering and Science, Inc. as Project No. 18-210661.2 and dated as of April 2, 2018.

"PIP" shall mean that certain property improvement plan attached hereto as Schedule 9 and any other property improvement plan that is issued in connection with any Franchise Agreement.

"PIP Costs" shall mean the costs incurred in connection with any PIP.

"PIP Deposit Amount" shall mean an amount equal to one-hundred percent (100%) of the estimated costs to complete any PIP as reasonably determined by Lender based upon estimates and documentation from contractors and/or other service or materials providers, certified as being true, correct and complete by an officer of Borrower, to perform and complete such PIP ((i) which estimates and documentation shall be updated and recertified by Borrower (in the same manner as above) upon Lender's reasonable request as any PIP Work progresses and (ii) the PIP Deposit Amount shall be adjusted as reasonably determined by Lender based on such updated estimates and documentation).

"PIP Work" shall mean all work performed in connection with or in furtherance of a PIP.

"Plan" shall mean (i) an employee benefit or other plan established or maintained by a Borrower or any ERISA Affiliate or to which a Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

"Pooling and Servicing Agreement" shall mean any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction.

"Properties" shall mean collectively, the parcels of real property and Improvements thereon owned by Borrowers and encumbered by the Mortgages; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Mortgages and referred to therein as the Mortgaged Property or the Trust Property, as applicable. The location of each Property is identified on Exhibit A hereto.

"Qualified Brand" shall mean (i) a hotel brand of a Qualified Franchisor listed on the then current STR Chain Scales for North America and Caribbean on the same or greater scale than the brand being replaced, or (iv) such other hotel brand reasonably acceptable to Lender.

"Qualified Equity Holder" shall mean a Qualified Transferee that is any one of the following:

(i) any real estate investment trust, real estate company, investment fund, bank, savings and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund, pension advisory firm, commingled pension trust fund, hedge fund, private equity fund, mutual fund, government entity or plan, investment fund or institutional entity substantially similar to any of the foregoing that, in each case, satisfies the Eligibility Requirements;

(ii) an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional

"accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that such entity satisfies the Eligibility Requirements; or

(iii) an institution substantially similar to any of the foregoing entities described in the foregoing clauses (i) or (ii) that satisfies the Eligibility Requirements.

"Qualified Franchisor" shall mean (i) Franchisor, (ii) Hyatt Hotels & Resorts, Marriott International, Hilton Hotels & Resorts, or InterContinental Hotels Group (or an Affiliate of any of the foregoing), so long as such franchisor offers licenses from a Qualified Brand and the there is no material adverse change in the financial condition or reputation for quality of such hotel franchise company between the date hereof and the date in question as reasonably determined by Lender, or (iii) other reputable and experienced franchisors which possesses experience in flagging hotel properties of Qualified Brands similar in location, size, class, use, operation and value as the Properties, as reasonably determined by Lender; and, if required by Lender for whom Borrowers shall have obtained a Rating Agency Confirmation from the Rating Agencies.

"Qualified Manager" shall mean (i) so long as Borrower is Controlled by Key Principal, a property management company owned and/or Controlled by Key Principal, (ii) an Unaffiliated Qualified Manager, or (iii) in the event of a Permitted Transfer pursuant to clause (ix) of the definition thereof, a property management company owned and/or Controlled by an Affiliate of Aspect Investment Partners Ltd.

"Qualified Transferee" shall mean a transferee for whom, prior to the Transfer, Lender shall have received evidence that the proposed transferee (1) has never been convicted of, is currently under indictment for, or pled guilty or no contest to, a felony, (2) has never been indicted or convicted for, or pled guilty or no contest to, a Patriot Act Offense and is not on any Government List, (3) has not been the subject of a voluntary or involuntary (to the extent the same has not been discharged) Bankruptcy Proceeding in the previous seven (7) years and (4) has no material outstanding judgments or litigations or regulatory actions continuing against such proposed transferee, in each case, as evidenced by searches customarily performed by Lender.

"Rating Agency" shall mean prior to the final Securitization of the Loan (or if a Securitization has not occurred), each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"), Moody's Investors Service, Inc. ("Moody's"), Fitch, Inc., a division of Fitch Ratings Ltd. ("Fitch"), DBRS, Inc., Kroll Bond Rating Agency, Inc. and Morningstar, Inc. or any other nationally-recognized statistical rating organization which has been designated by Lender, and after the final Securitization of the Loan, any of the foregoing that have rated any of the securities issued in connection with the Securitization. From and after the final Securitization of the Loan, only those Rating Agencies that actually rated any of the securities issued in connection with a Securitization shall be deemed a "Rating Agency" for all purposes of the Loan Documents.

"Rating Comfort Letter" shall mean a written affirmation from each of the Rating Agencies that the credit rating of the securities given by such Rating Agency of such securities immediately prior to the occurrence of the event with respect to which such Rating Comfort Letter is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion. In

the event that, at any given time, no Rating Agency has elected to consider whether to grant or withhold such an affirmation and Lender does not otherwise have an approval right with respect to such event, then the term Rating Comfort Letter shall be deemed instead to require the written reasonable approval of Lender based on its good faith determination of whether the Rating Agencies would issue a Rating Agency Confirmation, provided that the foregoing provisions of this sentence shall be inapplicable in any case in which Lender has an independent approval right in respect of the matter at issue pursuant to the terms of this Agreement.

"REA" shall mean collectively, those certain agreements more particularly described on Schedule 8 attached hereto and made a part hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"Regulation AB" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"Regulation S-K" shall mean Regulation S-K of the Securities Act, as such regulation may be amended from time to time.

"Regulation S-X" shall mean Regulation S-X of the Securities Act, as such regulation may be amended from time to time.

"Regulatory Change" shall mean at any time hereafter, (i) any change in any Legal Requirement (including by repeal, amendment or otherwise) or in the interpretation or application thereof by any central bank or other Governmental Authority or (ii) any new or revised request, guidance or directive issued by any central bank or other Governmental Authority and applicable to Lender.

"Related Loan" shall mean a loan to an Affiliate of any Borrower or any Guarantor or secured by a Related Property, that is included in a Securitization with the Loan, and any other loan that is cross-collateralized with the Loan.

"Related Property" shall mean a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" (within the meaning of the definition of Significant Obligor) to the Property.

"Release Amount" shall mean with respect to any Property released pursuant to Section 2.4.2 hereof, 115% of the Allocated Loan Amount for such Property.

"Release Date" shall mean the earlier to occur of (i) September 1, 2021 and (ii) the date that is two (2) years from the "startup day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust established in connection with the final Secondary Market Transaction involving this Loan.

"REMIC Trust" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note.

"Rents" shall mean all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of a Borrower, a Master Lessee, Manager, Liquor Permittee or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all Hotel Revenues, revenues and credit card receipts collected from guest rooms, restaurants, bars, telephone and internet services, television, meeting rooms, banquet rooms and recreational facilities, parking charges, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by a Borrower, a Master Lessee, Manager or any of their agents or employees, or any operator or manager of the hotel or the commercial space located in the Improvements at any Property or acquired from others (including, without limitation, from the rental of any office space, retail space, guest rooms or other space, halls, stores, and offices, and deposits securing reservations of such space), license, lease, sublease and concession fees and rentals, health club membership fees, food and beverage wholesale and retail sales, service charges, vending machine sales, and proceeds, if any, from business interruption or other loss of income insurance, and all other items of revenue, receipts or other income as identified in the USALI.

"Replacement Key Principal" shall mean a Person (i) that either (x) satisfies the conditions set forth in the definition of "Qualified Equity Holder" or (y) is reasonably approved by Lender and for whom a Rating Comfort Letter from the applicable Rating Agencies has been obtained (if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction) and (ii) who Controls Borrowers and either owns a direct or indirect interest in Borrowers or Master Lessees.

"Replacement Management Agreement" shall mean, either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement entered into between each Borrower and Manager on or prior to the Closing Date, or (ii) a management agreement with a Qualified Manager in form and substance reasonably acceptable to Lender, which acceptance shall not be unreasonably withheld, conditioned or delayed.

"Sanctions" shall mean any economic or financial sanctions or trade embargoes (or similar measures) imposed, administered or enforced from time to time by (a) the United States of America (including the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State), (b) the United Nations Security Council, (c) the European Union or any member state thereof, or (d) Her Majesty's Treasury of the United Kingdom.

"Sanctioned Person" shall mean any Person that is a designated target of any Sanctions or otherwise a subject of any Sanctions, including as a result of being (a) owned or controlled directly or indirectly by any Persons (or Person) that are designated targets of any Sanctions, or (b) organized or operating under the laws of, or a citizen or resident of, any country that is subject to any Sanctions.

"Scheduled Defeasance Payments" shall mean (i) in the case of a Full Defeasance, the aggregate Monthly Interest Payment Amounts (if applicable) and Monthly Debt Service Payment Amounts required under the Note (or, to the extent that there has been a previous Partial Defeasance, Undefeased Note, as the case may be) for all Payment Dates occurring after the Defeasance Date (including the outstanding Principal balance on the Note (or Undefeased Note, as the case may be) as of the Stated Maturity Date) and (ii) in the case of a Partial Defeasance, the Monthly Debt Service Payment Amount multiplied by the Defeasance Percentage for all Payment Dates occurring after the Defeasance Date (including the outstanding Principal balance on the Note (or Undefeased Note, as the case may be) as of the Stated Maturity Date).

"Security Agreement" shall mean a security agreement in form and substance that would be satisfactory to Lender (in Lender's sole but good faith discretion) pursuant to which Borrowers grant Lender a perfected, first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral.

"Servicer" shall mean a servicer selected by Lender to service the Loan, including any "master servicer" or "special servicer" appointed under the terms of any Pooling and Servicing Agreement.

"SG" shall mean Société Générale.

"Significant Obligor" shall mean has the meaning set forth in Item 1101(k) of Regulation AB under the Securities Act.

"Sole Member" shall mean **APIP-C BORROWER, LLC**, a Delaware limited liability company, the sole member of Borrowers.

"State" shall mean as to any Property, the state in which such Property is located.

"Stated Maturity Date" shall mean the Payment Date occurring in September, 2028, as such date may be changed in accordance with Section 2.2.5 hereof.

"Surveys" shall mean collectively, the surveys of the Properties prepared by surveyors licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policies, and containing a certification of such surveyor satisfactory to Lender.

"Taxes" shall mean all (i) real estate assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, (ii) Hotel Taxes, and (iii) personal property taxes, in each case, now or hereafter levied or assessed or imposed against all or part of the Properties. All taxes referred to in clause (i) above, including all interest and penalties thereon, are hereinafter collectively referred to as "Real Estate Taxes". In no event shall any PACE Loan be considered a Tax for purposes of this Agreement.

"Term" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrowers pursuant to the Loan Documents.

"Third Party Disbursements" shall mean, (A) to the extent actually deposited in the Clearing Account, (x) revenues paid by hotel guests for services provided by Persons that are not Affiliates of Borrower, Manager or Guarantor ("**Third Party Payees**"), which revenues Borrower or Master Lessee is contractually obligated to collect on behalf of, and pay over to, such Third Party Payees and not otherwise retain, and (y) gratuities collected by, or on behalf of, the Properties' employees, (B) any credits or refunds made to customers, guests or patrons in the ordinary course of Borrowers and/or Master Lessees' business, and (C) any taxes or other licensing fees in connection with the maintenance of liquor licensing at the Property by Manager.

"Title Insurance Policies" shall mean the ALTA mortgagee title insurance policies in the form acceptable to Lender issued with respect to each Property and insuring the Liens of the Mortgages.

"Transfer" shall mean (i) any sale, conveyance, transfer, encumbrance, pledge, lease or assignment, or the entry into any agreement to sell, convey, transfer, encumber, pledge, lease or assign, whether by law or otherwise, of, on, in or affecting (x) all or part of any Property (including any legal or beneficial direct or indirect interest therein), (y) any direct or indirect interest in any Borrower or any Master Lessee (including any profit interest), or (z) any direct or indirect interest in, (ii) entering into or subjecting any Property to a PACE Loan or (iii) any direct or indirect change of Control of any Borrower or any Master Lessee.

"UCC" shall mean the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

"Unaffiliated Qualified Manager" shall mean an unaffiliated property manager of the Properties that (A) is a reputable, nationally or regionally recognized hotel management company having at least five (5) years' experience in the management of similar type hotels of Qualified Brands in the geographic area in which the Properties are located, (B) at the time of its engagement as property manager of the Property manages, and for the five (5) year period immediately preceding such engagement managed, at least five (5) hotels of a size, quality, level of service and class similar to the Property, and (C) is not the subject of a bankruptcy or similar insolvency proceeding.

"Underwritten Net Cash Flow" shall mean, as of the end of any calendar quarter for which Underwritten Net Cash Flow is determined (or such other date for which Underwritten Net Cash Flow is determined) the excess of: (a) the sum of: (i) actual Rents received by Borrowers for the twelve (12) months preceding such calculation; *over* (b) for the twelve (12) month period preceding the month in which such Underwritten Net Cash Flow is calculated, Operating Expenses over such twelve months, in each case adjusted to reflect Lender's determination of: (i) subtraction of an imputed capital improvement/FF&E requirement amount equal to three percent (3.0%) of Rents per annum (regardless of whether a reserve therefor is required hereunder or the amount of such reserve); (ii) an adjustment so that property management fees are equal to the greater of three percent (3.0%) of Rents and the property management fees actually paid under the Management Agreement, and (iii) exclusion of (X) amounts representing non-recurring items and (Y) other than with respect to Hotel Transactions, amounts received from Tenants not currently in occupancy and paying full, unabated rent, from Tenants affiliated with Borrowers or Guarantors, from Tenants in default or in bankruptcy and from Tenants under month-to-month Leases or Leases where the term

is scheduled to expire within ninety (90) days. Lender's calculation of Underwritten Net Cash Flow shall be final absent manifest error.

"U.S. Obligations" shall mean obligations that are "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act of 1940, as amended that are not subject to prepayment, call or early redemption and that are acceptable to the applicable Rating Agencies.

"U.S. Person" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" shall have the meaning specified in Section 2.2.3(c)(ii)(B)(3).

"USALI" shall mean the Uniform System of Accounts for the Lodging Industry, 9th edition (or most current edition adopted by Borrower).

"Welfare Plan" shall mean an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

"Yield Maintenance Premium" shall mean (x) in connection with a Defeasance or Partial Defeasance of the Loan, an amount which, when added to the outstanding Principal, would be sufficient to purchase U.S. Obligations which provide payments (a) on or prior to, but as close as possible to, all successive scheduled payment dates under this Agreement through the Stated Maturity Date and (b) in amounts equal to the Monthly Debt Service Payment Amount and/or Monthly Interest Payment Amount, as the case may be, required under this Agreement through the Stated Maturity Date together with the outstanding principal balance of the Note as of the Stated Maturity Date assuming all such Monthly Debt Service Payment Amounts and/or Monthly Interest Payment Amounts, as the case may be, are made (including any servicing costs associated therewith). In no event shall the Yield Maintenance Premium be less than zero; and (y) if in connection with any other prepayment of the Loan an amount equal to the greater of (i) one percent (1%) of any applicable prepayment, or (b) the present value as of the Prepayment Date of the Calculated Payments determined by discounting such payments at the Discount Rate. As used in this definition, (i) the term "Prepayment Date" means the date on which the applicable prepayment is made; (ii) the term "Calculated Payments" means the monthly payments of interest only which would be due from the Prepayment Date through the Permitted Prepayment Date based on the Principal amount of the Loan being prepaid on the Prepayment Date and assuming an interest rate per annum in the amount, if any, by which the Interest Rate exceeds the Yield Maintenance Treasury Rate; (iii) the term "Discount Rate" means the rate which, when compounded monthly, is equivalent to the Yield Maintenance Treasury Rate, when compounded semi-annually. The calculation of the Yield Maintenance Premium shall be made by Lender and shall, absent manifest error, be final, conclusive and binding upon the parties.

"Yield Maintenance Treasury Rate" shall mean the yield calculated by Lender by the linear interpolation of the yields, as reported in the Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Government Securities/Treasury Constant Maturities for the week ending prior to the Prepayment Date, of U.S. Treasury Constant Maturities with maturity

dates (one longer and one shorter) most nearly approximating the Permitted Prepayment Date. In the event Release H.15 is no longer published, Lender shall select a comparable publication to determine the Yield Maintenance Treasury Rate. In no event, however, shall Lender be required to reinvest any prepayment proceeds in U.S. Treasury obligations or otherwise.

**1.2 Index of Other Definitions**. The following terms are defined in the sections or Loan Documents indicated below:

"*Additional Operating Expense*" - 6.3.6
"*Allocated Amount*" - 10.24
"*Annual Budget*" - 6.3.5
"*Approved Additional Operating Expense*" - 6.3.6
"*Approved Annual Budget*" - 6.3.5
"*Approved Capital Budget*" - 6.3.5
"*Approved Operating Budget*" - 6.3.5
"*Assignments of Leases and Rents*" - 1.1 (Definition of Loan Documents)
"*Award*" - 7.3.2
"*Borrower's Recourse Liabilities*" - 10.1
"*Broker*" - 10.2
"*Calculated Payments*" - 1.1 (Definition of Yield Maintenance Premium)
"*Capital/FF&E Expense Subaccount*"
"*Cash Collateral Subaccount*" - 3.8
"*Cash Management Accounts*" - 3.9
"*Casualty*" - 7.2.1
"*Casualty/Condemnation Prepayment*" - 2.3.2
"*Casualty/Condemnation Subaccount*" - 3.6
"*Cause*" - Schedule 5
"*Clearing Account*" - 3.1
"*Clearing Account Agreement*" - 1.1 (Definition of Loan Documents)
"*Clearing Bank*" - 3.1
"*Condemnation*" - 7.3.1
"*Defeasance Collateral Account*" - 2.3.3
"*Defeasance*" - 2.3.3
"*Defeasance Event*" - 2.3.3
"*Defeasance Date*" - 2.3.3
"*Defeased Note*" - 2.3.3
"*Delaware Act*" - Schedule 5
"*Deposit Account*" - 3.1
"*Deposit Account Agreement*" - 1.1 (Definition of Loan Documents)
"*Disclosure Document*" - 9.2(a)
"*Discount Rate*" - 1.1 (Definition of Yield Maintenance Premium)
"*DSCR Cash Management Period*" - 1.1 (Definition of Cash Management Period)
"*Easements*" - 4.14
"*Embargoed Person*" - 5.31(c)
"*Endorsement*" - 5.26.2
"*Environmental Laws*" - 4.21
"*Equipment*" - *Mortgage*

"*Event of Default*" - 8.1
"*Exchange Act*" - 9.2(a)
"*Exchange Act Filing*" - 9.1(d)
"*FF&E Reserve Account*" – 3.12.1
"*Fitch*" - 1.1 *(Definition of Rating Agency)*
"*Full Defeasance*" - 2.3.3
"*Guaranty*" - 1.1 (Definition of Loan Documents)
"*Hazardous Substances*" - 4.21
"*Hilton Borrower*" - Introductory paragraph
"*Homewood Borrower*" - Introductory paragraph
"*Improvements*" - *Mortgage*
"*Increased Costs*" - 2.2.4
"*Indemnified Liabilities*" - 5.30
"*Indemnified Party*" - 5.30
"*Independent Director*" - *Schedule* 5
"*Insolvency Law*" - 1.1 (Definition of Major Tenant Insolvency Proceeding)
"*Insurance Premiums*" - 7.1.2
"*Insured Casualty*" - 7.2.2
"*Intellectual Property*" - 4.28
"*Issuer*" - 9.2(b)
"*Key Principal Estate*" - 1.1 (Definition of Permitted Transfers)
"*Late Payment Charge*" - 2.5.3
"*Lender's Consultant*" - 5.8.1
"*Liabilities*" - 9.2(b)
"*Licenses*" - 4.11
"*Liquor Permittee*" – 5.34
"*Loan*" - 2.1
"*Low Debt Service Cure Deposit*" - 1.1 (Definition of "Low Debt Service Period")
"*Low Debt Service Cure Deposit Account*" –3.12
"*Low Debt Service Cure Deposit Funds*" - 3.12
"*Monthly Debt Service Payment Amount*" - 2.2.1
"*Monthly Interest Payment Amount*" - 2.2.1
"*Moody's*" - 1.1 *(Definition of Rating Agency)*
"*Mortgages*" - 1.1 *(Definition of Loan Documents)*
"*Nationally Recognized Service Company*" - Schedule 5
"*New Payment Date*" - 2.2.5
"*Note*" - 1.1 *(Definition of Loan Documents)*
"*Notice*" - 6.1
"*O & M Program*" - 5.8.3
"*OFAC*" - 1.1 (Definition of Government Lists)
"*Permitted Equipment Financing*" - 5.22
"*Permitted Indebtedness*" - 5.22
"*Permitted Investments*" - *Deposit Account Agreement*
"*Policies*" - 7.1.2
"*Prepayment Date*" - 1.1 (Definition of Yield Maintenance Premium)
"*Principal*" - 2.1

"*Proceeds*" - 7.2.2
"*Qualified Carrier*" - 7.1.1
"*Real Estate Taxes*" - 1.1 (Definition of Taxes)
"*Remedial Work*" - 5.8.2
"*Rent Roll*" - 4.16
"*Required Records*" - 6.3.7
"*Restoration*" - 7.4.1
"*Review Waiver*" - 10.5
"*S&P*" - 1.1 *(Definition of Rating Agency)*
"*Secondary Market Transaction*" - 9.1(a)
"*Securities*" - 9.1(a)
"*Securities Act*" - 9.2(a)
"*Securitization*" - 9.1(a)
"*Security Deposit Subaccount*" - 3.7
"*SG Group*" - 9.2(b)
"*Significant Casualty*" - 7.2.2
"*Single Member Bankruptcy Remote LLC*" - Schedule 5
"*Special Member*" - Schedule 5
"*Special Purpose Bankruptcy Remote Entity*" - 5.13
"*Springing Recourse Event*" - 10.1
"*Subaccounts*" - 3.1
"*Successor Borrower*" - 2.3.3(c)
"*Tax and Insurance Subaccount*" - 3.3
"*Terrorism Premium Cap*" - 7.1.1(j)
"*Third Party Payees*" – 1.1 (Definition of Third Party Disbursements)
"*Toxic Mold*" - 4.21
"*Transfer and Assumption*" - 5.26.2
"*Transferee Borrower*" - 5.26.2
"*Undefeased Note*" - 2.3.3
"*Underwriter Group*" - 9.2(b)
"*Updated Information*" - 9.1(b)(i)

**1.3 <u>Principles of Construction</u>**. Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP. With respect to any covenant of any Borrower Party herein, such provision shall mean that Borrower shall comply with such covenant or shall cause Master Lessee to comply with such covenant. Further, with respect to any Borrower covenant relating to the operation and maintenance of the Properties such covenant shall be deemed to also be a covenant of the Master Lessee (even if not expressly so stated herein).

## 2. <u>GENERAL LOAN TERMS</u>

**2.1 The Loan**. Subject to and upon the terms and conditions set forth herein, Lender is making a loan (the "Loan") to Borrowers on the date hereof, in the original principal amount (the "Principal") of $15,800,000, which shall mature on the Stated Maturity Date. Each Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) acquire the Properties, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs. Any excess proceeds may be used for any lawful purpose. Borrowers shall receive only one borrowing hereunder in respect of the Loan and no amount repaid in respect of the Loan may be reborrowed. The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement, the Note and the other Loan Documents.

**2.2 Interest; Monthly Payments**.

**2.2.1 Generally**. From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided. On the date hereof, Borrowers shall pay interest on the unpaid Principal from the date hereof through and including August 31, 2018. On October 1, 2018 and each Payment Date thereafter through and including the Payment Date immediately preceding the Amortization Commencement Date, Borrowers shall pay interest on the unpaid Principal accrued at the Interest Rate during the Interest Period immediately preceding such Payment Date (the "Monthly Interest Payment Amount"). On the Amortization Commencement Date and each Payment Date thereafter for the remainder of the Term, Principal and interest thereon at the Interest Rate shall be payable in equal monthly installments of $82,325.07 (the "Monthly Debt Service Payment Amount"); which is based on the Interest Rate and a 30-year amortization schedule. The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued during the preceding Interest Period and the remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal. All accrued and unpaid interest and unpaid Principal shall be due and payable on the Maturity Date. If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrowers shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

**2.2.2 Default Rate**. After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, calculated from the date such payment was due or such underlying Default shall have occurred without regard to any grace or cure periods contained herein, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

**2.2.3 Taxes**.

(a) Any and all payments by Borrowers hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any Applicable Taxes, except as required by applicable law. If any Borrower shall be required by applicable law to withhold or deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) if any deducted or withheld Applicable Tax is an Indemnified Tax, the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no deductions of Indemnified

Taxes been made, (ii) such Borrower shall make such deductions and (iii) such Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. Payments pursuant to this Section 2.2.3(a) shall be made within ten (10) Business Days after the date Lender makes written demand therefor.

(b) For purposes of this Section 2.2.3, the term "applicable law" includes FATCA.

(c) (i) Any Lender that is entitled to an exemption from or reduction of withholding Applicable Tax with respect to payments made under any Loan Document shall deliver to the Borrowers, at the time or times reasonably requested by the Borrowers, such properly completed and executed documentation reasonably requested by the Borrowers as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrowers, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers as will enable the Borrowers to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (c)(ii)(A), (ii)(B) and (ii)(D) of this Section 2.2.3) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Borrowers on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers (in such number of copies as shall be requested by the Borrowers) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Applicable Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Applicable Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit C-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to a Borrower as described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W 8BEN-E; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W 8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-2 or Exhibit C-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit C-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers (in such number of copies as shall be requested by the Borrowers) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Applicable Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Applicable Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers as may be necessary for the Borrowers to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers in writing of its legal inability to do so.

(d) If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Applicable Taxes as to which it has been indemnified pursuant to

this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Applicable Taxes giving rise to such refund), net of all out-of-pocket expenses (including Applicable Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-tax position than the indemnified party would have been in if the Applicable Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Applicable Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its tax returns (or any other information relating to its Applicable Taxes that it deems confidential) to the indemnifying party or any other Person.

(e) Unless the Loan (or the portion thereof in question) has been the subject of (and continues to be a part of) a Securitization:

(i) If any Lender requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.2.3 or requests compensation under Section 2.2.4, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking the Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.2.3 or 2.2.4, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(ii) If any Lender requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.2.3 or requests compensation under Section 2.2.4 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with paragraph (a) of this Section 2.5.4, then the Borrower may, at its sole expense and effort, upon notice to such Lender, require such Lender to assign and delegate, without recourse all of its interests, rights (other than its existing rights to payments pursuant to Section 2.2.3 or Section 2.2.4) and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment) provided that:

(A) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts);

(B) such assignment will result in a reduction in the payments made under Section 10.24; and

(C) such assignment does not conflict with Legal Requirements; and

(D) Lender shall not be required to make any such assignment or delegation pursuant to this Section if, prior thereto, as a result of a waiver by Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

**2.2.4 Increased Costs**. If as a result of any Regulatory Change or compliance of Lender therewith, the basis of taxation of payments to Lender or any company Controlling Lender of the principal of or interest on the Loan is changed or Lender or the company Controlling Lender shall be subject to (i) any tax, duty, charge or withholding of any kind with respect to this Agreement (excluding (A) Indemnified Taxes, (B) taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes); or (ii) any reserve, special deposit or similar requirements relating to any extensions of credit or other assets of, or any deposits with or other liabilities, of Lender or any company Controlling Lender is imposed, modified or deemed applicable; or (iii) any other condition is imposed on Lender or any company Controlling Lender and Lender determines that, by reason thereof, the cost to Lender or any company Controlling Lender of making, maintaining or extending the Loan to Borrowers is increased, or any amount receivable by Lender or any company Controlling Lender hereunder in respect of any portion of the Loan to Borrowers is reduced, in each case by an amount deemed by Lender in good faith to be material (such increases in cost and reductions in amounts receivable being herein called "Increased Costs"), then Lender shall provide notice thereof to Borrowers and Borrowers agree that they will pay to Lender upon Lender's written request such additional amount or amounts as will compensate Lender or any company Controlling Lender for such Increased Costs to the extent Lender determines that such Increased Costs are allocable to the Loan. If Lender requests compensation under this Section 2.2.4, Lender shall, if requested by notice by Borrowers to Lender, furnish to Borrowers a statement setting forth the basis for requesting such compensation and the method for determining the amount thereof.

**2.2.5 New Payment Date**. Lender shall have the right, to be exercised not more than once during the term of the Loan, to change the Payment Date to a date other than the first day of each month (a "New Payment Date"), on thirty (30) days' written notice to Borrowers; provided, however, that any such change in the Payment Date: (i) shall not modify the amount of regularly scheduled monthly principal and interest payments, except that the first payment of principal and interest payable on the New Payment Date shall be accompanied by interest at the interest rate herein provided for the period from the Payment Date in the month in which the New Payment Date first occurs to the New Payment Date, (ii) shall change the Stated Maturity Date to

the New Payment Date occurring in the month set forth in the definition of Stated Maturity Date and (iii) shall extend the Amortization Commencement Date to the New Payment Date occurring in the month set forth in the definition of Amortization Commencement Date.

**2.3 Loan Repayment**.

**2.3.1 Repayment**. Borrowers shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. No Borrower shall have any right to prepay or defease all or any portion of the Principal except in accordance with Section 2.3.2 below, Section 2.3.3 below and Section 2.3.4 below. Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loan, shall be applied by Lender as follows in the following order of priority: *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Permitted Prepayment Date). If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium applicable to such Principal so accelerated. During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on one or more of the Properties (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2 Mandatory Prepayments**.

(a) The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "Casualty/Condemnation Prepayment"), in the manner and to the extent set forth in Section 7.4.2 hereof. Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1 above, and if such Casualty/Condemnation Prepayment is made on any date other than a Payment Date, then such Casualty/Condemnation Prepayment shall include interest that would have accrued on the Principal prepaid to but not including the next Payment Date. Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium. Notwithstanding anything to the contrary contained herein, each Casualty/Condemnation Prepayment shall be applied in inverse order of maturity (and the principal component thereof applied to reduce the Allocated Loan Amount of the affected Property), and shall not extend or postpone the due dates of the monthly installments due under the Note or this Agreement, or change the amounts of such installments. Provided that no Event of Default is then continuing and the Debt Service Coverage Ratio of the Properties (other than the affected Property) is at least 2.27:1.00, any Proceeds or Award in excess of the Release Amount shall be returned to Borrowers in the event that Lender intends on applying such Proceeds or Award is applied to the Debt.

(b) In the event that (i) no Event of Default exists, and (ii) Borrowers are obligated to make a Casualty/Condemnation Prepayment under Section 2.3.2(a) above, then Borrower shall have a one-time right resulting from the applicable Casualty or Condemnation to obtain the release of the affected Property by prepaying a portion of the principal in an amount equal to the sum of (x) the applicable Release Amount of the affected Property (after taking into account the amount of any Casualty/Condemnation Prepayment applied to the Debt with respect to the affected Property), and (y) amount, if any, necessary to cause the Debt Service Coverage Ratio of the Properties (after giving affect to the release in question) to equal 2.27:1.00, together, in each such case, with all accrued and unpaid interest (including, if such prepayment is not made on a Payment Date, interest that would have accrued on such prepaid principal to, but not including, the next Payment Date), without payment of the Yield Maintenance Premium or any other prepayment premium, penalty or fee (or any requirement to defease the Loan) on any Business Day; provided that (x) Borrower gives written notice of such election to prepay the Debt as set forth above not later than ten (10) Business Days after the date which is the date Lender notifies Borrower that it has elected to apply the Proceeds or Award to the Debt; (y) the Debt is prepaid as set forth in this clause (b) not later than three (3) months after Borrowers give Lender such notice, and (z) Borrowers satisfy each of clause (c), (d), (e), (i), (j), (k), (l) and (m) of Section 2.4.2 below. Notwithstanding anything contained in Section 7 hereof to the contrary, Borrower shall not have any obligation to commence Restoration upon delivery of written notice set forth in clause (x) of the preceding sentence (unless Borrowers subsequently fail to satisfy the requirements of clauses (y) and (z) of the preceding sentence).

**2.3.3 Voluntary Prepayments/Defeasance**.

(a) Subject to Sections 2.3.2, 2.4.2 and 2.4.4 hereof, provided no Event of Default shall be continuing, Borrowers shall have the right, only on a Business Day, after the Release Date and prior to the Permitted Prepayment Date to voluntarily prepay the Loan in whole (but not in part) provided that such payment is accompanied by the Yield Maintenance Premium. Any such prepayment received by Lender on a date other than a Payment Date shall include interest that would have accrued on such prepaid Principal to, but not including, the next Payment Date.

(b) **Conditions to Defeasance**. Provided no Event of Default shall be continuing, Borrower shall have the right after the Release Date and prior to the Permitted Prepayment Date to voluntarily defease the entire amount of the Principal (a "Full Defeasance") or, in connection with a Property release pursuant to Section 2.4.2 hereof, a portion of the Principal (a "Partial Defeasance") (any such Full Defeasance or Partial Defeasance, a "Defeasance") by providing Lender with the Defeasance Collateral (a "Defeasance Event"), subject to the satisfaction of the following conditions precedent:

(i) Borrowers shall give Lender not less than thirty (30) days prior written notice specifying a date (the "Defeasance Date") on which the Defeasance Event is to occur.

(ii) Borrowers shall pay to Lender (A) all payments of Principal and interest due on the Loan to and including the Defeasance Date and (B) all other sums, then due under the Note, this Agreement and the other Loan Documents;

(iii) Borrowers shall deposit the Defeasance Collateral into the Defeasance Collateral Account and otherwise comply with the provisions of subsections (b) and (c) of this Section 2.3.3;

(iv) Borrowers shall execute and deliver to Lender a Security Agreement in respect of the Defeasance Collateral Account and the Defeasance Collateral;

(v) Borrowers shall deliver to Lender an opinion of counsel for Borrowers that is standard in commercial lending transactions and subject only to customary qualifications, assumptions and exceptions opining, among other things, that (A) Lender has a legal and valid perfected first priority security interest in the Defeasance Collateral Account and the Defeasance Collateral, (B) if a Securitization has occurred, the REMIC Trust formed pursuant to such Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of a Defeasance Event pursuant to this Section 2.3.3, and (C) a non-consolidation opinion with respect to the Successor Borrower;

(vi) In the case of a Partial Defeasance, the execution and delivery by Borrowers of all necessary documents to amend and restate the Note and issue two (2) substitute notes: one having a principal balance equal to the defeased portion of the original Note (the "Defeased Note") and the other having a principal balance equal to the undefeased portion of the original Note (the "Undefeased Note"). The Defeased Note and Undefeased Note shall have terms identical to the terms of the Note, except for the principal balance and a pro rata allocation of the Monthly Debt Service Payment Amount. (After a Partial Defeasance, all references hereunder and in the other Loan Documents to "Note" shall be deemed to mean the Undefeased Note, unless expressly provided to the contrary.) A Defeased Note cannot be the subject of any further Defeasance;

(vii) Borrowers shall deliver to Lender and the Rating Agencies a Rating Comfort Letter as to the Defeasance Event as and to the extent required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction;

(viii) Borrowers shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.3.3 have been satisfied;

(ix) Borrowers shall deliver a certificate of a nationally recognized public accounting firm acceptable to Lender certifying that (A) the Defeasance Collateral will generate monthly amounts equal to or greater than the Scheduled Defeasance Payments, (B) the revenue from the Defeasance Collateral will be applied within four (4) months of receipt towards payments of Debt Service, (C) the securities that comprise the Defeasance Collateral are not subject to prepayment, call or early redemption and (D) the interest income to Borrower (or the Successor Borrower, if applicable) from the Defeasance Collateral will not in any tax year exceed the interest expense associated with the defeased Loan;

(x) Borrowers shall deliver such other certificates, opinions, documents and instruments as Lender may reasonably request; and

(xi) Borrowers shall pay all costs and expenses of Lender incurred in connection with the Defeasance Event, including Lender's reasonable attorneys' fees and expenses and Rating Agency fees and expenses.

(c) **Defeasance Collateral Account**. On or before the date on which Borrowers deliver the Defeasance Collateral, Borrowers shall open at any Eligible Institution the defeasance collateral account (the "Defeasance Collateral Account") which shall at all times be an Eligible Account. The Defeasance Collateral Account shall contain only (i) Defeasance Collateral, and (ii) cash from interest and principal paid on the Defeasance Collateral. All cash from interest and principal payments paid on the Defeasance Collateral shall be paid over to Lender on each Payment Date and applied first to accrued and unpaid interest and then to Principal. Any cash from interest and principal paid on the Defeasance Collateral not needed to pay accrued and unpaid interest or Principal shall be retained in the Defeasance Collateral Account as additional collateral for the Loan. Borrowers shall cause the Eligible Institution at which the Defeasance Collateral is deposited to enter an agreement with Borrowers and Lender, satisfactory to Lender in its sole discretion, pursuant to which such Eligible Institution shall agree to hold and distribute the Defeasance Collateral in accordance with this Agreement. The Successor Borrower shall be the owner of the Defeasance Collateral Account and shall report all income accrued on Defeasance Collateral for federal, state and local income tax purposes in its income tax return. Borrowers shall prepay all cost and expenses associated with opening and maintaining the Defeasance Collateral Account. Lender shall not in any way be liable by reason of any insufficiency in the Defeasance Collateral Account.

(d) **Successor Borrower**. In connection with a Defeasance Event under this Section 2.3.3, Borrowers shall designate an Affiliate of Lender as a successor entity (the "Successor Borrower") which shall be a Special Purpose Bankruptcy Remote Entity. Pursuant to an assumption agreement in form and substance satisfactory to Lender in its sole discretion, Borrowers shall transfer and assign all obligations, rights and duties under and to the Defeased Note, together with the Defeasance Collateral to such Successor Borrower. Such Successor Borrower shall assume the obligations under the Note and the Security Agreement and Borrowers shall be relieved of their obligations under such documents. Borrowers shall pay a minimum of $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement. As a condition to such assignment and assumption, Borrowers shall deliver to Lender an opinion of counsel in form and substance and delivered by counsel satisfactory to Lender in its sole discretion stating, among other things, that such assumption agreement is enforceable against Borrowers and such successor entity in accordance with its terms and that the Note and the Security Agreement, as so assumed, are enforceable against such successor entity in accordance with their respective terms. Borrowers shall pay all costs and expenses incurred by Lender, including Lender's attorney's fees and expenses, incurred in connection therewith.

(e) **Appointment as Attorney in Fact**. Upon the defeasance of the Loan in accordance with clauses (a), (b) and (c) of this Section 2.3.3, Borrowers shall have no further right to prepay the Note pursuant to the other provisions of this Section 2.3.3 or otherwise. In connection

with the conditions set forth in this Section 2.3.3, Borrowers hereby appoints Lender as its agent and attorney-in-fact for the purpose of purchasing the Defeasance Collateral with funds provided by Borrowers. Borrowers shall pay any and all expenses incurred in the purchase of the Defeasance Collateral and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this Section 2.3.3.

**2.3.4 Optional Prepayments**. From and after the Permitted Prepayment Date, Borrowers shall have the right to prepay the Loan in whole (but not in part), provided that Borrowers give Lender at least fifteen (15) days' prior written notice thereof. If any such prepayment is not made on a Payment Date, Borrowers shall also pay interest that would have accrued on such prepaid Principal to, but not including, the next Payment Date. Any such prepayment shall be made without payment of the Yield Maintenance Premium.

**2.4 Release of Properties**.

**2.4.1 Release on Defeasance**. If Borrowers have elected a Full Defeasance and the requirements of Section 2.3.3 hereof and this Section 2.4 have been satisfied, the Properties shall be released from the Liens of the Mortgages and the Defeasance Collateral pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Note. In connection with the release of the Lien, Borrowers shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date (or such shorter time as is acceptable to Lender in its sole discretion), releases of Lien (and related Loan Documents) for execution by Lender. Such releases shall be in a form appropriate in the jurisdiction in which the Properties are located and contain standard provisions protecting the rights of the releasing lender. In addition, Borrowers shall provide all other documentation Lender reasonably requires to be delivered by Borrowers in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement. Borrower shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgage, including Lender's reasonable attorneys' fees. Borrowers, pursuant to the Security Agreement, shall authorize and direct that the payments received from Defeasance Collateral be made directly to Lender and applied to satisfy the obligations under the Loan Documents, including payment in full of the unpaid Principal as of the Stated Maturity Date.

**2.4.2 Sale of Properties**. On any Payment Date after the Release Date, any Borrower may obtain the release of any Property owned by it from the Lien of the Mortgage encumbering such Property (and related Loan Documents) and of Borrower's and the applicable Master Lessee's obligations under the Loan Documents with respect to such Property (other than with respect to such obligations that are expressly stated to survive) thereon upon a bona fide third-party sale of such Property, *provided* each of the following conditions are satisfied:

(a) The sale of such Property is pursuant to an arm's-length agreement to a third party not Affiliated with any Borrower or Guarantor, and in which no Borrower and no Affiliate of any Borrower and/or Guarantor has any beneficial interest;

(b) Borrowers shall either (x) defease an amount of Principal equal to the Release Amount for the Property in question and Borrowers shall satisfy all of the requirements

of Section 2.3.3 with respect to such Defeasance, or (y) make a prepayment of principal in an amount equal to the applicable Release Amount, together with all accrued and unpaid interest (including, if such prepayment is not made on a Payment Date, interest that would have accrued on such prepaid principal to, but not including, the next Payment Date) and pay the applicable Yield Maintenance Premium, if any;

(c) Both immediately before such sale and immediately thereafter, no Event of Default shall be continuing;

(d) Concurrently with such sale, either (i) the Borrower owning the Property being released and the Master Lessee as the tenant at such Property shall dissolve and liquidate or (ii) the SPE Party shall cease to be a member or manager or a partner, as the case may be, of such Borrower, and in all events the SPE Party and the remaining Master Lessees shall remain a Special Purpose Bankruptcy Remote Entity;

(e) After giving effect to such release, each Borrower and each Master Lessee that remain subject to the Liens of the Loan Documents remain a Special Purpose Bankruptcy Remote Entity;

(f) Intentionally left blank;

(g) Borrowers shall have given Lender at least twenty (20) days' prior written notice of such sale, accompanied by a copy of the applicable contract of sale and all related documents, and drafts of any applicable release documents (which shall be subject to Lender's approval);

(h) Borrowers shall have delivered to Lender a copy of the final closing settlement statement for such sale at least two (2) Business Days prior to the closing of such sale;

(i) Borrowers shall have paid to Lender all costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with such sale and the release of such Property from the Lien of the Loan Documents;

(j) To the extent that the Clearing Account is solely in the name of the Borrower that owns the Property that is being released, as a condition to such release, the name of the Borrower on the Clearing Account will be changed with the Clearing Bank to the name of a remaining Borrower;

(k) Borrowers and Guarantor shall execute and deliver such documents as Lender may reasonably request to confirm the continued validity of the Loan Documents and the Liens thereof;

(l) after giving effect to such release and Defeasance, the Debt Service Coverage Ratio for all of the Properties then remaining subject to the Liens of the Mortgages (after giving affect to the release in question) shall be no less than 2.27:1.00; and

(m) in connection with any prepayment of the Loan, in the event that, after taking into account the prepayment of Principal pursuant to subclause (b) above, the loan-to-value

ratio (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any) is greater than 125%, Borrowers shall also make payment of Principal in an amount such that the loan-to-value ratio (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any) is no more than one hundred and twenty five percent (125%).

**2.4.3 Release on Payment in Full**. Lender shall, upon the written request and at the expense of Borrowers, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrowers, assign to Borrowers' designee (without any representation or warranty by and without any recourse against Lender whatsoever), the Liens of the Loan Documents if not theretofore released. In connection with the release of the Lien, Borrowers shall submit to Lender, not less than thirty (30) days prior to the date of repayment (or such shorter time as is acceptable to Lender in its sole discretion), a release of Lien (and related Loan Documents) for execution by Lender. Such release shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of the releasing lender. In addition, Borrowers shall provide all other documentation Lender reasonably requires to be delivered by Borrowers in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement. Borrowers shall pay all costs, taxes and expenses associated with the release of the Lien of the Mortgages, including Lender's reasonable attorneys' fees.

**2.4.4 Release of Properties to Cure Default**. Without in any way limiting Lender's right and remedies under the Loan Documents, within fifteen (15) Business Days following the notification by Lender to Borrowers of the occurrence of a Property specific Default or Event of Default hereunder that Lender in good faith has determined to be solely non-monetary in nature, outside of the reasonable control of Borrowers and Master Lessees and to have not been caused by the actions or inactions of any Borrower, any Master Lessee, Guarantor or any Affiliate of any of the foregoing or any Person acting on behalf thereof, Borrowers may obtain the release of such affected Property owned by it from the Lien of the Mortgage encumbering such Property (and related Loan Documents) and of Borrower's and the applicable Master Lessee's obligations under the Loan Documents with respect to such Property (other than with respect to such obligations that are expressly stated to survive), *provided* each of the following conditions are satisfied within such fifteen (15) Business Day period (and upon satisfaction thereof, such Default or Event of Default shall be deemed cured):

(a) Borrowers shall either (x) defease an amount of Principal equal to the Release Amount for the Property in question and Borrowers shall satisfy all of the requirements of Section 2.3.3 with respect to such Defeasance, or (y) make a prepayment of principal in an amount equal to the applicable Release Amount, together with all accrued and unpaid interest (including, if such prepayment is not made on a Payment Date, interest that would have accrued on such prepaid principal to, but not including, the next Payment Date) and pay the applicable Yield Maintenance Premium, if any;

(b) Both immediately before such sale and immediately thereafter, no monetary Event of Default shall be continuing and no non-monetary Event of Default shall be continuing with respect to the Properties not the subject of such release;

(c) Concurrently with such release, either (i) the Borrower owning the Property being released and the Master Lessee as the tenant at such Property shall dissolve and liquidate or (ii) the SPE Party shall cease to be a member or manager or a partner, as the case may be, of such Borrower, and in all events the SPE Party and the remaining Master Lessees shall remain a Special Purpose Bankruptcy Remote Entity;

(d) After giving effect to such release, each Borrower and each Master Lessee that remain subject to the Liens of the Loan Documents remain a Special Purpose Bankruptcy Remote Entity;

(e) Borrowers shall have paid to Lender all costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with such release of such Property from the Lien of the Loan Documents;

(f) To the extent that the Clearing Account is solely in the name of the Borrower that owns the Property that is being released, as a condition to such release, the name of the Borrower on the Clearing Account will be changed with the Clearing Bank to the name of a remaining Borrower;

(g) Borrowers and Guarantor shall execute and deliver such documents as Lender may reasonably request to confirm the continued validity of the Loan Documents and the Liens thereof;

(h) after giving effect to such release and Defeasance, the Debt Service Coverage Ratio for all of the Properties then remaining subject to the Liens of the Mortgages (after giving affect to the release in question) shall be no less than 2.27:1.00; and

(i) in connection with any prepayment of the Loan, in the event that, after taking into account the prepayment of Principal pursuant to <u>subclause (b)</u> above, the loan-to-value ratio (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any) is greater than 125%, Borrowers shall also make payment of Principal in an amount such that the loan-to-value ratio (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any) is no more than one hundred and twenty five percent (125%).

**2.5 <u>Payments and Computations</u>**.

**2.5.1 <u>Making of Payments</u>**. Each payment by a Borrower or Borrowers shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 2:00 p.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrowers. Whenever any such payment shall be stated to be due on a day that is not a Business

Day, such payment shall be made on the first Business Day thereafter. All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2 Computations**. Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

**2.5.3 Late Payment Charge**. If any Principal or interest due under any Loan Document is not paid by Borrowers the date on which it is due (other than the balloon payment of principal due on the Maturity Date); or if any or other sum due under any Loan Document is not paid by Borrowers on the date on which it is due, Borrowers shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable law (the "Late Payment Charge"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Such amount shall be secured by the Loan Documents.

## 3. CASH MANAGEMENT AND RESERVES

**3.1 Cash Management Arrangements**. Each Borrower shall cause all Rents (including Rents in the nature of sums payable by issuers of credit cards accepted at its Property) to be transmitted directly into an Eligible Account (the "Clearing Account") related to its Property, which such account shall be maintained by such Borrower at a bank selected by Borrower, which shall at all times be an Eligible Institution (the "Clearing Bank") as more fully described in the Clearing Account Agreement. Funds deposited into each Clearing Account shall be swept by the Clearing Bank on a daily basis into the applicable Borrower's operating account at such Clearing Bank, unless a Cash Management Period is continuing, in which event such funds shall be swept on a daily basis into an Eligible Account at the Deposit Bank controlled by Lender (the "Deposit Account") and applied and disbursed in accordance with this Agreement. Funds in the Deposit Account if invested, at Lender's discretion, shall be invested in Permitted Investments. Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "Subaccounts"). The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and no Borrower shall have any right of withdrawal therefrom. In the event of a termination of the existing Clearing Account Agreement on or before the effective date of such termination and provided no Event of Default has occurred and is continuing hereunder, Borrowers shall appoint a successor Clearing Bank reasonably approved by Lender, any failure by Borrower to do so shall be an Event of Default hereunder. Borrowers shall pay for all expenses of opening and maintaining all of the above accounts.

**3.2 Required Repairs**.

**3.2.1 Completion of Required Repairs**. Borrowers shall, or shall cause the applicable Master Lessee to, perform and complete each item of the repairs and environmental remedial work relating to the Properties described on Schedule 1 hereto (the "Required Repairs") within the time-frames set forth on Schedule 1 hereto (subject to Force Majeure Delays), which may be extended at Lender's option if diligently pursued.

**3.2.2 Required Repairs Reserves**. On the date hereof, Borrowers shall (or shall cause the applicable Master Lessee to) deposit with Lender the aggregate amount set forth on Schedule 1 hereto as being required to complete the Required Repairs and Lender shall cause such amount to be transferred to a Subaccount (the "Required Repairs Subaccount"). Provided no Event of Default shall have occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrowers, within ten (10) Business Days after the delivery by Borrowers to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 (or such lesser amount if the total amount of funds remaining in the Required Repairs Subaccount is less than $5,000, in which case only one disbursement of the remaining amount shall be made), provided that (x) such disbursement is for Required repairs; (y) Lender shall have (if it desires) verified (by an inspection conducted at Borrowers' expense) performance of the work associated with such Required Repairs; and (z) the request for disbursement is accompanied by accompanied by the following items (which items shall be in form and substance reasonably satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been (or will be) completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements and (B) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) with respect to any request for disbursement that exceeds $50,000, Lien waivers (which may be conditioned on payment) or other evidence of payment satisfactory to Lender; and (iii) with respect to any request for disbursement that exceeds $100,000, at Lender's option, a title search for the applicable Property indicating that it is free from all Liens not previously approved by Lender. Provided no Event of Default shall have occurred and is continuing, upon Borrowers' completion of all Required Repairs in accordance with this Section 3.2, Lender shall release any funds remaining in the Required Repairs Subaccount, if any, to Borrowers.

**3.3 Taxes and Insurance**. Borrowers shall, or shall cause the applicable Master Lessee to, pay to Lender (i) $64,451.00 on the date hereof on account of Real Estate Taxes, (ii) $23,140.24 on the date hereof on account of Insurance Premiums, and (iii) on each Payment Date, (x) one-twelfth (1/12) of the Real Estate Taxes that Lender estimates will be payable during the next twelve (12) months (initially $10,741.84 per month) in order to accumulate with Lender sufficient funds to pay all such Real Estate Taxes at least thirty (30) days prior to their respective due dates and (y) one-twelfth (1/12) of the Insurance Premiums that Lender estimates will be payable (initially $5,425.81 per month) for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Such amounts will be transferred by Lender to a Subaccount (the "Tax and Insurance Subaccount"). Provided that no Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrowers pursuant to Section 5.2 hereof and Section 7.1 hereof, provided that Borrowers have promptly supplied Lender with notices of all Real Estate Taxes and Insurance Premiums due, or (b) reimburse Borrowers for such amounts upon presentation of evidence of payment; subject, however, to Borrowers' right to contest Real Estate Taxes in accordance with Section 5.2 hereof. In making any payment relating to Real Estate Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Real Estate Taxes) or insurer or agent (with respect to Insurance Premiums), without

inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Real Estate Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrowers to the Tax and Insurance Subaccount. Notwithstanding anything to the contrary contained in Section 3.3, in the event that an Acceptable Blanket Policy is in effect with respect to the Policies required pursuant to Section 7.1 and such Acceptable Blanket Policy is not being financed (in whole or in-part) through a third-party premium financing company, deposits into the Tax and Insurance Subaccount required for Insurance Premiums pursuant to clause (iii)(y) above shall be suspended to the extent that Insurance Premiums relate to such Acceptable Blanket Policy.

**3.4 Capital/FF&E Expense Reserves**.

(a) Borrowers shall (or shall cause the applicable Master Lessee to) deposit with or on behalf of Lender on each Payment Date an amount equal to the greatest of (i) (A) on each of the first twelve (12) Payment Dates, $5,480.00, (B) on each of the thirteenth (13th) through the twenty-fourth (24th) Payment Dates, one-twelfth (1/12th) of two percent (2.00%) of the gross annual income of the Properties (based on the prior year's performance), and (C) on each Payment Date thereafter, one-twelfth (1/12th) of four percent (4.00%) of the gross annual income of the Properties (based on the prior year's performance), (ii) the then-current amount required by each Management Agreement and (iii) the then-current amount required by the Franchise Agreement for Approved Capital Expenses and/or FF&E Expenses and the repair and replacement of the FF&E, and Capital Expenses that may be incurred following the date hereof, which amounts shall be transferred into a Subaccount established (the "Capital/FF&E Reserve Subaccount"). Additionally, upon thirty (30) days' prior notice to Borrowers, Lender may reassess the amount of the monthly payment required under this Section 3.4 from time to time in its reasonable discretion (based upon its then current underwriting standards).

(b) Provided that no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital/FF&E Reserve Subaccount to Borrowers, within ten (10) Business Days after the delivery by Borrowers to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 (or such lesser amount if the total amount of funds remaining in the Capital/FF&E Reserve Subaccount is less than $5,000, in which case only one disbursement of the remaining amount shall be made) provided that (i) such disbursement is for an Approved Capital/FF&E Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrowers' expense) performance of the work associated with such Approved Capital/FF&E Expenses; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (1) that such funds will be used to pay or reimburse Borrowers for Approved Capital/FF&E Expenses and a description thereof, (2) that all invoiced and unpaid trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (3) that the same has not been the subject of a previous disbursement, and (4) that all previous disbursements have been used to pay the previously identified Approved Capital/FF&E Expenses, and (B) with respect to any request for disbursement that exceeds $50,000, Lien waivers (which may be conditioned on payment) or other evidence of payment satisfactory to Lender, (C) with respect to any request for disbursement that exceeds $100,000, at Lender's option, a title search for the applicable Property or Properties

indicating that such Property or Properties that are the subject of such disbursement are free from all Liens, claims and other encumbrances not previously approved by Lender and (D) if requested by Lender, confirmation from the applicable Franchisor that the work associated with such Approved Capital/FF&E Expenses have been satisfactorily completed. Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Capital/FF&E Expenses may, at Lender's option, be made by direct check payable to Borrowers and the payee on such Approved Capital/FF&E Expenses.

**3.5 Intentionally Omitted**.

**3.6 Casualty/Condemnation Subaccount**. Borrowers shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "Casualty/Condemnation Subaccount") in accordance with the provisions of Article 7 hereof. All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of Article 7 hereof.

**3.7 Security Deposits**. Each Borrower shall (or shall cause the applicable Master Lessee to), keep and hold all security deposits under Leases in accordance with applicable Legal Requirements and at a separately designated account under such Borrower's (or such Master Lessee's) control (and in the case of a letter of credit, assigned with full power of attorney and executed sight drafts to Lender) so that the security deposits shall not be commingled with any other funds of such Borrower, or such Master Lessee. During an Event of Default, Borrowers shall, or shall cause the applicable Master Lessee to, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "Security Deposit Subaccount") subject to the terms of the Leases. Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrowers or Master Lessee together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrowers or the applicable Master Lessee under the applicable Lease. Any letter of credit or other instrument that any Borrower or any Master Lessee receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

**3.8 Cash Collateral Subaccount**. If a Cash Management Period shall have commenced, then on the immediately succeeding Payment Date and on each Payment Date thereafter during the continuance of such Cash Management Period, all Available Cash shall be paid to Lender, which amounts shall be transferred by Lender into a Subaccount (the "Cash Collateral Subaccount") as cash collateral for the Debt. Any funds in the Cash Collateral Subaccount and not previously disbursed or applied shall be disbursed to Borrowers upon the termination of such Cash Management Period. Lender shall have the right, but not the obligation, at any time during the continuance of an Event of Default, in its sole and absolute discretion to apply all sums then on deposit in the Cash Collateral Subaccount to the Debt, in such order and in such manner as Lender shall elect in its sole and absolute discretion, including to make a

prepayment of Principal (together with the applicable Yield Maintenance Premium applicable thereto).

**3.9 Grant of Security Interest; Application of Funds**. As security for payment of the Debt and the performance by Borrowers of all other terms, conditions and provisions of the Loan Documents, each Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all such Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "Cash Management Accounts"). Each Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account. No Borrower shall, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of any Mortgage or exercise its other rights under the Loan Documents. Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender. Provided no Event of Default is continuing, all interest which accrues on the funds in any Cash Management Account (other than the Tax and Insurance Subaccount) shall accrue for the benefit of Borrowers and shall be taxable to Borrowers and shall be added to and disbursed in the same manner and under the same conditions as the principal sum on which said interest accrued. In connection with a release of a Property pursuant to Section 2.4.2 of the Loan Agreement, Lender shall disburse to the Borrower so being released the portion of the reserves in the Subaccounts, if any, attributable to such released Property, as determined by Lender in its sole, but good faith discretion. Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrowers.

**3.10 Property Cash Flow Allocation**.

(a) During any Cash Management Period, all Rents deposited into the Deposit Account during the immediately preceding Interest Period shall, provided no Event of Default is continuing (except that (A) the items described in clauses (i)(x) below shall be made available on each Payment Date until an acceleration of the Loan and (B) the items described in clause (i)(y) below shall be made available on each Payment Date (whether or not the Loan is in Default, Event of Default or has been accelerated)), be applied on each Payment Date as follows in the following order of priority:

(i) First, to Borrowers, such amount as is necessary to pay (x) Hotel Taxes prior to the next Payment Date and (y) pay Third Party Disbursements to the extent that each of the same were deposited into the Deposit Account;

(ii) Second, to make payments into the Tax and Insurance Subaccount as required under Section 3.3 hereof;

(iii) Third, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement;

(iv) Fourth, to Lender to pay the Monthly Debt Service Payment Amount or the Monthly Interest Payment Amount, as the case may be, due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 3.10(a), then due to Lender under the Loan Documents);

(v) Fifth, to the Capital/FF&E Expense Subaccount (as defined below), to make the required payments of Capital/FF&E Reserve Funds as required by under Section 3.4;

(vi) Sixth, funds in an amount equal to the Monthly Operating Expense Budgeted Amount and any then-current Approved Additional Operating Expenses shall be disbursed to Borrowers (or to an account designated by Borrowers);

(vii) Seventh, to Lender, of any other amounts then due and payable under the Loan Documents;

(viii) Eighth, to Borrowers, to the extent not paid pursuant to clause (vi) above, up to $200,000 to reimburse Borrowers for audit and administrative expenses incurred by Borrowers, Master Lessees, AHP PHX USB 3 LLC, a Delaware limited liability company and/or the American Hospitality Properties Fund III LLC, a Delaware limited liability company based on invoices submitted to Lender together with an Officer's Certificate from the Borrowers stating that the items for which such invoice relates to work that was performed and either were paid for or will be paid for with such amounts, and

(ix) Lastly, to make payments in an amount equal to all Available Cash on such Payment Date into the Cash Collateral Subaccount in accordance with Section 3.8 hereof.

(b) The failure of Borrowers to make all of the payments required under clauses (i) through (vii) of Section 3.10(a) above in full on each Payment Date shall constitute an Event of Default under this Agreement; provided, however, if adequate funds are available in the Deposit Account for such payments, the failure by the Deposit Bank to allocate such funds into the appropriate Subaccounts shall not constitute an Event of Default.

(c) Notwithstanding anything to the contrary contained in this Section 3.10 or elsewhere in the Loan Documents, after the occurrence of an Event of Default, Lender may apply all Rents deposited into the Deposit Account (other than Rents constituting Third Party Disbursements (and such amounts will be made available to Borrowers notwithstanding the continuance of such Event of Default) and Hotel Taxes (and such amounts will be made available to Borrowers notwithstanding the continuance of such Event of Default until such time as Lender accelerates the Loan as a result thereof)) and other proceeds of repayment in such order and in

such manner as Lender shall elect. Lender's right to withdraw and apply any of the foregoing funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**3.11 PIP Reserve.**

**3.11.1 Deposit of PIP Funds**. The Borrowers shall (or shall cause the applicable Master Lessee to) deposit with Lender the following amounts (the "PIP Funds") into a Subaccount (the "PIP Reserve Subaccount"), which PIP Funds shall be disbursed and applied in accordance with Section 3.10 above:

(a) $4,323,637.00 on the date hereof;

(b) If Lender reasonably determines in good faith (it being understood that Lender's good faith determination of the estimated costs to complete the PIP Work shall be based upon estimates and documentation from contractors and/or other service or materials providers, certified as being true, correct and complete by an officer of Borrower, to perform and complete such PIP (which estimates and documentation shall be updated and recertified by Borrower (in the same manner as above) promptly following Lender's reasonable request (or as Borrower may determine is needed) as any PIP Work progresses and shall take into account all funds on deposit in the PIP Reserve Subaccount at the time of determination) that the PIP Funds on deposit in the PIP Reserve Subaccount are less than the estimated costs to complete each PIP then in effect then either (x) Borrowers shall (or shall cause the applicable Master Lessee to) deposit with Lender an amount equal to the amount by which the PIP Deposit Amount exceeds the amount of funds on deposit in the PIP Reserve Subaccount for such PIP Work (such amount, the "PIP Shortfall Deposit Amount") within ten (10) Business Days of Lender notifying the Borrowers of such determination, or (y) if the Borrowers have not deposited the PIP Shortfall Deposit Amount as and when required by clause (x) of this Section 3.11(b), then the Borrowers shall (or shall cause the applicable Master Lessee to) pay to Lender on each Payment Date all Available Cash, until such time as an amount equal to the PIP Deposit Amount is then on deposit in the PIP Reserve Subaccount;

(c) if the Franchisor hereafter requires a Borrower to implement a PIP at any of the Properties (other than the PIP in effect as of the date hereof), then either (x) Borrowers shall (or shall cause the applicable Master Lessee to) deposit with Lender an amount equal to the PIP Deposit Amount within ten (10) Business Days of such PIP being required by such Franchisor, or (y) if the Borrowers have not deposited the PIP Deposit Amount as and when required by clause (x) of this Section 3.11(c), then the Borrowers shall (or shall cause the applicable Master Lessee to) pay to Lender on each Payment Date all Available Cash, until such time as an amount equal to the PIP Deposit Amount is then on deposit in the PIP Reserve Subaccount with respect to such PIP; or

(d) if any Franchise Agreement has been terminated or expired or has been surrendered or cancelled, the Borrowers shall pay to Lender on each Payment Date all Available Cash, until such time as the Franchise Sweep Termination Conditions have been satisfied and an amount equal to the PIP Deposit Amount is then on deposit in the PIP Reserve Subaccount.

**3.11.2 Release of PIP Funds**. Provided no Event of Default is continuing, Lender shall direct Servicer to disburse PIP Funds to the Borrowers out of the PIP Reserve Subaccount, within ten (10) days after the delivery by the Borrowers to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000 (or such lesser amount if the total amount of funds remaining in the PIP Reserve Subaccount is less than $5,000, in which case only one disbursement of the remaining amount shall be made) provided that: (i) such disbursement is for PIP Costs; (ii) the request for disbursement is accompanied by (A) an Officer's Certificate from the Borrowers (1) stating that the items to be funded by the requested disbursement are PIP Costs, and a description thereof, (2) stating that all PIP Costs to be funded by the requested disbursement have been completed (or completed to the extent of the requested disbursement) or will be completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (3) stating that the PIP Costs (or the relevant portions thereof) to be funded from the disbursement in question have not been the subject of a previous disbursement, (4) stating that all previous disbursements of PIP Funds have been used to pay the previously identified PIP Costs, and (5) stating that all invoiced and unpaid trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (B) a copy of any license, permit or other approval required by any Governmental Authority in connection with the PIP Costs and not previously delivered to Lender, (C) with respect to any request for disbursement that exceeds $50,000, Lien waivers (which may be conditioned on payment) or other evidence of payment satisfactory to Lender, (D) with respect to any request for disbursement that exceeds $100,000, at Lender's option, a title search for the Properties indicating that the Properties are free from all Liens, claims and other encumbrances not previously approved by Lender or otherwise constituting a Permitted Encumbrance, and (E) if requested by Lender, confirmation from the applicable Franchisor that the PIP Work associated with such request for disbursement has been satisfactorily completed and (iii) Lender shall have (if it desires) verified (by an inspection conducted at Borrowers' expense) performance of the work associated with such PIP Cost. Provided no Event of Default has occurred and is then continuing, at such time as there is no PIP in effect and all PIP Work associated with any PIP that was in effect has been completed and approved by Franchisor and Lender, any excess funds in the PIP Reserve Account shall be transferred by Lender to the Capital/FF&E Reserve Subaccount to be held and disbursed in accordance with the provisions of Section 3.4 hereof.

**3.12 Low Debt Service Cure Reserve**.

**3.12.1 Cash Deposits of Low Debt Service Cure Deposit**. If the Borrowers deposit with Lender one or more Low Debt Service Cure Deposits in cash to avoid the commencement of a Low Debt Service Period as permitted herein, Lender shall transfer such amounts into an Account (the "Low Debt Service Cure Deposit Account"). Lender shall hold such Low Debt Service Cure Deposit(s) as cash collateral for the Debt. Amounts on deposit from time to time in the Low Debt Service Cure Deposit Account pursuant to this Section 3.12 are referred to as the "Low Debt Service Cure Deposit Funds".

**3.12.2 Release of Cash Deposits of Low Debt Service Cure Deposit**. Provided no Cash Management Period is continuing (without taking into account any Low Debt Service Cure Deposits of cash or Letters of Credit deposited with Lender), funds on deposit in the Low Debt Service Cure Deposit Account not previously disbursed or applied shall be disbursed to Borrowers if either (x) Borrowers deposit with Lender a Letter of Credit in the aggregate amount

of the Low Debt Service Cure Deposit Funds on deposit in the Low Debt Service Cure Deposit Account to be held and applied in accordance with the provisions of Section 3.12.3 below or (y) the Properties have achieved (without taking into account any Low Debt Service Cure Deposits of cash or Letters of Credit deposited with Lender) a Debt Service Coverage Ratio of at least 1.20:1.00 for two (2) consecutive Calculation Dates, as determined by Lender. Notwithstanding the foregoing, Lender shall have the right, but not the obligation, at any time during the continuance of an Event of Default, in its sole and absolute discretion to apply any and all Low Debt Service Cure Deposit Funds then on deposit in the Low Debt Service Cure Deposit Account to the Debt, in such order and in such manner as Lender shall elect in its sole and absolute discretion, including to make a prepayment of principal (together with the Yield Maintenance Premium, if any, applicable thereto) or any other amounts due hereunder.

**3.12.3 Letter of Credit Deposits of Low Debt Service Cure Deposit**. If Borrowers deliver to Lender one or more Letters of Credit in an amount equal to Low Debt Service Cure Deposits to avoid the commencement of a Low Debt Service Period as permitted herein, the provisions of Section 3.14 shall apply. Letters of Credit delivered to Lender to avoid the commencement of a Low Debt Service Period that have not been previously drawn on and applied shall be returned to Borrower if either (x) Borrowers deposit with Lender cash in the aggregate face amount of the Letters of Credit to be held and disbursed in accordance with the provisions of Section 3.12.1 and 3.12.2 above or (y) the Properties have achieved (without taking into account any Low Debt Service Cure Deposits of cash or Letters of Credit deposited with Lender) a Debt Service Coverage Ratio of at least 1.20:1.00 for two (2) consecutive Calculation Dates, as determined by Lender, and no Cash Management Period is continuing.

**3.13 Intentionally left blank**.

**3.14 Letters of Credit.** (a) All Letters of Credit delivered to Lender in connection with this Loan shall be held as collateral and additional security for the payment of the Debt. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to draw on all or any portion of any such Letter of Credit and to apply such amount drawn to payment of the Debt in such order, proportion or priority as Lender may determine. Any such application to the Debt after an Event of Default shall be subject to any Yield Maintenance Premium, any Prepayment Premium and all other sums due to Lender in respect of the Loan or under any Loan Document. On the Maturity Date, if the Debt has not otherwise been paid in full, any or all of such Letters of Credit may be applied to reduce the Debt.

(b) With respect to any Letter of Credit delivered to Lender in connection with this Loan, such Letter of Credit must be accompanied by an instrument reasonably acceptable to Lender whereby the applicant/obligor under such Letter of Credit shall have waived all rights of subrogation against Borrower thereunder until the Debt has been paid in full. Borrower shall also pay to Lender all of Lender's reasonable out-of-pocket costs and expenses in connection therewith. Neither Borrower nor the applicant/obligor under the Letter of Credit shall be entitled to draw upon the Letter of Credit.

(c) In addition to any other right Lender may have to draw upon any Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit: (i) with respect to any evergreen Letter of Credit, if Lender has received

a notice from the issuing bank that the applicable Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (ii) with respect to any Letter of Credit with a stated expiration date, if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least twenty (20) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (iii) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided at least ten (10) Business Days prior to such termination); or (iv) if Lender has received notice that the bank issuing the Letter of Credit shall cease to be an Approved Bank and Borrower shall not have replaced such Letter of Credit with a Letter of Credit issued by an Approved Bank within ten (10) Business Days after notice thereof. Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in clauses (i), (ii), (iii) or (iv) above and shall not be liable for any losses sustained by Borrower or applicable/obligor due to the insolvency of the bank issuing the Letter of Credit if Lender has not drawn the applicable Letter of Credit.

## 4. REPRESENTATIONS AND WARRANTIES

Borrowers represent and warrant to Lender as of the date hereof that, except to the extent (if any) disclosed on Schedule 2 hereto with reference to a specific Section of this Article 4:

### 4.1 Organization; Special Purpose.

(a) Each of Borrower and Master Lessee are duly organized, validly existing and in good standing under the laws of the states of their formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged. Each Borrower is duly qualified to do business and is in good standing in the jurisdiction in which the Property owned by such Borrower is located and in each other jurisdiction where it is required to be so qualified in connection with its properties, business and operations.

(b) Borrowers and Master Lessees have at all times since their formation been, and as of the date hereof are each, a Special Purpose Bankruptcy Remote Entity.

(c) Each Master Lessee has the full power, authority and legal right to enter into and perform its obligations under the Master Lease Documents.

**4.2 Proceedings; Enforceability**. Each Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents by it, and has the power and authority to execute, deliver and perform under the Loan Documents and all the transactions contemplated thereby. The Loan Documents have been duly authorized, executed and delivered by each Borrower that is a party to such Loan Document and constitute legal, valid and binding obligations of such Borrower, enforceable against such Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights

generally, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrowers or Guarantor including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and none of Borrowers or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**4.3** **No Conflicts**. The execution, delivery and performance of the Loan Documents by each Borrower and the transactions contemplated hereby will not conflict with any provision of any law or regulation to which any Borrower Party is subject, or conflict with, or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of any such Borrower pursuant to the terms of, any agreement or instrument to which any such Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over any Borrower or any of its properties. To Borrower's knowledge, no Borrower's rights under the Licenses, the Franchise Agreement and any Management Agreement will be adversely affected by the execution and delivery of the Loan Documents, any Borrower's performance thereunder, the recordation of the Mortgages, or the exercise of any remedies by Lender. To Borrower's knowledge, any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by any Borrower of, or compliance by any Borrower with, the Loan Documents or the consummation of the transactions contemplated hereby, has been obtained and is in full force and effect.

**4.4** **Litigation**. There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened (in writing) against or affecting any Borrower Party, Guarantor, Manager or any Property, in any court or by or before any other Governmental Authority, which, if adversely determined, might materially or adversely affect the condition (financial or otherwise) or business of any Borrower Party (including the ability of Borrowers to carry out its obligations under the Loan Documents), Guarantor, Manager or the use, value, condition or ownership of any Property.

**4.5** **Agreements**. Neither Borrower nor Master Lessee are a party to any agreement or instrument or subject to any restriction which might materially or adversely affect any Borrower or any Property, or any Borrower's business, properties or assets, operations or condition, financial or otherwise. Neither Borrower nor Master Lessee is in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default might have consequences that would materially or adversely affect the condition (financial or other) or operations of such Borrower or its properties or might have consequences that would adversely affect its performance hereunder. Neither Borrower nor Master Lessee is in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which any Borrower is a party or by which any Borrower or any Property is bound.

**4.6** **Title**. Borrowers have good, marketable and indefeasible title in fee to the real property and good title to the balance of the Properties, free and clear of all Liens except the

Permitted Encumbrances. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of each Property to a Borrower have been paid or are being paid simultaneously herewith. The Mortgages when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority liens on Borrowers' interest in the Properties and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. All mortgage, mortgage recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgages, have been paid or are being paid simultaneously herewith. All taxes and governmental assessments due and owing in respect of any of the Properties have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policies. The Permitted Encumbrances, individually or in the aggregate, do not (a) materially interfere with the benefits of the security intended to be provided by the Mortgages and this Agreement, (b) materially and adversely affect the value, operation or use of any of the Properties, or (c) impair Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to any Borrower's best knowledge, is contemplated with respect to all or any portion of any of the Properties or for the relocation of roadways providing access to any of the Properties. There are no mechanics', materialman's or other similar Liens or claims which have been filed for work, labor or materials affecting any of the Properties which are or may become a Lien prior to, or equal or coordinate priority with, the Liens created by the Loan Documents. There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property. The Surveys do not fail to reflect any material matter affecting such Property or the title thereto. All of the Improvements which were included in determining the appraised value of each Property lie wholly within the boundaries and building restriction lines of such Property, and no improvements on adjoining properties encroach upon such Property, and no easements or other encumbrances affecting such Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property, except those which are set forth on the Surveys and insured against by the Title Insurance Policies. Each parcel comprising each Property is a separate tax lot and is not a portion of any other tax lot that is not a part of such Property. To Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting any Property, nor are there any contemplated improvements to any Property that may result in such special or other assessments.

**4.7** **No Bankruptcy Filing**. No Borrower Party nor any of such Borrower's constituent Persons have filed, or are contemplating the filing of, a Bankruptcy Proceeding, and no Borrower Party has any knowledge of any Person having filed, or contemplating the filing of, a Bankruptcy Proceeding against it or such constituent Persons. In addition, no Borrower Party nor Borrower nor Sole Member nor any principal nor Affiliate of any Borrower Party or Sole Member has been a party to, or the subject of a Bankruptcy Proceeding for the past seven (7) years.

**4.8** **Full and Accurate Disclosure**. No statement of fact made by any Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading, and the Borrower Parties are

not aware of any information which, if it had been disclosed, could have altered the decision of the Lender to enter into the financing. There is no material fact presently known to any Borrower Party that has not been disclosed to Lender which adversely affects, or, as far as any Borrower Party can foresee, might adversely affect, any Property or the business, operations, performance or condition (financial or otherwise), properties or prospects of any Borrower or any Master Lessee. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrowers, Master Lessees and, to Borrowers' knowledge, the Properties (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of each Borrower, each Master Lessee, and each Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein. Neither any Borrower nor any Master Lessee has any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of any Borrower, any Master Lessee, or (to Borrower's knowledge) any Property from that set forth in said financial statements.

**4.9 Tax Filings**. To the extent required, each Borrower Party has filed (or has obtained effective extensions for filing) all federal, state, commonwealth, district and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state, commonwealth, district and local taxes, charges and assessments payable by such Borrower Party. Each Borrower Party's tax returns (if any) properly reflect the income and taxes of such Borrower Party for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**4.10 ERISA; No Plan Assets**. As of the date hereof and throughout the Term (i) Borrowers, Master Lessees, Guarantor or any ERISA Affiliate do not sponsor, are not obligated to contribute to, and are not themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or Section 4975 of the Code, (ii) none of the assets of Borrowers, Master Lessees nor Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, (iii) Borrowers, Master Lessees and Guarantor are not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrowers, Master Lessees or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans. As of the date hereof, neither Borrowers, Master Lessees, Guarantor nor any ERISA Affiliate maintains, sponsors or contributes to, or has any obligations with respect to, a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA). Neither Borrowers, Master Lessees nor Guarantor has engaged in any transaction in connection with which it could be subject to either a material civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a material tax imposed under the provisions of Section 4975 of the Code.

**4.11 Compliance**. Each Borrower Party and each Property (including the Improvements) and the use thereof comply in all material respects with all applicable Legal

Requirements (including with respect to parking, building and applicable zoning and land use laws, codes, regulations and ordinances, under municipal, state and federal laws). No Borrower Party is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of any Borrower Party. No Borrower Party has committed any act which may give any Governmental Authority the right to cause such Borrower Party to forfeit the Property owned or leased by such Borrower Party or any part thereof or any monies paid in performance of such Borrower Party's obligations under any of the Loan Documents. Each Property is used exclusively for hotel use and other appurtenant and related uses. In the event that all or any part of the Improvements at any Property are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits. To Borrower's knowledge, no legal proceedings are pending or, to the knowledge of Borrowers, threatened with respect to the zoning of any Property. To Borrower's knowledge, neither the zoning nor any other right to construct, use or operate any Property is in any way dependent upon or related to any property other than such Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required of each Borrower for the legal use, occupancy and operation of the Properties for its current use (collectively, the "Licenses"), have been obtained and are in full force and effect. The use being made of each Property is in conformity with the certificate of occupancy issued for such Property and all other restrictions, covenants and conditions affecting such Property.

**4.12 Major Contracts**. No Borrower Party has entered into, or is bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender. Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by any Borrower Parties thereunder and, to the best knowledge of each Borrower Party, there are no monetary or other material defaults thereunder by any other party thereto. None of Borrowers, Manager, Master Lessees or any other Person acting on any Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute. Borrowers have delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender. Except for Manager under each of the Management Agreements and Master Lessee under the Master Lease Documents, no Major Contract has as a party an Affiliate of any Borrower.

**4.13 Federal Reserve Regulations; Investment Company Act; Bank Holding Company**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. No Borrower Party is (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; or (ii) subject to any other federal, state or foreign law or regulation which purports to restrict or regulate its ability to borrow money. No Borrower Party is a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

**4.14 Easements; Utilities and Public Access**. To Borrower's knowledge and except as set forth on the surveys delivered to Lender in connection with the origination of the Loan, all easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "Easements"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policies and are in full force and effect without default thereunder. Each Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service such Property for its intended uses. To Borrower's knowledge, all public utilities necessary or convenient to the full use and enjoyment of each Property are located in the public right-of-way abutting such Property, and all such utilities are connected so as to serve such Property without passing over other property absent a valid irrevocable easement. To Borrower's knowledge, all roads necessary for the use of each Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.15 Physical Condition**. Except as may be expressly set forth in the Physical Conditions Reports, each Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; there exists no structural or other material defects or damages to any Property, whether latent or otherwise. No Borrower Party has received written notice from any insurance company or bonding company of any defects or inadequacies in any Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened (in writing) termination of any policy of insurance or bond. No portion of any Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located the flood insurance required pursuant to Section 7.1.1 hereof is in full force and effect with respect to such Property. The Improvements have suffered no material casualty or damage which has not been fully repaired and the cost thereof fully paid.

**4.16 Leases**. The rent roll attached hereto as Schedule 3 (the "Rent Roll") is true, complete and correct and no Property is subject to any Leases other than the Leases described in the Rent Roll and the Master Leases. Except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the tenant thereunder for an adjustment to the rent; (v) no tenant has made any claim against the landlord under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrowers' best knowledge, there is no present material default by the tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and are held consistent with Section 3.7 hereof; (viii) the applicable Borrower is the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of such Borrower and the applicable tenant thereunder; (x) no Person has any

possessory interest in, or right to occupy, any Property except under the terms of the Leases (other than in connection with Hotel Transactions); (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement; (xii) all work to be performed by the applicable Borrower under each Lease has been performed as required and has been accepted by the applicable tenant under such Lease; (xiii) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by any Borrower to any tenant under any Lease has already been received by such tenant; (xiv) no Tenant under any Lease (or any sublease) is an Affiliate of any Borrower; (xv) all tenants under the Leases are open for business and paying full, unabated rent; (xvi) there are no brokerage fees or commissions due and payable in connection with the leasing of space at the Property, and no such fees or commissions will become due and payable in the future in connection with the Leases, including by reason of any extension of such Lease or expansion of the space leased thereunder; (xvii) no tenant under any Lease has assigned its Lease or sublet all or any portion of the premises demised thereby, no such tenant holds its leased premises under assignment or sublease, nor does anyone except such tenant and its employees occupy such leased premises; (xviii) no tenant under any Lease has any right or option for additional space in the Improvements; and (xix) each Tenant under a Lease is free from Bankruptcy Proceedings. The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto. None of the Leases contains any option to purchase or right of first refusal to purchase any Property or any part thereof. Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except the tenants thereunder.

**4.17 Fraudulent Transfer**. No Borrower has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and each Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents and the transactions contemplated by the Master Lease Documents, the fair saleable value of each Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents and the transactions contemplated by the Master Lease Documents, exceed such Borrower's total probable liabilities, including subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of each Borrower's assets is, and immediately following the making of the Loan, will be, greater than such Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Each Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents and the transactions contemplated by the Master Lease Documents and the Operating Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. No Borrower intends to, and believes that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by such Borrower and the amounts to be payable on or in respect of the obligations of such Borrower).

**4.18 Ownership of Borrower**.

(a) Borrowers exact legal names are: **AHP FT WAYNE INN, LLC**, and **AHP FT WAYNE SUITES, LLC**, each a Delaware limited liability company; Borrowers' Tax I.D. numbers are 83-1088205 and 83-1105641, respectively; and Borrowers' Delaware Organizational I.D. numbers are 6959584 and 6959589, respectively. Each Borrower is of the following

organizational type (e.g., corporation, limited liability company): limited liability company, and the jurisdiction in which each Borrower is organized is: Delaware. The sole managing member of each Borrower is Sole Member. The membership interests in each Borrower are owned free and clear of all Liens, warrants, options and rights to purchase. No Borrower has any obligation to any Person to purchase, repurchase or issue any ownership interest in it. The organizational chart attached hereto as Schedule 4 is true, complete and accurate.

(b) Hilton Master Lessee's exact legal name is: **APIP-C FT. WAYNE INN MASTER TENANT, LLC**, a Delaware limited liability company. Hilton Master Lessee is of the following organizational type (e.g., corporation, limited liability company): limited liability company, and the jurisdiction in which Hilton Master Lessee is organized is: Delaware. Hilton Master Lessee's Tax I.D. number is 83-1085945 and Hilton Master Lessee's Organizational I.D. number is 6959591. The sole member of Hilton Master Lessee is APIP-C OperCo, LLC, a Delaware limited liability company.

(c) Homewood Master Lessee's exact legal name is: **APIP-C FT. WAYNE SUITES MASTER TENANT, LLC**, a Delaware limited liability company. Homewood Master Lessee is of the following organizational type (e.g., corporation, limited liability company): limited liability company, and the jurisdiction in which Homewood Master Lessee is organized is: Delaware. Homewood Master Lessee's Tax I.D. number is 83-1086211 and Homewood Master Lessee's Organizational I.D. number is 6959597. The sole member of Homewood Master Lessee is APIP-C OperCo, LLC, a Delaware limited liability company.

**4.19 Purchase Options**. Neither any Property nor any part thereof are subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

**4.20 Management Agreement**. Each of the Management Agreements are in full force and effect. With respect to each Management Agreement, there are no defaults, breaches or violations existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto under any of the Management Agreements.

**4.21 Hazardous Substances**. Except as otherwise disclosed by that certain Phase I environmental report with respect to a Property delivered to Lender by Borrower in connection with the origination of the Loan: (i) to the best of Borrowers' knowledge, no Property is in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any state super-lien and environmental clean-up statutes (including with respect to Toxic Mold), any local law requiring related permits and licenses and all amendments to and regulations in respect of the foregoing laws (collectively, "Environmental Laws"); (ii) no Property is subject to any private or governmental Lien or judicial proceeding nor has Borrower

received any material written administrative notice, action or inquiry, investigation or claim with respect to any Property and relating to the presence or release of hazardous, toxic and/or dangerous substances, toxic mold or fungus of a type that would reasonably be expected to pose a material risk to human health or the environment or would reasonably be expected to negatively impact the value of the Property in any material respects ("Toxic Mold") or any other hazardous or toxic substances or materials which are included under or regulated by Environmental Laws (collectively, "Hazardous Substances"); (iii) to the best of each Borrower's knowledge, after due inquiry, no Hazardous Substances are or have been (including the period prior to such Borrower's acquisition of its Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from any Property other than in compliance in all material respects with all Environmental Laws; (iv) to the best of each Borrower's knowledge, after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which have been determined could migrate or are migrating to or otherwise adversely affecting any Property in any material effect and which require remediation by a Borrower pursuant to applicable Environmental Laws; (v) to the best of Borrowers' knowledge, after due inquiry, no Toxic Mold is on or about any Property which requires remediation pursuant to applicable Environmental Laws; (vi) to the best of Borrowers' knowledge, after due inquiry, no underground storage tanks exist on any Property and no Property has ever been used as a landfill; and (vii) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of any Borrower which have not been provided to Lender.

**4.22 Name; Principal Place of Business**. No Borrower Party uses or will use any trade name or has done or will do business under any name other than its actual name set forth herein. The principal place of business of each Borrower Party is its primary address for notices as set forth in Section 6.1 hereof, and no Borrower Party has any other place of business.

**4.23 Other Debt**. There is no indebtedness with respect to any Property or any excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.24 Assignments of Leases and Rents**. The Assignments of Leases and Rents create a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrowers to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Properties. No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

**4.25 Insurance**. The Borrower Parties have obtained and have delivered to Lender certificates of all of the Policies, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. No claims have been made under any of the Policies, and no Person, including any Borrower, has done, by act or omission, anything which would impair the coverage of any of the Policies.

**4.26 FIRPTA**. No Borrower Party is a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

**4.27 Fiscal Year**. Each fiscal year of Borrowers commences on January 1.

**4.28 Intellectual Property/Websites**. Other than as set forth on Schedule 7, neither any Borrower Party, nor any Affiliate (i) has or holds any tradenames, trademarks, servicemarks, logos, copyrights, patents or other intellectual property (collectively, "Intellectual Property") with respect to the Properties or the use or operations thereof or is (ii) is the registered holder of any website with respect to the Properties (other than Tenant websites).

**4.29 Operations Agreements**. Each Operations Agreement is in full force and effect and neither any Borrower nor, to Borrowers' knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrowers' knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as described herein, the REA has not been modified, amended or supplemented.

**4.30 Illegal Activity**. No portion of any of the Properties has been or will be purchased with proceeds of any illegal activity, and to the best of Borrowers' knowledge, there are no illegal commercial activities or commercial activities relating to controlled substances at the Property (including, without limitation, any growing, distributing and/or dispensing of marijuana for commercial purposes, medical or otherwise for so long as the foregoing is a violation of a Legal Requirement of any applicable Governmental Authority).

**4.31 Patriot Act; Foreign Corrupt Practices Act; Anti-Money Laundering**. No Borrower Party nor Guarantor nor any partner or officer, director or employee of any Borrower Party or Guarantor nor member of such partner nor any other owner of a direct or indirect interest in any Borrower Party or Guarantor (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, (d) has engaged in any activity or conduct that would breach any Anti-Corruption Laws or Anti-Money Laundering Laws, (e) is currently under investigation by any Governmental Authority for alleged criminal activity or (f) is a Sanctioned Person. Each Borrower has instituted and maintains policies and procedures designed to cause compliance with Anti-Corruption Laws and Anti-Money Laundering Laws. No part of the proceeds of the Loan will be used, directly or indirectly, in violation of Sanctions or for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.21 above shall survive in perpetuity.

**4.32 Franchise Agreement**.

(a) The Franchise Agreements are in full force and effect and there are no defaults, breaches or violations existing thereunder by any party thereto and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation by any party thereunder. Neither the execution and delivery of the Loan Documents nor Borrowers' performance thereunder will adversely affect Borrowers' rights under the Franchise Agreement.

(b) Attached hereto as **Schedule 9** is a true, correct and complete copy of the PIP currently required by the Franchisor.

(c) The scope of work and budget attached hereto as **Schedule 9** includes the entirety of the PIP currently being required by the Franchisor.

**4.33 Master Lease**. Each Master Lease is in full force and effect and there is no Event of Default (as defined in each Master Lease). There has been no prior sale, transfer or assignment, hypothecation or pledge of any Master Lease or of the Rents received therein which is outstanding. No Master Lessee has any right or option pursuant to the Master Lease Documents or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part, other than under the Master Lease Call Option Letter, which option is subject and subordinate to the Lien of each applicable Security Instrument.

## 5. COVENANTS

Until the end of the Term, Borrowers hereby covenant and agree with Lender that:

**5.1 Existence**. Each Borrower Party and Sole Member shall (or shall cause the applicable Master Lessee) to (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all material Licenses and all applicable governmental authorizations, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property owned by it.

**5.2 Taxes and Other Charges**. Borrowers shall (or shall cause the applicable Master Lessee), pay all Taxes and Other Charges as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and the Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrowers need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to Section 3.3 hereof). Borrowers shall not, and shall not permit the applicable Master Lessee to, suffer and shall promptly cause to be paid and discharged any Lien or charge against any Property, and shall promptly pay for all utility services provided to any Property. After prior notice to Lender, Borrowers or Master Lessees, at their own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances, (iii) such proceeding shall suspend the collection of the Taxes or such Other Charges, (iv) such

proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which any Borrower Party is subject and shall not constitute a default thereunder, (v) no part of or interest in any Property will be in danger of being sold, forfeited, terminated, canceled or lost, (vi) Borrowers shall (or shall cause the applicable Master Lessee to) have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon, which shall be 110% of the Taxes and Other Charges being contested, (vii) Borrowers shall (or shall cause the applicable Master Lessee to) promptly upon final determination thereof pay the amount of such Taxes or Other Charges, together with all costs, interest and penalties, (viii) such contest shall not affect the ownership, use or occupancy of any of the Properties, and (ix) Borrowers shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (viii) of this Section 5.2. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or any Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of any Mortgage being primed by any related Lien.

**5.3 Access to Properties**. Borrowers shall (or shall cause the applicable Master Lessee to), permit agents, representatives, consultants and employees of Lender to inspect the Properties or any part thereof at reasonable hours upon reasonable advance notice (which may be given verbally). Lender or its agents, representatives, consultants and employees as part of any inspection may take soil, air, water, building material and other samples from any Property, subject to the rights of tenants under Leases and hotel guests occupying the Properties.

**5.4 Repairs; Maintenance and Compliance; Alterations**.

**5.4.1 Repairs; Maintenance and Compliance**. Borrowers shall at all times maintain, preserve and protect all franchises and trade names, and Borrowers shall (or shall cause the applicable Master Lessee to) cause the Properties to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.4.2 below and normal replacement of Equipment with Equipment of equivalent value and functionality). Borrowers shall (or shall cause the applicable Master Lessee to) promptly comply with all Legal Requirements (including but not limited to municipal, state and federal laws) and immediately cure properly any violation of a Legal Requirement (including, but not limited to, municipal, state and federal laws). Each of Borrower and Master Lessee also hereby covenants and agrees that it shall not commit, permit or suffer to exist any illegal commercial activities or commercial activities relating to controlled substances at the Property (including, without limitation, any growing, distributing and/or dispensing of marijuana for commercial purposes, medical or otherwise for so long as the foregoing is a violation of a Legal Requirement of any applicable Governmental Authority). Borrowers shall (or shall cause the applicable Master Lessee to) promptly repair, replace or rebuild any part of the Properties that becomes damaged, worn or dilapidated, or as otherwise required to comply with the Franchise Agreement, and shall complete and pay for any Improvements at any time in the process of construction or repair.

**5.4.2** **Alterations**. Borrower or the applicable Master Lessee may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not materially and adversely affect any Borrower Party's financial condition or the value or Net Operating Income of the Property and, (iii) are in the ordinary course of Borrower's business (which shall be deemed to include any work performed pursuant to a PIP or Lease or any Restoration following a Casualty or Condemnation in accordance with the terms of this Agreement). No Borrower Party shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration the cost of which is reasonably estimated to exceed $750,000 or which is likely to result in a decrease of Net Operating Income by two and one half percent (2.5%) or more for a period of thirty (30) days or longer. Lender may, as a condition to giving its consent to a Material Alteration, require that Borrowers deliver to Lender security (which may be in the form of cash or a Letter of Credit) for payment of the cost of such Material Alteration in an amount equal to 110% of the cost of the Material Alteration as estimated by Lender. Upon substantial completion of the Material Alteration, Borrowers shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed) to the extent that plans and specifications were prepared in connection with such Material Alteration, (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of liens and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of tenant improvement work) have been issued. Borrowers shall reimburse Lender upon demand for all out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.4.2.

**5.5** **Performance of Other Agreements**. Borrowers (or shall cause the applicable Master Lessee to) shall observe and perform each and every term to be observed or performed by one or more Borrowers pursuant to the terms of the Loan Documents. Borrowers (or shall cause the applicable Master Lessee to) shall observe and perform each and every term to be observed or performed by one or more Borrowers pursuant to the terms of any agreement or instrument affecting or pertaining to any Property, the failure of which could reasonably be expected to have a Material Adverse Effect.

**5.6** **Cooperate in Legal Proceedings**. Borrowers shall reasonably cooperate with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way adversely affect the rights of Lender under any Loan Document.

**5.7** **Further Assurances**. Borrowers shall, at Borrowers' sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from

time to time; (ii) provide all such information as Lender may reasonably require to ensure Borrowers' ongoing compliance with Sections 5.26 and 5.31 hereof, including ensuring compliance with all "know your customer" procedures as Lender may from time-to-time institute with respect to loans that are of a similar size and nature as the Loan; and (iii) upon Lender's request therefor given from time to time after the occurrence of any Event of Default pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to any Borrower Party and Sole Member and (b) searches of title to one or more of the Properties, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

**5.8 Environmental Matters**.

**5.8.1 Hazardous Substances**. So long as one or more Borrowers own or are in possession of one or more of the Properties, each such Borrower shall, and shall cause the applicable Master Lessee to (i) keep the Property owned or possessed by it free from Hazardous Substances and in compliance with all Environmental Laws (other than those Hazardous Substances that are used to operate or maintain the Property or used, handled, stored, or disposed in the ordinary course of Borrower's or Master Lessee's or any of their tenant's business, in each such case in compliance in all material respects with all Environmental Laws), (ii) promptly notify Lender if any Borrower Party shall become aware that (A) any Hazardous Substance is on or near such Property, (B) such Property is in violation of any Environmental Laws or (C) any environmental condition on or near such Property shall pose a threat to the health, safety or welfare of humans at the Properties and (iii) remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law (or as shall be reasonably required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("Lender's Consultant")), promptly after such Borrower becomes aware of same, at Borrowers' sole expense. Nothing herein shall prevent such Borrower from recovering such expenses from any other party that may be liable for such removal or cure.

**5.8.2 Environmental Monitoring**.

(a) Borrowers shall give prompt written notice to Lender of (i) any proceeding or written inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or affecting any Property in violation of Environmental Laws or that requires remediation of the Property pursuant to Environmental Laws, (ii) all material claims made in writing or to the Borrower's knowledge, threatened, by any third party (including any Governmental Authority) against any Borrower Party or any Property or any party occupying any Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) any Borrower Party's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Property that could reasonably be expected to cause such Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Upon becoming aware of the presence of Toxic Mold at any Property, Borrowers shall, or shall cause Master Lessee to (i) undertake an appropriate investigation to identify the source(s) of such Toxic Mold and shall develop and implement an appropriate remediation plan to reasonably respond to the presence of any Toxic Mold, (ii) perform or cause to be performed all acts

reasonably necessary for the remediation of any Toxic Mold (including taking any action necessary to clean and disinfect any portions of such Property adversely affected by Toxic Mold, including providing any necessary moisture control systems at the affected Property), and (iii) provide evidence reasonably satisfactory to Lender of the foregoing. Borrowers shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to any Property in connection with any Environmental Law or Hazardous Substance, and Borrowers shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b) Upon Lender's reasonable request, but, not more than once per year with respect to a Property, unless there is an Event of Default or Lender has a reasonable basis to believe that such Property is in material violation of Environmental Laws or that there is an environmental condition on a Property that requires remediation pursuant to Environmental Laws , Borrowers shall provide an inspection or audit of one or more such Properties designated by Lender prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm reasonably approved by Lender assessing the presence or absence of Hazardous Substances on, in or near such Property or Properties, and, after the occurrence of an Event of Default, or if Lender reasonably determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrowers. Such inspections and audit may include soil borings and ground water monitoring reasonably recommended in connection with an environmental assessment of a Property performed hereunder and reasonably necessary to confirm the presence or extent of Hazardous Substances on the Property in violation of Environmental Laws or that would reasonably be expected to require remediation. If Borrowers fail to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrowers hereby grant to Lender and its employees and agents with reasonable advance notice and at reasonable times access to the Properties without disturbing any of Borrower's, Master Lessee's or any other tenant's or hotel guests', and a license to undertake such inspection or audit.

(c) If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary with respect to a Property under an applicable Environmental Law ("Remedial Work"), Borrowers shall, or shall cause Master Lessee to, commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by licensed contractors or engineers or, if reasonable and appropriate, site personnel, reasonably approved in advance by Lender and under the supervision of a consulting engineer reasonably approved by Lender. All costs of such Remedial Work shall be paid by Borrowers, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work. If Borrowers or Master Lessee do not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrowers' expense. Notwithstanding the foregoing, Borrowers shall not be required to commence and/or continue such Remedial Work as specified above: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in any Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrowers, at their expense and after prior written notice to Lender, are contesting by appropriate legal, administrative or other proceedings,

conducted in good faith and with due diligence, the need to perform Remedial Work. Borrowers shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrowers are permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither any Property nor any part thereof or interest therein will be sold, forfeited or lost if a Borrower fails to promptly perform the Remedial Work being contested, and if such Borrower fails to prevail in such contest, such Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrowers have not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither any Property nor any interest therein would be subject to the imposition of any Lien for which Borrowers have not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrowers shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrowers' failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than 110% of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrowers' failure to prevail in such contest.

(d) No Borrower shall install or permit to be installed on any Property any underground storage tank.

**5.8.3 O & M Program**. In the event any environmental report delivered to Lender in connection with the Loan reasonably recommends the development of or continued compliance with an operation and maintenance program for any Property (including with respect to the presence of asbestos and/or lead-based paint) ("O & M Program"), Borrowers shall, or shall cause Master Lessee to, develop (or continue to comply with, as the case may be) at its cost and expense such O & M Program and shall, during the term of the Loan, including any extension or renewal thereof, comply in all material respects with the terms and conditions of the O & M Program.

**5.9 Title to the Properties**. Borrowers Parties will warrant and defend the title to the Properties, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons.

**5.10 Leases**.

**5.10.1 Generally**. Notwithstanding anything to the contrary contained herein, Borrower shall not (and shall not permit any Master Lessee to) enter into any Lease (or any renewals, amendments or modifications of a Lease) without Lender's prior written consent, not to be unreasonably withheld, conditioned or delayed, provided an Event of Default is not then continuing. Upon request, Borrowers shall furnish (or shall cause the applicable Master Lessee to furnish) Lender with executed copies of all Leases then in effect.

**5.10.2 Additional Covenants With Respect to Leases**. Each Borrower Party (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all material notices of default that such Borrower shall

send or receive under any Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the applicable Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents and Master Lease Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of any Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld, conditioned or delayed; and (ix) shall not cancel or terminate any Lease or accept a surrender thereof (except in the exercise of the applicable Borrower's commercially reasonable judgment in connection with a tenant default under a Lease) without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld, conditioned or delayed.

**5.11 Estoppel Statement**.

(a) After request by Lender, Borrowers shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest and/or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, and (v) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

(b) Borrowers shall deliver to Lender, upon request, estoppel certificates from each party under any Operations Agreement, in form and substance reasonably satisfactory to Lender; provided, that Borrowers shall not be required to deliver such certificates more than three (3) times during the Term and not more frequently than once per calendar year (or twice during any calendar year in which a Securitization occurs).

**5.12 Property Management**.

**5.12.1 Management Agreement**. Each Borrower Party shall (or shall cause Master Lessee to) (i) cause the Property owned by it to be managed pursuant to a Management Agreement; (ii) promptly perform and observe in all material respects all of the material covenants required to be performed and observed by it under such Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (iii) promptly notify Lender of any material default under such Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by such Borrower under its Management Agreement; and (v) promptly enforce the performance and observance of all of the material covenants required to be performed and observed by Manager under such Management Agreement. If any Borrower Party shall default in the performance or observance of any material term, covenant or condition of the Management Agreement to which such Borrower Party is a party on the part of such Borrower Party to be

performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing such Borrower Party from any of its obligations hereunder or under the Management Agreement to which such Borrower Party is a party, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the material terms, covenants and conditions of the Management Agreement to which such Borrower Party is a party on the part of such Borrower Party to be performed or observed. Without Lender's prior written consent, no Borrower Party shall (a) surrender, terminate, cancel, extend or renew its Management Agreement or otherwise replace Manager or enter into any other management agreement (except pursuant to Section 5.12.2 below), except any Management Agreement may be extended or renewed pursuant to the express terms thereof without Lender's prior written consent; (b) reduce or consent to the reduction of the term of its Management Agreement (except pursuant to Section 5.12.2 below); (c) increase or consent to the increase of the amount of any charges under its Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its material rights and remedies under, its Management Agreement, it being understood that Borrower and Master Lessee may make modifications or amendments to the Management Agreement without Lender's prior written consent, so long as such modifications or amendments do not increase any of the monetary obligations of Borrower or Master Lessee, modify the term thereof or materially and adversely affect Borrower's or Master Lessee's rights and remedies under such Management Agreement; (e) suffer or permit the occurrence and continuance of a default beyond any applicable cure period under its Management Agreement (or any successor management agreement) if such default permits Manager to terminate such Management Agreement (or such successor management agreement); or (f) suffer or permit the ownership, management or control of Manager to be transferred to a Person other than an Affiliate of a Borrower Party (except pursuant to Section 5.12.2 below).

**5.12.2 Termination of Manager**. If (i) an Event of Default shall be continuing, (ii) Manager is in default under any Management Agreement beyond all applicable notice and cure periods, (iii) Manager shall become a debtor in any Bankruptcy Proceeding or (iv) upon the gross negligence, malfeasance or willful misconduct of Manager, Borrowers shall (or shall cause Master Lessee to), at the request of Lender, terminate the Management Agreements and replace Manager with an Qualified Manager that is not an affiliate of the Manager being replaced pursuant to a Replacement Management Agreement; provided that if a Manager is terminated as a result of the continuance of an Event of Default, such Manager must be an Unaffiliated Qualified Manager. Borrowers' failure to appoint such a replacement Manager within sixty (60) days after Lender's request of Borrowers to terminate the Management Agreements shall constitute an immediate Event of Default. So long as no Event of Default is continuing, Borrower Parties may from time to time appoint a successor manager to manage the Properties, provided that such successor manager is an Qualified Manager and such successor management agreement is a Replacement Management Agreement. As a condition precedent to the appointment of a new Manager, such new manager and Borrowers shall in connection with such replacement execute a consent and subordination of management agreement substantially in the form of the Consent and Subordination of Manager dated of even date herewith executed and delivered by Manager to Lender.

**5.13 Special Purpose Bankruptcy Remote Entity**. Each Borrower and each Master Lessee shall at all times be a Special Purpose Bankruptcy Remote Entity. Neither any Borrower

nor any Master Lessee shall directly or indirectly make any change, amendment or modification to its organizational documents, or otherwise take any action which could result in such Borrower or such Master Lessee not being a Special Purpose Bankruptcy Remote Entity. A "Special Purpose Bankruptcy Remote Entity" shall have the meaning set forth on Schedule 5 hereto.

**5.14 Assumption in Non-Consolidation Opinion**. Each Borrower Party shall conduct its business so that the assumptions (with respect to each Person) made in that certain substantive non-consolidation opinion letter dated the date hereof delivered by Borrowers' counsel in connection with the Loan, shall be true and correct in all respects.

**5.15 Change in Business or Operation of Properties**. The Borrower Parties shall not purchase or own any real property other than the Properties and shall not enter into any line of business other than the ownership and operation of the Properties, or make any material change in the scope or nature of their business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Properties as hotel properties, or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to a Property).

**5.16 Debt Cancellation**. No Borrower Party shall cancel or otherwise forgive or release any claim or debt (other than termination of Leases in accordance herewith) owed to such Borrower Party by any Person, except for adequate consideration and in the ordinary course of such Borrower Party's business.

**5.17 Affiliate Transactions**. Except with respect to the Master Lease Documents and the Management Agreement, no Borrower Party shall enter into, or be a party to, any transaction with an Affiliate of any Borrower Party or any of the members of any Borrower Party except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to such Borrower Party or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

**5.18 Zoning**. No Borrower Party shall initiate or consent to any zoning reclassification of any portion of any Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of any Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**5.19 No Joint Assessment**. No Borrower Party shall suffer, permit or initiate the joint assessment of any Property (i) with any other real property constituting a tax lot separate from such Property, and (ii) with any portion of such Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such Property.

**5.20 Principal Place of Business**. No Borrower Party shall change its principal place of business or chief executive office from the address set forth in Section 6.1 hereof without first giving Lender thirty (30) days' prior written notice.

**5.21 Change of Name, Identity or Structure**. No Borrower Party shall change its name, identity (including its trade name or names) or such Borrower Party's corporate, partnership

or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in such Borrower's structure, without first obtaining the prior written consent of Lender. Each Borrower Party shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, each Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which such Borrower intends to operate the Property or Properties owned by such Borrower, and representing and warranting that such Borrower does business under no other trade name with respect to the Property.

**5.22 Indebtedness**. No Borrower Party shall directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership (or possession) and operation of the Property owned by such Borrower or Master Lessee and (iii) Permitted Equipment Financing (hereinafter defined), which in the case of such unsecured trade payables and Permitted Equipment Financing (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of three percent (3%) of the Allocated Loan Amount of such Property owned by such Borrower and leased by such Master Lessee (or, when taken together with the unsecured trade payables of all Borrowers, three percent (3%) of the original amount of the Principal) and (C) are paid within sixty (60) days of the date incurred (collectively, "Permitted Indebtedness"). As used herein, "Permitted Equipment Financing" means equipment financing that is (i) entered into in the ordinary course of a Borrower's business, (ii) for equipment related to the ownership and operation of the Property owned by such Borrower whose removal would not materially damage or impair the value of such Property, and (iii) which is secured only by the financed equipment.

**5.23 License; Intellectual Property; Website**.

**5.23.1 Licenses**. No Borrower Party shall Transfer any License required for the operation of any of the Properties.

**5.23.2 Intellectual Property**. Each Borrower Party shall keep and maintain all Intellectual Property relating to the use or operation of the Properties and all Intellectual Property shall be held by and (if applicable) registered in the name of such Borrower Party. No Borrower Party shall Transfer or let lapse any Intellectual Property without Lender's prior consent.

**5.23.3 Website**. Any website with respect to any of the Properties (other than Tenant and Franchisor websites) shall be maintained by or on behalf of the Borrower Party that owns such Property and any such website shall be registered in the name of the Borrower Party that owns such Property. To the extent any website is owned and/or operated by any Borrower Party or Manager, no Borrower Party shall Transfer such website without Lender's prior consent.

**5.24 Compliance with Restrictive Covenants**. Borrowers shall at all times comply in all material respects with all Operations Agreements. No Borrower will enter into, modify, waive in any material respect or release any Easements, Operations Agreements or other Permitted Encumbrances, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.

**5.25 ERISA.**

(a) No Borrower Party shall engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any successor or assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code. Borrowers' covenant in this clause (a) is based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which any Borrower is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions are satisfied.

(b) No Borrower Party shall maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of any Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of any Borrower to become "plan assets" within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(c) Each Borrower Party shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (i) Borrowers and Guarantor are not and do not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrowers and Guarantor are not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) the assets of Borrowers and Guarantor do not constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, as modified in application by Section 3(42) of ERISA, and any "benefit plan investor" as defined in Section 3(42) of ERISA.

**5.26 Prohibited Transfers.**

**5.26.1 Generally.** No Borrower Party shall directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer. Borrowers shall provide Lender with copies of all organizational documents (if any) relating to any Permitted Transfer. Borrowers shall pay within ten (10) Business Days of written demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer, whether or not the same is permitted or occurs.

**5.26.2 Transfer and Assumption.**

(a) Notwithstanding the foregoing and subject to the terms and satisfaction of all of the conditions precedent set forth in this Section 5.26.2, Borrowers shall have the right to (i) Transfer all (but not less than all) of the Properties (which have not theretofore been released pursuant to Section 2.4.2 hereof) to another party (the "Transferee Borrower") and have the Transferee Borrower assume all of Borrowers' obligations under the Loan Documents (a "Property

Sale"), or (ii) Transfer one hundred percent (100%) of the direct or indirect equity interests in Borrowers to a Person (an "Equity Sale") which Transfer would not otherwise constitute a Permitted Transfer hereunder and, in each case, and have replacement guarantors and indemnitors replace the guarantors and indemnitors with respect to all of the obligations of the indemnitors and guarantors of the Loan Documents from and after the date of such Property Sale or Equity Sale, as applicable (collectively, a "Transfer and Assumption"). Borrowers may make a written application to Lender for Lender's consent to the Transfer and Assumption, subject to the conditions set forth in paragraphs (b) and (c) of this Section 5.26.2. Together with such written application, Borrowers will pay to Lender the reasonable review fee then required by Lender and being charged to borrowers under similarly situated Loans. Borrowers also shall pay within ten (10) Business Days of written demand all of the reasonable costs and expenses incurred by Lender, including reasonable attorneys' fees and expenses, and, if a Securitization has occurred, including the fees and expenses of Rating Agencies and other outside entities, in connection with considering any proposed Transfer and Assumption, whether or not the same is permitted or occurs.

(b) Lender's consent, which may be withheld in Lender's sole and absolute discretion, to a Transfer and Assumption shall be subject to satisfaction of all of the following conditions:

(i) Borrowers have provided Lender with not less than sixty (60) days prior written notice, which notice shall contain sufficient detail to enable Lender to determine that the Transferee Borrower complies with the requirements set forth herein;

(ii) No Event of Default has occurred and is continuing;

(iii) Borrowers have submitted to Lender true, correct and complete copies of any and all information and documents of any kind requested by Lender concerning the Properties, the Transferee Borrower (including the direct and indirect constituent Persons thereof) in connection with a Property Sale or the direct and indirect constituent Person of Borrower in the event of an Equity Sale, replacement guarantors and indemnitors and Borrowers;

(iv) if such Transfer and Assumption is a Property Sale, the Transferee Borrower shall be a Special Purpose Bankruptcy Remote Entity and if such Transfer and Assumption is an Equity Sale, Borrower will continue to be a Special Purpose Bankruptcy Remote Entity;

(v) If the Loan, by itself or together with other loans, has been the subject of a Secondary Market Transaction, then Lender shall have received a Rating Comfort Letter from the applicable Rating Agencies (if required pursuant to a Pooling and Servicing Agreement from and after the occurrence of a Secondary Market Transaction);

(vi) Borrowers shall have paid all of Lender's reasonable costs and expenses in connection with considering the Transfer and Assumption hereunder, and shall have paid the amount requested by Lender as a deposit against Lender's costs and expenses in connection with the effecting the Transfer and Assumption;

(vii) Borrowers, the Transferee Borrower (if applicable), and the replacement guarantors and indemnitors shall have indicated in writing in form and substance reasonably satisfactory to Lender their readiness and ability to satisfy the conditions set forth in subsection (c) below;

(viii) each Acceptable Replacement Guarantor shall execute and deliver to Lender a guaranty of recourse obligations (in substantially the same form as the Guaranty delivered to Lender by Guarantor on the date hereof), pursuant to which, in each case, the Acceptable Replacement Guarantor(s) agree(s) to be liable under each such guaranty of recourse obligations from and after the date of such Transfer and Assumption (whereupon the previous guarantor shall be released from any further liability under the guaranty of recourse obligations for acts that arise from and after the date of such Transfer and Assumption (other than the acts or actions of the released Guarantor or any Affiliate thereof (or any Person acting on behalf thereof)) and such Acceptable Replacement Guarantor(s) shall be the "Guarantor" for all purposes set forth in this Agreement);

(ix) Satisfactory Patriot Act, OFAC and similar searches shall have been received by Lender with respect to (A) each Acceptable Replacement Guarantor, (B) the Transferee Borrower/Borrowers, (C) any Person that Controls Transferee Borrower/Borrowers or owns an equity interest in the Transferee Borrower/Borrowers which equals or exceeds ten percent (10%) and (D) any other Person reasonably required by Lender in order for Lender to fulfill its then-current Patriot Act compliance guidelines;

(x) (A) The Transferee Borrower shall be Controlled by a Person who is a Qualified Transferee with a minimum ownership interest in the Transferee Borrower reasonably acceptable to Lender, (B) each replacement guarantor and indemnitor is an Acceptable Replacement Guarantor and (C) the identity, experience, financial condition and creditworthiness of the Transferee Borrower and the replacement guarantors and indemnitors shall be satisfactory to Lender; and

(xi) The proposed property manager shall be a Qualified Manager and the proposed Management Agreement for each Property shall be reasonably satisfactory to Lender.

(c) If Lender consents to the Transfer and Assumption, the Transferee Borrower and/or Borrower as the case may be, shall immediately deliver the following to Lender:

(i) Borrowers shall deliver to Lender an assumption fee equal to (a) one-half of one percent (0.50%) of the then unpaid Principal for the first Transfer and Assumption hereunder, and (b) one percent (1.00%) of the unpaid Principal in connection with each Transfer and Assumption thereafter;

(ii) Borrowers, the Transferee Borrower/Borrowers and the original and replacement guarantors and indemnitors shall execute and deliver to Lender any and all documents required by Lender, in form and substance required by Lender, in Lender's sole discretion;

(iii) Counsel to the Transferee Borrower and replacement guarantors and indemnitors shall deliver to Lender opinions in form and substance reasonably satisfactory to Lender as to such matters as Lender shall require, which may include opinions as to substantially the same matters and were required in connection with the origination of the Loan (including a new substantive non-consolidation opinion with respect to the Transferee Borrower);

(iv) Borrowers shall cause to be delivered to Lender, an endorsement (relating to the change in the identity of the vestee and execution and delivery of the Transfer and Assumption documents) to the Title Insurance Policies in form and substance acceptable to Lender, in Lender's reasonable discretion (the "Endorsement"); and

(v) Borrowers shall deliver to Lender a payment in the amount of all remaining unpaid costs incurred by Lender in connection with the Transfer and Assumption, including but not limited to, Lender's reasonable attorneys' fees and expenses, all recording fees, and all fees payable to the title company for the delivery to Lender of the Endorsement.

(d) Notwithstanding anything to the contrary set forth in this Agreement, upon the closing of a Transfer and Assumption and execution of a replacement guaranty in accordance with the terms of this Section 5.26.2, Lender shall release Borrowers and Guarantor from all obligations under the Loan Documents arising from and after the date of the Transfer and Assumption.

Notwithstanding anything to the contrary contained in this Section 5.26, no Transfer shall be a Permitted Transfer unless such Transfer is made in compliance with the Franchise Agreement.

**5.27 Liens**. Without Lender's prior written consent, no Borrower Party shall create, incur, assume, permit or suffer to exist any Lien on all or any portion of any Property or any direct or indirect legal or beneficial ownership interest in any Borrower, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after any Borrower first receives notice of such Lien. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Liens, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable statutes, laws and ordinances; (iii) neither the applicable Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Liens, together with all costs, interest and penalties which may be payable in connection therewith; (v) to insure the payment of such Liens, Borrower shall deliver to Lender either (A) cash, or other security as may be reasonably approved by Lender, in an amount equal to one hundred ten percent (110%) of the contested amount or (B) a payment and performance bond in an amount equal to one hundred percent (100%) of the contested amount from a surety acceptable to Lender in its reasonable discretion, (vi) failure to pay such Liens will not subject Lender to any civil or criminal liability, (vii) such contest shall not affect the ownership, use or occupancy of the applicable Property, and (viii) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the

conditions set forth in clauses (i) through (vii) of this Section 5.27. Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the applicable Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage secured by such Property being primed by any related Lien.

**5.28 Dissolution**. No Borrower Party shall (i) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (ii) engage in any business activity not related to the ownership and operation of any Property, or (iii) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of such Borrower except to the extent expressly permitted by the Loan Documents.

**5.29 Expenses**.

(a) Except with respect to any costs and expenses for which Lender is expressly liable for under this Agreement and the other Loan Documents, Borrowers shall pay or (or shall cause Master Lessee to pay), if Borrowers fail to pay, reimburse Lender upon receipt of notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) actually incurred by Lender or Servicer in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrowers; (ii) Borrowers' and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by a Borrower or required of any Borrower Party under the terms of any Loan Document; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals conducted pursuant to and in accordance with the Loan Documents; (vi) the creation, perfection or protection of Lender's Liens in the Properties and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting one or more Borrower Party, the Loan Documents, one or more of the Properties, or any other security given for the Loan; (viii) fees charged by Servicer and, if a Securitization has occurred, the Rating Agencies in connection with any Borrower request under the Loan or any modification thereof and (ix) enforcing any obligations of or collecting any payments due from Borrowers under any Loan Document or with respect to any Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any Bankruptcy Proceedings.

(b) In addition, in connection with any Rating Comfort Letter, Review Waiver or other Rating Agency consent, approval or review requested or required hereunder (other than the initial review of the Loan by the Rating Agencies in connection with a Securitization), Borrowers shall pay all of the reasonable costs and expenses of Lender and Servicer and the costs

and expenses of each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency in connection therewith.

(c) Any costs and expenses due and payable by Borrowers hereunder which are not paid by Borrowers within ten (10) Business Days after demand may be paid from any amounts in the Deposit Account, with notice thereof to any Borrower. The obligations and liabilities of Borrowers under this Section 5.29 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of any Property by foreclosure or a conveyance in lieu of foreclosure.

**5.30 Indemnity**. Borrowers shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "Indemnified Party"), from and against any and all actual liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "Indemnified Liabilities") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by any Borrower Party of its obligations under, or any misrepresentation by any Borrower Party contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of any Borrower Party, or contained in any documentation approved by any Borrower Party; (iv) ownership of any Mortgage, any Property or any interest therein, or receipt of any Rents (including due to any Increased Costs); (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about any Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about any Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of any Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting any Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of any Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving any Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of any Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrowers shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party. Any

amounts payable to any Indemnified Party by reason of the application of this paragraph shall be payable within ten (10) Business Days of written demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid. The obligations and liabilities of Borrowers under this Section 5.30 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of any Property by foreclosure or a conveyance in lieu of foreclosure.

**5.31 Patriot Act Compliance; Anti-Money Laundering Laws.**

(a) Borrowers will (and will cause the applicable Master Lessee to) use their good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrowers and/or the Properties, including those relating to money laundering and terrorism. Lender shall have the right, from time to time, to audit Borrowers' compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over the Borrower Parties and/or the Properties, including those relating to money laundering and terrorism. In the event that any Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause such Borrower to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be secured by the Mortgages and the other Loan Documents and shall be immediately due and payable.

(b) At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, no Borrower Party nor Guarantor nor any partner in any Borrower Party or Guarantor nor member of any such partner nor any other owner of a direct or indirect interest in any Borrower Party or Guarantor (a) shall be listed on any Government Lists, (b) shall be a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) shall have been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense or (d) shall be under investigation by any Governmental Authority for alleged criminal activity.

(c) At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of any Borrower or Guarantor, any partner in any Borrower Party or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in any Borrower Party or Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person is subject to Sanctions, (ii) none of any Borrower Party or Guarantor, any partner in any Borrower Party or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in any Borrower Party or Guarantor shall be a Sanctioned Person, (iii) no Sanctioned Person shall have any interest of any nature whatsoever in any Borrower Party or Guarantor, any partner in any Borrower Party or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in any Borrower Party or Guarantor with the result that the investment in any Borrower Party or Guarantor, any partner in any Borrower Party or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in any Borrower Party or Guarantor would be prohibited by law or the Loan would be in violation of

law, and (c) none of the funds of any Borrower Party or Guarantor, any partner in any Borrower Party or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in any Borrower Party or Guarantor shall be derived from any unlawful activity with the result that the investment in Borrower Party or Guarantor, any partner in any Borrower Party or Guarantor, any member of any such partner or any other owner of a direct or indirect interest in any Borrower Party or Guarantor would be prohibited by law or the Loan would be in violation of law.

(d) No portion of the proceeds of any Loan will be used, directly or indirectly, (i) in violation of Anti-Corruption Laws or Anti-Money Laundering Laws, or (ii) for any payment, promise to pay, or authorization of any payment (or giving of anything of value) to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business, or obtain any improper advantage, in violation of Anti-Corruption Laws.

**5.32 Approval of Major Contracts**. No Borrower Party shall, without Lender's prior consent: (a) enter into, surrender or terminate any Major Contract to which it is a party or to which such Borrower Party or the Property owned by such Borrower is subject (unless the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Major Contract to which it is a party or to which such Borrower Party or the Property owned by such Borrower is subject, except as provided therein or on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Major Contract to which it is a party or to which such Borrower Party or the Property owned by such Borrower is subject in any material respect, except on an arm's-length basis and commercially reasonable terms.

**5.33 PIP Covenants**.

(a) Borrowers shall (or shall cause Master Lessee to) (i) observe and perform in all material respects the obligations imposed upon any Borrower Party under any PIP, (ii) not enter into a PIP without Lender's prior written consent (to the extent such Borrower Party has approval or consent rights over same), nor shall any Borrower Party modify, change, supplement, alter or amend any PIP without Lender's prior written consent (provided that Lender shall not be entitled to withhold its consent to any such modification, change, supplement, alteration or amendment if the same is required by Franchisor), (iii) promptly furnish to Lender any notice of default received by such Borrower Party with respect to any PIP, (iv) notify Lender in writing prior to the commencement of any PIP Work, and (v) notify Lender upon the completion of all work contemplated by a PIP and provide evidence of such completion, including confirmation from the Franchisor that such PIP is complete to the extent that such confirmation is required by Franchisor as a condition to the completion of such PIP.

(b) Each Borrower hereby covenants and agrees (i) to obtain (or cause to be obtained) from all appropriate Governmental Authorities all Licenses, approvals and consents necessary to commence, perform and complete any PIP Work, (ii) to commence, perform and complete all PIP Work in accordance with the schedule and/or deadlines set forth in the applicable PIP, (iii) to cause all PIP Work to be constructed and/or installed in a good and workmanlike

manner, in accordance with all Legal Requirements and free and clear from any and all Liens or claims of any and all Persons performing services or labor on the Property or furnishing materials or equipment thereto, and (iv) that the Property shall at all times be open and operating as a hotel during the performance of any PIP Work.

(c) Each Borrower shall (or shall cause the applicable Master Lessee to), from time to time, upon Lender's request, promptly furnish periodic reports to Lender on the progress of the PIP Work and the estimated completion date therefor.

**5.34 Hotel Covenants**.

(a) Borrowers shall (or shall cause the applicable Master Lessee to) cause the hotels located on each Property to be operated pursuant to the respective Franchise Agreement.

(b) Borrowers shall (or shall cause the applicable Master Lessee to) (i) promptly perform and/or observe all of the covenants and agreements required to be performed and observed by it under each Franchise Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any notice of default under any Franchise Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under each Franchise Agreement; and (iv) promptly enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by the Franchisor under any Franchise Agreement.

(c) Borrowers shall not (and shall not permit any Master Lessee to), without Lender's prior written consent (i) surrender, terminate or cancel any Franchise Agreement; (ii) reduce or consent to the reduction of the term of any Franchise Agreement; (iii) increase or consent to the increase of the amount of any charges under any Franchise Agreement that are not a result of an increase pursuant to the express terms of such Franchise Agreement; (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Franchise Agreement; (v) suffer or permit the occurrence of continuance a default beyond any applicable cure period under the Franchise Agreement (or any successor franchise agreement) if such default permits Franchisor to terminate or cancel the Franchise Agreement (or any successor franchise agreement); or (vi) replace a Franchisor or enter into any Replacement Franchise Agreement; provided that Borrower shall have the right, upon the stated expiration of the Franchise Agreement or earlier termination thereof, to replace the Franchisor with a Qualified Franchisor in connection with branding the Property under a Qualified Brand without obtaining Lender's prior consent as to the identity of such replacement franchisor or the brand thereof. Any Replacement Franchise Agreement or extension of the existing Franchise Agreement must have a term (exclusive of extension or renewal options) of no less than ten (10) years.

(d) In connection with any Borrower's request for approval of any new Franchise Agreement (each a "Replacement Franchise Agreement"), such Borrower shall (or shall cause the applicable Master Lessee to): (i) deliver a Rating Agency Confirmation from each applicable Rating Agency as to such Replacement Franchise Agreement (provided that no such Rating Agency Confirmation is required in connection with the replacement of the Franchisor with a Person that is a Qualified Franchisor in connection with branding the Property under a Qualified

Brand upon the stated expiration of the Franchise Agreement or earlier termination thereof, if such termination is not as a result of a Borrower default thereunder), (ii) pay all costs and expenses incurred in connection with such Replacement Franchise Agreement (including the cost of any work required by the Replacement Franchise Agreement or required by any property improvement plans entered in to in connection with the Replacement Franchise Agreement), (iii) obtain any new or amended License as may be required in connection with the Replacement Franchise Agreement and (iv) deliver to Lender within thirty (30) days following the execution of such Replacement Franchise Agreement a comfort letter from the Franchisor that is (I) substantially similar to the comfort letters delivered to Lender on the Closing Date or (II) otherwise approved by Lender (which approval shall not be unreasonably withheld, conditioned or delayed), it being agreed that Lender shall not unreasonably withhold its consent to any other comfort letter pursuant to which Franchisor shall agree (A) that Lender shall have the right, but not the obligation, to cure any defaults under the Replacement Franchise Agreement, (B) to give Lender written notice of, and a reasonable time to cure, any default of any Borrower Party under the Replacement Franchise Agreement, (C) not to assert against Lender any defaults which by their nature are personal to Borrower and not curable by Lender; (D) to allow Lender to change managers of the hotel operated at the Property; (E) that, if Lender or its Affiliate shall acquire title to the Property, Lender or its Affiliate shall have an option to succeed to the interest of such Borrower under the Replacement Franchise Agreement (or to be granted a new license agreement on the same terms as the Franchise Agreement) without payment of any fees to Franchisor; (F) that the Replacement Franchise Agreement will remain in effect during any foreclosure proceedings by Lender provided Lender cures all monetary defaults under the Replacement Franchise Agreement; (G) not to modify, cancel, surrender or otherwise terminate the Replacement Franchise Agreement during the Term without the consent of Lender; and (H) that if Lender or its Affiliate succeeds to such Borrower's interest under the Replacement Franchise Agreement, Lender may assign its rights therein to any entity which acquires the Property from Lender or its Affiliate (subject to Franchisor's reasonable approval).

(e) Without in any way limiting the covenants set forth in the Loan Documents, the Borrowers shall (or shall cause the applicable Master Lessee to): (i) cause the hotels located on each Property to be operated, repaired and maintained as a well-maintained "first-class hotel" which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of each respective Property, taking into consideration the age and location of the hotel located on the respective Property and (ii) maintain inventory in amounts sufficient to meet the hotel industry standard for hotels comparable to the hotel located on the Property and at levels sufficient for the operation of the hotel located on the Property at full occupancy levels.

(f) Hilton Borrower and/or its related Master Lessee have (or have caused to be) submitted all paperwork necessary for PAH Concessions Management, LLC, a Texas limited liability company ("***Liquor Permittee***"), an Affiliate of Manager, to obtain a license to sell and serve alcoholic beverages at their Properties (including the restaurants and bars contained therein) and shall cause Manager to cause Liquor Permittee to use commercially diligent efforts to pursue the receipt of each such license; provided that, in any event, Hilton Borrower covenants and agrees that it will obtain or cause Manager to cause Liquor Permittee to obtain such license(s) for the Property owned by the Hilton Borrower by December 1, 2018. Lender hereby consents to the

liquor licenses being held in the name of Liquor Permittee, and Borrowers hereby authorize (and have caused Manager and Liquor Permittee to authorize) Lender to fill in the blank information on the Agreement Regarding Liquor Licenses delivered on the date hereof with respect to each license received and shall agree to deliver, and cause to be delivered by Manager and Liquor Permittee, replacement agreements in substantially the same form and substance as the Agreement Regarding Liquor Licenses delivered on the date hereof as Lender determines to be reasonably necessary to cover each of the alcoholic beverage licences received.

(g) Hilton Borrower shall cause Liquor Permittee to maintain and/or renew each license (as needed) to sell and serve alcoholic beverages at its Property (including the restaurants and bars contained therein) during the term of the Loan and shall cause Liquor Permittee to use commercially reasonable efforts to pursue the receipt of permanent licenses to sell and serve alcoholic beverages at its Property (including the restaurants and bars contained therein).

## 6. NOTICES AND REPORTING

**6.1 Notices**. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a "Notice") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, and, with respect to Notices to Lender, for so long as SG is Lender hereunder, if a copy of such Notice is also delivered to SG via electronic mail, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):

If to Lender:

Société Générale
245 Park Avenue
New York, New York 10167
Attention: COO – CM Loan Origination
Facsimile No. (201) 839-8150
Electronic Mail: US-Glfi-Abp-Cmbs-Notices@sgcib.com

with a copy to:

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
Attention: Corey A. Tessler, Esq.
Facsimile No. (212) 294-4700

If to Borrowers:

AHP FT Wayne Suites, LLC / AHP FT Wayne Inn, LLC
5950 Berkshire lane, Suite 850

Dallas, TX 75225
Attn: General Counsel

with a copy to:

Dechert LLP
90 State House Square, 12th Floor
Hartford, Connecticut 06103
Attention: Krystyna Blakeslee, Esq.
Facsimile No. (860) 394 4188

And:

Eastman Law
5485 Belt Line Road, Suite 125
Dallas, TX 75254
Attn: Joel M. Eastman

A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of overnight delivery, upon the first attempted delivery on a Business Day; or in the case of facsimile, upon the confirmation of such facsimile transmission.

**6.2 Borrower Notices and Deliveries**. Borrowers shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against any Borrower Party or Sole Member which might materially adversely affect any Borrower Party's or Sole Member's condition (financial or otherwise) or business or any Property; (ii) any material adverse change in any Borrower Party's or Sole Member's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which any Borrower Party has knowledge; and (iii) any Default or Event of Default of which a Borrower Party is aware, along with the nature of such Default or Event of Default, the period of time such Default or Event of Default has existed and the action then being taken by such Borrower to remedy such Default or Event of Default, and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of any Borrower Party, Sole Member, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender. In addition, after request by Lender (but no more frequently than twice in any year), Borrowers shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of each Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, tenant estoppel certificates addressed to Lender, its successors and assigns from each tenant at each Property in form and substance reasonably satisfactory to Lender.

**6.3 Financial Reporting**.

**6.3.1 <u>Bookkeeping</u>**. Each Borrower Party shall keep on a calendar year basis, in accordance with GAAP and consistent with the USALI, and, to the extent required under <u>Section 9.1</u> hereof, the requirements of Regulation AB, proper and accurate books, records and accounts reflecting all of the financial affairs of such Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property owned by such Borrower, whether such income or expense is realized by such Borrower Party, Manager or any Affiliate of such Borrower Party. Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of such Borrower Party or other Person maintaining them, and to make such copies or extracts thereof as Lender shall desire. After an Event of Default, Borrowers shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2 <u>Annual Reports</u>**. Each Borrower Party shall furnish to Lender annually, within 120 days after each calendar year, a complete copy of such Borrower's annual financial statements audited by a "big four" accounting firm or another independent certified public accountant reasonably acceptable to Lender, each in accordance with GAAP and consistent with the USALI, and, to the extent required under <u>Section 9.1</u> hereof, the requirements of Regulation AB, and containing balance sheets and statements of profit and loss for such Borrower Party and the Property owned by such Borrower in such detail as Lender may request. Such financial statements (x) shall be in form and substance satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property owned by such Borrower for the immediately preceding calendar year, including statements of annual Net Operating Income and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate and presents fairly the financial condition of the Property owned by such Borrower and has been prepared in accordance with GAAP and consistent with the USALI, and, to the extent required under <u>Section 9.1</u> hereof, the requirements of Regulation AB, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (3) that as of the date of such Officer's Certificate, no litigation exists involving any Borrower or any Property in which the amount involved is $250,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (4) the amount by which operating expenses incurred by any Borrower for such period were greater than or less than the operating expenses reflected in the applicable Annual Budget.

**6.3.3 <u>Monthly/Quarterly Reports</u>**. The Borrower Parties shall furnish the following items to Lender within thirty (30) days after (x) prior to a Securitization, the end of each calendar month or (y) from and after a Securitization, the end of each calendar quarter: (i) monthly and year-to-date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP to fairly represent the financial position and results of operation of the Property owned by such Borrower during such calendar month or quarter (as applicable), all in form satisfactory to Lender; (ii) a balance sheet for such calendar month or quarter (as applicable); (iii) a comparison of the budgeted income and expenses and the actual income and expenses for each month and year-to-date for the Property owned by such Borrower; (iv) a statement of the actual Capital Expenses and FF&E Expenses made by any Borrower Party during each calendar month or quarter (as applicable) as of the last day of such calendar month or

quarter (as applicable); (v) a statement that no Borrower Party has incurred any indebtedness other than Permitted Indebtedness; (vi) an aged receivables report; (vii) all franchise inspection reports received by Borrower in such quarter (or month); (viii) a statement setting forth the monthly fees and expenses due by Borrower under the Franchise Agreement to Franchisor during such quarter (or month) and documentation evidencing the payment by Borrower of the same; (ix) a statement setting forth the occupancy rates (including the average daily rate) of the Property; (x) the Smith Travel Research, Inc.'s STAR report of the Property for such quarter (or month); and (xi) rent rolls identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, stating whether, within the past three (3) months, any tenant has "gone dark" or Borrower has received a notice from any Tenant of its intention to "go dark" and a delinquency report for the Property owned by such Borrower. Each such statement shall be accompanied by an Officer's Certificate certifying, to the best of the signer's knowledge, (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of the Borrower Parities and such Property in accordance with GAAP (subject to normal year-end adjustments), and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it, (3) that as of the date of such Officer's Certificate, no litigation exists involving any Borrower Party or any Property in which the amount involved is $250,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (4) the amount by which operating expenses incurred by the Borrower Parties for such period were greater than or less than the operating expenses reflected in the applicable Annual Budget. Such financial statements shall contain such other information as shall be reasonably requested by Lender for purposes of calculations to be made by Lender pursuant to the terms hereof.

**6.3.4 Other Reports**.

(a) The Borrower Parties shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property owned by such Borrower and the financial affairs of such Borrower, Sole Member or Manager as may be reasonably requested by Lender or any applicable Rating Agency. Each Borrower shall submit to Lender the financial data and financial statements required, and within the time periods required, under clauses (f) and (g) of Section 9.1, if and when available.

(b) Borrower shall furnish or cause to be furnished to Lender, within thirty (30) days after the end of each calendar month, the most current Smith Travel Research Reports then available to Borrower reflecting market penetration and relevant hotel properties competing with the Property.

(c) During the continuance of a Cash Management Period, Borrower will furnish to Lender no later than ten (10) Business Days prior to each Payment Date an Officer's Certificate setting forth (i) the actual amount of Hotel Taxes next becoming due and the date due, together with the actual amount paid since the delivery of the last Officer's Certificate required hereunder, and (ii) the amount Third Party Disbursements collected in the Clearing Account and

payable to Third Party Payees since the delivery of the last Officer's Certificate required hereunder.

**6.3.5 Annual Budget**. Each Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender, by November 30th of each year during the Term, a budget for the Property owned by such Borrower for the succeeding calendar year and, promptly after preparation thereof, any revisions to such Annual Budget (such budget and any revisions being the "Annual Budget") which (i) shall until the occurrence and continuance of a Cash Management Period, be provided to Lender for informational purposes, and (ii) upon the occurrence and continuance of a Cash Management Period shall not take effect until approved by Lender in accordance with this Section 5.1.11(e). Within ten (10) days of the first occurrence of a Cash Management Period, Borrower shall deliver to Lender such Annual Budget for approval of Lender, which approval shall not (provided no Event of Default is continuing) be unreasonably withheld, conditioned or delayed. Each Annual Budget submitted by such Borrower and approved by Lender is referred to herein as the "Approved Annual Budget". During the existence of a Cash Management Period, until such time that Lender approves a proposed Annual Budget, (1) to the extent that an Approved Annual Budget does not exist for the then applicable calendar year, the then current Annual Budget shall apply and continue to be in effect and (2) to the extent that an Approved Annual Budget exists (i.e. approved by Lender) for the immediately preceding calendar year, such Approved Annual Budget shall apply to the then current calendar year; provided, that in each case (to the extent necessary) such Annual Budget or Approved Annual Budget, as applicable, shall be adjusted to reflect actual increases in Taxes, Insurance Premiums, Other Charges and the actual cost of non-discretionary items. In the event that Lender objects to a proposed Annual Budget submitted by Borrower, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Provided no Event of Default is continuing, Lender's failure to approve or disapprove any Annual Budget or revision within thirty (30) days after Lender's receipt thereof shall be deemed to constitute Lender's approval thereof provided that Borrowers shall have complied with each of the conditions provided for in Section 6.3.5(b) below. The Annual Budget shall consist of (i) an operating expense budget showing, on a month-by-month basis, in reasonable detail, each line item of such Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain and/or increase any monthly payments required hereunder (and once such Annual Budget has, so long as no Cash Management Period is continuing, been submitted to Lender or, during a Cash Management Period been approved by Lender, such operating expense budget shall be referred to herein as the "Approved Operating Budget"), and (ii) a Capital Expenses and FF&E Expenses budget showing, on a month-by-month basis, in reasonable detail, each line item of anticipated Capital Expenses and FF&E Expenses (and once such Annual Budget has, so long as no Cash Management Period is continuing, been submitted to Lender or, during a Cash Management Period been approved by Lender, such Capital Expense budget shall be referred to herein as the "Approved Capital Budget").

**6.3.6 Additional Operating Expenses**.

(a) During a Cash Management Period, in the event that a Borrower Party incurs or will incur (i) any operating expense, including Emergency Expenditures, that is not in the Approved Annual Budget but is otherwise an Approved Operating Expense (each an "Emergency Operating Expense"), then such Borrower Party shall promptly (but in no event shall such Borrower be required to do so more frequently than monthly) deliver to Lender a reasonably detailed explanation of such Emergency Operating Expense(s) or, with respect to any such item that is subject to Lender's approval (which approval shall not (provided no Event of Default is continuing) be unreasonably withheld, conditioned or delayed), such proposed Emergency Operating Expense and, provided no Event of Default shall have occurred and is continuing, such an amount equal to such Emergency Operating Expense shall be disbursed to Borrowers by Lender on the next Payment Date after notification therefor by Borrowers to the extent there are funds available pursuant to Section 3.10(a)(vi) hereof, or (ii) an Approved Operating Expense Variance, then Borrower shall promptly deliver to Lender a notification of such Approved Operating Expense Variance and, provided no Event of Default shall have occurred and is continuing, such an amount equal to such Approved Operating Expense Variance shall be disbursed to Borrowers by Lender on the next Payment Date after notification therefor by Borrowers to the extent there are funds available pursuant to Section 3.10(a)(vi) hereof. Any Emergency Operating Expense or Approved Operating Expense Variance submitted to Lender (and, if required, approved by Lender) in accordance with this Agreement is referred to herein as an "Approved Additional Operating Expense".

(b) Any funds distributed to any Borrower Party for the payment of Approved Additional Operating Expenses (including any distribution to any Borrower Party pursuant to Section 3.10(a)(vi) hereof) shall be used by such Borrower Party only to pay for Approved Additional Operating Expenses or reimburse such Borrower Party for Approved Additional Operating Expenses, as applicable.

**6.3.7 Breach**. If any Borrower Party fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "Required Records") required by this Article 6 within thirty (30) days after the date upon which such Required Record is due, Borrower Parties shall pay to Lender, at Lender's option and in its discretion, an amount equal to $1,000 for each Required Record that is not delivered; provided Lender has given Borrowers at least fifteen (15) days prior notice of such failure. In addition, thirty (30) days after any Borrower Party's failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days' notice to Borrowers to gain access to such Borrower's books and records and prepare or have prepared at Borrower Parties' expense, any Required Records not delivered by the Borrower Parties.

**6.4 Hotel Account**. All monthly and other operating statements to be delivered by Borrower hereunder shall be (and all accompanying Officer's Certificates shall state that they have been) prepared based upon USALI.

**6.1 Reporting Generally**. Notwithstanding anything to the contrary contained herein, all reporting financial reporting provided for herein may be provided on a Property-by-Property basis and otherwise combined between a Borrower and the Master Lessee at the Property owned by such Borrower.

## 7. INSURANCE; CASUALTY; AND CONDEMNATION

### 7.1 Insurance.

**7.1.1 Coverage**. Each Borrower, at its sole cost, for the mutual benefit of each Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance with respect to the Property or Properties owned by such Borrower:

(a) Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including but not limited to: fire, lightning, windstorm/named storm, vandalism, malicious mischief, and subject to subsection (j) below, coverage for damage or destruction caused by the acts of "Terrorists" (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices for this loan type, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. Each such insurance policy shall (i) be in an amount equal to 100% full replacement cost of the Improvements without deduction for depreciation, (ii) have deductibles no greater than $25,000, or with respect to windstorm/named storm and earthquake, shall not exceed five percent (5%) of the total insurable value of the Property, (iii) be paid annually in advance and (iv) be issued on a replacement cost basis containing either no coinsurance or an agreed amount endorsement waiving any coinsurance provision, and shall cover, without limitation, all tenant improvements and betterments that Borrowers are required to insure.

(b) Flood insurance in accordance with Federal Reserve Board Regulation H if any part of the Improvements or Personal Property is located in an area now or hereafter designated by the Federal Emergency Management Agency as Flood Zone "A" or "V," or such other Special Hazard Flood Area if Lender so requires in its sole discretion. Such policy shall (i) be in an amount equal to (A) the maximum amount of building and, if applicable, contents insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended plus (B) such additional coverage as reasonably required by Lender, and (ii) have a maximum permissible deductible of $5,000 per building.

(c) Liability insurance with no exclusion for terrorism including (i) commercial general liability insurance; (ii) liquor liability insurance, if the Property is a hotel and liquor is sold anywhere on the premises; and (iii) excess liability/umbrella insurance. Such liability insurance shall provide minimum limits of $1,000,000 per occurrence and $2,000,000 in the aggregate for each policy year, with a maximum deductible or self-insured retention of $25,000; with at least $15,000,000 excess liability/umbrella insurance for any and all covered claims. The policies described in this subsection shall include coverage for "Personal and Advertising Injury," "Contractual Liability" (covering, to the maximum extent permitted by law, Borrowers' obligation to indemnify Lender as required under this Agreement and the other Loan Documents), and "Products and Completed Operations." Should coverage for third-party liability caused by the acts of "Terrorists" be excluded from the commercial general liability or excess liability/umbrella liability insurance, a separate policy must be provided for third-party liability in an amount no less than $5,000,000 each occurrence.

(d) Loss of rents or business income insurance with loss payable to Lender in an amount equal to the projected lost net profit, continuing expenses and necessary payroll for a period of at least 12 months, for the initial period of restoration, plus a six-month Extended Period of Indemnity which provides that after the physical loss to such Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or until the limit for such coverage as required above is exhausted, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance shall be increased each year at renewal during the Term, as and when the estimated or actual Rents or business income exposure increases.

(e) Equipment breakdown insurance, formerly known as boiler and machinery insurance, covering all boilers or pressure vessels, as well as any resulting physical damage to the building improvements, including all tenant improvements and betterments and loss or rents or business income that Borrowers are required to insure pursuant to the lease, on a replacement cost basis and in an amount acceptable to Lender.

(f) If applicable, worker's compensation coverage for any employees of each Borrower, as required by any Legal Requirement.

(g) During any period of restoration, renovation or construction, and if such work is excluded under the "all risk" or "special form" and/or general liability insurance policies, builder's risk or course of construction insurance with coverages at such limits as shall be required by Lender on a so called completed value basis in an amount equal to not less than the 100% of the full replacement cost of such Property, and construction operations liability and Owner's and Contractor's Protective Liability (or its equivalent) on terms consistent with the coverage requirements set forth in Section 7.1.1(a) and (c) above, in form and substance acceptable to Lender.

(h) Ordinance and law coverage, if at any time during the loan term any Property is deemed to be a legal non-conforming use or structure, covering the value of the undamaged portion, demolition and debris removal and the increased cost of construction in amounts satisfactory to Lender.

(i) Such other insurance (including but not limited to pollution legal liability insurance, earthquake insurance, mine subsidence insurance, and windstorm insurance if excluded under the "all risk" or "special form" policy) as may from time to time be reasonably required by Lender in order to protect its interests.

(j) Notwithstanding anything in subsections (a) and (d) above to the contrary, Borrowers shall be required to obtain and maintain coverage as part of its property insurance Policies against loss or damage by terrorist acts in an amount equal to 100% of the "Full Replacement Cost" of such Borrower's Property plus loss of rents or business income; provided that such coverage is available. There shall also be no exclusion for acts of terrorism under the general liability and excess liability/umbrella Policies. In the event that such coverage with respect to terrorist acts is not included as part of the policies required by subsections (a) and (d) above and/or the general liability and excess liability/umbrella Policies required by subsection (c) above, Borrowers shall, nevertheless be required to obtain coverage for terrorism (as stand alone

coverage) in an amount equal to 100% of the "Full Replacement Cost" of such Borrower's Property under subsection (a) above, the loss of rents and/or business interruption coverage under subsection (d) and third-party liability in an amount no less than $5,000,000 each occurrence; provided that such coverage is available. Borrowers shall obtain the coverage required under this subsection (j) from a carrier which otherwise satisfies the rating criteria specified in Section 7.1.2 below (a "Qualified Carrier") or in the event that such coverage is not available from a Qualified Carrier, Borrower shall obtain such coverage from the highest rated insurance company providing such coverage. For so long as the Terrorism Risk Insurance Program Reauthorization Act of 2015 or subsequent statute, reauthorization, extension thereof ("***TRIPRA***") is in effect and continues to cover both foreign and domestic acts, Lender shall accept terrorism insurance with coverage against acts which are "certified" within the meaning of TRIPRA. Notwithstanding the foregoing, in the event TRIPRA is no longer in effect, Borrower shall be required to carry terrorism insurance throughout the term of the Loan as required herein this clause (i), but in such event Borrower shall not be required to pay any Insurance Premiums solely with respect to such terrorism coverage in excess of the Terrorism Premium Cap (hereinafter defined) and, if the cost of such terrorism coverage exceeds the Terrorism Premium Cap, Borrower shall purchase the maximum amount of terrorism coverage available with funds equal to the Terrorism Premium Cap; provided that, if the Insurance Premiums payable with respect to such terrorism coverage exceeds the Terrorism Premium Cap, Lender may, at its option (1) purchase such stand-alone terrorism Policy, with Borrower paying such portion of the Insurance Premiums with respect thereto equal to the Terrorism Premium Cap and the Lender paying such portion of the Insurance Premiums in excess of the Terrorism Premium Cap or (2) modify the deductible amounts, policy limits and other required policy terms to reduce the Insurance Premiums payable with respect to such stand-alone terrorism Policy to the Terrorism Premium Cap. As used herein, (i) "***Terrorism Premium Cap***" means an amount equal to two times the amount of the insurance premium that is payable in respect of the property and business income/loss of rents insurance required under the Loan Documents (without giving effect to the cost of terrorism and earthquake components of such property and business interruption/rental loss insurance) at the time that such terrorism coverage is excluded from the applicable Policy.

**7.1.2 Policies**.

(a) All policies of insurance (the "Policies") required pursuant to Section 7.1.1 above shall (i) be issued by companies approved by Lender and authorized to do business in the State, with a claims paying ability rating of "A-" or better by S&P or A- VIII or better by AM Bests Key Rating Guide; (ii) name Lender and its successors and/or assigns as their interest may appear as the mortgagee (in the case of property insurance and business interruption/loss of rents coverage) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance), a Non-Contributory Standard Mortgagee Clause or a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iv) contain a waiver of subrogation in favor of Lender, as applicable; (v) the complete copies thereof delivered to Lender upon request; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither any Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of any modification, reduction or cancellation of the property Policies, and the applicable Borrower or its management company as first named insured shall receive at least thirty (30) days' prior

written notice of any modification, reduction or cancellation of liability Policies, and (C) providing that Lender is permitted to make payments to effect the continuation of such policies upon notice of cancellation due to non-payment of premiums; (vii) the Non-Contributory Standard Mortgagee Clause or a Lender's Loss Payable Endorsement, or their equivalents shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds. Borrowers shall pay the premiums for such Policies (the "Insurance Premiums") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.3 hereof) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender. If Borrowers do not furnish such evidence and receipts at least ten (10) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrowers shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate. Borrowers shall deliver to Lender a certified copy of each Policy within ten (10) days after request by Lender. Borrower shall promptly forward to Lender a copy of each written notice received by Borrower of any modification, reduction or cancellation of any of the Policies or of any of the coverages afforded under any of the Policies. Within thirty (30) days after request by Lender, Borrowers shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like. In the event of foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Indebtedness, all right, title and interest of Borrower in and to the Policies then in force with respect to the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or in Lender or other transferee in the event of such other transfer of title.

(b) The insurance coverages required by the provisions of Section 7.1 above may be effected under a blanket policy or policies covering the Property and other property and assets not constituting a part of the security for the Loan; provided that Lender is provided a full schedule of locations and values for all properties on such blanket policy and such blanket policy: (a) otherwise complies with the requirements set forth in Section 7.1 above; (b) specifies how much coverage and which sub limits apply exclusively to the Improvements and that any allocated coverage shall equal or exceed the coverage amounts specified in Section 7.1 above; (c) properly identifies the Properties, (d) provides the same protection as would a separate Policy insuring only the Properties in compliance with the provisions of Section 7.1 above, and (e) is otherwise acceptable to Lender (any such blanket policy, an "***Acceptable Blanket Policy***"). To the extent that the Policies are maintained pursuant to an Acceptable Blanket Policy that covers more than one location within a one thousand foot radius of the Properties (the "***Radius***"), the limits of such Acceptable Blanket Policy must be sufficient to maintain coverage as set forth in Section 7.1 above for the Property and any and all other locations combined within the Radius that are covered by such blanket policy calculated on a total insured value basis.

**7.2 Casualty.**

**7.2.1 Notice; Restoration**. If any Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), Borrowers shall give prompt notice thereof to Lender. Following the occurrence of a Casualty, Borrowers, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the affected Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

**7.2.2 Settlement of Proceeds**. If a Casualty covered by any of the Policies (an "Insured Casualty") occurs where the loss does not exceed five percent (5%) of the Allocated Loan Amount for the affected Property, provided no Event of Default has occurred and is continuing, Borrowers may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrowers are hereby authorized to collect and receipt for the insurance proceeds (the "Proceeds"). In the event of an Insured Casualty where the loss equals or exceeds five percent (5%) of the Allocated Loan Amount for the affected Property (a "Significant Casualty"), Lender may, in its sole discretion, settle and adjust any claim without the consent of any Borrower and agree with the insurer(s) on the amount to be paid on the loss, and the Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance herewith. If any Borrower Party or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, such Borrower Party shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender. Each Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse such check payable to the order of Lender. The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrowers to Lender upon demand. Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrowers propose be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrowers, such payment shall not be treated as business or rental interruption insurance proceeds unless Borrowers have demonstrated to Lender's satisfaction that the remaining net Proceeds that will be received from the property insurance carriers are sufficient to pay 100% of the cost of fully restoring the Improvements or, if such net Proceeds are to be applied to repay the Debt in accordance with the terms hereof, that such remaining net Proceeds will be sufficient to pay the Debt in full.

**7.3 Condemnation**.

**7.3.1 Notice; Restoration**. Borrowers shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting any Property (a "Condemnation") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Borrowers, regardless of whether an Award is available, shall (or shall cause the applicable Master Lessee to) promptly proceed to restore, repair, replace or rebuild the affected Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

**7.3.2 Collection of Award**. Lender is hereby irrevocably appointed as each Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "Award") and to make any compromise, adjustment or settlement in connection with such Condemnation. Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrowers shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. If any Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt. Borrowers shall cause any Award that is payable to Borrower to be paid directly to Lender. Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

**7.4 Application of Proceeds or Award**.

**7.4.1 Application to Restoration**. If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than fifteen percent (15%) of the Allocated Loan Amount for the affected Property, (ii) in the reasonable judgment of Lender, the affected Property can be restored within six (6) months, and prior to six (6) months before the Stated Maturity Date and prior to the expiration of the rental or business interruption insurance with respect thereto, to the affected Property's pre-existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt; (iii) less than (x) thirty percent (30%), in the case of an Insured Casualty or (y) fifteen percent (15%), in the case of a Condemnation, of the rentable area of the affected Improvements has been damaged, destroyed or rendered unusable as a result of such Insured Casualty or Condemnation; (iv) [intentionally left blank]; (v) in the reasonable judgment of Lender, the Restoration can and will be completed in accordance with any requirements under the Franchise Agreement; and (vi) no Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrowers for the cost of restoring, repairing, replacing or rebuilding the affected Property (the "Restoration"), in the manner set forth herein. Borrowers shall (or shall cause the applicable Master Lessee to) commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse any Borrower for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrowers shall (or shall cause the applicable Master Lessee to) pay (and if required by Lender, Borrowers shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount of the Proceeds or the Award made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents for such Property will be at least equal to the sum of the operating expenses and Debt Service for such Property and other reserve payments required hereunder, as reasonably determined by Lender.

**7.4.2 Application to Debt**.

(a) Except as provided in Section 7.4.1 above, any Proceeds and/or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note and/or any of the other Loan Documents, or applied to reimburse Borrowers for the cost of any Restoration, in the manner set forth in Section 7.4.3 below. Any such prepayment of the Loan made pursuant to this Section 7.4.2 shall be without any Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrowers shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.

(b) Notwithstanding anything to the contrary set forth in this Agreement, including the provisions of this Section 7.4, if the Loan is included in a REMIC Trust and, immediately following a release of any portion of the Lien of a Mortgage following a Casualty or Condemnation (but taking into account any proposed Restoration of the remaining Property), the ratio of the unpaid principal balance of the Loan to the value of the remaining Property(ies) are greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust; and which shall exclude the value of personal property or going concern value, if any), the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Award (after payment of Lender's costs and expenses and any other fees and expenses that have been approved by Lender), (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the loan-to-value ratio of the Loan (as so determined by Lender) does not increase after the release, unless Lender receives an opinion of counsel that if such amount is not paid, the applicable Securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Mortgage. If and to the extent the preceding sentence applies, only such amount of the net Award, if any, in excess of the amount required to pay down the principal balance of the Loan may be released for purposes of Restoration or released to Borrowers as otherwise expressly provided in this Section 7.4.

**7.4.3 Procedure for Application to Restoration**. If any Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications for such Restoration, such plans and specifications to be approved by Lender prior to commencement of any work. Lender may, at Borrowers' expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement. No payment made prior to the final

completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrowers for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien. Provided no Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrowers. Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrowers.

## 8. DEFAULTS

**8.1 Events of Default**. An "Event of Default" shall exist with respect to the Loan if any of the following shall occur:

(a) any portion of the Debt is not paid when due or Borrower shall fail to pay when due any payment required under Section 3.3, 3.4, 3.6, 3.7, 3.8, 3.11, 3.12, 3.13, or 3.14, provided that, in connection with a reassessment right exercised by Lender pursuant to the foregoing sections, if the same is not made within ten (10) Business Days of Lender's request for same;

(b) any of the Taxes are not paid when due (unless, if such past due Taxes are Real Estate Taxes and Lender is paying such Real Estate Taxes pursuant to Section 3.3 hereof or there are sufficient funds in the Tax and Insurance Subaccount allocated to pay such amounts when due, no other Event of Default is then continuing and Lender or Servicer fails to make such payment in violation of this Agreement), subject to Borrowers' right to contest Taxes in accordance with Section 5.2 hereof;

(c) if the Policies are not (A) delivered to Lender within ten (10) Business Days of Lender's written request and (B) kept in full force and effect (provided that it shall not be an Event of Default if there are sufficient funds in the Tax and Insurance Subaccount allocated to pay such amounts when due, no other Event of Default is then continuing and Lender or Servicer fails to make such payment in violation of this Agreement), each in accordance with the terms and conditions hereof;

(d) a Transfer other than a Permitted Transfer occurs (including any surrender, termination, cancellation, change, amendment, supplementation or other modification to or of the Master Lease Documents in violation of this Agreement) in violation of the terms of this Agreement, provided, however that if such breach is caused by the failure to give the requisite notice, Borrower delivers the requisite notice to Lender within ten (10) Business Days followings such Transfer and such Transfer was otherwise permitted, no Event of Default shall be deemed to have occurred;

(e) any certification, representation or warranty made by any Borrower, any Master Lessee, or Guarantor herein or in any other Loan Document, or in any report, certificate,

financial statement or other instrument, agreement or document furnished by any Borrower, any Master Lessee or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the certification, representation or warranty was made; provided, however, as to any such false or misleading representation or warranty which was unintentionally made or submitted to Lender and which can either be made true and correct by action of Borrower (without modification of such representation or warranty) or be cured to Lender's reasonable satisfaction, so long as such misrepresentation does not have a Material Adverse Effect, Borrower shall have a period of thirty (30) days following the earlier of (i) written notice thereof to Borrower and (ii) Borrower gaining actual knowledge that such representation or warranty was false or misleading, to undertake and complete all actions necessary to make such representation or warranty either true and correct in all material respects as and when made (as opposed to merely providing notice to Lender of such facts or circumstances) or cured to Lender's reasonable satisfaction;

(f) any Borrower, any Master Lessee or Guarantor shall make an assignment for the benefit of creditors, or shall generally not be paying its debts as they become due;

(g) a receiver, liquidator or trustee shall be appointed for any Borrower, any Master Lessee or Guarantor; or any Borrower or Guarantor shall be adjudicated a bankrupt or insolvent; or any Bankruptcy Proceeding, or any other petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal, state or foreign law, shall be filed by or against, consented to, or acquiesced in by, any Borrower, any Master Lessee or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of any Borrower or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by such Borrower, such Master Lessee or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within ninety (90) days;

(h) any Borrower breaches any covenant contained in Sections 5.12.1(a) - (f), 5.13, 5.22, 5.25 or 5.34 hereof;

(i) except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any portion of any of the Improvements without the prior written consent of Lender;

(j) an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k) any Borrower, any Master Lessee or Guarantor or any other Person contests in any manner the validity or enforceability of any Loan Document; or any Borrower, any Master Lessee or Guarantor denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document;

(l) except to the extent expressly permitted by the terms of this Agreement or any other Loan Document, Lender shall fail to have an enforceable, perfected, first priority security interest in the Mortgage;

(m) a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(n) any of the assumptions contained in any substantive non-consolidation opinion, delivered to Lender by Borrowers' counsel in connection with the Loan or otherwise hereunder, were not true and correct as of the date of such opinion or thereafter became untrue or incorrect;

(o) a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrowers (and Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non-monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)-day period, and Borrowers (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for an additional period of time as is reasonably necessary for Borrowers (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed ninety (90) days;

(p) if, without Lender's prior written consent, any Franchise Agreement is surrendered, terminated, cancelled, modified, renewed, extended or otherwise allowed to expire, unless such Borrower within ninety (90) days enters into a Replacement Franchise Agreement with a Qualified Franchisor for a Qualified Brand in accordance with the applicable terms and conditions of this Agreement;

(q) if without Lender's prior consent, there is any material change in any Franchise Agreement (or any successor franchise agreement);

(r) if any default has occurred and continues beyond any applicable cure period under a Franchise Agreement (or any successor franchise agreement) if such default permits a Franchisor to terminate or cancel a Franchise Agreement (or any successor franchise agreement);

(s) if there shall be a default under any of the other Loan Documents beyond any applicable cure periods contained in such Loan Documents, whether as to Borrower, Guarantor or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the unpaid Principal or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(t) Guarantor breaches any of financial covenants; provided that, it shall not be an Event of Default hereunder or under the Guaranty if, (i) within five (5) Business Days of such breach, Borrower and/or Guarantor delivers to Lender evidence in form and substance reasonably satisfactory to Lender that Guarantor has satisfied the financial covenants, as applicable, such that,

or (ii) (A) within thirty (30) days of the earlier to occur of the receipt of notice from Lender of such breach or Borrower and/or Guarantor obtaining knowledge of Guarantor's failure to satisfy the Guarantor's financial covenants, Borrower notifies Lender of same and delivers to Lender reasonable and customary information as Lender reasonably determines to be necessary in connection with its review and (to the extent required) approval of a Person to serve as an Acceptable Related Guarantor and (B) within five (5) Business Days after Lender has approved such Person as an Acceptable Related Guarantor such Acceptable Related Guarantor delivers to Lender a joinder to the Guaranty in form and substance reasonably acceptable to Lender, executed by such Acceptable Related Guarantor whereby such Acceptable Related Guarantor agrees to be liable (on a joint and several basis with all other Guarantor(s)) for any and all guaranteed obligations then existing or thereafter arising under the Guaranty;

(u) if, without Lender's prior written consent, (i) any Management Agreement is terminated, unless such termination is not as a result of a Borrower's default thereunder, and Borrowers deliver to Lender within sixty (60) days a replacement management agreement with an Unaffiliated Qualified Manager in accordance with the terms and conditions of this Agreement, (ii) the ownership, management or control of Manager is transferred, if Manager is an Affiliate of Borrowers, (iii) there is a material change in any Management Agreement without Lender's prior consent in violation of this Agreement, or (iv) if there shall be a material default by any Borrower under any Management Agreement beyond any applicable notice or grace period if such default would permit Manager to terminate the Management Agreement; or

(v) if either of Borrower or any Master Lessee is in default under any Master Lease beyond any applicable notice and grace period contained therein.

**8.2 Remedies**.

**8.2.1 Acceleration**. Upon the occurrence of an Event of Default (other than an Event of Default described in paragraph (f) or (g) of Section 8.1 above) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand (and each Borrower hereby expressly waives any such notice or demand), that Lender deems advisable to protect and enforce its rights against any or all Borrower Parties and in and to the Properties; including declaring the Debt to be immediately due and payable (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrowers), without notice or demand; and upon any Event of Default described in paragraph (f) or (g) of Section 8.1 above, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrowers) shall immediately and automatically become due and payable, without notice or demand, and each Borrower Party hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**8.2.2 Remedies Cumulative**. Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrowers under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure

proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents. Without limiting the generality of the foregoing, each Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Properties, the Mortgages have been foreclosed, the Properties have been sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full. To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any particular Property or any portion of any Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of all or less than all of the Properties or any part of any Property, in its discretion.

**8.2.3 Severance**.

(a) During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose any Mortgage in any manner and for any amounts secured by any Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event any Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose any Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose any Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage as Lender may elect. Notwithstanding one or more partial foreclosures, the Properties shall remain subject to the Mortgages to secure payment of the sums secured by the Mortgages and not previously recovered.

(b) During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder. Each Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Each Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, each Borrower ratifying all that such attorney shall do by virtue thereof.

**8.2.4 Delay**. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed

expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of any Mortgage to the extent necessary to foreclose on all or any portion of any Property, the Rents, the Cash Management Accounts or any other collateral.

**8.2.5 Lender's Right to Perform**. If any Borrower fails to perform (or fails to cause the applicable Master Lessee to perform) any covenant or obligation contained herein and such failure shall continue for a period of ten (10) Business Days after Borrowers' receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrowers to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Mortgage and other Loan Documents) and shall bear interest thereafter at the Default Rate. Notwithstanding the foregoing, Lender shall have no obligation to send notice to any Borrower of any such failure.

## 9. SPECIAL PROVISIONS

**9.1 Sale of Mortgage and Securitization**. Subject to Section 9.4 hereof and the limitations set forth in Section 9.3 hereof:

(a) Lender shall have the right (i) to sell, assign, syndicate or otherwise transfer the Loan or any portion thereof as a whole loan, (ii) to sell participation interests in the Loan, or (iii) to securitize the Loan or any portion thereof in a single asset securitization or a pooled loan securitization. (The transactions referred to in clauses (i), (ii) and (iii) are each hereinafter referred to as a "Secondary Market Transaction" and the transactions referred to in clause (iii) shall hereinafter be referred to as a "Securitization". Any certificates, notes or other securities issued in connection with a Securitization are hereinafter referred to as "Securities"). At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

(b) If requested by Lender, Borrowers shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be required in the marketplace, by prospective investors, the Rating Agencies, applicable Legal Requirements and/or otherwise in the marketplace in connection with any Secondary Market Transactions, including to:

(i) (A) provide updated financial and other information with respect to the Properties, the business operated at the Properties, Borrowers, Master Lessees and Manager, including the information set forth on Schedule 6 attached hereto, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Properties, and (C) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Properties (collectively, the "Updated Information"), together, if

customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii) provide opinions of counsel, which may be relied upon by Lender, the trustee in any Securitization, underwriters, NRSROs and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance and true sale or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Properties, the Loan Documents, and Borrowers, Master Lessees and their respective Affiliates, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies; and

(iii) provide updated, as of the closing date of any Secondary Market Transaction, representations and warranties made in the Loan Documents and such additional representations and warranties as the Rating Agencies may require.

(c) If, at the time a Disclosure Document is being prepared for a Securitization, Lender expects that Borrowers alone or Borrowers and one or more Affiliates of any Borrower Party (including any guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Properties alone or the Properties and Related Properties collectively, will be a Significant Obligor, Borrowers shall furnish to Lender upon request the following financial information:

(i) if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, net operating income for the Properties and the Related Properties for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB), or

(ii) if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Securitization, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Securitization, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X, and statements of income and statements of cash flows with respect to the Properties for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Properties are the Significant Obligor and the Properties (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) were acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d) Further, if requested by Lender, Borrowers shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any tenant of any Property if, in connection with a Securitization, Lender expects there to be, as of the cut-off date for such Securitization, a concentration with respect to such tenant or group of Affiliated tenants within all of the mortgage loans included or expected to be included in the Securitization such that such tenant or group of Affiliated tenants would constitute a Significant Obligor. Borrowers shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Securitization (an "Exchange Act Filing") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e) If Lender determines that Borrowers alone or Borrowers and one or more Affiliates of any Borrower Party collectively, or the Properties alone or the Properties and Related Properties collectively, are a Significant Obligor, then Borrowers shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f) Any financial data or financial statements provided pursuant to this Section 9.1 shall be furnished to Lender within the following time periods:

(i) with respect to information requested in connection with the preparation of Disclosure Documents for a Securitization, within ten (10) Business Days after notice from Lender; and

(ii) with respect to ongoing information required under Section 9.1(d) and (e) above, (1) not later than thirty (30) days after the end of each fiscal quarter of Borrowers and (2) not later than seventy-five (75) days after the end of each Fiscal Year of Borrowers.

(g) If requested by Lender, Borrowers shall provide Lender, promptly, and in any event within five (5) Business Days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Securitization or as shall otherwise be reasonably requested by Lender.

(h) If requested by Lender, whether in connection with a Securitization or at any time thereafter during which the Loan and any Related Loans are included in a Securitization, Borrowers shall provide Lender, promptly upon request, a list of tenants of the Properties

(including all affiliates of such tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the improvements or represent 20% or more of aggregate base.

(i) All financial statements provided by Borrowers pursuant to this Section 9.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP, and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements. All financial statements relating to a Fiscal Year shall be audited by independent accountants in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such independent accountants and the reference to such independent accountants as "experts" in any Disclosure Document and Exchange Act Filing (or comparable information is required to otherwise be available to holders of the Securities under Regulation AB or applicable Legal Requirements), all of which shall be provided at the same time as the related financial statements are required to be provided. All other financial statements shall be certified by the chief financial officer of each Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

**9.2 Securitization Indemnification.**

(a) Borrowers understand that information provided to Lender by Borrowers or Master Lessees and their agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with any Secondary Market Transaction, including a Securitization, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to any Secondary Market Transaction, including a Securitization. Borrowers also understand that the findings and conclusions of any third-party due diligence report obtained by Lender, the Issuer or the Securitization placement agent or underwriter may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(b) Borrowers hereby agree to indemnify SG (whether or not it is Lender), any Affiliate of SG that has filed any registration statement relating to the Securitization or has acted as the sponsor or depositor in connection with the Securitization, any Affiliate of SG that acts as an underwriter, placement agent or initial purchaser of Securities issued in the Securitization, Lender (and for purposes of this Section 9.2, Lender shall include its officers and directors), each

Person who controls SG within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act and each partner, participant, shareholder, member, managing member, agent, representative, counsel, officer, director, trustee and employee of each of the foregoing (collectively, the "SG Group"), the issuer of the Securities (the "Issuer" and for purposes of this Section 9.2, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Securitization, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any actual losses, claims, damages (but not including (a) special, exemplary, or punitive damages, or (b) consequential damages in the nature of alleged "diminution in value" (except to the extent such loss of value is demonstrated to be a result of the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 4.21 hereof and Section 5.8 hereof, and clauses (viii) through (xi) of Section 5.30 hereof), "lost profits" or "lost opportunities", in each case with respect to the foregoing clauses (a) and (b) except to the extent that a party seeking indemnification or reimbursement of such amount has paid or is required to pay such measure of damages). or liabilities (collectively, the "Liabilities") to which Lender, the SG Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon:

(i) any untrue statement or alleged untrue statement of any material fact contained in the information provided to Lender by Borrowers and their agents, counsel and representatives;

(ii) the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading; or

(iii) a breach of the representations and warranties made by Borrowers in Section 4.8 of this Agreement.

Borrowers also agree to reimburse Lender, the SG Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the SG Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities. Borrowers' liability under this paragraph will be limited to Liability that arises out of, or is based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrowers in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Properties. This indemnification provision will be in addition to any liability which Borrowers may otherwise have. Notwithstanding anything to the contained herein to the contrary, the indemnification provided by Borrowers under this Section 9.2 shall not apply to projections, Lender's calculations or other information related to Lender's underwriting criteria, except to the extent that such calculations or breach of underwriting criteria occurred as a result of the delivery (or failure to deliver) inaccurate information by a Borrower or a Person on behalf thereof.

(c) In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrowers agree to (i) indemnify Lender, the SG Group, the Issuer and the Underwriter Group for Liabilities to which Lender, the SG Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrowers in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Properties, and (ii) reimburse Lender, the SG Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the SG Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(d) Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party. Without the prior written consent of the relevant indemnified party (which consent shall not be unreasonably withheld, conditioned or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given the relevant indemnified party reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(e) In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrowers' relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrowers hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f) The liabilities and obligations of both Borrowers and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**9.3 Severance of Loan**. Subject to Section 9.4 below, Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time (whether prior to, in connection with, or after any Secondary Market Transaction), with respect to all or any portion of the Loan, to modify, split and/or sever all or any portion of the Loan as hereinafter provided. Without limiting the foregoing, Lender may (i) cause the Note and the Mortgages to be split into a first and second mortgage loan, (ii) create one or more senior and subordinate notes (*i.e.*, an A/B or A/B/C structure but expressly excluding a mezzanine loan), (iii) create multiple components of the Note or Notes (and allocate or reallocate the principal balance of the Loan among such components), (iv) [intentionally left blank], in each such case described in clauses (i) through (iv) above, in whatever proportion and whatever priority Lender determines, and (v) modify the Loan Documents with respect to the newly created Notes or components of the Note or Notes such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum rating levels for the Loan. Notwithstanding the foregoing, no such amendment described above shall (i) modify or amend any economic term of the Loan (other than to a de-minimis extent), (ii) affect the Shari'ah compliant structure as determined by Borrower or (iii) increase the obligations, or decrease the rights, of any Borrower, Master Lessee or Guarantor under the Loan Documents (other than to a de minimis extent); provided, however, in each such instance the outstanding principal balance of all the Notes evidencing the Loan (or components of such Notes) immediately after the effective date of such modification equals the outstanding principal balance of the Loan immediately prior to such modification and the weighted average of the interest rates for all such Notes (or components of such Notes) immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. If requested by Lender, Borrowers (and Borrowers' constituent members, if applicable, and Guarantor) shall execute within five (5) Business Days after such request, such documentation as Lender may reasonably request to evidence and/or effectuate any such modification or severance. At Lender's election,

each note comprising the Loan may be subject to one or more Securitizations. Lender shall have the right to modify the Note and/or Notes and any components in accordance with this Section 9.3 and, provided that such modification shall comply with the terms of this Section 9.3, it shall become immediately effective.

**9.4 Costs and Expenses**. Notwithstanding anything to the contrary contained in this Article 9, Borrowers shall not be required to incur any costs or expenses in the performance of its obligations under Sections 9.1, 9.2 (excluding the indemnity obligations set forth therein) or Section 9.3 above, other than expenses of Borrowers' counsel.

## 10. MISCELLANEOUS

**10.1 Exculpation**. Subject to the qualifications below, Lender shall not enforce the liability and obligation of any Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against such Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in all or any of the Properties, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against a Borrower (and expressly excluding any officer, director, employee, agent, member, partner or other Person (other than Guarantor and each Borrower) only to the extent of such Borrower's interest in the Properties, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against a Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document. The provisions of this Section 10.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name one or more Borrowers as a party defendant in any action or suit for foreclosure and sale under any Mortgage; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignments of Leases and Rents; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by any Mortgage or to exercise its remedies against all or any of the Properties; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrowers, by money judgment or otherwise, to the extent of any actual loss, damage, cost, expense, liability, claim or other obligation (but not including (a) special, exemplary, or punitive damages, or (b) consequential damages in the nature of alleged "diminution in value" (except to the extent such loss of value is demonstrated to be a result of the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 4.21 hereof and Section 5.8 hereof, and clauses (viii) through (xi) of Section 5.30 hereof), "lost profits" or "lost opportunities", in each case with respect to the foregoing clauses (a) and (b) except to the extent that a party seeking indemnification or reimbursement of such amount has paid or is required to pay such measure of damages) incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of

Borrower for any or all of the following being referred to herein as "Borrowers' Recourse Liabilities"):

(a) fraud, willful misconduct, misrepresentation or intentional failure to disclose a material fact by or on behalf of any Borrower, any Master Lessee, Guarantor, any Affiliate of any Borrower, any Master Lessee, or Guarantor, or any of their respective agents or representatives acting at their intentional or knowing direction in connection with the Loan, including by reason of any claim under the Racketeer Influenced and Corrupt Organizations Act (RICO);

(b) the forfeiture by any Borrower Party of any of the Properties, or any portion thereof, because of the commission of criminal activity by any Borrower Party or Guarantor or any of their respective agents or representatives acting at their intentional or knowing direction in connection therewith;

(c) intentional physical waste of the Property in violation of the Loan Documents, or after an Event of Default, any portion of any Property is wrongfully removed, destroyed or disposed of (as opposed to the failure to maintain) in violation of the terms of the Loan Documents by or on behalf of any Borrower, any Master Lessee, Guarantor, any Affiliate of any Borrower, any Master Lessee, or Guarantor, or any of their respective agents or representatives acting at their intentional or knowing direction, except to the extent that, in the case of physical waste, the rents are insufficient during the applicable period to avoid such physical waste, but for the purposes of such determination (1) excluding any liabilities incurred in violation of the Loan Documents and (2) assuming that Rents are applied in accordance with Section 3.10 hereof (unless (x) such portion of the Property is obsolete, or if not obsolete replaced with materials of the same utility and of the reasonably equivalent or greater value or (y) such removal, destruction or disposal occurs in the ordinary course of business relating to the ownership and operation of the Properties, including as a result of ordinary course wear and tear);

(d) any Proceeds paid by reason of any Insured Casualty or any Award received in connection with a Condemnation or other sums or payments attributable to any Property and received by any Borrower, any Master Lessee, or Manager but not applied in accordance with the provisions of the Loan Documents (except to the extent that a Borrower or a Master Lessee did not have the legal right, because of a bankruptcy, receivership or similar judicial proceeding, to direct disbursement of such sums or payments);

(e) all Rents of any Property received or collected by or on behalf of any Borrower Party after an Event of Default and not applied to payment of Principal and interest due under the Note, and to the payment of actual and reasonable operating expenses of such Property, as they become due or payable in accordance with the Loan Documents (except to the extent that such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which such Borrower or Master Lessee is legally prevented from directing the disbursement of such sums);

(f) misappropriation or conversion by or on behalf of any Borrower or any Master Lessee (including failure to turn over to Lender within ten (10) Business Days' demand following an Event of Default) of any gross revenues (including Rents, Third Party Disbursements,

Hotel Taxes, advance deposits, any other deposits, rents collected in advance, funds held by any Borrower for the benefit of another party and Lease Termination Payments);

(g) the failure to pay Taxes (except for any such Taxes or assessments being contested in good faith in accordance with the requirements of Section 5.2), provided Borrowers shall not be liable (x) to the extent funds to pay such amounts are allocated to the payment of the Taxes, and are available in, the Tax and Insurance Subaccount and Lender failed to pay same, or (y) the Rents are insufficient to pay all of Borrower's current and/or past due liabilities (including such amounts for Property Taxes), but for the purposes of such determination (1) excluding any liabilities incurred in violation of the Loan Documents and (2) assuming that Rents are applied in accordance with Section 3.10 hereof;

(h) the intentional breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 4.21 hereof and Section 5.8 hereof, and clauses (viii) through (xi) of Section 5.30 hereof;

(i) the failure to pay charges for labor or materials or other charges that can create Liens on any portion of any of the Properties), provided Borrowers shall not be liable (x) to the extent funds to pay such amounts are allocated to the payment of such amounts in a Subaccount maintained by Lender and Lender failed to pay same, or (y) the Rents are insufficient to pay all of Borrower's current and/or past due liabilities (including such amounts for charges), but for the purposes of such determination (1) excluding any liabilities incurred in violation of the Loan Documents and (2) assuming that Rents are applied in accordance with Section 3.10 hereof;

(j) any security deposits, advance deposits or any other deposits collected with respect to any of the Properties which are not delivered to Lender in accordance with the provisions of the Loan Documents, except to the extent any such deposits were applied in accordance with the terms and conditions of any of the Leases;

(k) failure to obtain and maintain the fully paid for Policies in accordance with Section 7.1.1 hereof; provided Borrowers shall not be liable (1) (x) to the extent funds to pay such amounts are allocated to the payment of the premiums, and are available in, the Tax and Insurance Subaccount and Lender failed to pay same, or (y) ongoing deposits into the Tax and Insurance Subaccount on account of the Policies are NOT suspended because of the existence of an acceptable blanket insurance policy, and (2) the rents are insufficient to pay all of Borrower's current and/or past due liabilities (including such amounts for Insurance Premiums), provided that for the purposes of such determination (x) excluding any liabilities incurred in violation of the Loan Documents and (y) assuming that Rents are applied in accordance with Section 3.10 hereof (it being agreed that in determining the amount of the insufficiency of Rents, distributions to the equity holders of Borrower not in violation of the terms of the Loan Documents shall not count towards rents available to pay for such insurance);

(l) Borrowers' indemnification of Lender set forth in Section 9.2 hereof;

(m) any out-of-pocket cost or expense incurred by Lender in connection with the enforcement of its rights and remedies hereunder or any other Loan Document; and/or

(n) if (i) either (A) the Franchise Agreement (or the right to operate any Property thereunder) shall expire, or be cancelled, surrendered or terminated by any Borrower or any Affiliate of Borrowers, or by reason of any failure of any Borrower or any Affiliate of Borrowers to perform its obligations thereunder and is not promptly replaced by a Replacement Franchise Agreement in accordance with this Agreement, (B) any Borrower amends or modifies the Franchise Agreement without the prior written consent of Lender in violation of this Agreement or (C) any default (beyond all applicable notice and cure periods) occurs under the Franchise Agreement unless, with respect to this clause (C) only, such default is a monetary default and Rents are insufficient to pay all of Borrower's current and/or past due liabilities (including such amounts to the Franchisor), but for the purposes of such determination (1) excluding any liabilities incurred in violation of the Loan Documents and (2) assuming that Rents are applied in accordance with Section 3.10 hereof, or (ii) if, in connection with any Transfer of the Property to Lender (or Lender's designee) in full or partial satisfaction of the Debt, such Borrower or any Affiliate of Borrowers fails to take any lawful action reasonably necessary to effect the transfer of any liquor license or other Licenses with respect to the Property from the then-current holder thereof to the transferee of the Property or its designee;

(o) if Guarantor, any Borrower Party or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Note, the Mortgages or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, other than, in any of the foregoing cases, claims and defenses alleged in good faith;

(p) if Manager is an Affiliate of any Borrower Party or Guarantor, the failure of Manager to comply with the transition obligations under the consent and subordination of manager and/or the failure of any Borrower Party to comply with the transition obligations under Section 5.12 of this Agreement;

(q) (A) any Master Lease Document is amended by any Borrower or any Master Lessee, except as permitted pursuant to this Agreement or otherwise due to Lender's exercise of remedies in accordance with this Agreement and the other Loan Documents, or (B) any Master Lease is extended or permitted to be extended, except as permitted pursuant to this Agreement;

(r) [intentionally left blank];

(s) the failure to maintain any license to sell and serve alcoholic beverages at a Property as a result of the gross negligence, willful misconduct or fraud of a Borrower, a Master Lessee, a Guarantor, Manager, Liquor Permittee or any Affiliate of any of the foregoing Persons;

(t) other than as covered by clause (ii) of the Springing Recourse Events below, a breach of the representation set forth in Section 4.1(b) hereof or a breach in the covenants set forth in Section 5.13 hereof; and/or

(u) any Master Lease Document is terminated, cancelled or otherwise ceases to exist, except as permitted pursuant to this Agreement or otherwise due to Lender's exercise of remedies upon the occurrence and during the continuance of an Event of Default hereunder.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrowers as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrowers in the event that one or more of the following occurs (each, a "Springing Recourse Event"):

(i) an Event of Default described in Section 8.1(d) hereof shall have occurred (but specifically excluding Permitted Transfers, Permitted Encumbrances and any other Lien expressly permitted under the Loan Documents). For the avoidance of doubt, a Transfer resulting from the exercise of Lender's rights under the Loan Documents, or the consummation of any remedial or enforcement action by the Lender, including, without limitation, any foreclosure, deed-in-lieu of foreclosure and the exercise of any rights of Lender shall not give rise to liability under this clause (i);

(ii) a breach of the representation set forth in Section 4.1(b) hereof or a breach in the covenants set forth in Section 5.13 hereof and such breach is cited as a factor in the consolidation of the assets and/or liabilities of a Borrower or a Master Lessee with any other Person in a bankruptcy or other similar proceeding;

(iii) any Borrower Party files a voluntary petition under the Bankruptcy Code or files a petition for bankruptcy, reorganization or similar proceeding pursuant to any other Federal, state or foreign bankruptcy, insolvency or similar law;

(iv) any Borrower is substantively consolidated with any other Person; unless such consolidation was involuntary and not consented to by such Borrower or Guarantor and is discharged, stayed or dismissed within thirty (30) days following the occurrence of such consolidation;

(v) the filing of an involuntary petition (other than a petition filed by, or on behalf of, Lender) against any Borrower Party under the Bankruptcy Code or an involuntary petition (other than a petition filed by, or on behalf of, Lender) for bankruptcy, reorganization or similar proceeding pursuant to any other Federal, state or foreign bankruptcy, insolvency or similar law by any other Person in which (x) such Borrower Party or any of their respective Affiliates, officers, directors or representatives which, directly or indirectly, Controls such Borrower Party colludes with or otherwise assists such Person, and/or (y) such Borrower Party or any Affiliate, officer, director or representative which, directly or indirectly, Controls any Borrower Party solicits or causes to be solicited petitioning creditors for any involuntary petition against any Borrower Party by any Person;

(vi) any Borrower Party or any of their respective Affiliates, officers, directors or representatives which, directly or indirectly, Controls any Borrower Party files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against it by any other Person under the Bankruptcy Code or any other Federal, state or foreign bankruptcy or insolvency law; provided, however, that neither the admission of truthful facts by Borrower nor Borrower's failure to assert any defense that lacks a substantial basis in fact or law shall constitute or be deemed to constitute acquiescence or result in any liability under this clause (v);

(vii) any Borrower Party or any of their respective Affiliates, officers, directors or representatives which, directly or indirectly, Controls any Borrower Party consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, liquidator, trustee or examiner for any Borrower Party or any portion of any Property (other than an application by Lender in connection with the enforcement of Lender's remedies under the Loan Documents or correspondence or other communication with Lender regarding Borrower's failure or potential failure to pay Debt Service); and/or

(viii) any Borrower Party makes an assignment for the benefit of creditors or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due, unless such admission is made in a legal proceeding and such admission a truthful admission regarding its insolvency and/or inability to pay its debts.

Notwithstanding anything to the contrary contained in any Loan Document, neither Borrowers nor Guarantors shall be liable for any (a) special, exemplary, or punitive damages, or (b) consequential damages in the nature of alleged "diminution in value" (except to the extent such loss of value is demonstrated to be a result of the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including Section 4.21, and Section 5.8 herein, and clauses (viii) through (xi) of Section 5.30 herein), "lost profits" or "lost opportunities", in each case with respect to the foregoing clauses (a) and (b) except to the extent that a party seeking indemnification or reimbursement of such amount has paid or is required to pay such measure of damages).

**10.2 Brokers and Financial Advisors.**

(a) Each Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loan other than CBRE Group, Inc. ("Broker") whose fees shall be paid by Borrowers pursuant to a separate agreement. Borrowers shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrowers in connection with the transactions contemplated herein. The provisions of this Section 10.2 shall survive the expiration and termination of this Agreement and the repayment of the Debt.

(b) Notwithstanding anything in Section 10.2(a) above to the contrary, each Borrower hereby acknowledges that (i) at Lender's sole discretion, Broker may receive further consideration from Lender relating to the Loan or any other matter for which Lender may elect to compensate Broker pursuant to a separate agreement between Lender and Broker (which compensation may include a one-time payment on the date hereof and/or ongoing payments from Lender to Broker), (ii) Lender shall have no obligation to disclose to any Borrower the existence of any such agreement or the amount of any such additional consideration paid or to be paid to Broker whether in connection with the Loan or otherwise and (iii) Borrower has had the opportunity to speak with Broker regarding such additional consideration.

**10.3 Retention of Servicer**. Lender reserves the right to retain Servicer to act as its agent hereunder with such powers as are specifically delegated to Servicer by Lender, whether pursuant to the terms of this Agreement, any Pooling and Servicing Agreement, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto. Borrower shall not be responsible for any set-up fees or any other initial costs and expenses relating to or arising under any servicing agreement or any Pooling and Servicing Agreement and shall not be responsible for monthly master servicing fees. Borrowers shall pay any customary fees and expenses of Servicer (i) in connection with a release of any Property (or any portion thereof), (ii) from and after a transfer of the Loan to any "master servicer" or "special servicer" for any reason, including as a result of a decline in the occupancy level of any Property, (iii) in connection with an assumption or modification of the Loan, (iv) in connection with the enforcement of the Loan Documents or (v) in connection with any other action or approval taken by Servicer hereunder on behalf of Lender.

**10.4 Survival; Successors and Assigns**. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All of Borrowers' covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.5 Lender's Discretion; Rating Agency Review Waiver**.

(a) Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive. Additionally, whenever in this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender in Lender's reasonable discretion, or Lender agrees to not withhold, condition or delay its consent, the decision of Lender to approve or disapprove, to consent, condition, delay or withhold

consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender while an Event of Default is continuing unless otherwise specifically herein provided.

(b) Whenever, pursuant to this Agreement or any other Loan Documents, a Rating Comfort Letter is required from each applicable Rating Agency, in the event that any applicable Rating Agency "declines review", "waives review" or otherwise indicates in writing or otherwise to Lender's or Servicer's satisfaction that no Rating Comfort Letter will or needs to be issued with respect to the matter in question (each, a "Review Waiver"), then the Rating Comfort Letter requirement with respect to such Rating Agency shall be deemed to be satisfied with respect to such matter. It is expressly agreed and understood, however, that receipt of a Review Waiver (i) from any one Rating Agency shall not be binding or apply with respect to any other Rating Agency and (ii) with respect to one matter shall not apply or be deemed to apply to any subsequent matter for which Rating Comfort Letter is required.

(c) Prior to a Securitization or in the event that there is a Review Waiver, if Lender does not have a separate and independent approval right with respect to the matter in question, then the term Rating Agency Confirmation shall be deemed instead to require the prior written consent of Lender.

**10.6 Governing Law.**

(a) THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS CREATED PURSUANT TO THE LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND THE DEBT. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN

ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

**Cogency Global Inc.**
**10 E. 40th Street, 10th Floor**
**New York, NY 10016**

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND BORROWERS AGREE THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF SUCH BORROWER MAILED OR DELIVERED TO SUCH BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON SUCH BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. EACH BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTWITHSTANDING THE FOREGOING, LENDER SHALL HAVE THE RIGHT TO INSTITUTE ANY LEGAL SUIT, ACTION OR PROCEEDING FOR THE ENFORCEMENT OR FORECLOSURE OF ANY LIEN ON ANY COLLATERAL FOR THE LOAN IN ANY FEDERAL OR STATE COURT IN ANY JURISDICTION(S) THAT LENDER MAY ELECT IN ITS SOLE AND ABSOLUTE DISCRETION, AND BORROWERS WAIVE ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWERS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

**10.7 Modification, Waiver in Writing**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by any Borrower Party therefrom, shall in any event be effective unless the same shall be in a writing signed by the party or parties against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific

instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on, any Borrower Party shall entitle any Borrower Party to any other or future notice or demand in the same, similar or other circumstances. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount. Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

**10.8 Trial by Jury**. EACH BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**10.9 Headings/Schedules**. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The Schedules attached hereto, are hereby incorporated by reference as a part of this Agreement with the same force and effect as if set forth in the body hereof.

**10.10 Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11 Preferences**. Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrowers to any portion of the Debt. To the extent Borrowers make a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state, federal or foreign law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds

had not been received by Lender. This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12** **Waiver of Notice**. No Borrower Party shall be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to such Borrower Party and except with respect to matters for which such Borrower Party is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Each Borrower Party hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to such Borrower Party.

**10.13** **Remedies of Borrower**. If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrowers agree that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrowers' sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment. Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment. Each Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrowers' behalf. To the fullest extent permitted by applicable law, Borrowers shall not assert, and hereby waive, any claim against Lender, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loan, or the use of the proceeds thereof.

**10.14** **Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15** **Offsets, Counterclaims and Defenses**. Each Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against one or more Borrowers by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents. Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which one or more Borrowers may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by one or more Borrowers in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrowers.

**10.16** **Publicity**. All news releases, publicity or advertising by any Borrower Party or its Affiliates through any media intended to reach the general public, which refers to the Loan

Documents, the Loan, Lender or any of Lender's Affiliates, a Loan purchaser, Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender. Lender shall have the right to issue any of the foregoing without any Borrower Party's approval.

**10.17 No Usury**. Borrowers and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrowers results in Borrowers having paid any interest in excess of that permitted by applicable law, then it is Borrowers' and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrowers), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18 Conflict; Construction of Documents; Reliance**. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation, drafting, execution and delivery of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them. Borrowers acknowledge that, with respect to the Loan, Borrowers shall rely solely on its own judgment and advisors in entering into the Loan, without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or affiliate of Lender. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or affiliate of Lender of any equity interest any of them may acquire in Borrowers, and Borrowers hereby irrevocably waive the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. Borrowers acknowledge that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrowers or its Affiliates.

**10.19 No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a) Borrowers and Lender intend that the relationships created under the Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, fiduciary, advisor, tenancy-in-common or joint tenancy relationship between Borrowers and Lender (or any of Lender's Affiliates) nor to grant Lender (or any of Lender's Affiliates) any interest in any of the Properties other than that of mortgagee, beneficiary or lender.

(b) The Loan Documents are solely for the benefit of Lender and Borrowers and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrowers any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20 Yield Maintenance Premium**. Borrowers acknowledge that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of Principal are made to Lender prior to the Stated Maturity Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs. For these reasons, and to induce Lender to make the Loan, each Borrower agrees that, except as expressly provided in Article 7 hereof, all prepayments, if any, whether voluntary or involuntary, will be accompanied by the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Permitted Prepayment Date); provided, however, that the foregoing shall not be deemed to imply that the Loan may be voluntarily prepaid in any manner or under any circumstance other than as expressly set forth in this Agreement. Such Yield Maintenance Premium shall be required whether payment is made by one or more Borrowers, by a Person on behalf of one or more Borrowers, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale prior to the Permitted Prepayment Date. Each Borrower further acknowledges that (A) it is a knowledgeable real estate developer and/or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrowers' obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions. Each Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Permitted Prepayment Date) and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrowers to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21 Assignments and Participations**. In addition to any other rights of Lender hereunder, the Loan, the Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be sold, assigned, participated or otherwise transferred by Lender and any of its successors and assigns to any Person at any time in its sole and absolute discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise without notice to or consent from Borrower or any other Person. Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter

stand in the place of Lender in all respects. Except as expressly permitted herein, no Borrower may assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22 Intentionally Left Blank**.

**10.23 Waiver of Marshalling of Assets**. To the fullest extent permitted by law, each Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of such Borrower, such Borrower's members or partners, as applicable, and others with interests in such Borrower, and of the Property owned by such Borrower, and shall not assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property owned by such Borrower for the collection of the Debt without any prior or different resort for collection, or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

**10.24 Joint and Several**. Each Borrower shall be jointly and severally liable for payment of the Debt and performance of all other obligations of Borrowers (or any of them) under this Agreement or any other Loan Document.

**10.25 Creation of Security Interest**. Notwithstanding any other provision set forth in this Agreement, the Note, the Mortgages or any of the other Loan Documents, Lender may at any time create a security interest in all or any portion of its rights under this Agreement, the Note, the Mortgages and any other Loan Document (including the advances owing to it) in favor of any Person, including any central bank or Federal Reserve Bank in accordance with Regulation A of the Board of Governors of the Federal Reserve System.

**10.26 Certain Additional Rights of Lender**. Notwithstanding anything to the contrary which may be contained in this Agreement, Lender shall have:

(i) the right to routinely consult with Borrowers' management regarding the significant business activities and business and financial developments of Borrowers, provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times;

(ii) the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower Parties at any time upon reasonable notice;

(iii) the right, in accordance with the terms of this Agreement, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness;

(iv) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict financing to be obtained with respect to the Properties so long as any portion of the Debt remains outstanding;

(v) the right, without restricting any other right of Lender under this Agreement or the other Loan Documents (including any similar right), to restrict, upon the occurrence of an Event of Default, Borrowers' payments of management, consulting, director or similar fees to Affiliates of Borrowers or Master Lessees from the Rents;

(vi) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any operating budget and/or capital budget of Borrowers;

(vii) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by any Borrower of any other significant property (other than personal property required for the day to day operation of the Properties); and

(viii) the right, without restricting any other rights of Lender under this Agreement (including any similar right), to restrict the transfer of interests in any Borrower held by its members, and the right to restrict the transfer of interests in such member, except for any transfer that is a Permitted Transfer.

The rights described above may be exercised directly or indirectly by any Person that owns substantially all of the ownership interests in Lender. The provisions of this Section 10.26 are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3-101.

**10.27 Acknowledgement and Consent to Bail-In of EEA Financial Institutions.**

(a) Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the respective parties thereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(ii) the effects of any Bail-in Action on any such liability, including, if applicable:

(A) a reduction in full or in part or cancellation of any such liability;

(B) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

(b) As used in this Section 10.27 the following terms have the following meanings ascribed thereto: (i) "Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution; (ii)"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule; (iii) "EEA Financial Institution" means (x) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority; (y) any entity established in an EEA Member Country which is a parent of an institution described in clause (x) of this definition, or (x) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (x) or (y) of this definition and is subject to consolidated supervision with its parent; (iv) "EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway; (v) "EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution; (vi) "EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time; and (vii) "Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**10.28 Set-Off. In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right in its sole discretion, without prior notice to any Borrower Party, any such notice being expressly waived by each Borrower Party to the extent permitted by applicable law, upon any amount becoming due and payable by any Borrower Party hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrowers. Lender agrees promptly to notify Borrowers after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.**

**10.29 <u>Negation of Implied Right to Cure Events of Default</u>**. Notwithstanding anything contained in this Agreement or any of the other Loan Documents providing that certain rights, remedies or privileges are only available to Lender during the "continuance" of an Event of Default (or words of similar import), Borrower expressly acknowledges and agrees that it does not have the right to cure an Event of Default once the same has occurred under this Agreement or any other Loan Document, in each case without the consent of Lender, which consent may be withheld, delayed or denied by Lender in its discretion.

**10.30 <u>Registered Obligations</u>**.

(a) Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the Note is, and any other promissory notes issued under the Loan Documents shall be, registered as to both principal and any stated interest.

(b) If Lender sells a participation interest in the Loan, such Lender shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under the Loan Documents (the "***Participant Register***"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Department of Treasury regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(c) Lender or its designee, acting for this purpose solely as a non-fiduciary agent of Borrowers, shall maintain a register (the "***Register***") for the recordation of the name and address of each Lender, the outstanding Principal, accrued and unpaid interest and other fees due it hereunder (any such amount a "Borrower Obligation") and whether such Lender is the original Lender or an assignee pursuant to an assignment under Section 10.21 hereof. The Register shall be made available for inspection by Borrower or Lender at any reasonable time and from time to time upon reasonable prior notice. The entries in the Register shall be conclusive, absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as the owner of any Borrower Obligation held by such holder, as indicated in the Register, for all purposes of this Agreement.

**10.31 <u>Counterparts</u>**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**10.32 <u>Cross Default; Cross Collateralization</u>**. Each Borrower acknowledges that Lender has made the Loan to Borrowers upon the security of its collective interest in the Properties and in reliance upon the aggregate of the Properties taken together being of greater value as collateral security than the sum of the Properties taken separately. Each Borrower agrees that the

Mortgages are and will be cross-collateralized and cross-defaulted with each other so that (i) an Event of Default under any of the Mortgages shall constitute an Event of Default under each of the other Mortgages which secure the Note; (ii) an Event of Default under the Note or this Agreement shall constitute an Event of Default under each Mortgage; and (iii) each Mortgage shall constitute security for the Note as if a single blanket lien were placed on all of the Properties as security for the Note.

**10.33 Contribution Among Borrowers**. Notwithstanding that Borrowers are jointly and severally liable to Lender for payment of the Loan, as among Borrowers, each shall be liable only for such Borrower's Allocated Amount (as hereinafter defined) and, accordingly, each Borrower whose Property or other assets are, from time to time, utilized to satisfy a portion of the Debt in excess of such Borrower's Allocated Loan Amount, shall be entitled, commencing 95 days after payment in full of the Debt, to contribution from each of the other Borrowers pro-rata in accordance with their respective liabilities in accordance with this Agreement. The "Allocated Amount" for each Borrower shall equal the Allocated Loan Amount for the Property owned by such Borrower.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**AHP FT WAYNE INN, LLC,**
a Delaware limited liability company

By: ______________________________
Name: Joel M. Eastman
Title: Executive Vice President

**AHP FT WAYNE SUITES, LLC,**
a Delaware limited liability company

By: ______________________________
Name: Joel M. Eastman
Title: Executive Vice President

*[Signatures continue on the following page]*

**LENDER:**

**SOCIETE GENERALE**

By: ______________________
Name: Kevin Kelley
Title: Director

# Exhibit A

## Location of Properties

**1. Hilton Garden Inn Fort Wayne, 8615 US 24 West, Fort Wayne, IN 46804**

Part of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana, described as follows:

Commencing at the Southwest corner of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana; thence North 00 degrees 17 minutes West (bearings in this description are based on the Indiana Highway Commission bearing of North 00 degrees 08 minutes East for the centerline of Interstate Highway #69) 523.00 feet; thence North 89 degrees 39 minutes 44 seconds East, 20.1 feet; thence North 19 degrees 50 minutes East 89.38 feet to a point on the South right of way line of U.S. highway #24; thence North 69 degrees 34 minutes 53 seconds East, along the South right of way line of U.S. Highway #24, a distance of 96.00 feet; thence South 20 degrees 25 minutes 07 seconds East, 48.00 feet; thence north 69 degrees 34 minutes 53 seconds East, 24.50 feet; thence South 20 degrees 25 minutes 07 seconds East, 154.54 feet to the point of beginning; thence North 89 degrees 39 minutes 44 seconds East, 59.59 feet; thence South 69 degrees 34 minutes 53 seconds West, 55.97 feet; thence North 20 degrees 25 minutes 07 seconds West, 20.46 feet to the point of beginning, said in previous deeds to contain 0.013 acre (572.5 square feet), more or less.

ALSO:

Part of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana, more particularly described as follows:

Commencing at the Southwest corner of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana; thence North 00 degrees 17 minutes West (bearings on this description are based on the Indiana State highway Commission bearing of North 00 degrees 08 minutes East for the centerline of Interstate Highway #69) a distance of 523.0 feet; thence North 89 degrees 43 minutes East, a distance of 20.1 feet to the point of beginning; thence North 19 degrees 50 minutes East, a distance of 89.38 feet to a point of the South right of way line of U.S. Highway #24; thence North 69 degrees 34 minutes 53 seconds East along the South right of way line of U.S. Highway #24, a distance of 336.5 feet to a point on the Westerly right of way line of Interstate Highway #69; thence South 81 degrees 58 minutes 35 seconds East along said right of way line a distance of 90.78 feet; thence South 46 degrees 10 minutes East along said right of way line a distance of 90.78 feet; thence South 14 degrees 29 minutes 12 seconds East along said right of way line a distance of 89.8 feet; thence South 75 degrees 30 minutes 48 seconds West a distance of 49.0 feet; thence South 14 degrees 29 minutes 12 seconds East, a distance of 41.12 feet; thence South 89 degrees 39 minutes 44 seconds West a distance of 142.5 feet; thence South 00 degrees 20 minutes 16 seconds East a distance of 49.0 feet; thence South 89 degrees 39 minutes 44 seconds West a distance of 164.0 feet; thence North 20 degrees 25 minutes 27 seconds West a distance of

69.16 feet; thence South 89 degrees 39 minutes 44 seconds West a distance of 156.06 feet to the point of beginning, said in previous deeds to contain 2.0 acres, more or less.

EXCEPTING THEREFROM:

Part of the Southeast Quarter of Section 23, Township 30 north, Range 11 East, Allen County, Indiana, described as follows:

Commencing at the Southwest corner of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana; thence North 00 degrees 17 minutes West (bearings in this description are based on the Indiana Highway Commission bearing of North 00 degrees 08 minutes East for the centerline of Interstate Highway #69) 523.00 feet; thence North 89 degrees 39 minutes 44 seconds East, 20.1 feet to the point of beginning; thence north 19 degrees 50 minutes East 89.38 feet to a point on the South right of way line of U.S. Highway #24; thence North 69 degrees 34 minutes 53 seconds East, along the South right of way line of U.S. Highway #24, a distance of 96.00 feet; thence South 20 degrees 25 minutes 07 seconds East, 48.00 feet; thence North 69 degrees 34 minutes 53 seconds East, 24.50 feet; thence South 20 degrees 25 minutes 07 seconds East, 154.54 feet; thence South 89 degrees 39 minutes 44 seconds West, 33.73 feet; thence North 20 degrees 25 minutes 07 seconds West, 69.16 feet; thence South 89 degrees 39 minutes 44 seconds West, 156.06 feet to the point of beginning, said in previous deeds to contain 0.391 acre, more or less.

PARCELS II BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Part of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana, described as follows:

Commencing at the Southwest corner of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana; thence North 00 degrees 17 minutes West (bearings in this description are based on the Indiana Highway Commission bearing of North 00 degrees 08 minutes East for the centerline of Interstate Highway #69) 523.00 feet; thence North 89 degrees 39 minutes 44 seconds East, 20.1 feet; thence North 19 degrees 50 minutes East, 89.38 feet to a point on the South right of way line of U.S. Highway #24: thence North 69 degrees 34 minutes 53 seconds East, along the South right of way line of U.S. Highway #24, a distance of 96.00 feet to the point of beginning; thence continuing North 69 degrees 34 minutes 53 seconds East, along said South right of way line, 240.50 feet to a point of the Westerly right of way line of Interstate Highway g#69; thence South 81 degrees 58 minutes 35 seconds East, along said South right of way line, 90.78 feet; thence South 46 degrees 10 minutes 00 seconds East along said right of way line 90.78 feet; thence South 14 degrees 29 minutes 12 seconds East, along said right of way line, 89.80 feet; thence South 75 degrees 30 minutes 48 seconds West, 49.00 feet; thence South 14 degrees 29 minutes 12 seconds East, 41.12 feet; thence South 89 degrees 39 minutes 44 seconds West, 142.50 feet; thence South 00 degrees 20 minutes 16 seconds East, 49.00 feet; thence South 89 degrees 39 minutes 44 seconds West, 70.68 feet; thence South 69 degrees 34 minutes 53 seconds West, 55.97 feet; thence North 20 degrees 25 minutes 07 seconds West, 175.00 feet; thence South 69 degrees 34 minutes 53 seconds West, 24.50 feet; thence North 20 degrees 25 minutes 07 seconds West,

48.00 feet to the point of beginning, said in previous deeds to contain 1.632 acres, more or less and subject to easements and rights of way of record.

TOGETHER WITH and subject to a non-exclusive perpetual easement for the purpose of ingress and egress as created by Coventry Plaza Cross Easement Agreement with covenants and restrictions affecting land as recorded March 8, 2000 as Document #200014202.

ALSO TOGETHER WITH: A non-exclusive perpetual easement for the purpose of ingress and egress as created by the First Amendment to Coventry Plaza Cross Easement Agreement with covenants and restrictions affecting land recorded March 15, 2007 as Document Number 207014987.

ALSO together with and subject to: A non-exclusive perpetual easement for parking purposes as created by Coventry Plaza Cross Easement Agreement with covenants and restrictions affecting land, as recorded March 8, 2000 as Document #200014202.

For information purposes only, the property address is purported to be: 8615 US 24, Fort Wayne, IN 46804

**2. Homewood Suites Fort Wayne, 8621 US Hwy 24 West, Fort Wayne, IN 46804**

Land situated in the County of Allen, State of Indiana, is described as follows:

Part of the Southeast Quarter of Section 23, Township 30 north, Range 11 East, Allen County, Indiana, described as follows:

Commencing at the Southwest corner of the Southeast Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana; thence North 00 degrees 17 minutes West (bearings in this description are based on the Indiana Highway Commission bearing of North 00 degrees 08 minutes East for the centerline of Interstate Highway #69), 523.00 feet; thence North 89 degrees 39 minutes 44 seconds East, 20.1 feet to the Point of Beginning; thence North 19 degrees 50 minutes East, 89.38 feet to a point on the South right-of-way line of U.S. Highway #24; thence North 69 degrees 34 minutes 53 seconds East, along the South right-of-way line of U.S. Highway #24, a distance of 96.00 feet; thence South 20 degrees 25 minutes 07 seconds East, 48.00 feet; thence North 69 degrees 34 minutes 53 seconds East, 24.50 feet; thence South 20 degrees 25 minutes 07 seconds East 175.00 feet; thence North 69 degrees 34 minutes 53 seconds East, 55.97 feet; thence North 89 degrees 39 minutes 44 seconds East, 70.68 feet to a point on the Easterly line of a 0.384 acre Ingress/Egress Easement described in Exhibit “D” of Document #200014202; thence on the Easterly , Southeasterly and Southerly lines of said Easement by the following 3 courses; South 00 degrees 20 minutes 16 seconds East 91.00 feet; thence South 32 degrees 11 minutes 47 seconds West, 79.53 feet to a point in the South line of a 4.574-acre parcel described in Document #99-10943; thence South 89 degrees 39 minutes 44 seconds West, on said South line, 266.24 feet to the Southwest corner of said 4.574-acre Parcel; thence North 00 degrees 17 minutes 00 seconds West, on the West line of said 4.574-acre parcel, 102.97 feet; thence South 89 degrees 43 minutes 00 seconds West 25.10 feet to a point on the Easterly right-of-way line of Ellison Road as described

in Document #71-4842; thence north 00 degrees 17 minutes 00 seconds West, on said Easterly right of way line, being parallel with and 30 feet East of the West line of said Southeast Quarter, 120.00 feet; thence South 89 degrees 39 minutes 44 seconds West 9.90 feet to the Point of Beginning, containing 1.733 acres, more or less and subject to Easements and rights of way of record.

TOGETHER with and subject to: A Non-Exclusive Perpetual Easement for the purpose of Ingress and Egress as created by Coventry Plaza Cross Easement Agreement with Covenants and Restrictions affecting land, as recorded March 8, 2000 as Document #200014202 amended by First Amendment to Coventry Plaza Cross Easement Agreement with Covenants and Restrictions affecting land as recorded March 15, 2007 as Document #207014987, over and across the real estate described in Exhibit A of said First Amendment.

For information purposes only, the property address is purported to be: 8621 US 24, Fort Wayne, IN 46804

**Exhibit B**

**Allocated Loan Amounts**

| Property Name | City / State | Allocated Cut-off Date Balance Loan Amount | % of Allocated Loan Amount |
|---|---|---|---|
| Hilton Garden Inn Fort Wayne | Fort Wayne, IN | $8,883,986 | 56.23% |
| Homewood Suites Fort Wayne | Fort Wayne, IN | $6,916,014 | 43.77% |
| **Total** | | **$15,800,000** | **100.0%** |

# EXHIBIT C-1

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the **LOAN AGREEMENT**, dated as of [____________], ______________________________ **AND** _________________________________ (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement").

Pursuant to the provisions of Section 10.24.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrower, and (2) the undersigned shall have at all times furnished Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:________________________________________
Name:
Title:
Date: ________ __, 20[ ]

# EXHIBIT C-2

FORM OF

U.S. TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the **LOAN AGREEMENT**, dated as of _________________, 20__ between ____________________________ **AND** _______________________________ (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement").

Pursuant to the provisions of Section 10.24.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_____________________________________
Name:
Title:
Date: ________ __, 20[ ]

# EXHIBIT C-3

FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the **LOAN AGREEMENT**, dated as of ________________, 20__ between ______________________________ **AND** _________________________________ (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement").

Pursuant to the provisions of Section 10.24.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:_______________________________________
Name:
Title:
Date: ________ __, 20[ ]

# **EXHIBIT C-4**

FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the **LOAN AGREEMENT**, dated as of __________________, 20__ between ______________________________ **AND** ________________________________ (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement").

Pursuant to the provisions of Section 10.24.6 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrower, and (2) the undersigned shall have at all times furnished Borrower with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:________________________________________
Name:
Title:
Date: ________ __, 20[ ]

## Schedule 1

## Required Repairs

| | Homewood Suites | Quantity | Unit | Unit Cost | Total Cost | Inflated Cost 110% | Time to Complete |
|---|---|---|---|---|---|---|---|
| *4.0* | *Structural Frame and Building Envelope* | | | | | | |
| 4.3.1 | The exterior walls were observed to be in generally fair condition. Partner identified cracked and distressed EIFS at the building façade, with localized staining. Partner recommends that the distressed EIFS be repaired at this time to prevent water infiltration. In addition, Partner recommends that the exterior wall scour be cleaned and repainted as needed at this time. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | EA | $15,000 | $15,000 | $16,500 | 120 days |
| 4.3.1 | Partner identified numerous areas of cohesion failure at caulk joints between wall and window frames, as well as areas of missing caulk at joints. Portions of the caulk joints appeared to have been applied directly over the original compromised caulk joint and not properly removed / cut out, as typically done when a caulk joint is replaced. Partner recommends that the building be recaulked at this time. Due to the potential | 1 | EA | $25,000 | $25,000 | $27,500 | 120 days |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | for varying and unforeseen circumstances, an allowance has been provided. An opinion of cost has been included in Table 1. | | | | | | |
| 4.3.2 | Windows were reported and observed to be in good to fair condition. Partner identified localized windows with a fogged appearance, indicative of compromised wet seals and entrapped moisture. Partner recommends that the distressed windows be replaced at this time. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | LS | $13,750 | $13,750 | $15,125 | 120 days |
| *5.0* | *Mechanical and Electrical Systems* | | | | | | |
| 5.4.1 | According to the site contact, the jack seals on one of the elevators was recently replaced. The jack seal at the remaining elevator should be replaced at this time to prevent possible elevator damage and inconvenience to the hotel guests. Partner recommends that the jack seal be replaced at this time. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | LS | $25,000 | $25,000 | $27,500 | 120 days |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5.5.2 | The unit smoke detectors were observed to be in good to fair condition and original. According to the Fire alarm Test Report, prepared by Fairchild Communication Systems, Inc., dated October 10, 2017, "FCPS on 6th floor; diagnostic LEDs are not operating, Panel did not operate under alarm." Partner recommends that the deficiency be investigated and repaired as necessary at this time. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | EA | $10,000 | $10,000 | $11,000 | 45 days |
| *7.0* | *Accessibility* | | | | | | |
| 7.0 | Retrofit and install permanently built-in communication features in nine of the currently non-ADA guest rooms. ADA communication features include ADA fire alarms, ADA notification devices, and, telephone interface jacks that are compatible with both digital and analog signal use. Note that communication features are required to be builtin, per the 2010 ADA Standards. Portable kits no longer satisfy the ADA requirements for communication rooms. | 9 | EA | $2,500 | $22,500 | $24,750 | 90 days |
| | **Total** | | | | **$111,250** | **$122,375** | |

| | Hilton Garden Inn | Quantity | Unit | Unit Cost | Total Cost | | |
|---|---|---|---|---|---|---|---|
| *3.0* | *Site Improvements* | | | | | | |
| 3.2.7 | The dumpster enclosure was identified as being in good to fair condition. Partner identified localized distressed EIFS at the exterior of the enclosure, with blistered and peeling paint at the inboard CMU. Partner recommends that the distressed EIFS be patched at this time. In addition, Partner recommends that the blistered and peeling paint be scraper and repainted with two coats of paint at this time. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | LS | $2,500 | $2,500 | $2,750 | 120 days |
| 3.2.9 | The swimming pool and spa were absent an ADA lift. Partner recommends the installation of an ADA lift at this time. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | LS | $7,000 | $7,000 | $7,700 | 90 days |
| *5.0* | *Mechanical and Electrical Systems* | | | | | | |
| 5.5.2 | According to the Fire alarm Test Report, prepared by Fairchild Communication Systems, Inc. dated October 10, 2017, "NAC Panel 3 is indicating an internal ground fault isolated to the board. NAC Panel troubles are not monitored by the FACP". Partner was not provided with information conforming that these repairs have been | 1 | LS | $6,500 | $6,500 | $7,150 | 45 days |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | completed. Correction of fire alarm inspection deficiencies is recommended at this time. | | | | | | |
| *7.0* | *Accessibility* | | | | | | |
| 7.0 | Convert one regular guestroom to an ADA accessible guestroom. Due to the potential for varying and unforeseen circumstances, an allowance has been provided. | 1 | EA | $12,000 | $12,000 | $13,200 | 90 days |
| | **Total** | | | | **$28,000** | **$30,800** | |

| | | |
|---|---|---|
| | | **(Reserved)** |
| **Grand Total** | **$139,250** | **$153,175** |

**Schedule 2**

**Exceptions to Representations and Warranties**

None.

# Schedule 3

## Rent Roll

Office Sublease, dated as of August 16, 2018, between APIP-C Ft. Wayne Inn Master Tenant, LLC, a Delaware limited liability company, as sublessor and Superhost Hospitality, Inc., an Indiana corporation, as subtenant, expiring on August 15, 2019 – subject to two (2) one-year extension options with annual rent of $3,500.

**Schedule 4**

**Organization of Borrower**

(attached hereto)

# ASPECT / PHX JV structure ±

Note: No individual investor owns greater than 10% of the property owners / borrowers or franchisees.




24643493.2

¹APIP-C Borrower LLC checks box to be taxed as a corporation.
± See page 2 for Ownership structure of Phoenix American Hospitality, LLC


6409 Partners, Ltd
W.L. "Perch" Nelson
Member
9.5%
90.5%
100%
Phoenix American
Hospitality, LLC
Delaware
26-4816977
William L. Nelson-
Manager
PAH Management,
LLC
Delaware
81-3508961
Ops Manager
Properties

# Schedule 5

## Definition of Special Purpose Bankruptcy Remote Entity

Except as otherwise expressly provided hereunder, including, without limitation, each individual Borrower's acting as a surety and guarantor of another individual Borrower's obligations under the Loan Documents:

(I) A "Special Purpose Bankruptcy Remote Entity" means (x) a limited liability company that is a Single Member Bankruptcy Remote LLC or (y) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

(i) was and will be organized solely for the purpose of (A) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the individual Property owned by it, obtaining the Loan form Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (B) acting as a managing member of the individual Borrower that owns the individual Property; or (C) acting as a general partner of the individual Borrower that owns the individual Property;

(ii) has not engaged and will not engage in any business or activity unrelated to the business or activities set forth in clause (i) immediately above;

(iii) has not owned and will not own any assets other than (A) the individual Property; (B) such incidental Personal Property as may be necessary for the operation of the individual Property; (C) if applicable, the general partnership interest, or the managing member interest, in the individual Borrower that owns the individual Property; and (D) cash and other assets or revenues received from the activities set forth in (i) immediately above;

(iv) has not engaged, sought or consented to and will not, to the extent permitted under applicable law, engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

(v) if such entity is a limited partnership, has and will have, as its only general partners, Special Purpose Bankruptcy Remote Entities that are corporations or Single Member Bankruptcy Remote LLCs;

(vi) if such entity is a corporation, has and will have at least two (2) Independent Directors, and has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of 100% of the members of its board of directors unless all of the directors and all Independent Directors shall have participated in such vote, and the organizational documents of such entity shall provide that no Independent Director may be removed or replaced without Cause and unless such entity provides Lender with not less than five (5) Business Days'

prior written notice of (a) any proposed removal of an Independent Director, together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director;

(vii) if such entity is a limited liability company, has and will have at least one (1) member that has been and will be a Special Purpose Bankruptcy Remote Entity that has been and will be a corporation or a Single Member Bankruptcy Remote LLC and such corporation or Single Member Bankruptcy Remote LLC is the managing member of such limited liability company;

(viii) if such entity is a limited liability company, has and will have articles of organization, a certificate of formation and/or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of a majority-in-interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the applicable Rating Agencies for as long as the Loan is outstanding;

(ix) has not, and without the unanimous consent of all of its partners, directors or members (including all Independent Directors), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

(x) has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations, provided that revenues from the operation of the Property are sufficient and are made available to a Borrower to enable it to do so, and provided further, that the foregoing shall not require any direct or indirect member, partner or shareholder of such Borrower or any other Person to make any additional capital contributions, loans or other equity infusions to such Borrower;

(xi) has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii) has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns, if any, as may be required under

applicable law, or the extent such entity is (A) not part of a consolidated group filing a consolidated tax return or tax returns, provided, however, that any such consolidated tax return shall contain a note indicating an individual Borrower's separateness from such co-filing entities and that its separate assets and liabilities are neither available to pay the debts of the co-filing entities nor constitute obligations of the co-filing entities, or (B) not treated as a division solely for tax purposes of another taxpayer, and has paid and will pay any taxes so required to be paid under applicable law;

(xiii) has maintained and will maintain its books, records, resolutions and agreements separate and apart from those of the partners, members, shareholders, principals and Affiliates of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity, except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP, the Uniform System of Accounts for Hotels or such other accounting basis in general use selected by a Borrower and reasonably approved by Lender in writing in advance; provided, however, that any such consolidated financial statement shall contain a note indicating an individual Borrower's separateness from such partners, members, shareholders, principals and Affiliates and that its separate assets and liabilities are neither available to pay the debts of such partners, members, shareholders, principals and Affiliates nor constitute obligations of them;

(xiv) except with respect to any co-Borrower, has not commingled and will not commingle its funds or assets with those of any other Person;

(xv) has held and will hold its assets in its own name and has conducted and will conduct its business in its own name or a name franchised or licensed to it by an entity other than an Affiliate of a Borrower or Manager;

(xvi) has conducted and will conduct its business in its name franchised or licensed to it by an entity other than an Affiliate of a Borrower or manager in order not (A) to mislead others as to the identity with which such other party is transacting business, or (B) to suggest that such entity is responsible for the debts of any third party (including any general partner, managing member, shareholder, principal or Affiliate of such entity but not including any Single Purpose Entity limited partnership of which such entity is expressly permitted to be a general partner in accordance with the terms of this Agreement or other than another Borrower under this Agreement) and/or the Loan Documents;

(xvii) subject to a Borrower's right to contest in accordance with the terms of this Agreement, has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets, provided that revenues from the operation of the Property are sufficient and are made available to a Borrower to enable it to do so, and provided further, that the foregoing shall not require any direct or indirect member, partner or shareholder of such Borrower or any other Person to make any additional capital contributions, loans or other equity infusions to such Borrower;

(xviii) has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xix) (A) if such entity owns the Property, has not and will not have any indebtedness other than Permitted Indebtedness, or (B) if such entity acts as the general partner of a limited partnership which owns the Property, has not and will not have any indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $20,000 and (2) are paid within sixty (60) days of the date incurred, or (C) if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $20,000 and (2) are paid within sixty (60) days of the date incurred;

(xx) has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xxi) has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxii) has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks, provided, however, that this shall not require any equity owner to make additional capital contributions to the applicable Borrower (or prohibit them from doing so);

(xxiii) except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxiv) has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxv) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxvi) except with respect to any co-Borrower or in connection with the Loan, has not made and will not make loans to any Person;

(xxvii) has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP, the Uniform System of Accounts for Hotels or such other accounting basis in general use selected by a Borrower and reasonably approved by Lender

in writing in advance; provided, however, that any such consolidated financial statement shall contain a note indicating an individual Borrower's separateness from such Affiliate and that its separate assets and liabilities are neither available to pay the debts of such Affiliate nor constitute obligations of the consolidated entity;

(xxviii) other than with respect to the Loan and the Master Lease Documents, has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxix) has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxx) has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents; and

(xxxi) will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

(II) "Single Member Bankruptcy Remote LLC" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter:

(i) was and will be organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the individual Property owned by it, obtaining the Loan from Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(ii) has not engaged and will not engage in any business or activity unrelated to (the business or activities set forth in clause (i) immediately above;

(iii) has not owned and will not own any assets other than (A) the individual Property, (B) such incidental Personal Property as may be necessary for the operation of the individual Property, and (C) cash and other assets or revenues received from the activities set forth in (i) immediately above;

(iv) has not engaged, sought or consented to and will not, to the extent permitted under applicable law, engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of membership interests or the like, or amendment of its limited liability company agreement or certificate of formation;

(v) has not, and without the unanimous consent of all of directors (including all Independent Directors), as applicable, will not, with respect to itself or to any other

entity in which it has a direct or indirect legal or beneficial ownership interest (A) file a bankruptcy, insolvency or reorganization petition or otherwise institute insolvency proceedings or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for such entity or for all or any portion of such entity's properties, (C) make any assignment for the benefit of such entity's creditors or (D) take any action that might cause such entity to become insolvent;

(vi) has remained and intends to remain solvent and has maintained and intends to maintain adequate capital in light of its contemplated business operations, provided that revenues from the operation of the Property are sufficient and are made available to a Borrower to enable it to do so, and provided further, that the foregoing shall not require any direct or indirect member of such Borrower or any other Person to make any additional capital contributions, loans or other equity infusions to such Borrower;

(vii) has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(viii) has maintained and will maintain its books, records, resolutions, financial statements, accounting records and agreements separate and apart from those of the members, principals and Affiliates of such entity, and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity, except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP, the Uniform System of Accounts for Hotels or such other accounting basis in general use selected by a Borrower and reasonably approved by Lender in writing in advance; provided, however, that any such consolidated financial statement shall contain a note indicating an individual Borrower's separateness from such members, principals and Affiliates and that its separate assets and liabilities are neither available to pay the debts of such members, principals and Affiliates nor constitute obligations of them;

(ix) except with respect to any co-Borrower, has not commingled and will not commingle its funds or assets with those of any other Person;

(x) has held and will hold its assets in its own name and has conducted and will conduct its business in its own name or a name franchised or licensed to it by an entity other than an Affiliate of a Borrower or Manager;

(xi) has conducted and will conduct its business in its name franchised or licensed to it by an entity other than an Affiliate of a Borrower or manager in order not (A) to mislead others as to the identity with which such other party is transacting business, or (B) to suggest that such entity is responsible for the debts of any third party (including any managing member, principal or Affiliate of such entity or other than another Borrower under this Agreement) and/or the Loan Documents;

(xii) subject to a Borrower's right to contest in accordance with the terms of this Agreement, has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets, provided that revenues from the operation of the Property are sufficient and are made available to a Borrower to enable it to do so, and provided further, that the foregoing shall not require any direct or indirect member of such Borrower or any other Person to make any additional capital contributions, loans or other equity infusions to such Borrower;

(xiii) has observed and will observe all limited liability company formalities;

(xiv) has not and will not have any indebtedness other than Permitted Indebtedness;

(xv) has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except for the Loan;

(xvi) has not and will not acquire obligations or securities of its members;

(xvii) has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks, provided, however, that this shall not require any equity owner to make additional capital contributions to the applicable Borrower (or prohibit them from doing so);

(xviii) except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xix) has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xx) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxi) except with respect to any co-Borrower or in connection with the Loan, has not made and will not make loans to any Person;

(xxii) has not identified and will not identify its members or any Affiliate of any of them, as a division or part of it, except that such entity's financial position, assets, results of operations and cash flows may be included in the consolidated financial position, assets, results of operations and cash flows may be included in the consolidated financial statements of an Affiliate of such entity in accordance with GAAP, the Uniform System of Accounts for Hotels or such other accounting basis in general use selected by a Borrower and reasonably approved by Lender in writing in advance; provided, however, that any such consolidated financial statement shall contain a note indicating an individual Borrower's separateness from such Affiliate and that its separate assets and liabilities are

neither available to pay the debts of such Affiliate nor constitute obligations of the consolidated entity;

(xxiii) other than with respect to the Loan and the Master Lease Documents, has not entered into or been a party to, and will not enter into or be a party to, any transaction with its members or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party;

(xxiv) has and will have no obligation to indemnify its officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation;

(xxv) has and will have an express acknowledgment in its organizational documents that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents;

(xxvi) will consider the interests of its creditors in connection with all limited liability company actions;

(xxvii) has and will have an operating agreement which provides that (A) the business and affairs of Borrower shall be managed by or under the direction of its Sole Member, and at all times there shall be at least two (2) duly appointed Independent Directors of each Borrower, and the Sole Member will not take any action requiring the unanimous affirmative vote of 100% of the Sole Member and the two (2) Independent Directors unless, at the time of such action there are at least two (2) Independent Directors, and all of the directors and all Independent Directors shall have participated in such vote and (B) the Independent Directors shall not have any fiduciary duties to any member, any officer or any other Person bound by the Borrower's organizational documents; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing;

(xxviii) has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding, (A) upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), the person acting as an Independent Director of Borrower shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "Special Member") and shall preserve and continue the existence of Borrower without dissolution, (B) no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its

appointment as an Independent Director, (C) no Independent Director may be removed or replaced without Cause and unless the company provides Lender with not less than three (3) Business Days' prior written notice of (a) any proposed removal of an Independent Director, together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Director, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director, and (D) except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower; and

(xxix) has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding, (A) Borrower shall be dissolved, and its affairs shall be wound up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "Delaware Act") or (y) the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act; (B) upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower; (C) the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution; (D) in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Delaware Act; and (E) to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

(III) "Cause" shall mean, with respect to an Independent Director or Independent Manager, (i) acts or omissions by such Independent Director or Independent Manager, as applicable, that constitute willful disregard of, or gross negligence with respect to such Independent Director's or Independent Manager's, as applicable, duties, (ii) such Independent Director or Independent Manager, as applicable, has engaged in or has been charged with or has been indicted or convicted for any crime or crimes of fraud or other acts constituting a crime under any law applicable to such Independent Director or Independent Manager, as applicable, (iii) such Independent Director or Independent Manager, as applicable, has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of Borrower's organizational documents, (iv) there is a material increase in the fees charged by such Independent Director or Independent Manager, as applicable, or a material change to such Independent Director's or Independent Manager's, as applicable, terms of service, (v) such Independent Director or Independent Manager, as applicable, is unable to perform his or her duties as Independent Director or Independent Manager, as applicable, due to death, disability or incapacity, or (vi) such Person no longer meets the criteria provided in the definition of Independent Director or Independent Manager, as applicable.

(IV) "Independent Director" or "Independent Manager" means a natural person selected by Borrower (a) with prior experience as an independent director, independent manager or independent member, (b) with at least three (3) years of employment experience, (c) who is provided by a Nationally Recognized Service Company (defined below), (d) who is duly appointed as an Independent Director or Independent Manager and is not, will not be while serving as Independent Director or Independent Manager (except pursuant to an express provision in Borrower's operating agreement providing for the appointment of such Independent Director or Independent Manager to become a "special member" upon Sole Member ceasing to be a member of Borrower) and shall not have been at any time during the preceding five (5) years, any of the following:

(i) a stockholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of Borrower, any Affiliate of Borrower or any direct or indirect parent of Borrower;

(ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower or any Affiliate of Borrower;

(iii) a Person or other entity Controlling or under Common Control with any such stockholder, partner, customer, supplier or other Person; or

(iv) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person.

A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the Independent Director or Independent Manager of a "special purpose entity" affiliated with Borrower shall be qualified to serve as an Independent Director or Independent Manager of Borrower, provided that the fees that such individual earns from serving as Independent Director or Independent Manager of affiliates of Borrower in any given year

constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

A natural person who satisfies the foregoing definition other than clause (ii) shall not be disqualified from serving as an Independent Director or Independent Manager of Borrower if such individual is an independent director, independent manager or special manager provided by a Nationally Recognized Service Company that provides professional independent directors, independent managers and special managers and also provides other corporate services in the ordinary course of its business.

(V) "Nationally Recognized Service Company" means any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., National Corporate Research, Ltd., Cogency Global, Inc., Wilmington Trust Company or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to Lender, in each case that is not an Affiliate of Borrower and that provides professional independent directors and other corporate services in the ordinary course of its business.

# Schedule 6

## Secondary Market Transaction Information

(A) Any proposed program for the renovation, improvement or development of the Properties, or any part thereof, including the estimated cost thereof and the method of financing to be used.

(B) The general competitive conditions to which the Properties are or may be subject.

(C) Management of the Properties.

(D) Occupancy rate expressed as a percentage for each of the last five years.

(E) Principal business, occupations and professions carried on in, or from the Properties.

(F) Number of tenants occupying 10% or more of the total rentable square footage of any of the Properties and principal nature of business of such tenant, and the principal provisions of the Leases with those tenants including, but not limited to: rental per annum, expiration date, and renewal options.

(G) The average effective annual rental per square foot or unit for each of the last three years prior to the date of filing.

(H) Schedule of the Lease expirations for each of the ten years starting with the year in which the registration statement is filed (or the year in which the prospectus supplement is dated, as applicable), stating:

(1) The number of tenants whose Leases will expire.

(2) The total area in square feet covered by such Leases.

(3) The annual rental represented by such Leases.

(4) The percentage of gross annual rental represented by such Leases.

## Schedule 7

**Intellectual Property/Websites**

None.

# <u>Schedule 8</u>

## REAs

1. That certain Coventry Plaza Cross Easement Agreement with Covenants and Restrictions Affecting Land, dated as of March 8, 2000 and recorded on March 8, 2000 in the Official Records of the Allen County Indiana Recorder as Document No. 200014202, as amended by that certain First Amendment to Coventry Plaza Cross Easement Agreement with Covenants and Restrictions Affecting Land, dated as of March 5, 2007 and recorded on March 15, 2007 in the Official Records of the Allen County Indiana Recorder as Document No. 207014987.

## **Schedule 9**

**PIP and PIP Budget**

# Product Improvement Plan

**Prepared for:**

## Hilton Garden Inn

**Fort Wayne, IN**
**(InnCode: FWAFE, Facility ID:27005)**

**8615 US 24 West, Fort Wayne, Indiana, United States**

**To be relicensed as a Hilton Garden Inn**

By Kenneth Savage

Inspection Date: Apr-04-2018
FINAL PIP REVISION DATE : Jun-08-2018 by Rajan Lalwani

**Brand Management Approval**

Final PIP Approval Date : Jun-08-2018

Final FLA PIP Approval Signature :

PIP Contact

FINAL PIP

# Property Information

| | |
|---|---|
| Open Date: | 2002-05-17 |
| Hotel Management Company: | SuperHost Enterprises, Inc. |
| Ownership Group: | |
| Last Renovation: | |
| Multiple Renovations: | |
| Guestrooms: | 2013: New beds, wooden bed frames and plank bathroom tile flooring. 2012: Guestroom carpet and base |
| Public Areas: | 2013: Project Grow Scenario I, All public area 18" floor tile; to include: vending, public restrooms, Pavilion, Guest Laundry, First floor hallway and elevator flooring. 2012: Meeting Room Carpet and base. 2011: Corridor carpet and base, building exterior painted, fitness center upgrades |
| | |
| Parking: | Asphalt surface |
| Pool (indoor or outdoor): | Indoor |
| Whirlpool: | Indoor |
| Hotel Van: | Yes. shared with Homewood Suites |
| Multiple Towers: | None |
| Number Floors: | 3 |
| Food Service Facilities: | Kitchen |
| Meeting Space/total size: | 2200 sq ft meeting room divided into two rooms |
| Boardroom: | None |
| Business Center: | Yes @ 7'13" |
| Gift Shop: | Pavilion Pantry |
| Exercise Room/Size: | Yes. PRECOR @ 14' X 19' |
| Date exercise room was last renovated: | 2011 |
| Other Recreation: | THIS HOTEL IS 100% NON-SMOKING |
| Retail Outlets: | None |
| Guest Laundry: | Yes @ 8' X 8' |
| Number Of Guest Rooms: | 84 |
| Accessible Rooms: | 4 |
| Guest Room Size: | 13' X 19' |
| Guest Room Mix: | |
| Typical King: | 34 |
| Typical Q/Q: | 36 |
| Typical D/D: | 0 |
| Two Bedroom(K;D/D): | |
| Suites: | |
| Junior Suites: | 10 |
| | |
| Guest Bathroom: | |
| Size: | 5' X 8' |
| Door Width: | 36" |
| Tub Surround: | 6" ceramic tile |
| Shower stalls: | 6" ceramic tile |
| Floor: | Dark brown plank tile |
| Vanity: | Granite top and apron |
| Water Closet: | Tank type w/ closed-front seats |
| | |
| HVAC System: | |
| 100% Makeup Air: | Yes 25 ton AAON units |
| Public Areas: | Packaged units |
| Guestrooms: | PTACS |
| Digital Thermostats: | Yes |
| | |
| Elevators: | 1 guest cab |
| Guest Elevator: | |
| Service Elevator: | |
| High Speed Internet (wired or wireless): | |
| Public Areas: | Stay Connected |
| Meeting Space: | Stay Connected |
| Guestrooms: | Stay Connected |
| | |
| TV Size: | 32" LED……June 2011 installation |
| Telephone System: | |
| Guestroom door lock system: | Onity locks….2002 opening installation |
| Executive Lounge: | |
| HHonors level: | |
| Fire Life Safety: | |
| Manufacturer: | |
| Installation Date: | |
| Last Fire System Upgrade Date: | |

FINAL PIP

**PLEASE NOTE: Key information about the terms and effectiveness of this Property Improvement Plan is set out at the end of the document.**

# General

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| | | **General** | |
| 1 | | All properties within the Hilton Worldwide portfolio of brands must be designed in compliance with local, regional and national codes or laws for individuals with disabilities for universal access. The more stringent between these code(s) and Section 2517.00 must be followed as a minimum. The owner of the property is responsible for compliance with and the provision of all applicable codes. The owner is urged to seek appropriate council to ensure compliance. Hilton Worldwide does not and cannot warrant conformance with or interpretation of any codes, laws or regulations relating to accessibility for individuals with disabilities. | Per Brand Standards |

# BRAND STANDARDS

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| | | **Support Rules** | |
| 2 | | The brand has implemented an updated lobby and public area refresh program – This Magnolia project touches all aspects of all common areas and includes both soft seating and other furnishings as well as flooring and hard finishes. Should Project Grow Scenario 2 (which includes Scenario 1) not be completed by the hotel, Magnolia will be required in lieu of Grow 2. For further details and approvals, contact - Design.Review@Hilton.com. | Per Brand Standards |
| 3 | | Brand Standard - All new interior design-related products and replacements must be submitted to Architecture Design & Construction for review prior to purchase and installation. For more information go to www.hiltonworldwide.com/design, select region, select Brand. Details are posted under Submittal Guidelines. | Per Brand Standards |
| 4 | | Support Rules - Structure and Décor Each hotel must maintain a structure and décor package that offers guests a fresh and contemporary product meeting brand standards. During a voluntary renovation, including the replacement of FF&E or soft goods, hotels must meet current brand standards. | Per Brand Standards |
| 5 | | The online images of the hotel must be updated within 90 days of completing the specific areas listed in the standard. To be published online, images must be taken by a professional photographer. See Standard 506.05 for specific on-line imagery requirements. | Upon Completion |
| 6 | | Brand Standard - Hilton Garden Inn is committed to providing the Digital Key option for all arriving guests. To accomplish this, the existing entrance door magnetic strip locks will need to be replaced with approved RFID locks to provide this function. For further information or any questions, send your inquiry to : ask_digitalkey@hilton.com | Per Brand Standards |
| 7 | | General - Hotel must not install wall vinyl over existing wall vinyl or paint over existing vinyl in any areas of the hotel. Old wall vinyl must be completely removed before new wall vinyl is installed. NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing wall vinyl. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | Per Brand Standards |
| 8 | | Tile must not be installed over existing tile in any areas of the property. Old tile must be completely removed before new tile is installed. | Per Brand Standards |
| 9 | | Interior Signage - Replace all interior signage - This includes room numbers, directional, informational, stariwell and way finding signage. Install approved sign package. | 24 Months |

# Commercial Facilities

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| | | **Corridors/Elevators/Stairwells** | |

FINAL PIP

| | | | |
|---|---|---|---|
| 10 | | Corridors - Replace corridor carpet, carpet pad, and base. Install approved flooring and base. | 24 Months |
| 11 | | Corridors - Tile must be provided at all exterior entrances to corridors. Install approved flooring at entrances. | 24 Months |
| 12 | | Corridors – Replace the window treatment. Decorative window treatment is required on guestroom corridor windows. Submit to Hilton Design for approval. | 24 Months |
| 13 | | Corridors - Remove telephone booths. Repair walls and ceiling and install latest finishes | 24 Months |
| 14 | | Corridors - Replace vinyl wall covering. At wall direction changes inside guestroom corridors, corner guards are required. They must be a resilient vinyl in a solid color to match the adjacent wall covering. Clear plastic guards are not allowed. They must be self-adhesive with no exposed screws or fasteners. They must extend from the floor base to the ceiling. | 24 Months |
| 15 | | Corridors – Replace current wall sconces/fixtures with updated approved fixtures. | 24 Months |
| 16 | | Elevators - Replace the white plastic panel ceiling within the elevator cabs. Install an updated ceiling system. | 24 Months |
| 17 | | Elevators -Repair or replace worn laminate in elevator cabs. | 24 Months |
| 18 | | Guest Laundry - A decorative waste receptacle and one side chair with upholstered seat is required, provide. | 24 Months |
| 19 | | Vending Areas - Provide an enclosed, flame retardant, decorative trash container and recycling container (when recycling is offered) that is pre-approved by the Brand. | 24 Months |
| 20 | | Vending - Replace ceiling mounted light fixtures. Surface mount strip fluorescent fixtures are not permitted. Install decorative fixtures - ensure all light levels are adequate and meet minimum standards. | 24 Months |
| **Exterior Components** | | | |
| 21 | | Porte Cochere - Repair damaged areas or replace drive lane. The drive lane under the Porte Cochere must be a decorative non-slip surface such as brick, stone, tile pavers, or stamped concrete. Painted finishes are not permitted. Hand troweled, scored concrete, floated concrete, or asphalt may not be used. | 24 Months |
| 22 | | Porte Cochere - Repair damaged soffit onf West side of porte cpchere (damaged by high profile trucks | 24 Months |
| 23 | | Exterior - Professionally clean building treatment to remove all discolorations. If cleaning does not return building to 'like-new', repainting of building will be required. | 24 Months |
| 24 | | Landscape - Renovate the landscape. This hotel a requires a comprehensive renovation of the landscape to provide an upscale look and appearance. Remove all dead and dying trees/shrubs. Replace all missing or dead plant material, including grass. Remove all stumps and overgrown greenery. A landscape architect must be retained and plans submitted for review and approval. | 24 Months |
| 25 | | Signage - All hotels 10 years of age and older must have a sign survey completed to ensure that the signage meets current brand standards. An approved sign vendor must be used. A list of approved vendors is available on "The Lobby". In addition, the scope of work included on the sign survey must be completed to satisfy this PIP requirement. | 24 Months |
| 26 | | Parking Lot - Repair damaged areas in the parking lot. Re-seal and re-stripe the parking lot. | 24 Months |
| 27 | | Parking Lot - Install continuous concrete curbing at end and back side of building parking lots. Remove all concrete parking bumpers before parking lot repairs are made. | 24 Months |
| **Pavilion Pantry/Business Center** | | | |
| 28 | | Business Center - Replace all carpet and carpet pad. Install approved flooring and base. | 36 Months |
| 29 | | Business Center - Install vinyl wall covering. | 36 Months |
| 30 | | Business Center - Replace both lower and upper cabinets; counter tops. Upper, lower cabinets must be furniture quality with all exposed surfaces made of wood. Desk top must be 30" above the finished floor and made of solid surface, stone, or composite stone material | 36 Months |
| 31 | | Business Center - Replace desk chairs. Install approved seating. | 36 Months |
| 32 | | Business Center - Provide an effective cord management system | 36 Months |

FINAL PIP

| | | | |
|---|---|---|---|
| 33 | | Retail Space - Hilton Garden Inn is implementing a more robust version of the sundries shop. This retail space will offer a wider variety of selections for guests. The location and size of the foot print of this location will require creativity in scaling for maximum functionality. Refer to the Design Guide and Design Review (https://designinformation.hilton.com/api/Document/41c07397- cd88- 43e8- bd11- dbcf9d373062 -- Retail Space & Breakfast Adaption Guide v.1.1 May, 2017) for direction. Retail Space Operational information (renovation guide, set up, ordering, approved products, etc.) are available on The Lobby - https://lobby.hilton.com/brands/hgi/Pages/food- beverage/us- canada/pavilion-pantry- us- and- canada.aspx | 36 Months |
| 34 | | Pavilion Pantry – Replace the refrigeration/freezer equipment, they are original (16 yrs old). Exterior surfaces must be black. Interior surfaces must be white. The refrigerator and freezer must match in size and color. | 36 Months |
| **Pavilion** | | | |
| 35 | | Front Desk - The front desk must be freestanding, open on both sides. The design must be a linear stacked formation in a wood finish. The area is defined by an architectural wrapped soffit in a wood finish to match the front desk. Recessed lighting must be incorporated into the soffit. Refer to the Design Guide and prototype drawings for millwork details. The top surface material must be compliant with Section 2515.04 and must be white in coloration. | 36 Months |
| 36 | | Front Desk - Wall finish on the back wall of the front desk may be customized per property but must be neutral in coloration to allow the required Brand graphic to stand out. The finish should have textural interest such as a dimensional wall panel, tile, or heavy texture wall vinyl. Refer to the Design Guide and prototype for more information. | 36 Months |
| 37 | | Lobby - The brand has developed a complete lobby refresh program. The Magnolia Lobby contains all elements for the entire lobby as shown on the prototype drawings: Reception Desk, The Shop, TV/Media Wall, Feature Wall (fireplace optional), Lounge and Dining Seating, Bar, Open Kitchen and Chef's Tables. Refer to the latest Design Guide for more information. Information on the dining area, buffet (Chef's Tables) and bar can be found in Section 2504.00 of the brand standards manual. For further details, contact Heather Lipke at Heather.Lipke@Hilton.com. All non-prototypical properties must obtain direction from Hilton Global Design regarding design intent and requirements. | 36 Months |
| 38 | | Lobby - Replace all carpet and carpet pad. Install approved flooring and base. | 36 Months |
| 39 | | Lobby - Paint cupola ceiling an accent color. The cupola ceiling must be painted to match the accent wall at the buffet/kitchen window. Refer to the FF&E Specifications for color options. | 36 Months |
| 40 | | Lobby - Replace lobby wall finishes (vinyl or paint required). | 36 Months |
| 41 | | Lobby - Install a Media Wall. Media Wall configuration and finishes may be customized per property. It must incorporate a 70” minimum HDTV and a print station for guest use. The inset wall at TV/Media wall must be finished in a contrasting color to the overall lobby wall color and must display an approved Brand graphic. | 36 Months |
| 42 | | Lobby - Replace all window treatments. Solar shades must be provided at the expanse of windows in the lobby/bar area. | 36 Months |
| 43 | | Lobby - Cabana drapes are no longer permitted, remove. All columns must be finished appropriately with architectural base (local treatment, faux rock, etc.). | 36 Months |
| 44 | | Lobby – Provide a communal table. The communal table within the center of the Conservatory lobby must be a fixed counter height table with integrated power outlets for guest use. The table must seat a minimum of 10 persons, utilizing counter height stools. | 36 Months |
| 45 | | Lobby - Replace all seating. Seating within the entire lobby must be composed of the lounge, dining area, buffet (Chef's Tables) and bar. Refer to the prototype for positioning of these within the lobby. | 36 Months |
| 46 | | Lobby - Seating at TV/Media Wall must be a mix of contemporary modular seating (with incorporated power outlets), ottomans and lounge chairs with a mix of coffee tables and side tables. | 36 Months |
| 47 | | Lobby - Seating at Feature Wall must be a mix of contemporary modular seating (with incorporated power outlets) and large lounge chairs with a mix of coffee tables and laptop/side tables. | 36 Months |
| 48 | | Lobby - Replace the lighting and lamp package. | 36 Months |
| 49 | | Offices - Replace carpet and pad. Vinyl base is acceptable is areas not visible to guests. | 36 Months |

FINAL PIP

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| 50 | | Terrace - Upgrade the terrace, provided outside the Pavilion. The terrace must have a minimum of 15 seats. Fifty percent of the seating must be soft seating with exterior grade upholstery on loose back and seat cushions. Tables must have tops of shatter resistant material. Plantings in exterior decorative pots and low level decorative lighting are required. Refer to the Design Guide and prototype for more information. Size of outside area limitations may reduce some seating. | 36 Months |
| **Public Restrooms** | | | |
| 51 | | Public Restrooms - Replace all wall tile at toilets and urinals. Install minimum 12" x 12" (minimum) ceramic, porcelain, or stone tile. Rectangular shaped tiles are also permitted. | 36 Months |
| 52 | | Public Restrooms - Replace all vinyl wall covering and wall tile. Ceramic, porcelain, or stone tile at full height is required at wet/plumbing walls. | 36 Months |
| 53 | | Public Restrooms - Replace the vanity. Install an approved vanity and basin. | 36 Months |
| 54 | | Public Restrooms - Replace the soap dispenser with an under-mount liquid soap dispenser. | 36 Months |
| 55 | | Public Restrooms - Remove the combination paper towel dispenser and waste receptacle recessed into the wall. Install an automated touch-less paper towel dispenser and a free-standing decorative trash receptacle. | 36 Months |
| 56 | | Public Restrooms - Install a baby changing station located in the public restroom. Installation in an accessible stall or accessible restroom is an approved alternate location. | 36 Months |
| 57 | | Public Restrooms - Remove the egg crate lighting above the vanities, urinal/toilets and ceiling light fixtures. Repair the wall and ceiling. Provide a decorative surface or ceiling recessed lighting. | 36 Months |
| 58 | | Public Restrooms - Install a decorative framed mirror over each vanity (minimum frame width of two inches). | 36 Months |
| 59 | | Public Restrooms - Replace the partitions. | 36 Months |
| 60 | | Public Restrooms -Pool Area - Refinish tile floor to eliminate scaling on tiles. | 36 Months |
| 61 | | Public Restrooms -Ensure feminine hygiene machine is removed - Feminine products, including tampons and feminine hygiene pads, must be provided in a decorative display and offered on a complimentary basis | 36 Months |
| **Recreation Facilities** | | | |
| 62 | | Exercise Room - Replace the television. A 40" minimum television is required. A second TV is required if room exceeds 350 sq. ft. | 36 Months |
| 63 | | Exercise Room - Replace all fitness equipment at 7 years of age. The fitness center will require expansion to comply with minimum size requirements. | 36 Months |
| 64 | | Pool Area - Replace the pool furniture. A combination of chairs and chaises must be provided to seat a minimum of 16 guests at indoor decks and 22 guests at outdoor decks. The minimum seating requirement may vary for certain markets. At least two freestanding sunscreen umbrellas must be provided at outdoor swimming pools. | 36 Months |
| **Food and Beverage Facilities** | | | |
| # | Active Date | Scope of Work | Finish Date |
| **Kitchens** | | | |
| 65 | | Kitchen – Remove the steam tables at the kitchen window. Install the Brand approved induction cook tops and chafer dishes. | 36 Months |
| **Meeting/Pre-Function Facilities** | | | |
| 66 | | Meeting Rooms - Replace all stack chairs. Install new seating with matching/coordinating finishes to other rom finishes. | 36 Months |
| 67 | | Meeting Rooms - Replace flooring. Install approved flooring and base. | 36 Months |
| 68 | | Meeting Rooms - Replace window treatments. Provide new decorative window treatment with blackout capability. Submit to Hilton Design for approval. | 36 Months |
| 69 | | Meeting Room - Replace Vinyl Wall Covering. | 36 Months |
| 70 | | Meeting Rooms - Operable partitions must be stacked behind a concealed door in a closet when not in use. Closet doors must match the surrounding wall finish. | 36 Months |
| 71 | | Meeting Rooms - Install new artwork, of an appropriate quantity and size, within the meeting space. Ensure that all artwork is reviewed and approved by Hilton Global Design Services. | 36 Months |

FINAL PIP

| | | | |
|---|---|---|---|
| 72 | | Meeting Rooms - Replace buffet cabinets and counters. Counters installed in alcoves must have a furniture finish. Countertops must be natural or engineered stone. 34" high base cabinets are required and must be finished to match room décor and finishes. | 36 Months |
| 73 | | Meeting rooms - Electronic locksets are required at the entrance to all meeting spaces. Provide | 36 Months |
| 74 | | Meeting Rooms - Provide 180 degree door viewers in both entrance and service doors to meeting rooms. Install viewers at centerline of the doors, 60" above the finished floor, looking into the meeting room. | 36 Months |
| **Restaurant Facilities** | | | |
| 75 | | Restaurant - Replace carpet flooring. Install approved flooring. | 36 Months |
| 76 | | Restaurant - Replace the buffet counter tops. Install granite or engineered stone counter tops that coordinate with Magnolia finishes. | 36 Months |
| 77 | | Restaurant - Replace all dining chairs. | 36 Months |
| 78 | | Restaurant - Replace all dining tables. | 36 Months |
| 79 | | Restaurant - Two counter height Chef's buffet tables are required. They must allow stools to be tucked completely below the tables when not being used as a buffet surface. The countertop must be granite or engineered stone and white in coloration. It must match the Buffet counter top. | 36 Months |
| 80 | | Restaurant - . Lighting must provide varying intensity levels. Upgrade with approved lamps and fixtures. | 36 Months |
| 81 | | Restaurant - The cold pan, wall-mounted brushed or chrome sneeze guard must be included. | 36 Months |
| 82 | | Restaurant - (Cold Buffet Counters) -The counter top must be granite or engineered stone suitable for hot and cold beverage use. It must be white in coloration and match the Chef's tables. A large operable window screen is required to close off the buffet when not in use. The plate display must also be able to be closed off when not in use. | 36 Months |
| **Guest Rooms** | | | |
| # | Active Date | Scope of Work | Finish Date |
| **Guest Bathrooms** | | | |
| 83 | | Guest Bathrooms – The updated guest bathroom must be installed in its entirety. This will include vanity (retrofit or replacement), wall treatment, and linear vanity lighting. Design specifications can be found online at the Lobby. For other questions, reference www.hiltonworldwide.com/design. For how to adapt to your Renovation, please refer to the Magnolia Design Guide (9.1), appendix chapter for a checklist. | 24 Months |
| 84 | | Guest Bathrooms - Replace tub surrounds. Install full height cultured marble panels. Finish must have a pattern and be white in color. Samples must be reviewed and approved prior to installation. | 24 Months |
| 85 | | Guest Bathrooms – Remove the bathtubs in King bedded rooms. Shower only solution is required in all king bedded rooms. Hilton Garden Inn will support a maximum of 90% of total guest bathrooms to be converted to shower only solutions. | 24 Months |
| 86 | | Guest Bathrooms - Replace showerheads. Install an approved showerhead. | 24 Months |
| 87 | | Guest Bathrooms - Replace the tub/shower chrome fixtures. | 24 Months |
| 88 | | Guest Bathrooms - Replace the grab bars. A decorative, stainless steel (or a finish to coordinate with surrounding fixtures and accessories) grab bar, 24"/600 mm in length, must be installed vertically on the back wall. Grab bars must have flange covers to conceal the mounting screws. Towel bar must not serve as a grab bar. | 24 Months |
| 89 | | Guest bathrooms - Install a new non-slip bathtub bottom application that is color matched to the existing tub finish. Bath mats (adhesive or rubber) and adhesive strips are not permitted. Tub inserts are not acceptable. | 24 Months |
| 90 | | Guest Bathrooms - Replace all vinyl wall covering. Primary field color must be white and accent wall behind mirror must be a subtle contrast | 24 Months |
| 91 | | Guest Bathrooms - Amenity Storage - A wall panel with simple linear shelves must be provided above the vanity to hold amenities. Wood finish must match the vanity | 24 Months |

FINAL PIP

| | | | |
|---|---|---|---|
| 92 | | Guest Bathrooms - A minimum of 2 towel hanging options must be provided at every tub/shower as well as a hand towel option at the vanity. Any combination of metal vanity frame, towel bars, towels hooks, or shower door bar may be used to satisfy this requirement. (Existing robe hooks cannot be used to meet these requirements). A towel hook is also required and must be counted in this requirement. | 24 Months |
| 93 | | Guest Bathrooms - Replace the vanity mirror. A large electric mirror is required above the vanity. There must be no visible clips or fasteners. Must be installed with tamper-proof wall mounts. | 24 Months |
| 94 | | Guest Bathrooms -- Retrofit existing vanities with removal of apron and install new cubbies or replace current vanities with new approved vanity. Wall mounted accessory shelves are required at vanities 54” W or wider. | 24 Months |
| 95 | | Guest Bathrooms - Replace vanity chrome. | 24 Months |
| 96 | | Guest Bathrooms - Replace all outlets and switches. | 24 Months |
| **Guest Rooms** | | | |
| 97 | | Guest Bedrooms -A complete room renovation is required to comply with the latest version. This will include installing the updated dressing area and walk in closet, new case goods and seating, new flooring, and the updated hospitality center. Design specifications can be found online at the Lobby. For other questions, reference www.hiltonworldwide.com/design. Note: For how to adapt to your renovation, please refer to the Magnolia Design Guide (9.1), appendix chapter for a checklist. | 24 Months |
| 98 | | Guest Bedrooms - Remove all whirlpool tubs from the bedrooms. Utilize space for additional seating, etc. | 24 Months |
| 99 | | Guest Bedrooms - All guestrooms must have Serta® Garden Sleeper III® or Restful Garden® box spring and mattress sets. There must be a minimum clearance of 12"/300 mm between beds or between any bed and the wall. NOTE: : Hilton encourages all hotels to participate in waste reduction by recycling the existing mattresses. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | 24 Months |
| 100 | | Guest Bedrooms- A minimum 10”/250 mm high bed base must be provided to achieve a typical top of bed height of 28”/710 mm to 29"/735 mm. Bed height is the measurement of the finished bed including base and mattress set (bedding not included).<br>Platform beds are no longer allowed. | 24 Months |
| 101 | | Guest Bedrooms - Replace all carpet and carpet pad with approved flooring and base. | 24 Months |
| 102 | | Guest Bedrooms - Install approved flooring and base at the guestroom entry. Consult HGI Standards Manual or Global Design Services for acceptable sizes and finishes. | 24 Months |
| 103 | | Guest Bedrooms - Replace all artwork. | 24 Months |
| 104 | | Guest Bedrooms - Replace wall painted finishes - Acrylic knockdown, accent vinyl wall covering (required at mirror wall in closet), paint (required in closets), accent tile required at wall behind hospitality unit. Refer to the v9.0 design guide for specifications. | 24 Months |
| 105 | | Guest Bedrooms – Replace the window treatments. Window treatment in guestrooms must consist of a double layer of roller shades with sheer/solar shade at the glazing and decorative blackout shade inboard with a valance concealing the ceiling mounted mechanisms. Refer to the v9.0 design guide for specifications. | 24 Months |
| 106 | | Guest Bedrooms - Replace all case goods. Submit for approval. | 24 Months |
| 107 | | Guest Bedrooms - A side table is required at all lounge chairs - Provide. | 24 Months |
| 108 | | Guest Bedrooms - Replace the lounge chairs. An over scaled or modern wing back lounge chair is required where shown in prototype drawings. Chair and arms must be fully upholstered; seat cushion must be loose and reversible. Provide patterned accent pillow. | 24 Months |
| 109 | | Guest Bedrooms - Replace the desk chairs. A functional ergonomic chair is required at the work surface in each guestroom. It must have an upholstered back and seat, limited adjustment gas lift, and metal finish five star base with casters. | 24 Months |
| 110 | | Guest Bedrooms - The headboard wall panel must incorporate a vinyl upholstered panel, cantilevered nightstands, power and data outlets above the bedside surface, and reading lights. | 24 Months |
| 111 | | Guest Bedrooms - Replace all sofas. | 24 Months |
| 112 | | Guest Bedrooms - Microwaves and under counter refrigerators are required and must have a stainless steel finish. | 24 Months |

FINAL PIP

| | | | |
|---|---|---|---|
| 113 | | Guest Bedrooms - A new framed, full-height mirror is required on the wall adjacent to the bath door. | 24 Months |
| 114 | | Guest Bedrooms - Replace the lamp package in all rooms. | 24 Months |
| 115 | | Guest Bedrooms - Install an approved "flip" auxiliary lock on all connecting and entry doors. | 24 Months |
| 116 | | Guest Bedrooms - Provide a cover for entrance door viewers (guestroom side) | 24 Months |
| 117 | | Guest Bedrooms - All hinges, auxiliary locks, etc. must be replaced with units of the same finish. | 24 Months |
| 118 | | Guest Rooms - Entry doors must have adjustable type, automatic, 2-stage hydraulic door closer in same brushed nickel finish as new digital key locks | 24 Months |
| 119 | | Guest Bedrooms - Replace the hospitality center. A cabinet door is required to screen the refrigerator. Finishes, including hardware, must match that at of the new case goods. Refer to the design drawings for specifications. | 24 Months |
| 120 | | Guest Bedrooms - A reach-in closet is required. Renovate the closet area. Closets are to have stack of three wood shelves with under mount wire baskets and a separate hanging rod with wire shelf. | 24 Months |
| 121 | | Guest Bedrooms - Provide a door sweep. The makeup air feature for these sweeps may be utilized if needed. Sweeps must be installed to allow 1/16"/1.59 mm gap. | 24 Months |
| 122 | | Guest Bedrooms - Provide a new vinyl threshold at the guestroom entry. | 18 Months |
| 123 | | Guest Bedroom – At connecting doors provide door sweeps the same as entry door on both doors for sound attenuation. Automatic drop down seals are also permitted. A makeup air feature is not allowed. This includes the Living Room of all Suites | 24 Months |
| 124 | | Guest Bedrooms - Replace all outlets and switches. | 24 Months |
| 125 | | Guest Bedrooms/Suites - Replace all televisions. Install 40" (minimum) flat panel Hospitality/Commercial HDTV televisions. Televisions must comply with the specifications provided in Sections 1706.00 and 2514.09. Provide appropriate service and equipment to allow high definition programming to the guest rooms. NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing televisions. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | 24 Months |

**The improvements identified in this property improvement plan ("PIP") relevant to the brand specified on the cover page of this PIP ("Brand") are based on conditions at the hotel existing on the Inspection Date specified on the cover page of this PIP ("Inspection Date"). This PIP and any specified waivers of relevant brand standards are only effective for the purpose of incorporation by reference into a fully executed and dated agreement relating to the implementation of the PIP ("Relevant Agreement") with the affiliate entity of Hilton Worldwide, Inc. that is party to such Relevant Agreement ("Hilton"), if such Relevant Agreement is entered into within 180 calendar days of the Inspection Date. In the event that a Relevant Agreement is not entered into within 180 calendar days of the Inspection Date, an updated PIP may be required (in Hilton's absolute discretion). The preparation and/or supply of this PIP shall not obligate Hilton (or any affiliate of Hilton) to enter into any Relevant Agreement (including, but not limited to, a franchise agreement or a management agreement).**

**This PIP review is limited to aesthetic and functional layout and design, and certain functional, operational and quality criteria as specified by Hilton. It does not encompass, and Hilton does not make any representation or warranty as to, nor shall Hilton be responsible for, the architectural, structural, mechanical, or electrical adequacy, accessibility requirements or other compliance with applicable government or other legal requirements. Compliance is required with brand standards (including the fire safety and security equipment standards specified by Hilton), all applicable local, state and federal building codes, any legally mandated accessibility requirements and all other legal requirements. Accordingly, Hilton recommends that its counterparty(ies) engage an appropriate professional team and legal counsel to advise on such compliance. Any omission in this PIP report does not constitute a waiver of such requirements and does not release any obligation in any Relevant Agreement to conform to brand standards. Nothing in this PIP is intended to modify the terms of any Relevant Agreement to which it may be attached and/or incorporated by reference. In the event of any conflict of the terms, the terms of the Relevant Agreement are the terms that prevail.**

**The works set out in this PIP are required to be completed by the specified "Finish Date". All "Finish Dates" that are a specified number of months or days shall mean the number of months or days from the date of the Relevant Agreement into which the PIP is incorporated by reference.**

FINAL PIP

# Product Improvement Plan

**Prepared for:**

## Homewood Suites by Hilton

**Fort Wayne, IN**

**(InnCode: FWAIN, Facility ID:42413)**

**8621 US Hwy 24 West, Fort Wayne, Indiana, United States**

**To be relicensed as a Homewood Suites by Hilton**

By Kenneth Savage

Inspection Date: Apr-04-2018

FINAL PIP REVISION DATE : Jun-03-2018 by Sean Sanders

**Brand Management Approval**

Final PIP Approval Date : Jun-03-2018

Final FLA PIP Approval Signature :

PIP Contact

FINAL PIP

Printed On: Jun-04-2018

# Property Information

| | |
|---|---|
| Open Date: | |
| Hotel Management Company: | Superhost Enterprises, Inc. |
| Ownership Group: | |
| Last Renovation: | none since 2011 opening |
| Multiple Renovations: | |
| Guestrooms: | |
| Public Areas: | |
| | |
| Parking: | Asphalt surface parking |
| Pool (indoor or outdoor): | None |
| Whirlpool: | None |
| Hotel Van: | Yes. Shared with HGI Next door |
| Multiple Towers: | None |
| Number Floors: | 6 |
| Food Service Facilities: | Kitchen |
| Meeting Space/total size: | 1 Meeting room @ 528 sq ft |
| Boardroom: | None |
| Business Center: | Yes @ 7'8" X 11'4" |
| Gift Shop: | Suite Shop |
| Exercise Room/Size: | Yes @ 12' X 28' |
| Date exercise room was last renovated: | 2011 |
| Other Recreation: | THIS HOTEL IS 100% NON-SMOKING |
| Retail Outlets: | None |
| Guest Laundry: | YEs @ 11'4" x 8'4" |
| Number Of Guest Rooms: | 79 |
| Accessible Rooms: | 6 |
| Guest Room Size: | 1 Bedroom Suite: 11 X 13 BR/11/21LR. Queen Suite: 11 X 13 BR/11 X 21 LR. King Studio: 18 X 25. Queen Galley: 11 X 13 BR/ 12 X 15 LR. 2 Bedroom Suite: 11 X 17 BR/12 X 22 LR |
| Guest Room Mix: | |
| Typical King: | 0 |
| Typical Q/Q: | |
| Typical D/D: | 0 |
| Two Bedroom(K;D/D): | |
| Suites: | |
| 1 Bedroom: | 19 |
| King Suite: | 1 |
| Queen Queen: | 8 |
| Studio: | 41 |
| 2 Bedroom: | 4 |
| | |
| Guest Bathroom: | |
| Size: | Prototypical tub/shower room w/ vanity area |
| Door Width: | 36" |
| Tub Surround: | White Mincey marble panels |
| Shower stalls: | White Mincey marble panels |
| Floor: | 12" Ceramic tile |
| Vanity: | Bowed front furniture base w/ under-mount basin |
| Water Closet: | Tank type w/ open-front seats |
| | |
| HVAC System: | |
| 100% Makeup Air: | Yes |
| Public Areas: | Outdoor packaged units |
| Guestrooms: | PTACS |
| Digital Thermostats: | Partial…missing bedroom t-stats |
| | |
| Elevators: | 2 guest cabs |
| Guest Elevator: | |
| Service Elevator: | |
| High Speed Internet (wired or wireless): | |
| Public Areas: | Stay Connected |
| Meeting Space: | Stay Connected |
| Guestrooms: | Stay Connected |
| | |
| TV Size: | 37" LED…April 2011 install |
| Telephone System: | |
| Guestroom door lock system: | Onity locks..2011 install…Note: new Digital key locks arriving in mid April 2018 |
| Executive Lounge: | |
| HHonors level: | |
| Fire Life Safety: | |
| Manufacturer: | |
| Installation Date: | |
| Last Fire System Upgrade Date: | |

FINAL PIP

**PLEASE NOTE: Key information about the terms and effectiveness of this Property Improvement Plan is set out at the end of the document.**

# General

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| | | **General** | |
| 1 | | All properties within the Hilton Worldwide portfolio of brands must be designed in compliance with local, regional and national codes or laws for individuals with disabilities for universal access. The more stringent between these code(s) and Section 2517.00 must be followed as a minimum. The owner of the property is responsible for compliance with and the provision of all applicable codes. The owner is urged to seek appropriate council to ensure compliance. Hilton Worldwide does not and cannot warrant conformance with or interpretation of any codes, laws or regulations relating to accessibility for individuals with disabilities. | Per Brand Standards |

# BRAND STANDARDS

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| | | **Brand Standards** | |
| 2 | | Project Elevate - All elements of Project Elevate must be implemented. Elevate includes: 1. All elements of Take Flight 2. All requirements to meet existing standards both interior and exterior 3. Exterior refresh. Details are outlined within this PIP document. | 18 Months |
| 3 | | Brand Standard - Take Flight - Homewood Suites by Hilton has developed a comprehensive hotel refresh concept called "Take Flight." A Style Guide is available online. Take Flight impacts items such as the front entrance; interior signage; FF&E, lighting, flooring and wall finishes in the lobby and lodge including the front desk, suite shop, and business center layout and design; outdoor kitchen, (pool, patio, and grilling areas),headboards, back lit vanity mirror, and other cosmetic updates in the suites. Details are posted on www.hiltonworldwide.com/design. A certified and approved designer or design firm MUST be consulted and retained. For further information, please contact Sean Sanders at sean.sanders@hilton.com. | Per Brand Standards |
| 4 | | Take Flight (Public Space) - All Take Flight elements in the public area must occur at once; they cannot be added individually overtime. Refer to the Take Flight Design Guide for information on design intent and design requirements. | Per Brand Standards |
| 5 | | Interior Signage - Replace all existing interior, pool, and sport court signage. Install new brand required signage package. (Refer to the Take Flight Design Guide) | 18 Months |
| 6 | | Brand Standard - Provide distributed audio (background music) in the following areas of the hotel: Outdoor Kitchen. | 18 Months |
| 7 | | In-suite Recycling - Provide a decorative in-suite recycling container at/near the work surface in each suite. The designated recycling container must be a 13 qt. container minimum. If trash can is offered at the work surface, the recycling and trash can must match. Blue recycling containers are prohibited. Required by due date per Brand Standards. | Per Brand Standards |
| 8 | | Brand Standard - All new interior design-related products and replacements must be submitted to Architecture Design & Construction for review prior to purchase and installation. For more information go to www.hiltonworldwide.com/design, select region, select Brand. Details are posted under Submittal Guidelines. | Per Brand Standards |
| 9 | | Support Rules - Hotel must not install wall vinyl over existing wall vinyl in any area of the hotel. Old wall vinyl must be completely removed before new wall vinyl is installed. NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing wall vinyl covering. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | Per Brand Standards |
| 10 | | Tile must not be installed aver existing tile in any areas of the property. Old tile must be completely removed prior to installation of new tile. NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing mattresses. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | Per Brand Standards |

FINAL PIP

| | | | |
|---|---|---|---|
| 11 | | The online images of the hotel must be updated within 90 days of completing the PIP. To be published online, images must be taken by a professional photographer. See Standard 506.05 for specific on-line imagery requirements. | Upon Completion |
| 12 | | Support Rules - Structure and Décor Each hotel must maintain a structure and décor package that offers guests a fresh and contemporary product meeting brand standards. During a voluntary renovation, including the replacement of FF&E or soft goods, hotels must meet current brand standards. At the time of a PIP, the age of an existing hotel's interior design package and its components must not exceed 7 years for soft goods and 14 years for FF&E. | Per Brand Standards |
| 13 | | Support Rules - Remove all silk plants from public areas in the hotel. | 18 Months |

# COMMERCIAL FACILITIES

| # | Active Date | Scope of Work | Finish Date |
|---|---|---|---|
| **ADMINISTRATION AREA** | | | |
| 14 | | Offices - Remove current window treatments. Install 2"/51 mm wood blinds at a minimum. | 18 Months |
| 15 | | Offices - Provide door viewer at the main office door entry. | 18 Months |
| **CORRIDORS/ELEVATORS/STAIRWELLS** | | | |
| 16 | | Corridors - Replace current carpet. Install approved flooring and base. | 18 Months |
| 17 | | Corridors - Replace the vinyl wall covering. Install new corner guards at all wall direction changes in the guest corridors. They must be a resilient vinyl in a solid color to match the adjacent wall covering. Clear plastic is not allowed. They must be self-adhesive with no exposed screws or fasteners. They must extend from the floor base to the ceiling. | 18 Months |
| 18 | | Corridor window treatment - Replace window treatment with operable sheers and decorative rod and hardware. Sheers must be pleated or rippled to double fullness. | 18 Months |
| 19 | | Corridors - Remove all kick plates from guestroom doors. Refinish doors to a like-new condition/appearance. Door replacement is warranted if refinishing does not return doors to like-new. | 18 Months |
| 20 | | Corridors - Provide artwork at elevator lobbies. | 18 Months |
| 21 | | Corridors - Install a sealed finish on all stairwells' flooring/steps. | 18 Months |
| 22 | | Corridors - Door frame finish is scratched/scarred. Professionally refinish door frames and restore to an excellent condition. | 18 Months |
| 23 | | Vending Areas - Replace the wall vinyl to match new corridor vinyl. | 18 Months |
| **ENTRANCE/LOBBY/REGISTRATION** | | | |
| 24 | | Lodge - Implement the "Take Flight" lobby and lodge concept by installing natural finish accents and prescribed furnishings to create the connect, dining, and lounge zones. Take Flight also includes the front desk, suite shop, pantry, integrated trash/recycle/bussing, home office, front porch, and outdoor kitchen areas. (Refer to the Take Flight Design Guide) | 48 months |
| 25 | | Lobby/Lodge Furniture - In the lobby, install the curved sofa and elliptical rug. In the Lodge, outfit the dining area with tables and chairs of different styles, finishes, and heights. Include the signature wing table and pendants in the dining zone. Install the two-sided sectional and lighting to help define the separation between the dining and lounge zone. On the lounge side, outfit with tea-height tables and lounge chairs. Incorporate corner banquette(s) with pendant lighting. (Refer to the Take Flight Design Guide) | 48 months |
| 26 | | Lobby/Lodge Flooring - Install carpet/pad in the lodge (dining and lounge zones) and home office. (Refer to the Take Flight Design Guide for flooring transitions) | 48 months |
| 27 | | Lobby/Lodge window treatment - Replace window treatment with operable sheers and decorative rod and hardware. Sheers must be pleated or rippled to double fullness. | 48 months |
| **EXTERIOR COMPONENTS** | | | |
| 28 | | Exterior - Front Entrance/Front Porch:<br>a. Provide ceiling recessed cans and decorative upscale wall sconces.<br>b. Provide outdoor seating for two minimum, adjacent to the primary entrance. Seating fabrication and style must be similar to the lodge patio seating; park benches are not allowed.<br>c. Provide a decorative combo trash, recycling, and ash receptacle at the main entrance. The unit must include a hood to protect trash from weather. Refer to the "Take Flight" Design Guide for design intent.<br>d. Provide three decorative planters of varying sizes. | 48 months |



FINAL PIP

| | | | |
|---|---|---|---|
| 29 | | Exterior - Secondary Entrances - Upgrade secondary entrances to include a covered area that matches the building and/or porte cochere in design and finish. Install upscale decorative lighting, along with a decorative/upscale trash and ash receptacle similar to the main entry. Refer to the Exterior Design Guidelines and Take Flight Design Guidelines - Project Elevate. (Note: Guest entrances that are in-set and provide shelter from weather elements do not require an additional covered area to be added as part of the PIP.) | 48 months |
| 30 | | Landscape - Add special landscaping or fencing to screen off transformers, HVAC units gas meters, etc., from guest view without hindering operation or routine maintenance. | 18 Months |
| 31 | | Parking Lot - Repair any cracked/damaged areas in the parking lot. Re-seal and re-stripe the parking lot. | 18 Months |
| **GUEST FACILITIES AREA** | | | |
| 32 | | Home Office - Implement the “Take Flight” home office concept. Open up the space – removing door and partial wall, install workstation/printer peninsula w/pendant, decorative panel/divider, wall vinyl, accent wall vinyl, contrasting flooring, etc. (Refer to the Take Flight Design Guide) | 48 months |
| 33 | | Home Office - Provide two power outlets (socket outlets) for guest use at each workstation. Provide a minimum of four convenience power outlets (socket outlets) below counter for required equipment at each workstation. | 48 months |
| 34 | | Home Office - Replace the desk chairs. Provide a minimum of two ergonomic chairs with casters, adjustable arms and fully upholstered seats and backs. | 48 months |
| 35 | | Home Office - Install new artwork. | 48 months |
| 36 | | Public Restrooms - Provide commercial grade faucets that are touchless. All faucets must be plated brass with replaceable cartridges, and manufactured by nationally known manufacturers. All fixtures must be low-flow type. | 18 Months |
| 37 | | Public Restrooms - Replace all vinyl wall covering due to scarring. | 18 Months |
| 38 | | Public Restrooms - Remove the combination paper towel dispenser and waste receptacle recessed into the wall. Install an automated touch-less paper towel dispenser and a free-standing decorative trash receptacle. | 18 Months |
| 39 | | Suite Shop - Install the “Take Flight” suite shop by opening up the space to the front desk/lobby, flooring, wall vinyl, accent wall vinyl, updated millwork, focal table w/pendant, refrigeration units and graphics. (Refer to the Take Flight Design Guide) | 48 months |
| 40 | | Suite Shop - Replace coolers/freezers that display product endorsements. Product endorsements are not allowed. Units must match in style, color, and finish. Black or stainless is required. | 18 Months |
| **KITCHEN and PANTRY** | | | |
| 41 | | Pantry - Provide accent lighting in upper cabinets with glass doors. All cabinet lighting must be on a dedicated switch. | 18 Months |
| 42 | | Pantry - Provide a new millwork piece for the trash/bussing station. A trash/recycle cabinet is required to conceal the bussing cart and trash cans for the dining area. All items must be approved. | 18 Months |
| 43 | | Pantry - Floor grout is discolored. Professionally clean floor grout and restore to an excellent condition. | 18 Months |
| **RECREATION AREAS** | | | |
| 44 | | Fitness Room - A 40" high-definition, commercial LCD television with remote control is required in addition to personal viewing screens (PVS). The power and cable outlets and cords must be concealed from view behind the television. Televisions must be set with closed caption as the default. Television must be wall or ceiling mounted. In cases where the exercise room shares a wall with a guest room, the ceiling mounted option must be used. | 18 Months |
| 45 | | Fitness Center - Install new Brand approved flooring in the Fitness Center. | 18 Months |
| 46 | | Fitness Center - Replace fitness equipment, as needed, if the current age exceeds 7 years. | 18 Months |
| 47 | | Outdoor Patio/Kitchen - Implement the “Take Flight” outdoor kitchen concept (Island w/stainless steel grills and upscale seating, pergola, string & sconce lighting, upscale lounge seating with removable cushions, upscale decorative outdoor trash container, Wi-Fi, music, outdoor planters, etc. Refer to the Take Flight Design Guide.) | 48 months |
| **GUEST SUITES** | | | |
| | | | |
| # | Active Date | Scope of Work | Finish Date |

FINAL PIP

| | | | |
|---|---|---|---|
| **BATHROOM/VANITY AREA** | | | |
| 48 | | Guest Bathrooms - Install approved dual massage showerheads by Water Pik - model #DSL-623H. | 18 Months |
| 49 | | Guest Bathrooms - Replace all open-front toilet seats with closed-front seats. | 18 Months |
| 50 | | Guest Bathroom - Provide new artwork over the water closet. Minimum size: 432 $in^2$/0.28 $m^2$. | 18 Months |
| 51 | | Guest Bathrooms - Vanity Mirror - Install back-lit mirror over vanity sink. (Take Flight) | 48 months |
| 52 | | Guest Bathrooms - Floor grout is discolored. Professionally clean floor grout as needed and restore to an excellent condition. | 18 Months |
| 53 | | Guest Bathrooms - Ceiling is discolored/paint chipped. Paint ceiling as needed and restore to a consistent appearance. | 18 Months |
| **BEDROOM** | | | |
| 54 | | Guest Bedrooms - Replace all mattresses and box springs. Install Serta "Suite Dreams" mattresses and box springs. NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing mattresses. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | 18 Months |
| 55 | | Guest Bedrooms - Replace flooring. Install approved flooring and base. | 18 Months |
| 56 | | Guest Bedrooms - Professionally refinish casegoods as needed and restore to an excellent condition. | 18 Months |
| 57 | | Guest Bedrooms - Replace all window treatments. | 18 Months |
| 58 | | Guest Bedrooms - Replace all artwork. | 18 Months |
| 59 | | Guest Bedrooms - All guestrooms must have a full length mirror with a minimum size of 30"/760 m wide x 69"/1.75 m high, including frame. Full length mirror must be located in the bedroom or near the dressing area. The mirror must be framed. There must be no visible clips or fasteners. | 18 Months |
| 60 | | Guest Bedrooms - Headboard wall - Install tonal, accent wall vinyl headboard wall. Bold or bright colors are not acceptable for the headboard accent wall. Accent wall should compliment the new carpet, window treatments, etc… | 18 Months |
| 61 | | Guest Bedrooms - Remove the pull chains from the ceiling fans. Pull chains are not allowed. | 18 Months |
| 62 | | Guest Bedrooms - Replace all televisions. Television sets must be a minimum of 40" and a maximum of 50". Ensure HD content, programming, and channel lineup meets Standards. Television chest with DVR/VCP shelf must be wider than television unit. Replacement of chest is required if there will be any portion of the television over hanging the edges. NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing televisions. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | 18 Months |
| **KITCHEN** | | | |
| 63 | | Guest Kitchens - Accent wall - Install tonal accent wall vinyl in kitchen. | 18 Months |
| 64 | | Guest Kitchens - Replace the artwork. | 18 Months |
| 65 | | Guest Kitchens - Cabinet front/shelf finish is worn/scarred. Professionally refinish cabinets as needed and restore to an excellent condition. | 18 Months |
| 66 | | Guest Kitchens - Floor grout is discolored. Professionally clean floor grout as needed and restore to an excellent condition. | 18 Months |
| **LIVING ROOM/DINING AREA** | | | |
| 67 | | Guest Parlors - Replace all carpet, carpet pad, and carpet base. Install approved flooring and base. | 18 Months |
| 68 | | Guest Parlors - Replace all sofas. | 18 Months |
| 69 | | Guest Parlors - Replace all lounge chairs. | 18 Months |
| 70 | | Guest Parlors - Cocktail Ottoman - Replace current coffee table or ottoman. Install an upholstered cocktail ottoman with a wrap-over parsons table. | 18 Months |
| 71 | | Guest Parlors - Replace all artwork. | 18 Months |
| 72 | | Guest Parlors - Replace all window treatments. | 18 Months |
| 73 | | Guest Parlors - Replace lighting package. Rocker switches are required on all lamps and electrical outlets must be available in the bases. | 18 Months |
| 74 | | Guest Parlors - Professionally refinish case goods as needed and restore to an excellent condition. This also includes table and dining chairs. | 18 Months |
| 75 | | Guest Parlors - Remove silk plants from suites. | 18 Months |

FINAL PIP

| | | | |
|---|---|---|---|
| 76 | | Guest Parlors - Install digital thermostats for all HVAC units (similar to Guest Bedrooms). | 18 Months |
| 77 | | Guest Parlors (Additional Power) - A minimum of 4 outlets at desk/activity table must be available above the surface and may include wall outlets or outlets in the lamp package. When guest accessible outlets above these surfaces are not available, brand approved power unit(s) must be permanently installed. Only two plugs are available above desk. | 18 Months |
| 78 | | Guest Parlors - Install an approved auxiliary lock on all connecting and entrance doors. | 18 Months |
| 79 | | Guest Parlors - Provide cover plates (guestroom side) for entrance door viewers. | 18 Months |
| 80 | | Guest Parlors - At connecting doors provide door sweeps the same as entry door on both doors for sound attenuation. Automatic drop down seals are also permitted. | 18 Months |
| 81 | | Guest Parlors - At connecting doors, a threshold matching the entry door must be provided. Threshold must be as wide as the door frame. | 18 Months |
| 82 | | Guest Parlors - Replace all televisions. Televisions must be a minimum of 40" and no larger than 50" NOTE: Hilton encourages all hotels to participate in waste reduction by recycling the existing televisions. Hilton offers programs including informational sheets containing reference and contact information. For additional details, contact Judy Pines (judy.pines@hilton.com). | 18 Months |

**The improvements identified in this property improvement plan ("PIP") relevant to the brand specified on the cover page of this PIP ("Brand") are based on conditions at the hotel existing on the Inspection Date specified on the cover page of this PIP ("Inspection Date"). This PIP and any specified waivers of relevant brand standards are only effective for the purpose of incorporation by reference into a fully executed and dated agreement relating to the implementation of the PIP ("Relevant Agreement") with the affiliate entity of Hilton Worldwide, Inc. that is party to such Relevant Agreement ("Hilton"), if such Relevant Agreement is entered into within 180 calendar days of the Inspection Date. In the event that a Relevant Agreement is not entered into within 180 calendar days of the Inspection Date, an updated PIP may be required (in Hilton's absolute discretion). The preparation and/or supply of this PIP shall not obligate Hilton (or any affiliate of Hilton) to enter into any Relevant Agreement (including, but not limited to, a franchise agreement or a management agreement).**

**This PIP review is limited to aesthetic and functional layout and design, and certain functional, operational and quality criteria as specified by Hilton. It does not encompass, and Hilton does not make any representation or warranty as to, nor shall Hilton be responsible for, the architectural, structural, mechanical, or electrical adequacy, accessibility requirements or other compliance with applicable government or other legal requirements. Compliance is required with brand standards (including the fire safety and security equipment standards specified by Hilton), all applicable local, state and federal building codes, any legally mandated accessibility requirements and all other legal requirements. Accordingly, Hilton recommends that its counterparty(ies) engage an appropriate professional team and legal counsel to advise on such compliance. Any omission in this PIP report does not constitute a waiver of such requirements and does not release any obligation in any Relevant Agreement to conform to brand standards. Nothing in this PIP is intended to modify the terms of any Relevant Agreement to which it may be attached and/or incorporated by reference. In the event of any conflict of the terms, the terms of the Relevant Agreement are the terms that prevail.**

**The works set out in this PIP are required to be completed by the specified "Finish Date". All "Finish Dates" that are a specified number of months or days shall mean the number of months or days from the date of the Relevant Agreement into which the PIP is incorporated by reference.**

FINAL DP

**Hilton Garden Inn & Homewood Suites Fort Wayne**
**Summary Renovation Plan - FULL SCOPE**

| | |
|---|---|
| Technology & Interior Signage | $86,832 |
| Exterior Components | $137,727 |
| BOH, Corridors, Elevators & Stairwells | $209,294 |
| Pavilion Pantry | $68,182 |
| Business Center | $25,818 |
| Lobby & Public Restrooms | $446,782 |
| Recreation Facilities | $66,935 |
| Kitchen | $16,136 |
| Meeting Rooms | $48,868 |
| Restaurant | $27,045 |
| Guestrooms | $1,972,963 |
| **Subtotal** | **$3,106,583** |
| Logistics & Taxes | $571,270 |
| GC Costs | $439,897 |
| **Total Cost** | **$4,117,750** |
| Additional 5% Contingency | $205,888 |
| **Total Project Cost** | **$4,323,638** |

**Hilton Garden Inn Fort Wayne**
**Summary Renovation Plan - FULL SCOPE**

| | |
|---|---|
| Technology & Interior Signage | $57,000 |
| Exterior Components | 101,273 |
| BOH, Corridors, Elevators & Stairwells | 100,591 |
| Pavilion Pantry | 47,273 |
| Business Center | 13,614 |
| Lobby & Public Restrooms | 275,373 |
| Recreation Facilities | 30,114 |
| Kitchen | 9,545 |
| Meeting Rooms | 48,868 |
| Restaurant | 27,045 |
| Guestrooms | 1,307,439 |
| **Subtotal** | **$2,018,135** |
| Logistics & Taxes | 369,267 |
| GC Costs | 275,988 |
| **Total Cost** | **$2,663,389** |
| Additional 5% Contingency | $133,169 |
| **Total Project Cost** | **$2,796,558** |

**Homewood Suites Fort Wayne**
**Summary Renovation Plan - FULL SCOPI**

| | |
|---|---|
| Technology & Interior Signage | $29,832 |
| Exterior Components | 36,455 |
| BOH, Corridors, Elevators & Stairwells | 108,703 |
| Suite Shop | 20,909 |
| Business Center | 12,205 |
| Lobby & Public Restrooms | 171,409 |
| Recreation Facilities | 36,822 |
| Kitchen | 6,591 |
| Meeting Rooms | 0 |
| Guestrooms | 665,524 |
| **Subtotal** | **$1,088,448** |
| Logistics & Taxes | 202,003 |
| GC Costs & Contingency | 163,910 |
| **Total Cost** | **$1,454,361** |
| Additional 5% Contingency | $72,718 |
| **Total Project Cost** | **$1,527,079** |

# APPENDIX II

**Recourse Guaranty**

# GUARANTY OF RECOURSE OBLIGATIONS

made by

**AMERICAN HOSPITALITY PROPERTIES FUND III LLC**

AND

**WILLIAM L. NELSON**

as guarantors,

in favor of

**SOCIETE GENERALE**

Dated as of August 16, 2018

# GUARANTY OF RECOURSE OBLIGATIONS

This **GUARANTY OF RECOURSE OBLIGATIONS** (this "***Guaranty***"), dated as of August 16, 2018, made by **AMERICAN HOSPITALITY PROPERTIES FUND III LLC**, a Delaware limited liability company, having an address at 5950 Berkshire Lane, Suite 850, Dallas, Texas 75225 ("***Properties Fund Guarantor***"), and **WILLIAM L. NELSON**, an individual, having an address 5950 Berkshire Lane, Suite 850, Dallas, Texas 75225 ("***Nelson Guarantor***"; and together with Properties Fund Guarantor, each, a "***Guarantor***", individually and/or collectively as the context requires, "***Guarantors***"), in favor of **SOCIETE GENERALE** (together with its successors and assigns, hereinafter referred to as "***Lender***"), having an address of 245 Park Avenue, New York, New York 10167.

R E C I T A L S :

A. Pursuant to that certain Loan Agreement dated as of the date hereof (as the same may be amended, modified, supplemented or replaced from time to time, the "***Loan Agreement***") between AHP FT Wayne Inn, LLC, a Delaware limited liability company ("***Inn Borrower***"), and AHP FT Wayne Suites, LLC, a Delaware limited liability company ("***Suites Borrower***"; and together with Inn Borrower, jointly and severally, individually and/or collectively as the context requires, "***Borrower***") and Lender, Lender has agreed to make a loan (the "***Loan***") to Borrower in an aggregate principal amount not to exceed $15,800,000.00, subject to the terms and conditions of the Loan Agreement;

B. As a condition to Lender's making the Loan, Lender is requiring that Guarantors execute and deliver to Lender this Guaranty; and

C. Each Guarantor hereby acknowledges that each such Guarantor will materially benefit from Lender's agreeing to make the Loan;

**NOW, THEREFORE**, in consideration of the premises set forth herein and as an inducement for and in consideration of the agreement of Lender to make the Loan pursuant to the Loan Agreement, each Guarantor hereby agrees, covenants, represents and warrants to Lender as follows:

1. **Definitions.**

(a) All capitalized terms used and not defined herein shall have the respective meanings given such terms in the Loan Agreement.

(b) The term "***Guaranteed Obligations***" means (i) Borrowers' Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event occurs, payment of all the Debt as and when the same is due in accordance with the Loan Documents (and whether accrued prior to, on or after such date).

2. **Guaranty.**

(a) Each Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment when due of the Guaranteed Obligations.

(b) All sums payable to Lender under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense.

(c) Each Guarantor hereby agrees to indemnify, defend and save harmless Lender from and against any and all actual, out-of-pocket costs, losses, liabilities, claims, causes of action, expenses and damages, including reasonable attorneys' fees and disbursements, which Lender may suffer or which otherwise may arise by reason of Borrower's failure to pay any of the Guaranteed Obligations when due, irrespective of whether such actual, out-of-pocket costs, losses, liabilities, claims, causes of action, expenses or damages are incurred by Lender prior or subsequent to (i) Lender's declaring the Principal, interest and other sums evidenced or secured by the Loan Documents to be due and payable, (ii) the commencement or completion of a judicial or non-judicial foreclosure of the Mortgage or (iii) the conveyance of all or any portion of the Property by deed-in-lieu of foreclosure, excluding, however, punitive and exemplary damages, unless the same are sought by a third-party from Lender.

(d) Each Guarantor agrees that no portion of any sums applied (other than sums received from each Guarantor in full or partial satisfaction of its obligations hereunder), from time to time, in reduction of the Debt shall be deemed to have been applied in reduction of the Guaranteed Obligations until such time as the Debt has been paid in full, or Guarantors shall have made the full payment required hereunder, it being the intention hereof that the Guaranteed Obligations shall be the last portion of the Debt to be deemed satisfied. Notwithstanding anything contained herein to the contrary, Guarantors are not liable for any of Lender's or its employees' or representatives' fraud, gross negligence or wilful misconduct.

3. **Representations and Warranties.** Each Guarantor hereby represents and warrants to Lender as follows (which representations and warranties shall be given as of the date hereof and shall survive the execution and delivery of this Guaranty):

(a) **Organization, Authority and Execution.** Properties Fund Guarantor is a Delaware limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all necessary power and authority to own its properties and to conduct its business as presently conducted or proposed to be conducted and to enter into and perform this Guaranty and all other agreements and instruments to be executed by it in connection herewith. This Guaranty has been duly executed and delivered by Guarantor.

(b) **Enforceability.** This Guaranty constitutes a legal, valid and binding obligation of each Guarantor, enforceable against each Guarantor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally.

(c) **No Violation.** The execution, delivery and performance by Guarantors of their obligations under this Guaranty has been duly authorized by all necessary action, and do not and will not violate any law, regulation, order, writ, injunction or decree of any

court or governmental body, agency or other instrumentality applicable to a Guarantor, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, lien, charge or encumbrance of any nature whatsoever upon any of the assets of a Guarantor pursuant to the terms of a Guarantor's articles of organization, or any mortgage, indenture, agreement or instrument to which a Guarantor is a party or by which it or any of its properties is bound. No Guarantor is a party to any agreement or instrument or subject to any restriction which might materially or adversely affect Guarantors or the Property, or Guarantors' businesses, properties or assets, operations or condition, financial or otherwise. No Guarantor is in default under any other guaranty which it has provided to Lender.

(d) **No Litigation.** There are no actions, suits or proceedings at law or at equity, pending or, to each Guarantor's best knowledge, threatened against or affecting a Guarantor or which involve or might involve the validity or enforceability of this Guaranty or which might materially adversely affect the financial condition of a Guarantor or the ability of a Guarantor to perform any of its obligations under this Guaranty. No Guarantor is in default beyond any applicable grace or cure period with respect to any order, writ, injunction, decree or demand of any Governmental Authority which might materially adversely affect the financial condition of such Guarantor or the ability of such Guarantor to perform any of its obligations under this Guaranty.

(e) **Consents.** All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Authorities (collectively, the "Consents") that are required in connection with the valid execution, delivery and performance by Guarantors of this Guaranty have been obtained and each Guarantor agrees that all Consents required in connection with the carrying out or performance of any of such Guarantor's obligations under this Guaranty will be obtained when required.

(f) **Financial Statements and Other Information.** All financial statements of Guarantors heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Guarantors as of the respective dates thereof, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof. None of the aforesaid financial statements or any certificate or statement furnished to Lender by or on behalf of a Guarantor in connection with the transactions contemplated hereby, and none of the representations and warranties in this Guaranty contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein or herein not misleading. There are no material facts presently known to Guarantors that have not been disclosed to Lender which adversely affect, or, as far as Guarantors can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Guarantors.

(g) **No Bankruptcy Filing.** No Guarantor nor any of its constituent Persons have filed, or are contemplating the filing of, a Bankruptcy Proceeding, and no Guarantor has any knowledge of any Person having filed, or contemplating the filing of, a Bankruptcy Proceeding against it or such constituent Persons. In addition, no Guarantor nor any principals nor Affiliates of any Guarantor has been a party to, or the subject of a Bankruptcy Proceeding for the past ten (10) years.

(h) **Consideration.** Each Guarantor is the owner, directly or indirectly, of certain legal and beneficial equity interests in Borrower.

(i) **Patriot Act; Foreign Corrupt Practices Act.** Nelson Guarantor (a) is not listed on any Government Lists, (b) is not a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has not been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is not currently under investigation by any Governmental Authority for alleged criminal activity. Neither Properties Fund Guarantor nor any partner in Properties Fund Guarantor nor member of such partner nor any other owner of a direct or indirect interest in Properties Fund Guarantor (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any Governmental Authority for alleged criminal activity. No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4. **Financial Statements.** Each Guarantor shall deliver to Lender, (a) (i) within 30 days after the date filed, a complete copy of each Guarantor's tax return prepared by an independent certified public accountant, certified by each Guarantor and in form, content, level of detail and scope reasonably acceptable to Lender, and (ii) simultaneously with Guarantor's delivery to Lender of such tax return, a certificate of Guarantor setting forth the Net Worth (as defined below) and Liquid Assets (as defined below) of Guarantor in form, content, level of detail and scope reasonably acceptable to Lender, and (b) 20 days after request by Lender, such other financial information with respect to Guarantor as Lender may reasonably request.

5. **Unconditional Character of Obligations of Guarantors.**

(a) The obligations of Guarantors hereunder shall be irrevocable, absolute and unconditional, irrespective of the validity, regularity or enforceability, in whole or in part, of the other Loan Documents or any provision thereof, or the absence of any action to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against Borrower, a Guarantor or any other Person or any action to enforce the same, any failure or delay in the enforcement of the obligations of Borrower under the other Loan Documents or Guarantors under this Guaranty, or any setoff, counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against a Guarantor by Lender or constitute a legal or equitable discharge or defense of a guarantor or surety. Lender may enforce the obligations of any Guarantor under this Guaranty by a proceeding at law, in equity or otherwise, independent of any loan foreclosure or similar proceeding or any deficiency action against

Borrower or any other Person at any time, either before or after an action against the Property or any part thereof, Borrower or any other Person. **This Guaranty is a guaranty of payment and performance and not merely a guaranty of collection.** Each Guarantor waives diligence, notice of acceptance of this Guaranty, filing of claims with any court, any proceeding to enforce any provision of any other Loan Document, against such Guarantor, Borrower or any other Person, any right to require a proceeding first against Borrower or any other Person, or to exhaust any security (including, without limitation, the Property) for the performance of the Guaranteed Obligations or any other obligations of Borrower or any other Person, or any protest, presentment, notice of default or other notice or demand whatsoever (except to the extent expressly provided to the contrary in this Guaranty).

(b) The obligations of Guarantors under this Guaranty, and the rights of Lender to enforce the same by proceedings, whether by action at law, suit in equity or otherwise, shall not be in any way affected by any of the following:

(i) any insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower, the Property or any part thereof, a Guarantor or any other Person;

(ii) any failure by Lender or any other Person, whether or not without fault on its part, to perform or comply with any of the terms of the Loan Agreement, or any other Loan Documents, or any document or instrument relating thereto;

(iii) the sale, transfer or conveyance of the Property or any interest therein to any Person, whether now or hereafter having or acquiring an interest in the Property or any interest therein and whether or not pursuant to any foreclosure, trustee sale or similar proceeding against Borrower or the Property or any interest therein;

(iv) the conveyance to Lender, any Affiliate of Lender or Lender's nominee of the Property or any interest therein by a deed-in-lieu of foreclosure;

(v) the release of Borrower or any other Person from the performance or observance of any of the agreements, covenants, terms or conditions contained in any of the Loan Documents by operation of law or otherwise; or

(vi) the release in whole or in part of any collateral for any or all Guaranteed Obligations or for the Loan or any portion thereof.

(c) Except as otherwise specifically provided in this Guaranty, each Guarantor hereby expressly and irrevocably waives all defenses (other than a valid defense of payment and/or performance in full of the applicable Guaranteed Obligations) in an action brought by Lender to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise.

(d) Lender may deal with Borrower and Affiliates of Borrower in the same manner and as freely as if this Guaranty did not exist and shall be entitled, among other things, to grant Borrower or any other Person such extension or extensions of time to perform any

act or acts as may be deemed advisable by Lender, at any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantors hereunder.

(e) No compromise, alteration, amendment, modification, extension, renewal, release or other change of, or waiver, consent, delay, omission, failure to act or other action with respect to, any liability or obligation under or with respect to, or of any of the terms, covenants or conditions of, the Loan Documents shall in any way alter, impair or affect any of the obligations of Guarantors hereunder, and Guarantors agree that if any Loan Documents are modified with Lender's consent, the Guaranteed Obligations shall automatically be deemed modified to include such modifications.

(f) Lender may proceed to protect and enforce any or all of its rights under this Guaranty by suit in equity or action at law, whether for the specific performance of any covenants or agreements contained in this Guaranty or otherwise, or to take any action authorized or permitted under applicable law, and shall be entitled to require and enforce the performance of all acts and things required to be performed hereunder by Guarantors. Each and every remedy of Lender shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity.

(g) No waiver shall be deemed to have been made by Lender of any rights hereunder unless the same shall be in writing and signed by Lender, and any such waiver shall be a waiver only with respect to the specific matter involved and shall in no way impair the rights of Lender or the obligations of Guarantors to Lender in any other respect or at any other time.

(h) At the option of Lender, any Guarantor may be joined in any action or proceeding commenced by Lender against Borrower in connection with or based upon any other Loan Documents and recovery may be had against any Guarantor in such action or proceeding or in any independent action or proceeding against such Guarantor to the extent of such Guarantor's liability hereunder, without any requirement that Lender first assert, prosecute or exhaust any remedy or claim against Borrower or any other Person, or any security for the obligations of Borrower or any other Person.

(i) Guarantors agree that this Guaranty shall continue to be effective or shall be reinstated, as the case may be, if at any time any payment is made by Borrower or a Guarantor to Lender and such payment is rescinded or must otherwise be returned by Lender (as determined by Lender in its sole and absolute discretion) upon insolvency, bankruptcy, liquidation, reorganization, readjustment, composition, dissolution, receivership, conservatorship, winding up or other similar proceeding involving or affecting Borrower or a Guarantor, all as though such payment had not been made.

(j) In the event that any Guarantor shall advance or become obligated to pay any sums under this Guaranty or in connection with the Guaranteed Obligations or in the event that for any reason whatsoever Borrower or any subsequent owner of the Property or any part thereof is now, or shall hereafter become, indebted to a Guarantor, such Guarantor agrees that (i) the amount of such sums and of such indebtedness and all interest thereon shall at all times be

subordinate as to lien, the time of payment and in all other respects to all sums, including Principal and interest and other amounts, at any time owed to Lender under the Loan Documents, and (ii) such Guarantor shall not be entitled to enforce or receive payment thereof until all Principal, interest and other sums due pursuant to the Loan Documents have been paid in full. Nothing herein contained is intended or shall be construed to give any Guarantor any right of subrogation in or under the Loan Documents or any right to participate in any way therein, or in the right, title or interest of Lender in or to any collateral for the Loan, notwithstanding any payments made by a Guarantor under this Guaranty, until the actual and irrevocable receipt by Lender of payment in full of all Principal, interest and other sums due with respect to the Loan or otherwise payable under the Loan Documents. If any amount shall be paid to a Guarantor on account of such subrogation rights at any time when any such sums due and owing to Lender shall not have been fully paid, such amount shall be paid by such Guarantor to Lender for credit and application against such sums due and owing to Lender.

(k) Guarantors' obligations hereunder shall survive a foreclosure, deed-in-lieu of foreclosure or similar proceeding involving the Property and the exercise by Lender of any or all of its remedies pursuant to the Loan Documents. Notwithstanding anything to the contrary herein, this Guaranty shall terminate and the obligations of Guarantor under this Guaranty (except for (x) those Guaranteed Obligations that expressly survive the payment of the Debt in full or the defeasance of the Note in full or (y) those obligations or liabilities of Borrowers that constitute Guaranteed Obligations first arising or accruing prior to such payment of the Debt in full or defeasance of the Note in full) shall be of no further force and effect from and after the full, complete and indefeasible payment of the Debt in full or the defeasance of the entire principal amount of the Note in accordance with the terms, provisions and requirements set forth in the Loan Agreement. For purposes of the preceding sentence, (i) payment in full of the Debt shall not be deemed to have occurred if Lender or its designee or nominee acquires title to the Property through the exercise of remedies (whether at foreclosure sale, a transfer in lieu of foreclosure or any other transfer) under the Loan Documents and (ii) to the extent a third party suit, proceeding, or claim has been instituted or commenced against Lender, or one of more Guaranteed Obligation(s) accrued or occurred prior to the termination date set forth in the foregoing sentence, this Agreement shall remain in full force and effect with respect to any such suit, proceeding, claim or Guaranteed Obligation until the completion of any such suits, proceedings or claims or payment in full of all such Guaranteed Obligations, including, without limitation, the payment by Guarantor of any amounts which are due and payable under this Guaranty in connection therewith.

6. **Covenants.**

(a) As used in this Section 6, the following terms shall have the respective meanings set forth below:

(i) "***GAAP***" shall mean generally accepted accounting principles, consistently applied.

(ii) "***Liquid Assets***" shall mean assets in the form of cash, cash equivalents, obligations of (or fully guaranteed as to principal and interest by) the United States or any agency or instrumentality thereof (provided the full faith and credit of the United States supports such obligation or guarantee), certificates of deposit issued by a

commercial bank having net assets of not less than $500 million, securities listed and traded on a recognized stock exchange or traded over the counter and listed in the National Association of Securities Dealers Automatic Quotations, or liquid debt instruments that have a readily ascertainable value and are regularly traded in a recognized financial market.

(iii) "***Net Worth***" shall mean, as of a given date, (x) the total assets of a Guarantor (exclusive of any interest in the Property or in any other asset that is part of the collateral for the Loan) as of such date less (y) such Guarantor's total liabilities as of such date, determined in accordance with GAAP.

(b) Until all of the Guaranteed Obligations have been paid in full, Guarantors (i) shall collectively maintain (A) a Net Worth in excess of $3,160,000.00 (the "***Net Worth Threshold***") and (B) Liquid Assets having a market value of at least $474,000.00 (the "***Liquid Assets Threshold***") and (ii) shall not sell, pledge, mortgage or otherwise transfer any of its assets, or any interest therein, which would cause Guarantor's Net Worth to fall below the Net Worth Threshold or Guarantor's Liquid Assets to fall below the Liquid Assets Threshold.

(c) No Guarantor shall, at any time while a default in the payment of the Guaranteed Obligations has occurred and is continuing, either (i) enter into or effectuate any transaction with any Affiliate which would reduce the Net Worth of such Guarantor below the net Worth Threshold or (ii) sell, pledge, mortgage or otherwise transfer to any Person any of such Guarantor's assets, or any interest if a primary purpose of such sale, pledge, mortgage or transfer is to make Guarantors' assets (or any interest therein) unavailable to satisfy any of the Guaranteed Obligations.

7. **Continuing Liability**. In the event that a replacement (as opposed to a supplemental) guaranty of recourse obligations is executed and delivered to Lender by an Acceptable Replacement Guarantor in compliance with the terms and conditions of the Loan Agreement, Guarantors shall not be liable under this Guaranty to the extent that Guarantors have demonstrated that such liability hereunder arises from actions taken, or the occurrence of any circumstance, condition or event that occurs, after the date of such Permitted Transfer, Transfer and Assumption or other appointment of an Acceptable Replacement Guarantor as expressly permitted or required under the Loan Agreement, as applicable, and further provided that such liability does not result from the acts or omissions of a Guarantor, any Affiliate of any Guarantor or any Person acting at the direction of any of the foregoing (it being acknowledged and agreed that Guarantors shall bear the burden of proof of such matters in a court of competent jurisdiction), and, for the avoidance of doubt, Guarantors' liability shall not be limited due to the fact that such liability, loss, cost, or expense does not occur, or the occurrence of the applicable circumstance, condition, action, omission or event is not discovered, until after the Permitted Transfer, Transfer and Assumption or other appointment of an Acceptable Replacement Guarantor as expressly permitted or required under the Loan Agreement, as applicable.

8. **Acceptable Replacement Guarantor and Approved Additional Guarantor**. Sections 5.26 and 8.1 of the Loan Agreement, as they relate to (i) the addition of an additional Guarantor, approved by Lender, and/or (ii) the replacement of Guarantor with an Acceptable Replacement Guarantor, are incorporated herein in their entirety

9. **Release**. Notwithstanding anything to the contrary contained herein but subject to the terms and provisions of this Guaranty, Guarantors shall not be liable under this Guaranty to the extent (and only to the extent) that Guarantors can prove (in a court of competent jurisdiction) that the event giving rise to any obligation of Guarantors under this Guaranty first occurred after the date (the "***Mortgage Transfer Date***") on which Lender or a third party that is not an Affiliate or nominee of Borrower or Guarantor acquires title to the Properties as a result of Lender's exercise of remedies under the Loan Documents, through foreclosure, deed in lieu thereof or otherwise (each a "***Mortgage Transfer***"); provided, however, that in no event shall either Guarantor be released from any liability or obligation hereunder (a) that occurred, arisen or accrued prior to the Mortgage Transfer Date, (b) that has occurred, arisen or accrued on or after the Mortgage Transfer Date to the extent that an act or action of Borrower, or an Affiliate of Borrower, or a Person acting at the intentional or knowing direction of any of the foregoing causes or authorizes the event giving rise to such liability or obligation to accrue or (c) that has occurred, arisen or accrued on or after the date that the related Mortgage Transfer is cancelled, terminated, nullified, unwound, revoked, rescinded, void or declared invalid for any reason until a Mortgage Transfer is successfully completed.

10. **Entire Agreement/Amendments.** This instrument represents the entire agreement between the parties with respect to the subject matter hereof. The terms of this Guaranty shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lender and Guarantors.

11. **Successors and Assigns.** This Guaranty shall be binding upon each Guarantor, and such Guarantor's estate, heirs, personal representatives, successors and assigns, may not be assigned or delegated by any Guarantor and shall inure to the benefit of Lender and its successors and assigns.

12. **Governing Law.**

(a) THIS GUARANTY WAS NEGOTIATED IN THE STATE OF NEW YORK AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT TO THE LOAN AGREEMENT WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS GUARANTY AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, EACH GUARANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS GUARANTY AND THE NOTE, AND THIS GUARANTY AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO § 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR GUARANTORS ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN NEW YORK COUNTY, NEW YORK AND GUARANTORS WAIVE ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GUARANTORS DO HEREBY DESIGNATE AND APPOINT COGENCY GLOBAL INC. AT 10 EAST 40TH STREET, 10TH FLOOR, NEW YORK, NEW YORK 10016, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF GUARANTORS MAILED OR DELIVERED TO GUARANTORS IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GUARANTORS (UNLESS LOCAL LAW REQUIRES ANOTHER METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GUARANTORS (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR. NOTWITHSTANDING THE FOREGOING, LENDER SHALL HAVE THE RIGHT TO INSTITUTE ANY LEGAL SUIT, ACTION OR PROCEEDING FOR THE ENFORCEMENT OR FORECLOSURE OF ANY LIEN ON ANY COLLATERAL FOR THE LOAN IN ANY FEDERAL OR STATE COURT IN ANY JURISDICTION(S) THAT LENDER MAY ELECT IN ITS SOLE AND ABSOLUTE DISCRETION, AND GUARANTORS WAIVE ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

13. **Section Headings.** The headings of the sections and paragraphs of this Guaranty have been inserted for convenience of reference only and shall in no way define, modify, limit or amplify any of the terms or provisions hereof.

14. **Severability.** Any provision of this Guaranty which may be determined by any competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, each Guarantor hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

15. **WAIVER OF TRIAL BY JURY.** EACH OF GUARANTOR AND BY LENDER'S ACCEPTANCE OF THIS GUARANTY, LENDER HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION THEREWITH.

16. **Other Guaranties.** The obligations of each Guarantor hereunder are separate and distinct from, and in addition to, the obligations of such Guarantor now or hereafter arising under any other guaranties, indemnification agreements or other agreements to which such Guarantor is now or hereafter becomes a party. In no event shall any Guarantor be entitled to any credit against amounts due under this Guaranty by reason of amounts paid to Lender by Guarantors (or any of them) or any other person under or by reason of the other guaranties, indemnification agreements or other agreements to which Guarantors (or any of them) are now or hereafter become a party.

17. **Notices.** All notices, consents, approvals and requests required or permitted hereunder (a "***Notice***") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party): If to Lender: Société Générale, 245 Park Avenue, New York, New York, 10167, Attn.: Kevin Kelley, Telecopier (201) 839-8150 and to: Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166, Attention: Corey A. Tessler, Esq., Telecopier: (212) 294-4700; if to Properties Fund Guarantor: American Hospitality Properties Fund III, LLC, 5950 Berkshire Lane, Suite 850, Dallas, Texas 75225, Attention: William L. Nelson, Email: perch.nelson@phoenixamericanhospitality.com, with a copy to: American Hospitality Properties Fund III, LLC, 5950 Berkshire Lane, Suite 850, Dallas, Texas 75225, Attention: General Counsel, Email: joel.eastman@pahmgt.com; and if to Nelson Guarantor: William L. Nelson, 5950 Berkshire Lane, Suite 850, Dallas, Texas 75225, Email: perch.nelson@phoenixamericanhospitality.com, with a copy to: Phoenix American Hospitality, LLC, 5950 Berkshire Lane, Suite 850, Dallas, Texas 75225, Attention: General Counsel, Email: joel.eastman@pahmgt.com. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of overnight delivery, upon the first attempted delivery on a Business Day.

18. **Guarantor's Receipt of Loan Documents.** Each Guarantor by its execution hereof acknowledges receipt of true copies of all of the Loan Documents, the terms and conditions of which are hereby incorporated herein by reference.

19. **Interest; Expenses.**

(a) If Guarantors fail to pay all or any sums due hereunder within ten (10) business days by Lender, the amount of such sums payable by Guarantors to Lender shall bear interest from the date of demand until paid at the Default Rate in effect from time to time.

(b) Each Guarantor hereby agrees to pay all actual, out-of-pocket costs, charges and expenses, including reasonable attorneys' fees and disbursements, that may be incurred by Lender in enforcing the covenants, agreements, obligations and liabilities of Guarantors under this Guaranty.

20. **Joint and Several Obligations.** Each Guarantor shall have joint and several liability for the obligations of Guarantors hereunder.

21. **Counterparts.** This Guaranty may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

22. **Exculpation**. The provisions of Section 10.1 of the Loan Agreement are hereby incorporated by reference into this Guaranty to the same extent and with the same force as if fully set forth herein.

**[Remainder of Page Intentionally Left Blank; Signature Pages Follow]**

**IN WITNESS WHEREOF**, each Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR:**

**AMERICAN HOSPITALITY PROPERTIES FUND III LLC**, a Delaware limited liability company

By: ______________________________
Name: Joel M. Eastman
Title: Executive Vice President

*[Signatures continue on the following page]*

**GUARANTOR:**

______________________________
**WILLIAM L. NELSON**, an individual

# APPENDIX III

## Sale-Purchase Agreement

**EXECUTION VERSION**

---

# SALE-PURCHASE AGREEMENT

**among**

**AHP PHX USB 3 LLC AND**
**AIP CB IV LTD.**

**collectively, as Seller,**

**and**

**AMERICAN HOSPITALITY PROPERTIES REIT, INC.,**

**as Purchaser.**

**COVERING:**

**Limited Liability Company Membership Interests of the applicable Seller in APIP-C Borrower, LLC and APIP-C OperCo, LLC, each a Delaware limited liability company**

---

# TABLE OF CONTENTS

**Page**

1. SALE-PURCHASE .......... 2
2. PURCHASE PRICE .......... 2
3. CLOSING DATE .......... 3
4. CLOSING DOCUMENTS AND CONDITIONS PRECEDENT .......... 3
5. PURCHASER'S DEFAULT .......... 5
6. REPRESENTATIONS .......... 5
7. BROKERS .......... 9
8. COVENANTS .......... 9
9. CLOSING COSTS .......... 9
10. INDEMNIFICATION .......... 9
11. MUTUAL RELEASE .......... 10
12. NON-LIABILITY .......... 11
13. SELLERS' DEFAULT .......... 11
14. CONDITION OF INTERESTS AND PROPERTIES; DISCLAIMERS; RELEASE BY PURCHASER .......... 12
15. NOTICES .......... 13
16. ENTIRE AGREEMENT; AMENDMENTS .......... 14
17. SUCCESSORS AND ASSIGNS .......... 14
18. PARTIAL INVALIDITY .......... 14
19. PARAGRAPH HEADINGS .......... 14
20. GOVERNING LAW .......... 15
21. PREVAILING PARTY TO RECEIVE ATTORNEYS' FEES .......... 15
22. CONFIDENTIALITY .......... 15
23. SURVIVAL .......... 15
24. TAX MATTERS .......... 15
25. SUBMISSION TO JURISDICTION .......... 18
26. WAIVER OF JURY TRIAL .......... 18
27. CERTAIN DEFINITIONS .......... 19
28. NO THIRD PARTY BENEFICIARIES .......... 20

**TABLE OF CONTENTS**
(continued)

**Page**

29. COUNTERPART EXECUTION; EXECUTION BY FACSIMILE TRANSMISSION ........ 20

# SALE-PURCHASE AGREEMENT

THIS **SALE-PURCHASE AGREEMENT** (this "Agreement"), is made as of this 31st day of May, 2023 (the "Effective Date"), between **AHP PHX USB 3 LLC**, a Delaware limited liability company ("AHP PHX Seller"), and **AIP CB IV LTD.**, an Exempted Company incorporated in the Cayman Islands with Limited Liability ("AIP CB IV Seller" and together with AHP PHX Seller, each a "Seller" and collectively, "Sellers"), each having a mailing address at c/o Lakemore Partners, Index Tower, L14 West Entrance, Office 1406, Dubai International Financial Centre, Dubai, United Arab Emirates, and **AMERICAN HOSPITALITY PROPERTIES REIT, INC.**, a Delaware corporation, having an office at 14643 Dallas Pkwy, Suite 970, Dallas, Texas 75254 ("Purchaser").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Limited Liability Company Agreement of APIP-C OperCo, LLC, dated as of August 16, 2018, by and among AHP PHX Seller, American Hospitality Properties Fund III, LLC, a Delaware limited liability company ("AHP Fund III"), and Phoenix American Hospitality, LLC, as manager (as amended, the "APIP-C OperCo Operating Agreement"), AHP PHX Seller owns 80% of the membership interests (the "APIP-C OperCo Interests") in APIP-C OperCo, LLC, a limited liability company formed and existing under the laws of the State of Delaware ("APIP-C OperCo");

WHEREAS, pursuant to that certain Limited Liability Company Agreement of APIP-C Borrower, LLC, dated as of August 16, 2018, by and among AIP CB IV Seller, AHP Fund III and Phoenix American Hospitality, LLC, as manager (as amended, the "APIP-C Borrower Operating Agreement" and together with the APIP-C OperCo Operating Agreement, collectively, the "Operating Agreements"), AIP CB IV Seller owns 80% of the membership interests (the "APIP-C Borrower Interests" and together with the APIP-C OperCo Interests, collectively, the "Interests") in APIP-C Borrower, LLC, a limited liability company formed and existing under the laws of the State of Delaware ("APIP-C Borrower" and together with APIP-C OperCo, each a "Company" and collectively, the "Companies");

WHEREAS, APIP-C Borrower owns 100% of the membership interests in each of AHP FT Wayne Inn, LLC, a Delaware limited liability company ("FT Wayne Inn Owner"), and AHP FT Wayne Suites, LLC, a Delaware limited liability company ("FT Wayne Suites Owner" and together with FT Wayne Inn Owner, each a "Property Owner" and collectively, the "Property Owners");

WHEREAS, FT Wayne Inn Owner is the owner of the property known as Hilton Garden Inn Fort Wayne and located at 8615 US Highway 24 West, Fort Wayne, Indiana 46804 (the "Hilton Garden Inn");

WHEREAS, FT Wayne Suites Owner is the owner of the property known as Homewood Suites Fort Wayne and located at 8621 US Highway 24 West, Fort Wayne, Indiana 46804 (the "Homewood Suites" and together with the Hilton Garden Inn, each a "Property" and collectively, the "Properties");

WHEREAS, the Properties are encumbered by mortgages pursuant to that certain loan made by Wells Fargo Bank, National Association, as Trustee for the benefit of the Registered Holders of UBS Commercial Mortgage Trust 2018-C13, Commercial Mortgage Pass-Through Certificates, Series 2018C13 ("Existing Lender"), as successor-in-interest to Societe Generale, to Property Owners pursuant to that certain Loan Agreement, dated as of August 16, 2018, by and between Property Owners and Existing Lender (as amended, the "Existing Loan");

WHEREAS, APIP-C OperCo owns 100% of the membership interests in each of APIP-C Ft. Wayne Inn Master Tenant, LLC, a Delaware limited liability company ("FT Wayne Inn Tenant"), and APIP-C Ft. Wayne Suites Master Tenant, LLC, a Delaware limited liability company ("FT Wayne Suites Tenant" and together with FT Wayne Inn Tenant, each an "APIP-C Master Tenant" and collectively, the "Master Tenants");

WHEREAS, pursuant to that certain Master Lease Financing Facility Agreement, dated as of August 16, 2018, between FT Wayne Inn Owner, as lessor, and FT Wayne Inn Tenant, as lessee, FT Wayne Inn Tenant owns a leasehold interest in the Hilton Garden Inn;

WHEREAS, pursuant to that certain Master Lease Financing Facility Agreement, dated as of August 16, 2018, between FT Wayne Suites Owner, as lessor, and FT Wayne Suites Tenant, as lessee, FT Wayne Suites Tenant owns a leasehold interest in the Homewood Suites; and

WHEREAS, Purchaser and Seller have agreed that Seller shall sell the Interests to Purchaser and Purchaser shall purchase the Interests from Seller, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of One Hundred Dollars ($100.00), the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1. **Sale-Purchase**. Each Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from each Seller, upon the terms and conditions hereinafter set forth, all of such Seller's right, title and interest in and to the applicable Interests in each Company.

2. **Purchase Price**. The aggregate purchase price for the Interests (the "Purchase Price") is Nine Million Three Hundred Sixty-Two Thousand Four Hundred Seventy-Seven and no/100 Dollars ($9,362,477.00), which shall be payable by Purchaser at Closing, minus the Downpayment, by wire transfer of immediately available federal funds through the Escrow Agent who will disburse such funds together with the Downpayment to an account or accounts designated by Seller.

2.1 Within one (1) Business Day of the Effective Date, Purchaser shall deposit the amount of One Million Three Hundred Fifty Thousand and 00/100 Dollars ($1,350,000.00) (the "Downpayment") with Stewart Title Guaranty Company, as escrow agent ("Escrow Agent"), pursuant to that certain Earnest Money Escrow Agreement dated as of the Effective Date, by and among Sellers, Purchaser, and Escrow Agent. In the event Purchaser fails to deliver the Downpayment as and when required hereunder, then this Agreement shall terminate whereupon neither Sellers nor Purchaser shall have any further rights or obligations hereunder other than the

Surviving Obligations, which shall survive such termination. The Downpayment shall be returned to Purchaser only in the event Purchaser is entitled to the return of the Downpayment in accordance with the express provisions of this Agreement.

2.2 The Purchase Price shall be allocated as follows: (i) the amount of Nine Million Three Hundred Sixty-Two Thousand Four Hundred Seventy-Seven and no/100 Dollars ($9,362,477.00) to the APIP-C OperCo Interests, and (ii) the amount of Zero Dollars ($0) to the APIP-C Borrower Interests (the Purchase Price, as so allocated for the Interests in each Company, shall be referred to herein as the "Allocated Purchase Price" for such Interests).

2.3 Each of Purchaser and the Escrow Agent (as applicable and without duplication) shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as it reasonably determines are required to be deducted and withheld with respect to the making of such payment under the Code, or any other applicable state, local or foreign law. Each of Purchaser and the Escrow Agent (as applicable) shall have provided written notice to each Seller of its intent to deduct or withhold on any payment made pursuant to this Agreement prior to such withholding, and Purchaser shall cooperate reasonably and in good faith with the Seller to prevent or mitigate any such withholding in a manner consistent with applicable law. To the extent that amounts are so deducted or withheld by Purchaser or the Escrow Agent, as the case may be, such withheld amounts (i) shall be timely remitted by Purchaser or the Escrow Agent, as applicable, to the applicable governmental authority and (ii) shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made by Purchaser or the Escrow Agent, as the case may be.

3. **Closing Date**. Subject to the terms and provisions of this Agreement, the consummation of the transactions contemplated hereby (the "Closing") shall take place through an escrow with Escrow Agent on June 2, 2023 (the "Closing Date").

4. **Closing Documents and Conditions Precedent**.

4.1 The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions precedent (as determined by Purchaser):

(a) Each Seller shall have performed or observed all of its obligations under this Agreement that are required to be performed on or prior to the Closing Date, including, without limitation, the delivery of all documents and instruments required to be delivered by Sellers pursuant to the provisions of Section 4.3 of this Agreement;

(b) The representations and warranties of Sellers contained in this Agreement shall be true, correct and accurate on the Closing Date as if first made on the Closing Date, and each Seller shall be required to deliver to Purchaser at Closing a bring-down Certificate with respect to such representations and warranties pursuant to Section 4.3(c) below;

If any of the foregoing conditions are not satisfied on the Closing Date, then Purchaser shall have the right (in addition to any other rights Purchaser may have under this Agreement), to (i) promptly receive a return of the Downpayment and terminate this Agreement by notice given to Sellers, whereupon no party hereto shall have any further rights or obligations hereunder except for the

Surviving Obligations, which shall survive such termination, or (ii) at Purchaser's sole option, waive any unsatisfied condition and consummate the transactions contemplated hereby.

4.2 The obligation of each Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction of the following conditions precedent (as determined by each Seller):

(a) Purchaser shall have performed or observed all of its obligations under this Agreement that are required to be performed on or prior to the Closing Date, including, without limitation, the delivery of all documents and instruments required to be delivered by Purchaser pursuant to the provisions of Section 4.4 of this Agreement; and

(b) the representations and warranties of Purchaser contained in this Agreement shall be true, correct and accurate on the Closing Date as if first made on the Closing Date, and Purchaser shall be required to deliver to Sellers at Closing a bring-down Certificate with respect to such representations and warranties pursuant to Section 4.4(d) below.

If any of the foregoing conditions are not satisfied on the Closing Date, then Sellers shall have the right to (i) promptly receive a return of the Downpayment and terminate this Agreement by notice given to Purchaser, and no party hereto shall have any further rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination, or (ii) at Sellers' sole option, waive any unsatisfied condition and consummate the transactions contemplated hereby.

4.3 At the Closing, each Seller shall deliver to Purchaser or to the Escrow Agent for delivery to Purchaser the following:

(a) an assignment and assumption of the Interests, in the form attached hereto as Exhibit A and made a part hereof (the "Assignment of Interests"), duly executed by such Seller;

(b) a closing statement or settlement statement (the "Closing Statement") prepared by the Escrow Agent and agreed to and duly executed by such Seller;

(c) a certification updating the representations and warranties given by such Seller pursuant to Section 6.1 hereof, duly executed by such Seller; and

(d) (i) an IRS Form W-9, duly completed and executed by AHP PHX Seller (including certification of not being subject to U.S. backup withholding) and (ii) the applicable version of IRS Form W-8, duly completed and executed by AIP CB IV Seller.

4.4 At the Closing, Purchaser shall deliver to Sellers or to Escrow Agent for delivery to Sellers the following:

(a) the Purchase Price, in accordance with Section 2 hereof;

(b) the Assignments of Interests, duly executed by Purchaser;

(c) the Closing Statement, agreed to and duly executed by Purchaser; and

(d) a certification updating the representations and warranties given by Purchaser pursuant to Section 6.2 hereof, duly executed by Purchaser.

4.5 The acceptance by Purchaser of Seller's transfer of Interests shall be deemed to be full performance and discharge of any and all obligations on the part of Sellers to be performed pursuant to the provisions of this Agreement, except for those obligations hereunder which survive Closing by their terms.

5. **Purchaser's Default**. If Purchaser shall default hereunder (including, without limitation, a default hereunder based on a breach by Purchaser of Purchaser's Representations (as hereinafter defined) that is discovered prior to the Closing Date and is not the result of an assignment of this Agreement permitted pursuant to Section 17 hereof or the result of a change of facts or circumstances with respect to Section 6.2(h) which was not the result of a breach of this Agreement by Purchaser), or shall fail or refuse to perform Purchaser's obligation to purchase the Interests in accordance with this Agreement, then the Downpayment shall be retained by Sellers, as Sellers' sole remedy (except as otherwise provided in this Section 5) as liquidated damages (the parties hereto acknowledging that it would be difficult or impossible to accurately ascertain the amount of Sellers' damages), whereupon this Agreement shall terminate and neither party shall have any further rights or obligations under this Agreement other than the Surviving Obligations, which shall survive such termination. In the event that following any such termination Sellers have a claim against Purchaser based on any of Sections 7 [Broker], 21 [Prevailing Parties to Receive Attorneys' Fees], 22 [Confidentiality] and 25 [Submission to Jurisdiction], Sellers shall be entitled to pursue damages from Purchaser, in addition to the Downpayment.

6. **Representations**.

6.1 Each Seller hereby represents and warrants to Purchaser that, as of the Effective Date:

(a) AIP CB IV Seller is a duly formed and validly existing exempted company incorporated in the Cayman Islands with limited liability, validly existing and in good standing under the laws of the Cayman Islands, and is duly qualified or licensed to do business as a foreign entity in, and is in good standing in, each jurisdiction in which the nature of its business or its ownership of its properties or assets or operation of its business requires it to be so qualified or licensed;

(b) AHP PHX Seller is a duly formed and validly existing Delaware limited liability company, in existence and in good standing under the laws of the State of Delaware;

(c) the execution, delivery and performance of this Agreement by such Seller (i) are within such Seller's applicable powers, and (ii) have been duly authorized by all necessary company or other applicable action;

(d) such Seller is the sole owner, beneficially, legally and of record, of the Interests stated to be owned by it in the Recitals, free and clear of all liens, claims, pledges, security interests and other encumbrances of any kind or nature whatsoever (whether arising by contract, operation of law or otherwise). No Seller has entered into or granted (or caused the Company to enter into or grant) any lien, claim, pledge, security interest or other encumbrance of any kind or nature whatsoever on the Interests owned by such Seller. Other than this Agreement and the Operating Agreements, there are no contracts for sale, conditional sales agreements, rights of first refusal, rights of first offer, options, or similar rights with respect to the Interests or any portion thereof, and no Seller is a party to any option, warrant, or other security, agreement or commitment of any character other than the Operating Agreements, that would require such Seller to sell, transfer, or otherwise dispose of the Interests owned by such Seller to any Person other than Purchaser. Other than the Operating Agreements, there are no outstanding or authorized options, warrants, rights, contracts, calls, puts, rights to subscribe, conversion rights, or other agreements or commitments which would be binding upon any Seller after Closing providing for the issuance, disposition, or acquisition of the Interests owned by any Seller;

(e) this Agreement and the agreements and other documents to be executed and delivered by such Seller hereunder, when duly executed and delivered, will be legal, valid and binding obligations of such Seller, enforceable in accordance with their terms except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to or limiting creditor's rights generally, and (ii) general principles of equity;

(f) neither Seller has made a general assignment for the benefit of creditors, filed any voluntary bankruptcy petition or suffered the filing of any involuntary petition by any of such Seller's creditors, suffered the appointment of a receiver to take possession of all, or substantially all, of such Seller's assets, suffered the attachment or judicial seizure of all, or substantially all, of such Seller's assets, admitted in writing its inability to pay its debts as they come due, or made an offer of settlement, extension, or composition to its creditors generally;

(g) Neither Seller, nor any person or entity who owns any direct or indirect equity or other interest in or controls either Seller is (i) identified on any Governmental List (as hereinafter defined), or otherwise qualifies as a Prohibited Person (as hereinafter defined) or (ii) in violation of any applicable law, rule or regulation relating to anti-money laundering or anti-terrorism, including, without limitation, any applicable law, rule or regulation related to transacting business with Prohibited Persons or the requirements of any Anti-Terrorism Law (as hereinafter defined). As used herein the term (i) "Anti-Terrorism Law" shall mean (v) the Cayman Islands Monetary Authority Proceeds of Crime Law; (w) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub. Law No. 107-56, 115 Stat. 296 (2001); (x) the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et. seq. (2003); (y) the Trading with the Enemy Act, 50 U.S.C. App. §§ 1 et. seq. (2003); and (z) other similar laws enacted or promulgated from time to time; in each case, together with any executive orders, rules or regulations promulgated thereunder, including, without limitation, temporary regulations, all as amended or otherwise modified from time to time; (ii) "Governmental List" shall mean (x) the List of Specially Designated Nationals and Blocked Persons promulgated by the U.S. Department of the Treasury Office of Foreign Assets Control from time to time and (y) any other similar list (including, without limitation, any

list of Prohibited Persons) promulgated by any governmental authority from time to time; and (iii) "Prohibited Person" shall mean any person or entity who is (x) designated by the United States federal government as a terrorist or as a suspected terrorist, whether on a Governmental List, or otherwise or (y) otherwise subject to trade, anti-money laundering or anti-terrorism restrictions under United States federal or state law from time to time, including, without limitation, under any Anti-Terrorism Law;

(h) there are no consents or approvals of any federal, state, or local governmental authorities, or any internal board of directors or other approval process of Seller, that are required in connection with the performance by Sellers of their obligations under this Agreement, other than such of the foregoing as have been obtained; and

(i) no action, suit, claim, investigation, or proceeding, whether legal or administrative or in mediation or arbitration, is pending or threatened in writing, at law or in equity, against any Seller before or by any court of federal, state, municipal or other governmental department, commission, board, bureau, agency, or instrumentality that affects the Interests and/or would prevent any Seller from performing its obligations pursuant to this Agreement, and there are no judgments, decrees, or orders entered on a suit or proceeding against any Seller, an adverse decision which might or which judgment, decree, or order does, adversely affect the Interests or such Seller's ability to perform its obligations pursuant to, or any Purchaser's rights under, this Agreement, or which seeks to restrain, prohibit, invalidate, set aside, rescind, prevent, or make unlawful this Agreement or the carrying out of this Agreement or the transactions contemplated hereby.

Purchaser acknowledges that to the extent that any of the foregoing representations are made as to an individual Seller, then such representations are made only by the Seller named in such representation, as to itself only, and not as to any other person comprising Sellers.

6.2 Purchaser hereby represents and warrants to each Seller that, as of the Effective Date:

(a) Purchaser is a corporation, validly existing, duly organized and in good standing under the laws of the State of Delaware;

(b) the execution, delivery and performance of this Agreement by Purchaser (i) are within Purchaser's corporate, partnership, limited liability company or other applicable powers, and (ii) have been duly authorized by all necessary corporate, partnership, limited liability company or other applicable action;

(c) this Agreement and the agreements and other documents to be executed and delivered by Purchaser hereunder, when duly executed and delivered, will be legal, valid and binding obligations of Purchaser, enforceable in accordance with their terms;

(d) Purchaser is not acquiring the Interests with the assets of an employee benefit plan as defined in Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), and the transaction which is the subject of this Agreement is not a prohibited transaction under Section 406 of ERISA;

(e) Purchaser is not (i) identified on any Governmental List, or otherwise qualifies as a Prohibited Person or (ii) in violation of any applicable law, rule or regulation relating to anti-money laundering or anti-terrorism, including, without limitation, any applicable law, rule or regulation related to transacting business with Prohibited Persons or the requirements of any Anti-Terrorism Law;

(f) Purchaser has not made a general assignment for the benefit of creditors, filed any voluntary bankruptcy petition or suffered the filing of any involuntary petition by any of Purchaser's creditors, suffered the appointment of a receiver to take possession of all, or substantially all, of Purchaser's assets, suffered the attachment or judicial seizure of all, or substantially all, of Purchaser's assets, admitted in writing its inability to pay its debts as they come due, or made an offer of settlement, extension, or composition to Purchaser's creditors generally;

(g) there are no consents or approvals of any federal, state, or local governmental authorities, or any internal board of directors or other approval process of Purchaser, that are required in connection with the performance by Purchaser of its obligations under this Agreement, other than such of the foregoing as have been obtained; and

(h) no action, suit, claim, investigation, or proceeding whether legal or administrative or in mediation or arbitration, is pending or threatened, at law or in equity, against Purchaser before or by any court of federal, state, municipal or other governmental department, commission, board, bureau, agency, or instrumentality that would prevent Purchaser from performing its obligations pursuant to this Agreement, and there are no judgments, decrees, or orders entered on a suit or proceeding against Purchaser, an adverse decision which might or which judgment, decree, or order does, adversely affect Purchaser's ability to perform Purchaser's obligations pursuant to, or any Seller's rights under, this Agreement, or which seeks to restrain, prohibit, invalidate, set aside, rescind, prevent, or make unlawful this Agreement or the carrying out of this Agreement or the transactions contemplated hereby.

6.3 (a) Each of the representations and warranties of each Seller set forth in Section 6.1 of this Agreement (collectively, with respect to each such Seller, such "Seller's Representations") shall be deemed to have been remade at and as of the Closing Date with the same force and effect as if first made on and as of the Closing Date;

(b) If prior to Closing, Seller's Representations, as made as of the Effective Date, are determined to be untrue in any material respect as of the Effective Date or if Seller's Representations are untrue in any material respect when remade on the Closing Date, then Purchaser may, at Purchaser's option, either (i) terminate this Agreement by notice in writing to Sellers, in which event (subject to the provisions of this Section 6.3 and Purchaser's rights if the representations are untrue as a result of a Seller default as set forth in Section 13) the provisions of Section 5 of this Agreement shall apply to such termination, or (ii) waive the same and purchase the Interests without any abatement of the applicable Allocated Purchase Price. Seller's Representations shall survive the Closing until 5:00 p.m. New York Time on November 30, 2023; provided, however, that Seller's Representation contained in Section 6.1(d) shall survive the Closing for the applicable statute of limitations (the "Fundamental Rep Survival Period").

6.4 Each of the representations and warranties set forth in Section 6.2 of this Agreement (collectively, "Purchaser's Representations") shall be deemed to have been remade at and as of the Closing Date with the same force and effect as if first made on and as of the Closing Date. Purchaser's Representations shall terminate upon the termination of this Agreement or the Closing of the transaction contemplated by this Agreement.

6.5 The parties acknowledge that their respective rights and remedies pertaining to the Seller's Representations and the Purchaser's Representations, as applicable, are further limited as provided in Section 12.

7. **Brokers**. Each Seller and Purchaser each represents and warrants that it has not dealt with any broker, agent, finder or similar party in connection with the transaction contemplated hereby other than Jones Lang LaSalle Americas, Inc., a Maryland corporation ("Broker"), and (i) Purchaser hereby indemnifies and holds harmless each Seller and each Seller Exculpated Party (as hereinafter defined) from, and (ii) each Seller hereby indemnifies and holds harmless Purchaser and each Purchaser Exculpated Party from, any liability, cost or expense (including, without limitation, reasonable attorneys' fees and costs of enforcement of the foregoing indemnity) arising out of the falsity of the foregoing representation. The provisions of this Section 7 shall survive the Closing or any earlier termination of this Agreement.

8. **Covenants**. From the Effective Date until the Closing or earlier termination of this Agreement, no Seller shall:

(a) sell, assign, or otherwise transfer its Interests. Furthermore, no Seller shall, directly or indirectly, attempt to sell, assign, or otherwise transfer, or otherwise actively engage or negotiate with any independent third parties, other than Purchaser and its affiliates, for the sale, assignment or other transfer of the Interests. Sellers shall cause the officers, employees, agents, representatives and any other persons acting at the direction of Sellers not to, directly or indirectly, solicit, pursue, negotiate, accept or enter into any contract regarding any offers for the Interests or any portion thereof or interest therein other than this Agreement and any other documents to be entered into by any Seller in connection herewith; and

(b) enter into or grant (or cause the Company to enter into or grant) any lien, claim, pledge, security interest or other encumbrance of any kind or nature whatsoever on the Interests owned by such Seller. No Seller shall become a party to any option, warrant, or other security, agreement or commitment of any character that would require such Seller to sell, transfer, or otherwise dispose of the Interests owned by such Seller to any person other than Purchaser.

9. **Closing Costs**. Purchaser shall pay fifty percent (50%) of any escrow fees charged by Escrow Agent. Sellers shall pay (i) fifty percent (50%) of any escrow fees charged by Escrow Agent and (ii) one hundred percent (100%) of any fees charged by Broker. Each party hereto shall pay such party's own legal fees and all of such party's other expenses in connection with this transaction.

10. **Indemnification**.

10.1 From and after the Closing, Purchaser shall indemnify, defend and hold harmless Sellers and each Seller Indemnified Party (as hereinafter defined) from and against any

and all actual losses that may be imposed on, incurred by, or asserted against any Seller or any direct or indirect directors, officers, employees, affiliates, agents, successors and assigns of any Seller (each a "Seller Indemnified Party") arising out of claims made against any Seller Indemnified Party by any person or entity (including, without limitation, by any Company, any direct or indirect subsidiary of any Company and/or any member of any Company) in connection with the Interests, any Company, any Property Owner, any Master Tenant, any Property, the Existing Loan and/or any franchise, management or similar agreement with respect to the Properties (but expressly excluding Tax liabilities that are the responsibility of Sellers, as contemplated by Section 24.4) (collectively, the "Indemnified Liabilities"); provided, however, that Purchaser shall not have any obligation to Sellers for Indemnified Liabilities to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, or fraud of any Seller Indemnified Party. The provisions of this Section 10.1 shall survive the Closing.

10.2 From and after the Closing, Sellers shall jointly and severally indemnify, defend, and hold harmless Purchaser from and against any and all actual losses that may be imposed on, incurred by, or asserted against Purchaser or its direct or indirect directors, officers, employees, affiliates, agents, successors and assigns resulting from or arising out of any breach or inaccuracy in Seller's Representation in Section 6.1(d). The provisions of this Section 10.2 shall survive the Closing for the Fundamental Rep Survival Period.

11. **Mutual Release.**

11.1 Upon Closing, Seller (on behalf of itself and its affiliates) shall be deemed to have waived, relinquished, and released Purchaser and each Purchaser Exculpated Party (as hereinafter defined) from and against any and all claims, demands, causes of action (including, without limitation, causes of action in tort), losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and court costs) (collectively, "Claims") of any and every kind or character, known or unknown, that any Seller or any affiliate of any Seller might have asserted or alleged against Purchaser or any Purchaser Exculpated Party at any time by reason of or arising out of any and all acts, omissions, events, circumstances, or matters regarding the Interests, the Properties and the Operating Agreements; **PROVIDED**, **HOWEVER**, that Sellers hereby expressly reserve and retain any Claims against Purchaser arising under this Agreement or any other document delivered by Purchaser in connection with this Agreement, including, without limitation, by reason of any indemnification obligation of Purchaser under, or any breach by Purchaser of, this Agreement or any such other document.

11.2 Notwithstanding anything to the contrary set forth in this Agreement or the Operating Agreements, Purchaser (on behalf of itself, the Companies and their respective affiliates), upon Closing, shall each be deemed to have waived, relinquished, and released each Seller and each Seller Exculpated Party from and against any and all claims, demands, causes of action (including, without limitation, causes of action in tort), losses, damages, liabilities, costs, and expenses (including, without limitation, attorneys' fees and court costs) of any and every kind or character, known or unknown, that Purchaser, the Companies or any affiliate of any of them might have asserted or alleged against any Seller or any Seller Exculpated Party at any time by reason of or arising out of any and all acts, omissions, events, circumstances, or matters regarding the Properties, the Interests, the Companies, the Property Owners, the Master Tenants, the Existing Loan, the Operating Agreements, any franchise, management or similar agreement with respect to

the Properties and any other agreement affecting or relating to the Interests, the Companies, the Property Owners, the Master Tenants and/or the Properties, including, without limitation, any breach of Seller's Representations (except as provided in Section 10) and any claims related to Taxes assessed or imposed against the Companies or any subsidiaries of the Companies (but not, for the avoidance of doubt, any Taxes assessed or imposed against the Sellers or any of their direct and indirect equity owners, including for their share of Taxes assessed against the Companies which shall be the responsibility of Sellers pursuant to Section 24 of this Agreement).

12. **Non-Liability**. Notwithstanding anything to the contrary contained in this Agreement, no director, officer, employee, shareholder, member, manager, partner or agent of any Seller nor any of the directors, officers, employees, shareholders, members, managers, partners, joint venturers or agents of any of the directors, officers, employees, shareholders, members, managers, partners, joint venturers or agents of any Seller nor any other person, partnership, limited liability company, corporation, joint venture or trust, as principal of any Seller, whether disclosed or undisclosed (but in any event excluding Seller Guarantor (defined below)) (collectively, the "Seller Exculpated Parties"), nor any director, officer, employee, shareholder, member, manager, partner or agent of Purchaser nor any of the directors, officers, employees, shareholders, members, managers, partners, joint venturers or agents of any of the directors, officers, employees, shareholders, members, managers, partners, joint venturers or agents of Purchaser nor any other person, partnership, limited liability company, corporation, joint venture or trust, as principal of any Purchaser, whether disclosed or undisclosed (collectively, the "Purchaser Exculpated Parties") shall have any personal obligation or liability hereunder. Purchaser shall not seek to assert any claim or enforce any of Purchaser's rights hereunder against any Seller Exculpated Party, and no Seller shall seek to assert any claim or enforce any of Sellers' rights hereunder against any Purchaser Exculpated Party.

13. **Sellers' Default**. Subject to the provisions of Sections 12 and 23 of this Agreement, if any Seller shall default under this Agreement beyond any applicable notice and/or cure period, then Purchaser, as Purchaser's sole and exclusive remedy (Purchaser specifically waiving any right to bring an action for monetary damages, including, without limitation, consequential, speculative or punitive damages), may either:

13.1 terminate this Agreement and receive a refund of the Downpayment pursuant to Section 5, and Sellers shall pay to Purchaser an amount equal to Purchaser's costs incurred in connection with its investigation and efforts to acquire the Interests, including, without limitation, fees and costs of counsel and consultants (but in no event shall such costs payable by Sellers to Purchaser in connection with this Section 13.1 exceed One Hundred Thousand Dollars ($100,000), whereupon neither Seller nor Purchaser shall have any further rights or obligations hereunder except for the Surviving Obligations, which shall survive such termination; or

13.2 bring an action against such Seller to seek specific performance of such Seller's obligations hereunder within thirty (30) days following the scheduled Closing Date. Such action for specific performance shall not be construed to require such Seller to cure any title defect, untrue representation, comply with any covenant hereunder, cure any physical condition (including, without limitation, any structural condition) existing at the Properties, or cause any third party to take any action with respect to the Properties, the Company owned by such Seller or such Seller.

If Purchaser believes that any Seller has defaulted as aforesaid, then Purchaser shall within five (5) Business Days after becoming aware of such default, deliver written notice to such Seller of such default. Notwithstanding anything to the contrary contained in this Agreement, in the event that Purchaser becomes aware that any Seller has defaulted in any respect under this Agreement prior to the Closing Date and nonetheless proceeds to Closing, then same shall be deemed to be a waiver by Purchaser of any further right to make a claim arising out of such default. Purchaser and Sellers acknowledge that a breach of any of Seller's Representations that is alleged by Purchaser under this Agreement shall not be deemed to fall within this Section 13 if such representation became untrue solely because of a change in circumstances which was not caused by any Seller and is not the result of a breach or default of any Seller under this Agreement).

14. **Condition of Interests and Properties; Disclaimers; Release by Purchaser**.

14.1 Except as otherwise expressly provided in this Agreement and the Seller Documents, Purchaser shall accept the Interests at the Closing on an "as is" and "where is" basis with all faults as of the Closing Date. Purchaser acknowledges that neither any Seller nor any of the employees, agents or attorneys of any Seller have made any verbal or written representations or warranties whatsoever to Purchaser, whether express, implied, statutory, or by operation of law, except as expressly set forth in this Agreement and the Seller Documents. Purchaser has not relied and is not relying upon any representations or warranties, other than Seller's Representations set forth in Section 6.1 and the representations of Seller set forth in Section 7 and Section 24 of this Agreement, or upon any statements made in any informational materials provided by any Seller or any other person or entity, including Broker or any shareholder, member, manager, employee, agent, attorney or other person representing or purporting to represent any Seller or Broker. Without limitation of the foregoing, Purchaser specifically acknowledges and agrees that, except as otherwise set forth in this Agreement, it has assumed all matters relating to, and the risk of changes in, the condition of the Companies, the Property Owners, the Master Tenants and the Properties between the Effective Date and the Closing Date, and no adverse change therein or in such condition shall grant Purchaser any right to terminate this Agreement or to obtain any damages against any Seller (except to the extent such adverse change shall arise from the gross negligence, illegal acts, or fraud of any Seller Indemnified Party). IN ADDITION TO, AND WITHOUT LIMITATION OF THE FOREGOING, EXCEPT AS SET FORTH IN THIS AGREEMENT OR ANY SELLER DOCUMENT, NO SELLER MAKES ANY WARRANTY, EXPRESS, IMPLIED, STATUTORY, OR BY OPERATION OF LAW, AS TO THE QUANTITY, QUALITY, MERCHANTABILITY, TITLE, MARKETABILITY, FITNESS, OR SUITABILITY FOR A PARTICULAR PURPOSE OF THE INTERESTS, AND THE INTERESTS ARE SOLD IN AN "AS IS", "WHERE IS" CONDITION, WITH ALL FAULTS.

14.2 Without limiting the generality of the provisions of Section 14.1 of this Agreement, Purchaser specifically acknowledges and agrees as follows:

(a) Except as provided in this Agreement or any Seller Document, no Seller nor any other party acting (or purporting to act) on behalf of any Seller has made any (and each Seller hereby disclaims any) representation or warranty of any kind of nature concerning any condition (including, without limitation, any environmental condition) existing at any Property; and

(b) Purchaser hereby releases each Seller and each Seller Exculpated Party from any liability of any kind or nature arising with respect to any and all environmental conditions existing at any Property (or the presence of any matter or substance relating to any such environmental condition at any Property), whether known or unknown, disclosed or undisclosed, and any and all claims and/or liabilities relating to (in any manner whatsoever) any hazardous, toxic or dangerous materials or substances located in, at, about or under any Property, or for any and all claims or causes of action (actual or threatened) based upon, in connection with or arising out of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and the Superfund Amendments and Reauthorization Act, 42 U.S.C. §9601 et seq., or any other law or cause of action (including any federal or state based statutory, regulatory or common law cause of action) related to environmental matters or liability with respect to or affecting any Property (any of the foregoing described in this clause (b) being referred to as "Environmental Conditions") and, specifically, agrees that if any claim is brought against Purchaser arising out of any Environmental Condition Purchaser shall have no claim of any kind or nature against any Seller or any Seller Exculpated Party.

15. **Notices**. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given or made (a) on the day one (1) Business Day after deposit with a nationally recognized overnight courier service, if notice is delivered by nationally recognized overnight courier service, or (b) upon the date of transmission (unless a delivery failure report is received by the sender's computer), if notice is delivered by electronic mail, and in any case addressed to the parties at the addresses set forth below (or to such other addresses as the parties may specify by due notice to the other):

If to Seller:

c/o Lakemore Partners
Index Tower, L14 West Entrance, Office 1406
Dubai International Financial Centre
Dubai, United Arab Emirates
Attention: Shreyas Phadnis
Email: shreyas@lakemore.com; management@lakemore.com

with a copy to:

Dechert LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Attention: Craig Brown, Esq.
Email: craig.brown@dechert.com

If to Purchaser:

14643 Dallas Pkwy, Suite 970
Dallas, Texas 75254

Attention: W.L. "Perch" Nelson
Email: perch.nelson@phoenixamericanhospitality.com

with a copy to:

Latham & Watkins LLP
330 N. Wabash
Suite 2800
Chicago, IL 60611
Attention: Rachel Bates
Email: rachel.bates@lw.com

16. **Entire Agreement; Amendments**. This Agreement contains all of the terms agreed upon by and among Purchaser and Sellers with respect to the subject matter hereof, and all agreements heretofore had or made by and among Purchaser and Sellers are merged in this Agreement which alone fully and completely expresses the agreement of Purchaser and Sellers with respect to the transaction set forth in this Agreement. This Agreement may not be changed, modified or amended, except by an instrument executed by the parties who are or will be affected by the terms of such instrument.

17. **Successors and Assigns**. The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, the heirs, executors, administrators, successors and assigns of the respective parties. Purchaser may not assign this Agreement or any of Purchaser's rights hereunder without the prior written consent of Sellers, which may be granted or withheld in each Seller's sole discretion; provided, however, upon written notice to Sellers prior to the Closing Date, Purchaser shall have the right, without Sellers' consent, to assign its interests in this Agreement to William L. "Perch" Nelson or one or more of Purchaser's affiliates that are owned or controlled by William L. "Perch" Nelson; provided, however, that (i) no such assignment shall release Purchaser from any of its liabilities and obligations hereunder and Purchaser shall remain liable for all such liabilities and obligations as a primary obligor until Closing occurs, (ii) on or prior to the date of such assignment, Purchaser shall provide Sellers with the name, signature block, address, federal taxpayer identification number, if applicable, and other information pertaining to the proposed assignee reasonably requested by Sellers (including, without limitation, evidence that the assignee satisfies the requirements set forth in this Section 17), (iii) such assignee shall assume all of the obligations of Purchaser under this Agreement pursuant to an assignment and assumption agreement in form reasonably acceptable to Sellers and (iv) no such assignment shall have the effect of delaying the Closing in any respect.

18. **Partial Invalidity**. If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than such persons or circumstances as to which such term or provision is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

19. **Paragraph Headings**. The headings of the various paragraphs of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and

shall not be deemed in any manner to modify, explain or restrict any of the provisions of this Agreement.

20. **Governing Law**. This Agreement shall be governed by, and shall be interpreted, construed and enforced in accordance with, the laws of the State of Delaware, without regard to the rules regarding conflicts of law in such laws of such state.

21. **Prevailing Party to Receive Attorneys' Fees**. In the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to receive from the losing party an amount equal to the prevailing party's costs incurred in such litigation, including, without limitation, the prevailing party's reasonable attorneys' fees, costs and disbursements. The provisions of this Section 21 shall survive the Closing or any earlier termination of this Agreement.

22. **Confidentiality**. Unless and until the Closing occurs hereunder, neither Purchaser nor Sellers will make, or direct anyone to make on their behalf, any public statement or public comment with respect to this Agreement, the transactions contemplated hereby, that is intended for public distribution or made to any print or other media, without the approval by the other party as to such disclosure and the information to be disclosed, which approval shall not be unreasonably withheld or delayed. Purchaser and each Seller shall keep the terms of the transaction and matters contemplated in this Agreement, including, without limitation, the Purchase Price (and each Allocated Purchase Price) (collectively, the "Information"), confidential and will not disclose any such information to any person or entity except as follows. The parties shall be permitted to disclose Information: (a) to any governmental authority, if required by any law, rule, or regulation, or any subpoena, interrogatory, civil investigation, demand, or similar process applicable to such party; (b) pursuant to the order of any court of competent jurisdiction requiring such disclosure; and (c) to its officers, directors, employees, agents, existing and potential lenders, investors, attorneys, accountants, consultants and other professionals to whom such disclosure is reasonably necessary for the consummation of the transactions contemplated hereby, provided that each such person maintains such Information in a confidential manner. The provisions of this Section 22 shall survive the Closing or any earlier termination of this Agreement.

23. **Survival**. Except as otherwise specifically herein provided, no representation, warranty, covenant or obligation of any Seller set forth in (a) this Agreement or (b) any Seller Document (as hereinafter defined), shall survive the Closing. For purposes of this Agreement, a "Seller Document" means any document or instrument executed and delivered by any Seller to Purchaser in connection herewith, including, without limitation, the Assignments of Interests.

24. **Tax Matters**.

24.1 Tax Treatment. The parties hereby acknowledge and agree (a) that the purchase and sale of the APIP-C OperCo Interests shall be treated, for U.S. federal (and applicable state and local) income Tax purposes, as a sale of partnership interests of APIP-C OperCo; and (b) that the purchase and sale of the APIP-C Borrower Interests shall be treated, for U.S. federal (and applicable state and local) income Tax purposes, as a sale of equity interests of an association taxable as a corporation (such treatment in (a) and (b) collectively, the "Agreed Tax Treatment"). Except to the extent otherwise required by a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of state, local or foreign law, as appropriate),

Purchaser and Sellers shall file, or cause to be filed all Tax Returns in a manner consistent with the Agreed Tax Treatment.

24.2 Tax Returns. All Tax Returns of APIP-C OperCo with respect to a Pre-Closing Tax Period that are required to be filed after the Closing Date shall be prepared in a manner consistent with APIP-C OperCo's past practices, procedures, and accounting methods unless otherwise required by applicable law (the "Pre-Closing APIP-C OperCo Tax Returns"). Purchaser shall deliver a copy of each such Pre-Closing APIP-C OperCo Tax Return to AHP PHX Seller no later than fifteen (15) calendar days prior to filing such Tax Return (taking into account applicable extensions). Purchaser shall cause APIP-C OperCo, at APIP-C OperCo's expense, to prepare and timely file all Pre-Closing APIP-C OperCo Tax Returns that are income Tax Returns for APIP-C OperCo with the appropriate authorities, and shall cause any information necessary in the preparation of any APIP-C OperCo Interest holder's individual income Tax Returns with respect to any income allocable by APIP-C OperCo to such holder, including Schedule K-1 of IRS Form 1065, to be distributed to such APIP-C OperCo Interest holder not later than seventy-five (75) days after the end of APIP-C OperCo's fiscal year. Purchaser shall also cause APIP-C OperCo to distribute a copy of any Pre-Closing APIP-C OperCo Tax Returns to any APIP-C OperCo Interest holder, if requested by such holder.

24.3 Cooperation. Each of Purchaser and Sellers (to the extent within their possession) shall provide the other party with such information and records, make such of its officers, directors, employees and agents available and sign such Tax Returns as may reasonably be requested by such other party in connection with the preparation of any Tax Return or any audit or other proceeding that relates to the Companies. Each of Purchaser and Sellers agree to retain all books and records with respect to Tax matters pertinent to the Companies relating to any Taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Sellers, any extensions thereof) of the respective Taxable periods. Each party shall furnish the other parties with copies of all relevant correspondence received from any Taxing authority in connection with any Tax audit or other proceeding that relates to the Companies with respect to any Pre-Closing Tax Period.

24.4 Tax Indemnity. From and after the Closing, Sellers and the Seller Guarantor shall jointly and severally save, defend, indemnify and hold harmless Purchaser and its affiliates, officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") from and against any and all losses incurred, sustained or suffered by any of the foregoing as a result of, arising out of or relating to: (i) eighty percent (80%) of any Taxes of APIP-C Borrower with respect to any Pre-Closing Tax Period, (ii) any federal, state, local or foreign income Taxes based on AHP PHX Seller's, or its direct or indirect owners, allocable share of taxable income or gain of APIP-C OperCo and/or any of its direct or indirect subsidiaries with respect to any Pre-Closing Tax Period (including any income Taxes paid by APIP-C OperCo on the basis of any pass-through entity Tax regime), (iii) Taxes of Sellers, or any of their direct and indirect equity owners or affiliates (excluding the Companies and their subsidiaries), for any Tax period; (iv) any breach of any covenant contained in Section 24; and (v) any withholding Taxes required to be deducted and withheld by Purchaser and the Escrow Agent (as applicable and without duplication) with respect to the transactions contemplated by this Agreement pursuant to the Code (or any other applicable state, local or foreign law).

24.5 Tax Contests. Each of Purchaser and Sellers shall use reasonable best efforts to notify the other party in writing within fifteen (15) Business Days of receipt of written notice of any pending or threated audit, examination, contest or other proceeding relating to Taxes that would reasonably be expected to result in an indemnification obligation under Section 24.4(v) (such audit, examination, contest or proceeding, a "Pre-Closing Tax Proceeding"); provided, that no failure or delay of Purchaser or Sellers in providing such notice shall reduce or otherwise affect the obligations of the other party pursuant to this Agreement, except to the extent that the defense of such Pre-Closing Tax Proceeding is adversely prejudiced as a result of such failure or delay. Sellers shall, at their sole expense, control the conduct and defense of any such Pre-Closing Tax Proceeding; provided, however, that (i) Sellers shall keep Purchaser reasonably informed regarding the status of such Pre-Closing Tax Proceeding, (ii) Sellers shall act in good faith in conducting and contesting such Pre-Closing Tax Proceeding with the relevant governmental authority, (iv) Purchaser shall be entitled to participate in the conduct of such Pre-Closing Tax Proceeding at Purchaser's sole expense, including by participating in any meetings and teleconferences in connection therewith, and (iii) Sellers shall not settle, compromise or resolve any portion of such Pre-Closing Tax Proceeding without Purchaser's prior written consent (not to be unreasonably withheld, conditioned or delayed).

24.6 Tax Treatment of Certain Payments. For applicable Tax purposes, Purchaser, Sellers, the Companies, and each of their respective affiliates shall treat any payments made pursuant to Section 10 or Section 24 as an adjustment to the Purchase Price to the maximum extent permitted by applicable law.

24.7 Backstop Funds. From and after Closing, at Seller's election, either (i) AHP PHX Seller or (ii) Lakemore Real Estate Advisor 1 Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Lakemore Advisor"), shall maintain liquid funds in an amount equal to or greater than Two Hundred Seventy Thousand and no/100 Dollars ($270,000.00) (the "Backstop Funds") for a period ending on the date that is two (2) years from the Closing Date (the "Backstop Period"). AHP PHX Seller hereby absolutely, unconditionally, and irrevocably guarantees, for the Backstop Period and as a primary obligor, the full and timely performance of the indemnification obligations, covenants and conditions of Sellers pursuant to Section 24.4, provided no such indemnification obligation arises as a result of a Purchaser Tax Act. At the expiration of the Backstop Period, provided Purchaser has not made any claim hereunder, AHP PHX Seller and Lakemore Advisor, as applicable, shall be entitled to distribute the Backstop Funds in its sole discretion.

24.8 Seller Guarantor. Lakemore Advisor (in such capacity, "Seller Guarantor") is an affiliate of Sellers and, as a result, receives a direct financial benefit from the transactions contemplated by this Agreement. In consideration of the foregoing benefit, the Purchase Price, and other good and valuable consideration paid to Sellers on the Closing Date pursuant to this Agreement, and as a further inducement for Purchaser to enter into this Agreement, Seller Guarantor hereby absolutely, unconditionally, and irrevocably guarantees, from and after the Closing Date, (i) as secondary obligor until expiration of the Backstop Period, and (ii) as primary obligor from the expiration of the Backstop Period until the expiration of the Tax Survival Period, the full and timely performance of the indemnification obligations, covenants and conditions of Sellers pursuant to Section 24.4, provided no such indemnification obligation arises as a result of a Purchaser Tax Act.

24.9 Purchaser Tax Acts. Following the Closing, without the prior written consent of the relevant Seller (not to be unreasonably withheld, conditioned, or delayed), Purchaser and its affiliates shall not, and shall cause the Companies to not: (a) file (other than as permitted under Section 24.2), amend, or re-file a Tax Return for any Company relating to any Pre-Closing Tax Period to the extent such act is reasonably expected to increase Seller Taxes, (b) engage in any voluntary disclosure or similar process or initiate communications with any Tax authority with respect to any Company attributable to a Pre-Closing Tax Period to the extent such act is reasonably expected to increase Seller Taxes, (c) extend or waive, or cause to be extended or waived, any statute of limitations or other period for the assessment or assertion of a deficiency of any Company related to a Pre-Closing Tax Period to the extent such act is reasonably expected to increase Seller Taxes, (d) make, revoke or change any Tax election (other than any election under Section 6226 of the Code) or accounting method with respect to, or that has retroactive effect to, any Pre-Closing Tax Period of any Company to the extent such act is reasonably expected to increase Seller Taxes, or (e) take a position on a Tax Return of a Company that is inconsistent with the Allocated Purchase Price to the extent such act is reasonably expected to increase Seller Taxes (other than as required by applicable law) (each of the foregoing clauses (a) through (e), a "Purchaser Tax Act").

24.10 Survival. Notwithstanding anything in this Agreement to the contrary, the covenants, rights and obligations set forth in this Section 24 shall survive the Closing for the applicable statute(s) of limitations (including any applicable extensions) (the "Tax Survival Period").

25. **Submission to Jurisdiction**. PURCHASER AND EACH SELLER EACH HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN THE STATE OF DELAWARE, OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH SELLER MAY, IN ITS SOLE DISCRETION, ELECT THE STATE OF DELAWARE, OR THE UNITED STATES OF AMERICA, FEDERAL DISTRICT COURT HAVING JURISDICTION OVER THE STATE OF DELAWARE, AS THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO SUCH VENUE AS BEING AN INCONVENIENT FORUM. THE PROVISIONS OF THIS SECTION 25 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

26. **Waiver of Jury Trial**. PURCHASER AND EACH SELLER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY PURCHASER AND EACH SELLER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH SELLER OR PURCHASER, AS APPLICABLE, IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS

WAIVER BY PURCHASER OR SUCH SELLER, AS APPLICABLE. THE PROVISIONS OF THIS SECTION 26 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

27. **Certain Definitions**. As used herein, the following capitalized terms shall have the following definitions:

"Business Day" shall mean any day other than (a) a Saturday or a Sunday, (b) a national holiday, or (c) a day on which banks are not required to be open for business within the State of Delaware or the State of New York.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"IRS" means the United States Internal Revenue Service.

"Pre-Closing Tax Period" means any taxable period ending on or prior to the Closing Date and the portion of any Straddle Period ending on (and including) the Closing Date.

"Seller Taxes" means (a) any Taxes for which a Seller or the Seller Guarantor would be liable pursuant to Section 24.4 or (b) any Taxes for which a Seller, or its direct and indirect equity owners or affiliates, would be directly liable under applicable law.

"Surviving Obligations" shall mean the obligations of Purchaser and/or Sellers pursuant to Sections 7, 10, 11, 13.1, 21, 22, 23, 25, and 26 of this Agreement that are expressly stated to survive the termination of this Agreement.

"Straddle Period" shall mean any taxable period beginning before and ending after the Closing Date.

"Tax" (including, with correlative meanings, the terms "Taxes" and "Taxable") means all (a) federal, state, local and foreign income, profits, franchise, gross receipts, customs duty, capital gains, capital, capital unit, capital stock, severance, stamp, payroll, wage, social security (or similar), severance, sales, employment, unemployment, use, goods and services, production, privilege, lease, service, license, service use, recapture, real and personal property, withholding, excise, ad valorem, value added, transfer, documentary, stamp, business and occupation, premium, escheat or unclaimed property, windfall profits, registration, utility, environmental, communications, disability, worker's compensation, alternative or add on minimum, employee, estimated taxes and any other taxes of any kind whatsoever and regulatory fees, duties and surcharges, including all interest and penalties, fines and additions to tax imposed in connection with any item described in this definition and (b) any liability for the payment of amounts determined by reference to amounts described in clause (a) as a result of being or having been a member of any group of corporations that files, will file, or has filed any Tax Returns on a combined, consolidated or unitary basis, as a result of any obligation under any agreement or arrangement (including any Tax allocation, Tax indemnity or Tax sharing agreement), Treasury Regulation Section 1.1502-6, as a result of being a transferee or successor, by operation of law or otherwise.

"Tax Return" means all returns and reports with respect to Taxes, including any information return, claim for refund, amended return, declaration of estimated Tax, election, attachment, report, schedule, notice, notification, certificate, form, disclosure, or other related document or information.

"Treasury Regulations" means regulations promulgated from time to time under the Code (including corresponding provisions and succeeding provisions) as in effect for the relevant Taxable period.

28. **No Third Party Beneficiaries**. PURCHASER AND EACH SELLER HEREBY ACKNOWLEDGE AND AGREE THAT THERE ARE NO THIRD PARTY BENEFICIARIES TO THIS AGREEMENT, AND, ACCORDINGLY, NO THIRD PARTY (INCLUDING, WITHOUT LIMITATION, ANY BROKER) SHALL HAVE THE RIGHT TO ENFORCE THIS AGREEMENT FOR THE BENEFIT OF SUCH THIRD PARTY OR AGAINST THE INTERESTS OF PURCHASER OR ANY SELLER.

29. **Counterpart Execution; Execution by Facsimile Transmission**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. Each party may rely upon a facsimile or ".pdf" counterpart of this Agreement signed by the other party with the same effect as if such party had received an original counterpart signed by such other party. Electronic signatures may be used in place of original signatures on this Agreement. All parties hereto intend to be bound by the signatures on the electronic document, are aware that other parties shall rely on the electronic signatures, and hereby waive any and all defenses to the enforcement of the terms thereof based on the form of signature.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, this Agreement has been duly executed by the parties hereto as of the Effective Date.

SELLER:

**AHP PHX USB 3 LLC**, a Delaware limited liability company

By: ______________________________
Name: Mohamed Seif
Title: Director

**AIP CB IV LTD.**, a Cayman Islands exempted company

By: ______________________________
Name: Mohamed Seif
Title: Director

SELLER GUARANTOR:

**LAKEMORE REAL ESTATE ADVISOR 1 LTD.**, a Cayman Islands exempted company

By: ______________________________
Name: Ahmed Farid Alaulaqi
Title: Director

[*Signatures continue on following pages*]

PURCHASER:

**AMERICAN HOSPITALITY PROPERTIES REIT, INC.,**
a Delaware corporation

By: ______________________________
Name: William L. Nelson
Title: Chief Executive Officer

# EXHIBIT A

## FORM OF ASSIGNMENT AND ASSUMPTION OF INTERESTS

This **ASSIGNMENT AND ASSUMPTION OF INTERESTS** (this "**Assignment**"), dated as of [______], 2023 (the "**Effective Date**") is made by and among [_____], a [___] ("**Assignor**"), and [________] ("**Assignee**").

## PRELIMINARY STATEMENT

A. Assignor, [____], and [American Hospitality Properties REIT, Inc., a Delaware corporation (the "**REIT**"), an affiliate of Assignee,] entered into that certain Sale-Purchase Agreement, dated as of May 31, 2023 (as the same may be amended, modified and/or supplemented, the "**Agreement**"), pursuant to which, among other things, the REIT agreed to acquire (or cause its affiliate(s) to acquire) Assignor's limited liability company interests in [___] (the "**Assigned Interests**") from Assignor on the terms and conditions contained therein.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Assignment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1. Capitalized Terms. All capitalized terms used and not otherwise defined in this Assignment shall have the meanings ascribed to them in the Agreement.

2. Sale and Transfer of Assigned Interests. Assignor hereby conveys, assigns, transfers and delivers to Assignee, effective as of the Effective Date, all of its right, title and interest in and to the Assigned Interests, free and clear of all encumbrances, except as otherwise expressly permitted by the Agreement, together with all of Assignor's rights, privileges and obligations in respect of the Assigned Interests, in each case, to the extent accruing from and after the Effective Date, and Assignee hereby accepts such sale, conveyance, assignment, transfer and delivery and expressly assumes all of the rights, obligations and liabilities of Assignor with respect to the Assigned Interests to the extent accruing from and after the Effective Date.

3. Miscellaneous Provisions.

(a) Modification. This Assignment may not be amended, supplemented or otherwise modified except by a written agreement executed by all parties hereto.

(b) Construction. The headings of sections in this Assignment are provided for convenience only and will not affect its construction or interpretation. The parties have negotiated the Agreement and this Assignment at length, and have had the opportunity to consult with, and be represented by, their own competent counsel. This Assignment is, therefore, deemed to have been jointly prepared. In determining the meaning of, or resolving any ambiguity with respect to, any word, phrase or provision of this Assignment, no uncertainty or ambiguity shall be construed or resolved against any party under any rule of construction, including the party primarily responsible for the drafting and preparation of this Assignment. All words in this Assignment shall be deemed to include any number or gender as the context or sense of the Assignment requires. The words "will," "shall" and "must" in this Assignment indicate a mandatory obligation.

(c) Governing Law. This Assignment, and all claims or causes of actions (whether at law, in contract or in tort) that may be based upon, arise out of or related to this Assignment or the negotiation, execution or performance of this Assignment, shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to its conflicts of laws principles (whether the State of Delaware or any other jurisdiction that would cause the application of the laws of any jurisdiction other than the State of Delaware).

(d) Severability. If any term or provision of this Assignment or the application thereof to any person or circumstance shall be invalid or unenforceable, the remainder of this Assignment, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each such term and provision of this Assignment shall be valid and be enforced to the fullest extent permitted by law.

(e) Counterparts. This Assignment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Assignment and all of which, when taken together, will be deemed to constitute one and the same agreement, binding on all parties notwithstanding that all the parties are not signatories to the same counterpart. The exchange of copies of this Assignment and of signature pages by electronic mail transmission shall constitute effective execution and delivery of this Assignment as to the parties and may be used in lieu of the original Assignment for all purposes. Signatures of the parties transmitted by electronic mail shall be deemed to be their original signatures for all purposes.

(f) No Third-Party Beneficiaries. Except as otherwise expressly provided herein, the parties agree that there are no third parties who are intended to benefit from or who are entitled to rely on any of the provisions of this Assignment, and no third party shall be entitled to assert any claims or to enforce any rights whatsoever pursuant to this Assignment. Except as otherwise expressly provided herein, the covenants and agreements provided in this Assignment are solely for the benefit of such parties and their permitted successors and assigns respectively.

(g) Assignment. This Assignment and all of the provisions hereof shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. Neither this Assignment, nor any of the rights, interests or obligations under this Assignment, may be assigned or delegated, in whole or in part, by operation of law or otherwise by Assignor or Assignee without the prior written consent of the other parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed as of the day and year first above written.

**ASSIGNOR:**
[_______1,
a [_______1

By ________________________________________
Name:
Title:

**ASSIGNEE:**

[_______1,
a [_______1

By ________________________________________
Name:
Title:

# APPENDIX IV

## Assignment and Assumption of Sale-Purchase Agreement

# ASSIGNMENT AND ASSUMPTION OF SALE-PURCHASE AGREEMENT

This Assignment and Assumption of Sale-Purchase Agreement (this "**Assignment**") between AMERICAN HOSPITALITY PROPERTIES REIT, INC., a Delaware corporation ("**Assignor**"), and WILLIAM L. NELSON, an individual ("**Assignee**"), is effective as of June 1, 2023.

## RECITALS

WHEREAS, Assignor is a party to that certain Sale-Purchase Agreement dated May 31, 2023, by and among Assignor (as "Purchaser" thereunder), AHP PHX USB 3 LLC, a Delaware limited liability company, and AIP CB IV LTD., an Exempted Company incorporated in the Cayman Islands with Limited Liability (collectively, as "Seller" thereunder) (the "**Agreement**");

WHEREAS, Assignor is a party to that certain Earnest Money Escrow Agreement dated May 31, 2023, by and among Assignor (as "Purchaser" thereunder), AHP PHX USB 3 LLC, a Delaware limited liability company, and AIP CB IV LTD., an Exempted Company incorporated in the Cayman Islands with Limited Liability (collectively, as "Seller" thereunder), and STEWART TITLE GUARANTY COMPANY (as "Escrow Agent" thereunder) (the "**Escrow Agreement**"); and

WHEREAS, Assignor desires to assign to Assignee, and Assignee desires to assume from Assignor, all of Assignor's interest in each of the Agreement in accordance with Section 17 of the Agreement, the Escrow Agreement and the Downpayment.

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants and promises contained herein and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, Assignor and Assignee agree as follows.

1. The recitals are hereby incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed thereto in the Agreement.

2. Assignor hereby assigns to Assignee all of Assignor's rights, obligations and interest in and with respect to the Agreement, the Escrow Agreement and the Downpayment.

3. Assignee hereby assumes the rights, obligations and interest in and with respect to the Agreement, the Escrow Agreement and the Downpayment.

4. This Assignment shall be construed in accordance with and governed by the laws of the State of Delaware without regard to the conflicts of law rules of such state.

5. The provisions of this Assignment shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

6. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original and all of which, together, shall constitute one and the same instrument. A party may deliver executed signature pages to this Assignment by electronic means to any other party (e.g., via a PDF transmitted via email, DocuSign or AdobeSign), which electronic copy shall be deemed to be an original executed signature page. The use of electronic signatures and electronic records (including any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by Applicable Law.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be effective as of the date first set forth above.

**ASSIGNOR**:

**AMERICAN HOSPITALITY PROPERTIES REIT, INC.,**
a Delaware corporation

By: ______________________
Name: William L. Nelson
Title: Chief Executive Officer

**ASSIGNEE**:

______________________
William L. Nelson, an individual

# APPENDIX V

**Assignment of Certain Economic Interests**

# ASSIGNMENT OF CERTAIN ECONOMIC INTERESTS

THIS ASSIGNMENT OF CERTAIN ECONOMIC INTERESTS (this "Assignment") is effective as of March 31, 2025 by and between William L. Nelson, an individual (the "Assignor") and American Hospitality Properties REIT, Inc., a Delaware corporation (the "Assignee").

RECITALS

WHEREAS, pursuant to that certain Assignment and Assumption of Interests, by and between AHP PHX USB 3 LLC, a Delaware limited liability company ("AHP"), and Assignor, dated as of June 2, 2023, made pursuant to that certain Sale-Purchase Agreement (the "Sale-Purchase Agreement"), by and among AHP, AIP CB IV LTD., a Cayman Islands exempted company ("AIP"), and Assignee, dated as of May 31, 2023, as assigned by Assignee to Assignor, AHP assigned to Assignor its eighty percent (80%) interest (the "OperCo Membership Interest") in APIP-C OperCo, LLC, a Delaware limited liability company ("OperCo");

WHEREAS, pursuant to that certain Assignment and Assumption of Interests, by and between AIP and Assignor, dated as of June 2, 2023, made pursuant to the Sale-Purchase Agreement, as assigned by Assignee to Assignor, AIP assigned to Assignor its eighty percent (80%) interest (the "Borrower Membership Interest" and, together with the OperCo Membership Interest, the "Membership Interests") in APIP-C Borrower, LLC, a Delaware limited liability company ("Borrower");

WHEREAS, certain rights and obligations of each member of each of OperCo and Borrower are set forth in the Limited Liability Company Agreement of OperCo, dated as of August 16, 2018, as amended by that certain First Amendment to Limited Liability Company Agreement of OperCo, dated as of October 28, 2019 and by that certain Second Amendment to Limited Liability Company Agreement of OperCo, dated as of November 30, 2021 (collectively, as so amended, the "OperCo LLC Agreement"), and in the Limited Liability Company Agreement of Borrower, dated as of August 16, 2018 (the "Borrower LLC Agreement"), respectively;

WHEREAS, under the OperCo LLC Agreement, the owner of the OperCo Membership Interest has certain economic interests;

WHEREAS, under the Borrower LLC Agreement, the owner of the Borrower Membership Interest has certain economic interests;

WHEREAS, Assignor desires to assign, transfer and convey, irrevocably, certain of Assignor's economic interests in each of OperCo and Borrower (as more specifically set forth below) (the "Limited Economic Interests"), which Assignor owns as owner of the Membership Interests; and

WHEREAS, Assignee desires to acquire the Limited Economic Interests from Assignor.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee hereby covenant and agree as follows:

1. Assignor hereby assigns, transfers, conveys, sets over, delivers and confirms unto Assignee all Assignor's rights, title and interest in the Limited Economic Interests. For purposes hereof, the Limited Economic Interests assigned by Assignor to Assignee hereby include all of Assignor's right to receive distributions of net cash flow and net refinancing proceeds under Section 5.1 of the OperCo LLC Agreement and all distributions under Article IV of the Borrower LLC Agreement respectively. The Limited Economic Interests do not include any tax gains and losses allocated to the Assignor from OperCo under the OperCo LLC Agreement or from Borrower under the Borrower LLC Agreement, which rights shall be retained by Assignor.

2. Assignee hereby assumes, accepts and acquires ownership of the Limited Economic Interests, and Assignee's ownership of the Limited Economic Interests shall be reflected on the books and records of each of OperCo and Borrower.

3. Assignor hereby irrevocably names and appoints Assignee, with full powers of substitution, as Assignor's true and lawful attorney, in Assignor's name, place and stead, to make, execute, acknowledge and deliver any document, agreement, and instrument and to take any other action as may be required to effectuate the assignment of the Limited Economic Interests set forth herein and to cause each of OperCo and Borrower to distribute and pay to Assignee all of the amounts payable pursuant to this Assignment (including net cash flow distributions and net refinancing proceeds). Assignor authorizes Assignee, as Assignor's attorney-in-fact, to take such actions as Assignee deems necessary or convenient in connection with the foregoing. It is expressly understood and intended that this is a special power of attorney coupled with an interest and this power of attorney shall survive the death, incompetence or dissolution of Assignor.

4. This Assignment shall insure to the benefit of and bind the parties hereto and their respective successors and assigns.

5. This Assignment shall be governed by and construed in accordance with the laws of the State of Delaware.

[Remainder of page intentionally left blank]

SimplyAgree Sign signature packet ID: 610f9e38-1526-4a80-95c9-f630ac26d253


IN WITNESS WHEREOF, the parties have executed this Assignment as of the day first set forth above.

**ASSIGNOR:**

William L. Nelson

William L. Nelson, an individual

**ASSIGNEE:**

American Hospitality Properties REIT, Inc.,
a Delaware corporation

By: William L. Nelson

William L. Nelson, Chief Executive Officer

The foregoing Assignment is hereby acknowledged, approved and consented to by the undersigned, as Manager of each of OperCo and Borrower.

**MANAGER OF OPERCO AND BORROWER:**

Phoenix American Hospitality, LLC,
a Delaware limited liability company

By: William L. Nelson

William L. Nelson, President

# APPENDIX VI

## Exchangeable Promissory Note Agreement

***Execution Version***

# EXCHANGEABLE PROMISSORY NOTE AGREEMENT

Executed on December 19, 2025, to be effective as of June 1, 2023

**WILLIAM L. NELSON** ("***Maker***"), an individual residing at 6409 Waggoner Drive, Dallas, Texas 75230, for value received, hereby promises to pay to **AMERICAN HOSPITALITY PROPERTIES REIT, INC.** or its registered assigns (such person or entity or its permitted assigns, as applicable, are hereinafter referred to as "***Holder***"), the initial principal amount of $9,362,477.00 as of the Effective Date referred to below (the "***Effective Date Principal Amount***") or such greater or lesser amount as shall equal the Adjusted Principal Balance (as hereinafter defined), on or prior to the Maturity Date (as hereinafter defined), and to pay interest on the Adjusted Principal Balance outstanding from time to time, on the dates set forth herein, for the period commencing on the Effective Date until paid in full.

The outstanding principal balance of this Exchangeable Promissory Note Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, this "***Note***") at any time shall be the Effective Date Principal Amount, plus the amount of any Subsequent Advances (as hereinafter defined), plus interest paid in kind as provided in Section 3.1, less the amount of payments of principal made on this Note by or for the account of Maker (such balance, the "***Adjusted Principal Balance***"). Subsequent Advances of the Loans (as hereinafter defined) that occurred on or after the Effective Date and prior to the date hereof are set forth on ***Schedule 1*** hereto.

To the extent permitted under applicable law, this Note shall have retroactive effect from and including June 1, 2023 (the "***Effective Date***").

**1.** ***Defined Terms***. Terms not otherwise defined herein shall have the meanings set forth below:

"***Business Day***" means any day (other than a Saturday or Sunday) on which banks are not authorized or are required to close in New York.

"***Distribution Event***" means the receipt by or on behalf of Maker of any dividend or other distribution of cash, cash equivalents or other assets of any type on account of or in exchange for the Specified Equity.

"***Distribution Event Cash Proceeds***" means any cash or cash equivalent proceeds received by or on behalf of Maker or otherwise on account of the Specified Equity in connection with any Distribution Event.

"***Distribution Event Non-Cash Proceeds***" means any assets of any type (other than cash and cash equivalents) distributed to or otherwise received by or on behalf of Maker or otherwise in exchange for or on account of the Specified Equity in connection with any Distribution Event.

"***Exchange Triggering Event***" means the occurrence of any of the following: (a) termination of the Issuer Loan Agreement, and (b) the Specified Requisite Lenders (as hereinafter defined) grant, agree or consent to, or otherwise approve or modify the Issuer Loan Agreement to accommodate the Issuer Consent Request on or prior to the Maturity Date.

"***Issuer Consent Request***" means the request for consent to the transfer of the Specified Purchased Equity from Maker to Holder made under that that certain notice letter dated January 29, 2025 and entitled "Re: Ft. Wayne Hotel Portfolio Loan Agreement – Notice of Permitted Transfer and Change of Manager and Consent Request", addressed to Société Générale from AHP FT WAYNE INN, LLC, a Delaware limited liability company, and AHP FT WAYNE SUITES, LLC, a Delaware limited liability company, together with any subsequent similar request for consent to such transfer of the Specified Purchased Equity.

"***Issuer LLC Agreements***" means, individually or collectively as the context requires, (a) the Limited Liability Company Agreement of APIP-C Operco, LLC, dated August 16, 2018, and (b) the Limited Liability Company Agreement of APIP-C Borrower, LLC, dated August 16, 2018, in each case as amended, restated, supplemented, or otherwise modified from time to time.

"***Issuer Loan Agreement***" means that certain Loan Agreement dated August 16, 2018, between AHP FT WAYNE INN, LLC and AHP FT WAYNE SUITES, LLC, as borrowers, and Wells Fargo Bank, National Association, as trustee for the benefit of the registered holders of UBS Commercial Mortgage Trust 2018-C13, Commercial Mortgage Pass-Through Certificates, Series 2018-C13 (as successor in interest to Société Générale), as lender, as amended, restated, supplemented, or otherwise modified from time to time.

"***Specified Equity***" means (i) all limited liability company interests, membership interests, and similar or equivalent equity interests in the Issuers, in each case whether now owned or hereafter acquired by Maker, in each case consisting of or otherwise received on account of or in exchange for the Specified Purchased Equity, (ii) all distributions (cash or otherwise) and all other rights and property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of any of the foregoing, (iii) all security entitlements in respect of any of the foregoing, (iv) Maker's rights under the certificate of formation or other equivalent organic record of organization of each Issuer, the operating agreement, limited liability company agreement, or other equivalent governing or organizational document of each Issuer, and all other books, records, agreements or understandings of any kind, nature or description in each case relating to the governance and management of each Issuer and the corresponding legal and economic rights of Maker as the owner of any of the foregoing, (v) all replacements, additions to and substitutions for any of the property referred to in this definition, and (vi) to the extent not otherwise included, all cash and non-cash proceeds and products of any and all of the foregoing.

**2.** ***The Loans***. This Note evidences (i) the initial loans made by Holder to Maker in a principal amount equal to the Effective Date Principal Amount (the "***Initial Loan***") for the purpose of funding Maker's purchase of certain equity interests in APIP-C OperCo, LLC, a Delaware limited liability company, and APIP-C Borrower, LLC, a Delaware limited liability company (each individually, an "***Issuer***" and together, the "***Issuers***" and such purchased equity interests being referred to as the "***Specified Purchased Equity***"), as described in that certain Sale-Purchase Agreement, dated May 31, 2023, among AHP PHX USB 3 LLC, AIP CB IV LTD. and American

Hospitality Properties REIT, Inc., as amended by that certain Assignment and Assumption Agreement, among American Hospitality Properties REIT, Inc. and Maker, and (ii) subsequent advances of loans made by Holder to Maker from time to time after the Effective Date at Holder's discretion for the purpose of funding certain capital contributions by Maker to the Issuers in respect of operating costs and similar amounts (collectively, "***Subsequent Advances***" and, together with the Initial Loan, the "***Loans***"). Holder shall have no obligation to fund any Subsequent Advances after the date hereof, each of which may be funded or not funded in the sole and absolute discretion of Holder.

**3.** ***Terms of this Note.***

**3.1** ***Interest.*** Interest shall accrue daily (computed on the basis of a 365 or 366 day year) on the outstanding Adjusted Principal Balance at a rate of 3.53% per annum, and accrued unpaid interest shall be paid in kind semiannually on June 30 and December 31 of each calendar year as follows: (a) such accrued interest shall be added to the Adjusted Principal Balance on such date and shall thereupon be deemed paid, and (b) such amount so paid shall thereafter be deemed outstanding principal under this Note and shall increase the Adjusted Principal Balance of this Note. Accrued and unpaid interest on this Note shall also be due and payable on the Maturity Date. The accrual, payment in kind, and resulting deferral of cash payment of interest to the Maturity Date in accordance with the preceding sentence shall not constitute a default hereunder.

**3.2** ***Principal***. Subject to <u>Section 3.6</u>, the Adjusted Principal Balance of this Note shall be due and payable in full in cash on the earliest to occur of (i) September 1, 2028, (ii) Maker is notified by the requisite lenders (the "***Specified Requisite Lenders***") under the Issuer Loan Agreement (or their authorized agent or other representative) that the Specified Requisite Lenders reject or will not grant the Issuer Consent Request or otherwise will not approve or consent to the acquisition of the Specified Purchased Equity by Holder, (iii) any Exchange Triggering Event, and (iv) the acceleration of this Note in accordance with the terms hereof (the date of such earliest event, the "***Maturity Date***"). Principal amounts repaid under this Note may not be reborrowed.

**3.3** ***Payments, Generally***. All payments on or in respect of this Note, including principal and interest, will be made in such coin and currency of the United States as at the time of payment is legal tender for the payment of public and private debts, by wire transfer of immediately available funds to Holder's account as directed in writing by Holder to Maker or, at the option of Holder, in such manner and at such other place in the United States as Holder shall have designated to Maker in writing pursuant to the provisions of this Note.

**3.4** ***Prepayments***. Except as provided in <u>Section 3.6</u>, the Note may not be voluntarily prepaid by Maker unless consented to by Holder. On the same Business Day as any Distribution Event, Maker shall cause one hundred percent (100%) of all related Distribution Event Cash Proceeds to be applied towards the repayment of the outstanding amounts owing in respect of this Note until all such amounts are repaid in full. Distribution Event Cash Proceeds shall be applied, first, to the repayment of then accrued and unpaid interest, and second, to the repayment and reduction of the then outstanding Adjusted Principal Balance.

**3.5** ***Waivers***. Maker hereby waives diligence, presentment, demand, protest, notice of intent to accelerate the maturity hereof, notice of acceleration of the maturity hereof, and notice of

every kind whatsoever. The failure of Holder to exercise any of its rights under this Note in any particular instance will not constitute a waiver of the same or of any other right in that or any subsequent instance. In the event this Note is placed in the hands of an attorney for collection, or if Holder incurs any costs incident to the collection of the indebtedness evidenced by this Note, Maker will pay to Holder an amount equal to all such costs, including all actual reasonable attorneys' fees and expenses and all court costs.

**3.6** ***Satisfaction by Exchange of the Specified Equity***.

(a) Upon the occurrence of any Exchange Triggering Event, Holder shall be entitled to exchange its rights under this Note for the Specified Equity in lieu of repayment pursuant to the foregoing provisions of this Section 3. Such exchange shall be effective upon the delivery of written notice from Holder to Maker of Holder's election to consummate such exchange.

(b) Maker covenants and agrees with Holder that it will not sell or otherwise dispose of, transfer, assign or grant any competing lien or other encumbrance on any of the Specified Equity without Holder's written consent.

(c) Maker acknowledges and agrees that to the extent this Note is exchanged for the Specified Equity in accordance with the terms hereof, Holder shall be entitled to be admitted as a "Member" (as defined in the applicable Issuer LLC Agreement) of each Issuer upon Holder's execution and delivery to the Issuers of joinders to the applicable Issuer LLC Agreements in form and substance reasonably acceptable to Holder and each Issuer (or other documentation reasonably acceptable to Holder and each Issuer).

(d) Upon satisfaction of this Note via exchange for the Specified Equity under this Section 3, this Note will, for all purposes, be deemed cancelled and all of Maker's obligations hereunder shall be deemed paid in full.

(e) Maker acknowledges that, in the event Holder exchanges its rights under this Note for the Specified Equity pursuant to Section 3.6(a), Maker may have income from the discharge of indebtedness (within the meaning of Section 61(a)(11) of the Internal Revenue Code of 1986, as amended) to the extent that the Adjusted Principal Balance exceeds the fair market value of the Specified Equity at the time of such exchange.

**4.** ***Events of Default, Remedies and Security.***

**4.1** ***Events of Default***. An "***Event of Default***" will exist if any of the following occurs and is continuing:

(a) Maker fails to make any payment of principal or interest on this Note or any other payment obligation of any nature pursuant to this Note, in each cash when and as the same becomes due and payable, whether by demand, acceleration or otherwise;

(b) a voluntary or involuntary bankruptcy or other insolvency proceeding shall be commenced or shall be filed with respect to Maker that seeks (i) reorganization,

arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts or (ii) appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets; or

(c) Maker fails to observe or perform any covenant, obligation, condition or agreement contained in this Note.

**4.2** ***Remedies Generally***.

(a) If an Event of Default has occurred and is continuing (i) in the case of any Event of Default under Section 4.1(b), the entire principal of this Note shall become immediately due and payable in full without further notice or demand by Holder, and Maker will forthwith pay to Holder the entire outstanding principal of, and all accrued interest on, this Note, and (ii) in the case of any Event of Default other than under Section 4.1(b), Holder will have the right to accelerate payment of the entire principal of this Note, and, upon such acceleration, this Note will thereupon become forthwith due and payable, without any presentment, demand, protest or other notice of any kind, all of which are expressly waived, and Maker will forthwith pay to Holder the entire outstanding principal of, and all accrued interest on, this Note.

(b) If an Event of Default has occurred and is continuing, Holder may further proceed to protect and enforce its rights with respect to this Note either by suit, in equity and/or by action at law, or by other appropriate proceedings, whether for specific performance (to the extent permitted by applicable law or equitable principles) of any covenant or agreement contained in this Note, or in aid of the exercise of any power granted in this Note, or may proceed to enforce payment of this Note or to enforce any other legal or equitable right of Holder.

(c) No course of dealing on the part of Holder or any delay or failure on the part of Holder to exercise any right will operate as a waiver of such right or otherwise prejudice Holder's rights, powers and remedies.

(d) The rights and remedies of Holder hereunder are cumulative and are not exclusive of any rights or remedies that Holder would otherwise have.

(e) Any waiver or failure to insist upon strict compliance with any obligation, covenant, agreement or condition of this Note will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**4.3 Distribution Event Non-Cash Proceeds.** Upon the receipt by or on behalf of Maker of any Distribution Event Non-Cash Proceeds, Maker shall:

(a) Immediately segregate and hold such Distribution Event Non-Cash Proceeds in trust for the benefit of Holder;

(b) Notify Maker of such receipt in writing (including a reasonably detailed description of such Distribution Event Non-Cash Proceeds) within one Business Day thereafter; and

(c) Promptly (and in any event within five Business Days thereafter) take such further actions and execute such security instruments, in each case as reasonably requested by Holder, in order for Maker to (i) grant to Holder a first priority security interest in such Distribution Event Non-Cash Proceeds to secure the obligations under this Note, and/or (ii) make other arrangements for the turnover of such Distribution Event Non-Cash Proceeds to Holder in connection with any Exchange Triggering Event.

**5. *Miscellaneous*.**

**5.1** ***Amendment and Waiver***. This Note may be amended, and the observance of any term of this Note may be waived or consented to, with and only with the written consent of Maker and Holder.

**5.2** ***Notices***. All notices and other communications under this Note must be in writing and will be deemed given when received if delivered personally or by courier (with written confirmation of receipt), at the following addresses (or at such other address as may be specified in a notice in accordance with this Section 5.2):

If to Maker:

14643 Dallas Parkway, Suite 970
Dallas, Texas 75254
Attention: Jay Anderson
Email: jay.anderson@pahmgt.com

If to Holder:

14643 Dallas Parkway, Suite 970
Dallas, Texas 75254
Attention: W.L. "Perch" Nelson
Email: perch.nelson@phoenixamericanhospitality.com

**5.3** ***Assignment; Third Party Beneficiaries***. This Note shall be binding upon and inure to the benefit of Maker and his, her, their, or its successors and permitted assigns, but neither this Note nor any of the rights, interests or obligations under this Note may be assigned by Maker without the prior written consent of Holder. Any attempted sale, transfer, assignment or pledge in violation of the preceding sentence shall be voided and of no force or effect. This Note will be binding upon and inure to the benefit of Holder and its successors, heirs, personal representatives and permitted assigns. Holder may assign to one or more assignees this Note or all or a portion of its rights and obligations under this Note without the consent of Maker; *provided* that Holder shall not make any such assignment of this Note prior to the Maturity Date while no Event of Default is continuing without the consent of Maker. This Note is not intended to confer any rights or remedies upon any person or entity except Maker and Holder.

**5.4** ***Governing Law***. THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS-OF-LAW PRINCIPLES OF SUCH JURISDICTION.

**5.5** ***Headings; Internal References***. The article and section headings contained in this Note are solely for reference, and will not affect in any way the meaning or interpretation of this Note. Any references in this Note to an article, section, paragraph or clause will be deemed to be a reference to the article, section, paragraph or clause contained in this Note unless expressly stated otherwise. As used in this Note, "including" means "including without limitation."

**5.6** ***No Oral Agreements***. THIS NOTE EMBODIES THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES AND SUPERSEDES ALL OTHER AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF. THIS NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENT OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**5.7** ***Severability***. If any term, provision, covenant, agreement or restriction of this Note is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants, agreements and restrictions of this Note will continue in full force and effect and will in no way be affected, impaired or invalidated.

**5.8** ***Expenses***. Maker hereby agrees to pay (a) all reasonable out-of-pocket expenses incurred by Holder after the date hereof, including the reasonable fees, charges and disbursements of counsel for Holder, in connection with the Loan evidenced by this Note and any amendments, modifications or waivers of the provisions hereof, and (b) all reasonable out-of-pocket expenses incurred by Holder in connection with the enforcement or protection of its rights in connection with the Loan evidenced by this Note, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect thereon.

[*Signature Page Follows*]

EXECUTED as of the date first written above.

**MAKER:**

DocuSigned by:
Perch Nelson
4A52EDFD56AB424...

**WILLIAM L. NELSON**

Acknowledged and agreed of the date first written above.

**HOLDER:**

**AMERICAN HOSPITALITY PROPERTIES REIT, INC.**

DocuSigned by:
Jay Anderson
F8A23CA20DCE4E5...

Name: Jay Anderson
Title: Executive Vice President and Controller

Consented to, acknowledged and agreed as of the date first written above.

**ISSUERS:**

**APIP-C OPERCO, LLC**,
a Delaware limited liability company

By: Phoenix American Hospitality, LLC,
a Delaware limited liability company, its Manager

DocuSigned by:
Perch Nelson
4A52EDFD56AB424...

Name: William L. Nelson
Title: President and Chief Executive Officer

**APIP-C BORROWER, LLC**,
a Delaware limited liability company

By: Phoenix American Hospitality, LLC,
a Delaware limited liability company, its Manager

DocuSigned by:
Perch Nelson
4A52EDFD56AB424...

Name: William L. Nelson
Title: President and Chief Executive Officer

Docusign Envelope ID: 183A13F4-9479-4CBA-8830-004BEF5EE06D


**SCHEDULE 1**
**Historical Advances, PIK Interest, and Repayments**

*See attached*

| | | | |
|---|---|---|---|
| Loan Balance | 9,362,477 | # of Days | 365 |
| Interest Rate | 3.53% | | |
| Compoound Dates | 30-Jun | | |
| | 31-Dec | | |

| | # of Days | Princple Balance | Interest Calculation | Additional Debt Balance | Paid Amount | Paid Acc Int | Paid Principle | Accrued Unpaid Interest |
|---|---|---|---|---|---|---|---|---|
| 6/1/2023 | | $ 9,362,477.00 | | | | | | - |
| 6/13/2023 | 12 | 9,362,477.00 | 10,865.60 | - | (210,759.20) | (10,865.60) | (199,893.60) | - |
| 6/30/2023 | 17 | 9,162,583.40 | 15,064.29 | - | - | - | - | 15,064.29 |
| 6/30/2023 | - | 9,177,647.69 | - | - | - | - | - | (15,064.29) |
| 7/5/2023 | 5 | 9,177,647.69 | 4,437.96 | - | (3,200.00) | (3,200.00) | - | 1,237.96 |
| 7/13/2023 | 8 | 9,177,647.69 | 7,100.73 | - | (240,000.00) | (8,338.69) | (231,661.31) | - |
| 8/14/2023 | 32 | 8,945,986.39 | 27,685.99 | - | (240,000.00) | (27,685.99) | (267,685.99) | - |
| 8/21/2023 | 7 | 8,678,300.40 | 5,875.09 | 12,000.00 | - | - | - | 5,875.09 |
| 9/15/2023 | 25 | 8,690,300.40 | 21,011.48 | - | (124,000.00) | (26,886.57) | (97,113.43) | - |
| 9/19/2023 | 4 | 8,593,186.97 | 3,324.27 | 24,000.00 | - | - | - | 3,324.27 |
| 9/22/2023 | 3 | 8,617,186.97 | 2,500.16 | 64,000.00 | - | - | - | 5,824.43 |
| 10/2/2023 | 10 | 8,681,186.97 | 8,395.78 | 80,000.00 | - | - | - | 14,220.21 |
| 10/13/2023 | 11 | 8,761,186.97 | 9,320.46 | 480,000.00 | - | - | - | 23,540.67 |
| 10/13/2023 | - | 9,241,186.97 | - | - | (560,000.00) | (23,540.67) | (536,459.33) | - |
| 12/1/2023 | 49 | 8,704,727.64 | 41,250.87 | 810,000.00 | - | - | - | 41,250.87 |
| 12/31/2023 | 30 | 9,514,727.64 | 27,605.74 | - | - | - | - | 68,856.61 |
| 12/31/2023 | - | 9,583,584.25 | - | | | | | (68,856.61) |
| | | | 184,438.43 | 1,470,000.00 | (1,377,959.20) | (100,517.53) | (1,332,813.65) | 0.00 |
| 1/1/2024 | | 9,583,584.25 | - | | | | | 0.00 |
| 2/1/2024 | 31 | 9,583,584.25 | 28,732.37 | 120,000.00 | - | - | - | 28,732.38 |
| 3/1/2024 | 29 | 9,703,584.25 | 27,215.23 | 8,000.00 | - | - | - | 55,947.61 |
| 6/30/2024 | 121 | 9,711,584.25 | 113,646.82 | - | - | - | - | 169,594.43 |
| 6/30/2024 | - | 9,881,178.68 | - | | | | | (169,594.43) |
| 7/1/2024 | 1 | 9,881,178.68 | 955.63 | 60,800.00 | - | - | - | 955.63 |
| 7/2/2024 | 1 | 9,941,978.68 | 961.51 | 8,000.00 | - | - | - | 1,917.14 |
| 10/11/2024 | 101 | 9,949,978.68 | 97,190.85 | - | (80,000.00) | (80,000.00) | - | 19,107.99 |
| 11/8/2024 | 28 | 9,949,978.68 | 26,944.00 | - | (240,000.00) | (46,051.99) | (193,948.01) | - |
| 12/5/2024 | 27 | 9,756,030.67 | 25,475.27 | 40,000.00 | - | - | - | 25,475.27 |
| 12/6/2024 | 1 | 9,796,030.67 | 947.40 | 16,000.00 | - | - | - | 26,422.66 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 12/18/2024 | 12 | 9,812,030.67 | 11,387.33 | 80,000.00 | - | - | - | 37,810.00 |
| 12/20/2024 | 2 | 9,892,030.67 | 1,913.36 | 57,600.00 | - | - | - | 39,723.36 |
| 12/30/2024 | 10 | 9,949,630.67 | 9,622.52 | 39,255.96 | - | - | - | 49,345.88 |
| 12/30/2024 | - | 9,988,886.63 | - | 22,057.60 | - | - | - | 49,345.88 |
| 12/31/2024 | 1 | 10,010,944.23 | 968.18 | 57,600.00 | - | - | - | 50,314.06 |
| 12/31/2024 | - | 10,068,544.23 | - | 16,000.00 | - | - | - | 50,314.06 |
| 12/31/2024 | - | 10,084,544.23 | - | - | - | - | - | 50,314.06 |
| 12/31/2024 | - | 10,134,858.29 | - | | | | | (50,314.06) |
| | | 10,134,858.29 | 345,960.47 | 525,313.56 | (320,000.00) | (126,051.99) | (193,948.01) | 435,411.92 |