Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

George R. Howard (admitted *pro hac vice*)
**VINSON & ELKINS LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al.*,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **(Emergency Hearing Requested)** |

**NOTICE OF FILING OF SECOND INTERIM CASH COLLATERAL ORDER**

**PLEASE TAKE NOTICE** that on October 4, 2026, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed chapter 11 cases (the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "***Court***").

**PLEASE TAKE FURTHER NOTICE** that on October 10, 2026, the Debtors filed the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III), Scheduling a Final Hearing on the Motion, and (IV) Granting Related Relief* [Dkt. No. 45] (the "***Cash Collateral Motion***").

**PLEASE TAKE FURTHER NOTICE** that on October 13, 2026, the Court entered the Debtors' *First Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing on the Motion, and (IV) Granting Related Relief* [Dkt. No. 60] (the "***Interim Cash Collateral Order***").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby submit a proposed Second Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

Protection, (III) Scheduling a Final Hearing on the Motion and (IV) Granting Related Relief (the "***Proposed Second Interim Cash Collateral Order***"), which is attached as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that a redline of the Proposed Second Interim Cash Collateral Order against the Interim Cash Collateral Order is attached as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that copies of all documents filed in these Chapter 11 Cases are available free of charge by visiting the Debtors' restructuring website at https://omniagentsolutions.com/AHPREIT.

**PLEASE TAKE FURTHER NOTICE** that the Court has scheduled a hearing to consider the relief requested in the Cash Collateral Motion on **October 29, 2026, at 9:30 a.m. (Central Time).**

[*Remainder of Page Intentionally Left Blank*]

Dated: October 28, 2026
Dallas, Texas

*/s/ Bradley R. Foxman*
**VINSON & ELKINS LLP**
Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**CERTIFICATE OF SERVICE**

I certify that on October 28, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Bradley R. Foxman*
One of Counsel

# EXHIBIT A

**Proposed Second Interim Cash Collateral Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY** | § | **(Chapter 11)** |
| **PROPERTIES REIT, INC., *et al.*,** | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Re: Dkt. Nos. 45 & 60** |

**SECOND INTERIM ORDER**
**(I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,**
**(II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A**
**FINAL HEARING ON THE MOTION AND (IV) GRANTING RELATED RELIEF**

Upon the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing on the Motion, and (IV) Granting Related Relief* (the "***Cash Collateral Motion***")[2] filed by the above-captioned debtors and debtors in possession (the "***Debtors***"), including Debtors AHP

---

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Cash Collateral Motion.

LP7 Fayetteville, LLC; AHP LP7 Bentonville, LLC; AHP LP7 Jonesboro, LLC; AHP LP7 CY Baton Rouge, LLC; AHP LP7 RI Baton Rouge, LLC; AHP LP7 Metairie, LLC; AHP LP7 Ft Myers, LLC (collectively, the "***AHP Debtors***") and PAH Charlotte LLC (the "***PAH Debtor***"), for entry of this second interim order (this "***Second Interim Order***"); and the Court having entered an interim order granting the relief requested in the Cash Collateral Motion on an interim basis [Docket No. 60] (the "***Interim Order***"); and a hearing on the Cash Collateral Motion having been held before this Court on October 29, 2026 (the "***Second Interim Hearing***"); and due and sufficient notice of the Second Interim Hearing and the relief requested in the Cash Collateral Motion having been given; and all objections, if any, to the entry of this Second Interim Order having been withdrawn, resolved, or overruled on an interim basis; and upon the record of the Second Interim Hearing and all proceedings held before this Court, and good and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS:**

A. On October 4, 2026 (the "***Petition Date***"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are now operating their businesses and managing their properties as debtors in possession pursuant to § 1107(a) of title 11 of the United States Code (the "***Bankruptcy Code***").[3] No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed. By order entered October 5, 2026 [Docket No. 15], the Debtors' chapter 11 cases are being jointly administered for procedural purposes only under Case No. 26-80071 (SGJ).

[3] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and the Cash Collateral Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. As supported by the *Amended Declaration of Alan Tantleff in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 20], the *Declaration of Alan Tantleff in Support of Additional First Day Motions* [Docket No. 53], and the *Declaration of Alan Tantleff in Support of (I) Final Relief Requested in the Debtors' Additional First Day Motions; and (II) Supplemental First Day Motions* [Docket No. 111], an immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their businesses. Without such funds, the Debtors will not be able to pay their direct operating expenses, including wages, salaries, benefits, and other compensation owed to employees and directors, and premiums and other amounts due under the Debtors' insurance policies, and obtain goods and services needed to carry on their businesses in a manner that will avoid irreparable harm to the Debtors' estates. The Debtors' ability to use Cash Collateral is vital to the confidence of the Debtors' employees, guests, vendors, and suppliers of goods and services, to the continuation of the insurance coverage required to protect the Properties (as defined below) and the Debtors' estates, and to the preservation and maintenance of the going concern value of the Debtors' estates.

D. The AHP Debtors respectively own the following properties (the "***AHP Properties***"):

| Debtor | Property |
|---|---|
| AHP LP7 Fayetteville, LLC | TownePlace Suites Fayetteville |
| AHP LP7 Bentonville, LLC | aloft Rogers Bentonville |
| AHP LP7 Jonesboro, LLC | Fairfield Inn & Suites Jonesboro |
| AHP LP7 CY Baton Rouge, LLC | Courtyard Baton Rouge Siegen Lane |
| AHP LP7 RI Baton Rouge, LLC | Residence Inn Baton Rouge Siegen Lane |

| Debtor | Property |
|---|---|
| AHP LP7 Metairie, LLC | TownePlace Suites New Orleans Metairie |
| AHP LP7 Ft Myers, LLC | Hampton Inn & Suites Ft. Myers Beach |

The AHP Lender (as defined below) asserts that each of the AHP Properties is encumbered by a *Mortgage, Assignment of Leases and Rents and Security Agreement* to secure repayment of two promissory notes, issued in the amounts of $25,000,000 and $40,000,000 (the "***AHP Loans***"), upon the terms set forth in the promissory notes and the accompanying loan agreement, mortgages, and other loan and security documents (collectively, "***AHP Loan Documents***"). The AHP Lender further asserts that each AHP Debtor is jointly and severally liable for the entire amount of each AHP Loan, and that each AHP Property secures repayment of each of the AHP Loans in their entirety. The AHP Lender asserts that the AHP Loans are held by Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of Deutsche Mortgage & Asset Receiving Corporation, CD 2017-CD6 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-CD6 (the "***AHP Lender***").

E. In addition, the PAH Debtor owns the property known as the Doubletree Charlotte Airport (the "***PAH Property***" and, with the AHP Properties, the "***Properties***"). The PAH Lender (as defined below) asserts that the PAH Property is encumbered by a *Mortgage, Assignment of Leases and Rents and Security Agreement* to secure repayment of a promissory note in the amount of $18,150,000 (the "***PAH Loan***" and, with the AHP Loans, the "***Loans***"), upon the terms set forth in the promissory note and the accompanying loan agreement, mortgages, and other loan and security documents (collectively, "***PAH Loan Documents***" and, with the AHP Loan Documents, the "***Loan Documents***"). The PAH Lender asserts that the PAH Loan is held by Wells Fargo Bank, National Association, as Trustee, for the benefit of the registered holders of UBS

Commercial Mortgage Trust 2018-C11, Commercial Mortgage Pass-Through Certificates, Series 2018-C11 (the "***PAH Lender***" and, with the AHP Lender, the "***Secured Lenders***").

F. Argentic Investment Management, LLC, acting as special servicer for Argentic Services Company LP (as successor-in-interest to LNR Partners LLC), acting as Special Servicer for each of the Secured Lenders (the "***Special Servicer***") asserts that the respective Debtors' obligations under the AHP Loans and the PAH Loan are secured by valid, binding, and enforceable liens on and security interests in substantially all of the applicable AHP Debtors' and PAH Debtor's assets, including the Properties and all Gross Revenue, Rents, room revenues, accounts, accounts receivable, deposit accounts, the Clearing Account, the Deposit Account (each as defined in the applicable Loan Documents), and all reserve and other cash management accounts (as described in the applicable Loan Documents), and the proceeds thereof (the "***Prepetition Collateral***"), and further asserts that all cash and cash equivalents of the AHP Debtors and the PAH Debtor, wherever held, constitute "cash collateral" of the respective Secured Lenders within the meaning of section 363(a) of the Bankruptcy Code. As used in this Order, "***Cash Collateral***" means any cash and cash equivalents of the Debtors, to the extent such cash and cash equivalents constitute "cash collateral" of the Secured Lenders or other parties within the meaning of section 363(a) of the Bankruptcy Code. The Special Servicer further asserts that, under Section 6.1 of the applicable loan agreement included in the Loan Documents, Gross Revenue received by the AHP Debtors or the PAH Debtor or their manager is deemed collateral for the respective Loans, held in trust for the benefit of the respective Secured Lenders, and may not be commingled with other funds. The Debtors have not stipulated to, and this Order does not determine, the validity, extent, perfection, priority, or enforceability of any lien, claim, or security interest asserted in the

Prepetition Collateral, the Cash Collateral, or whether any particular account or funds constitute Cash Collateral.

G. Notice of the Cash Collateral Motion, the Interim Order, and the Second Interim Hearing was provided in accordance with the Interim Order, Rule 4001(b) and (d) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and the N.D. Tex. L.B.R., and such notice was good, adequate, and sufficient under the circumstances, and no other or further notice is required for entry of this Second Interim Order. The authority granted herein to allow the Debtors to obtain the use of Cash Collateral on an interim basis pending the Final Hearing (as defined below) is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Second Interim Order is in the best interests of the Debtors, their estates, and their creditors, as its implementation will, among other things, allow the Debtors to continue operations pending the Final Hearing.

**THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** as follows:

1. The Cash Collateral Motion is **GRANTED** on a interim basis as set forth herein, pending the Final Hearing. Except as modified herein, the findings contained in this Second Interim Order are adopted herein as if fully restated herein.

2. Authorization to Use Cash Collateral. The Debtors are hereby authorized, on an interim basis pending the Final Hearing, subject to the protections and consideration described in this Order, to use Cash Collateral only in the amounts and only for the purposes specified in the Budget attached hereto as Exhibit A and incorporated herein (as the same may be amended or modified with the express prior written consent of the applicable Secured Lender, the "***Budget***") and shall not, except to the extent permitted in the following sentence, exceed the aggregate amount of the total cash outflows shown on the Budget. Except as otherwise agreed to in writing

by the Special Servicer, the Debtors shall not permit Cash Collateral of the Special Servicer with respect to the AHP Debtors or the PAH Debtor to be used such that: (i) the cumulative total for any individual line item for the AHP Debtors or the PAH Debtor to exceed the projected disbursements for such line item for the AHP Debtors and the PAH Debtor by a variance greater than ten percent (10%) from the amounts set forth in the Budget, and (ii) the cumulative total for all actual disbursements made for the AHP Debtors and the PAH Debtors to exceed the cumulative total for all projected disbursements by a variance of greater than five percent (5%) from the amounts set forth in the Budget for the AHP Debtors and the PAH Debtors (together, the "***Permitted Variances***"). Without limiting the foregoing, the purposes for which Cash Collateral may be used in accordance with the Budget (subject to the Permitted Variances) include (i) the payment of payroll, working capital, general corporate purposes, and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases and related proceedings, (ii) the payment of fees owed to members of the Debtors' boards of directors, and (iii) the funding of the Carve-Out Reserves and the Professional Fee Reserve Account in accordance with paragraphs 8 and 9, respectively, of this Second Interim Order. Notwithstanding the foregoing, the Debtors are authorized to use Cash Collateral to pay any fees owed to the Office of the United States Trustee without regard to any amount set forth in the Budget.

3. Replacement Liens. As adequate protection for, but only to the extent of any actual diminution in the value of the interest of the respective Secured Lenders as of the Petition Date in their respective collateral resulting from the use of Cash Collateral pursuant to 11 U.S.C. § 363(c), the imposition of the automatic stay under 11 U.S.C. § 362(a), or otherwise, the Secured Lenders are hereby granted valid, perfected liens and enforceable postpetition replacement liens and security interests (the "***Replacement Liens***"), in each case, subject and subordinate to the Carve-

Out (as defined below), the Professional Fee Reserve Account, and any Prior Senior Liens (as defined below), in all property, whether acquired before or after the Petition Date, of either (i) the AHP Debtors or (ii) the PAH Debtor, who benefited from the use of such Cash Collateral; *provided*, *however*, that such Replacement Liens shall not encumber causes of action held by the Debtors' estates under §§ 544, 545, 547, 548, 549, 550, 551, 552, 553, or 558 (or otherwise arising principally under the Bankruptcy Code), or the proceeds thereof; *provided*, *further*, that the Replacement Liens shall secure only the amount of such actual diminution and shall not secure any other claim, damages, or amounts. "***Prior Senior Liens***" means (a) valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or (b) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and the proceeds, products, rents, and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise.

4. Automatic Perfection. The adequate protection liens granted herein are valid, enforceable and perfected liens, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, lease, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be required to effect such perfection. The Debtors and the Secured Lenders are hereby authorized, but not required, to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction or take any other action to validate and perfect the liens and security interests granted hereunder. A certified copy of this Second Interim Order may, in the discretion of each Secured Lender, be filed with or recorded in any filing or recording office in addition to or in lieu of such financing statements, mortgages,

deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), and all filing offices are hereby authorized and directed to accept such certified copy of this Second Interim Order for filing and recording.

5. Taxing Authorities. Nothing herein shall be construed to prime the liens of any taxing authority.

6. Section 507(b) Claim. As further adequate protection, each Secured Lender is hereby granted pursuant to § 507(b) an allowed superpriority claim solely against either (i) the AHP Debtors or (ii) the PAH Debtor, that benefited from the use of Cash Collateral, and not against any other Debtor, in an amount not to exceed such actual diminution (the "***Section 507(b) Claim***") if and to the extent the Replacement Liens are insufficient to provide adequate protection against the actual diminution, if any, in value of such Secured Lender's interest in any collateral resulting from the use of Cash Collateral. The priority of the Section 507(b) Claim shall be senior in priority of payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, except fees owed to the Office of the United States Trustee, the Carve-Out, and the Professional Fee Reserve Account; *provided, however*, that the Section 507(b) Claim shall be subject and subordinate only to the Carve-Out and the Professional Fee Reserve Account.

7. Carve-Out. Notwithstanding anything to the contrary in this Second Interim Order, the Prepetition Collateral, the liens and security interests of the Secured Lenders under the AHP Loan Documents and the PAH Loan Documents, the Replacement Liens, and the Section 507(b) Claim shall each be subject and subordinate to the payment of the Carve-Out. As used in this

Second Interim Order, the "***Carve-Out***" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under § 726(b) (without regard to the Carve-Out Trigger Notice); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") including counsel, financial advisors, investment bankers, and claims and noticing agents, at any time before or on the first business day following delivery by the Special Servicer of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the "***Pre-Trigger Amount***"); and (iv) Allowed Professional Fees of any official committee appointed in these chapter 11 cases (a "***Committee***") pursuant to §§ 328 and 1103 of the Bankruptcy Code up to a maximum of $25,000 (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***"), including counsel and one financial advisor; and (v) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $100,000 incurred after the first business day following delivery by the Special Servicer of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (v), the "***Post-Trigger Amount***").

8. <u>Carve-Out Trigger Notice; Carve-Out Reserves</u>. For purposes of this Second Interim Order, "***Carve-Out Trigger Notice***" means a written notice delivered by email (or other electronic means) by Special Servicer to the Debtors, their lead restructuring counsel, the Office of the United States Trustee, and counsel to any Committee, which notice may be delivered only

following the occurrence and during the continuation of an Event of Default or a Termination Event (each as defined below), stating that the Post-Trigger Amount has been invoked. On the day on which a Carve-Out Trigger Notice is delivered (the "***Termination Declaration Date***"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available Cash Collateral to fund (i) a reserve in an amount equal to the then-unpaid amounts of the Allowed Professional Fees of Debtor Professionals incurred through the Termination Declaration Date, not to exceed the Pre-Trigger Amount (the "***Pre-Carve-Out Trigger Notice Reserve***"), and (ii) a reserve in an amount equal to the Post-Trigger Amount (the "***Post-Carve-Out Trigger Notice Reserve***" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "***Carve-Out Reserves***"), in each case prior to any and all other claims. The Debtors shall deposit and hold the Carve-Out Reserves in the Professional Fee Reserve Account (as defined below) in trust exclusively to pay such Allowed Professional Fees in accordance with the terms of paragraph 9. Notwithstanding the occurrence of a Termination Event, the Debtors shall be authorized to use Cash Collateral to fund the Carve-Out Reserves, and the Secured Lenders shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Reserves. Any amounts remaining in the Pre-Carve-Out Trigger Notice Reserve after payment in full of all obligations described therein shall be applied to fund the Post-Carve-Out Trigger Notice Reserve, and any amounts remaining in the Post-Carve-Out Trigger Notice Reserve after payment in full of all obligations described therein shall be distributed to the applicable Secured Lenders in accordance with their respective rights and priorities as of the Termination Declaration Date.

9. Professional Fee Reserve Account. Upon entry of this Second Interim Order, and notwithstanding any other provision of this Second Interim Order or any provision of the Loan Documents, the Debtors are authorized and directed to fund an escrow account for the sole purpose

of reserving for and paying unpaid Allowed Professional Fees (the "***Professional Fee Reserve Account***"). The Professional Fee Reserve Account shall be held for the benefit of Professional Persons and shall not be property of the Debtors' estates or subject to the control, lien, security interest, or claims of the Special Servicer, the Secured Lenders, or any other creditor. Upon entry of this Second Interim Order, the Debtors shall fund the Professional Fee Reserve Account in an amount equal to the aggregate fees and expenses of the Professional Persons set forth in the Budget (the "***Budgeted Professional Fees***") for the period beginning on the Petition Date through the end of the week in which this Second Interim Order is entered, to the extent not previously paid. Thereafter, on the first business day of each week commencing with the first full calendar week following entry of this Second Interim Order, the Debtors shall transfer to the Professional Fee Reserve Account cash, including Cash Collateral, in an amount equal to the Budgeted Professional Fees for such week (including, in the event of the closing of any sale, restructuring, financing, or other transaction upon which one or more success or transaction fees is earned by any Professional Person, any amount equal to the sum of all such fees, to the extent such fees are not paid to the Professional Person upon such closing).

10. <u>Cash Collateral Accounts</u>. All cash of the AHP Debtors and the PAH Debtor and all Gross Revenue and other collections of such Debtors after the Petition Date shall continue to be deposited into the Debtors' account ending 1566 for AHP Debtors and Debtors' account ending 5802 for PAH Debtor or shall otherwise be deposited in separate debtor in possession accounts maintained solely for such Debtors (the "***Cash Management Accounts***"), and shall not be commingled with the cash or receipts of any other Debtor or non-debtor except as expressly permitted by this Second Interim Order. Nothing herein shall constitute a determination or

admission that any Cash Management Account, or any funds deposited therein, constitutes Cash Collateral or is subject to any valid lien or security interest.

11. Limitation on Use of Cash Collateral. Notwithstanding any other provision of this Second Interim Order or any other order entered by the Court, no Cash Collateral and no portion of the Carve-Out or the Carve-Out Reserves may be used in connection with (a) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Special Servicer or the Secured Lenders, or (b) attempts to seek to modify any of the rights and remedies granted to the Special Servicer or the Secured Lenders under this Second Interim Order, other than in accordance with this Second Interim Order; *provided*, *however*, that nothing in this paragraph shall restrict the Debtors from contesting whether an Event of Default or a Termination Event has occurred or from seeking to enforce the terms of this Second Interim Order.

12. Insurance. During the pendency of this Order, the Debtors will cause to be paid from available Cash Collateral insurance on the Properties consistent with their prepetition practice.

13. Reporting. Starting on October 20, 2026, and continuing on a bi-weekly basis thereafter, the Debtors shall deliver to the Special Servicer and Spirit Realty, LP ("***Spirit Realty***") a detailed report of actual receipts and expenditures for the immediately preceding calendar week as compared to the corresponding amounts and line items set forth in the Budget, together with an explanation of any variances above the projected amounts set forth in the Budget and the Permitted Variances.

14. Information Rights. The Debtors shall, within three (3) business days after receipt of any written request, promptly provide:

(a) to Special Servicer or a Secured Lender all other financial information reasonably requested by Special Servicer or a Secured Lender or their counsel, including copies of any STR reports, hotel management reports, and franchisor correspondence relating to the Properties, and all information that is required to be provided by the Debtors to the Secured Lenders under the Loan Documents; and

(b) to Spirit Realty all other financial information requested by Spirit Realty or their counsel including copies of any STR reports, hotel management reports, and franchisor correspondence relating to the Cape Canaveral Property[4] and applicable Debtors and all information that is required to be provided by the Debtors to Spirit Realty under the Lease.[5]

15. Inspections. During the pendency of this Second Interim Order, the Debtors shall reasonably cooperate with Special Servicer and the Secured Lenders and their agents in all inspections of the Properties whether to review their condition or for appraisal purposes. At all times, Special Servicer and its agents shall be entitled, upon reasonable notice, to inspect the Properties and review the Debtors' books and records during reasonable business hours.

16. No Priming. Except as otherwise provided herein, no claim or lien having a priority superior to or *pari passu* with those granted to any Secured Lender by this Order shall be granted or allowed absent further order of the Court or the express written consent of such Secured Lender.

17. Survival. Except as expressly provided in this Second Interim Order, and notwithstanding the occurrence of a Termination Event (hereinafter defined) or the termination otherwise of the Debtors' authority to use Cash Collateral, the Carve-Out, the Professional Fee Reserve Account, the adequate protection and all other rights and remedies of the Secured Lenders

---

[4] The "***Cape Canaveral Property***" shall mean the Residence Inn by Marriott Cape Canaveral Cocoa Beach.

[5] The "***Lease***" shall mean the Lease Agreement (as amended and assigned), dated March 28, 2019, between Spirit Realty, as Landlord, and AHP Master Lease, LLC, as original tenant.

and the Debtors granted by the provisions of this Second Interim Order shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of these chapter 11 cases to a case under chapter 7, dismissing any of these chapter 11 cases, appointing a chapter 7 or chapter 11 trustee or by any other act or omission, nor shall the Carve-Out, the Professional Fee Reserve Account, the adequate protection, or any of the other rights and remedies of the Secured Lenders or the Debtors granted by the provisions of this Second Interim Order be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in these chapter 11 cases. If an order converting or dismissing any of these chapter 11 cases is at any time entered, such order shall provide that (i) the Carve-Out and the Professional Fee Reserve Account shall continue in full force and effect and shall maintain their priorities as provided in this Second Interim Order, (ii) the adequate protection granted to the Secured Lenders pursuant to this Second Interim Order, including the Replacement Liens and the Section 507(b) Claim, shall continue in full force and effect and shall maintain their priorities as provided in this Second Interim Order until any and all adequate protection obligations shall have been paid and satisfied in full notwithstanding such dismissal, and any court of competent jurisdiction may enforce the claims, liens and security interests or replacement security interests.

18. Effect of Modification. If any or all of the provisions of this Second Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (a) the Carve-Out and the Professional Fee Reserve Account, (b) the validity of any adequate protection obligations incurred prior to the actual receipt of written notice by the Secured Lenders of the effective date of such reversal, stay, modification or vacation or (c) the validity or enforceability of any security interest, lien or priority authorized or created hereby or pursuant to this Second Interim Order with respect to any adequate protection obligations.

Notwithstanding any such reversal, stay, modification or vacation, any adequate protection obligations incurred by the Debtors to the Secured Lenders prior to the actual receipt of written notice by the Secured Lenders of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the provisions of this Second Interim Order.

19. Termination Events. The use of Cash Collateral under this Second Interim Order shall terminate upon notice from the applicable Secured Lender to the Debtors of the earliest to occur of: (i) conversion to chapter 7 or dismissal of any Debtor's case; (ii) the appointment of a trustee or an examiner with expanded powers in any Debtor's case; (iii) the entry of any order granting any party other than a Secured Lender a lien on or security interest senior or equal in right of priority to any lien or security interest of such Secured Lender in any property of the AHP Debtors' or PAH Debtor's estates without the express prior written consent of the applicable Secured Lender, including any order approving debtor in possession financing secured by any of the Properties or other Prepetition Collateral; (iv) the entry of any order modifying, reversing, revoking, staying, rescinding, vacating or amending this Second Interim Order without the express prior written consent of the applicable Secured Lender, which consent shall not be implied from any action, inaction, course of conduct or acquiescence by the Special Servicer or a Secured Lender; (v) the entry of any order granting any party other than the Special Servicer or a Secured Lender relief from the automatic stay to the extent it affects the liens on the Properties or other collateral; (vi) the rejection of, or termination of the automatic stay with regard to, any franchise agreement for any Property; (vii) occurrence of any Event of Default by the Debtors under the terms of this Second Interim Order which remains uncured five (5) business days after the receipt of written notice from Special Servicer or a Secured Lender; and (viii) the effective date of a

confirmed chapter 11 plan in the applicable Debtor's case, unless otherwise agreed by the applicable Secured Lender (any of the foregoing, a "***Termination Event***").

20. Events of Default. The occurrence of any one or more of the following events shall constitute an "***Event of Default***" hereunder: (i) the Debtors fail to timely and punctually perform any of their obligations in strict accordance with the terms hereof or otherwise defaults hereunder or breaches any provision hereof, including (a) the use and expense of disbursement of Cash Collateral except as expressly permitted hereunder and in the Budget; (b) the failure to provide any report, document, or information to Special Servicer or a Secured Lender as required hereby; (ii) any person or entity obtains an order permitting the use of Cash Collateral without the Special Servicer's or the applicable Secured Lender's written consent in its sole discretion; or (iii) the Replacement Liens granted to the Secured Lenders pursuant to this Second Interim Order cease to be valid and perfected liens having the priority provided in this Second Interim Order, save and except tax liens that may prime such liens.

21. Reservation of Rights. The grant of adequate protection to the Secured Lenders is without prejudice to (i) Special Servicer's or the Secured Lenders' right to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and (ii) the right of any other party in interest to contest any such modification. Nothing contained in this Second Interim Order shall be deemed or construed to be an admission that any Secured Lender is adequately protected. Nothing contained in this Second Interim Order shall be deemed or construed to be an admission or finding by the Debtors or the Court as to the amount, validity, extent, perfection, priority, or enforceability of any claim, lien, or security interest asserted by any Secured Lender or any other party, or as to whether any account, cash, or other property constitutes Cash Collateral, and the Debtors and all other parties in interest reserve all

rights to challenge the same. Moreover, except as otherwise expressly set forth in this Second Interim Order, nothing contained herein shall be construed to limit in any way any right by any Secured Lender, including the right to seek relief from the automatic stay, to object to any proposed debtor in possession financing, to seek any other relief in these cases or any related adversary proceeding not directly inconsistent with this Second Interim Order, or to assert any rights under any guaranty against a non-Debtor, including any guaranty against Phoenix American Hospitality, LLC, and W.L. Nelson, and any rights against any non-Debtor entity, all of which are expressly reserved.

22. Binding Effect. The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the Special Servicer, the Secured Lenders, and the Debtors. However, nothing herein shall prevent any Secured Lender from seeking any form of relief under the Bankruptcy Code.

23. Objections Overruled. All objections to the entry of this Second Interim Order, to the extent not withdrawn, waived, or resolved, are hereby overruled on an interim basis, without prejudice to the assertion of any such objection at the Final Hearing.

24. Final Hearing. A final hearing (the "***Final Hearing***") to consider the Cash Collateral Motion will be held on [●], 2026, at [●] [a.m./p.m.] (Central Time) before the Honorable Stacey G.C. Jernigan in the United States Bankruptcy Court for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242. Any objections to the relief requested in the Cash Collateral Motion on a final basis shall be filed and served so as to be actually received no later than [●], 2026, at [●] [a.m./p.m.] (Central Time).

25. Notice of Second Interim Order and Final Hearing. The Debtors shall, within two (2) business days after entry of this Second Interim Order, mail copies of this Second Interim Order

and a notice of the Final Hearing to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) counsel to Special Servicer; (iii) counsel to William Lee "Perch" Nelson; (iv) counsel to Phoenix American Hospitality, LLC; (v) the Debtors' 20 largest unsecured creditors as set forth in the list filed by the Debtors in these cases; (vi) all known holders of liens on, or equipment leasing interests in, the Debtors' assets; (vii) all applicable government agencies to the extent required by the Bankruptcy Rules or local rules of this Court; and (viii) all parties requesting notice in these cases.

26. Immediate Effect. Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Second Interim Order shall be immediately effective and enforceable upon its entry.

27. The Court shall retain jurisdiction to interpret, implement and enforce this Second Interim Order.

**# # # END OF ORDER # # #**

**Order submitted by:**

**VINSON & ELKINS LLP**

Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR**
**THE DEBTORS AND DEBTORS IN POSSESSION**

# Exhibit A

## Budget

American Hospitality Properties

# 13-Week Budget

Confidential

FTI CONSULTING

October 27, 2026

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **10/5/2026** | **10/12/2026** | **10/19/2026** | **10/26/2026** | **11/2/2026** | **11/9/2026** | **11/16/2026** |
| **Week End Date >>** | **1/3/2027** | **10/11/2026** | **10/18/2026** | **10/25/2026** | **11/1/2026** | **11/8/2026** | **11/15/2026** | **11/22/2026** |
| Forecast Week | | **1** | **2** | **3** | **4** | **5** | **6** | **7** |
| Month | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Operating Receipts | | | | | | | | |
| LPIP-B | $ 4,713,458 | $ 413,132 | $ 413,132 | $ 413,132 | $ 413,132 | $ 377,410 | $ 377,410 | $ 377,410 |
| DTC | 1,455,491 | 133,182 | 133,182 | 133,182 | 133,182 | 103,872 | 103,872 | 103,872 |
| RICC | 2,161,333 | 155,060 | 155,060 | 155,060 | 155,060 | 171,368 | 171,368 | 171,368 |
| APIP-C | 1,623,214 | 138,677 | 138,677 | 138,677 | 138,677 | 118,152 | 118,152 | 118,152 |
| **Total Operating Receipts** | **$ 9,953,496** | **$ 840,051** | **$ 840,051** | **$ 840,051** | **$ 840,051** | **$ 770,802** | **$ 770,802** | **$ 770,802** |
| Hotel Labor Disbursements | | | | | | | | |
| LPIP-B | $ (1,430,163) | $ - | $ (180,789) | $ (200,990) | $ - | $ (214,301) | $ - | $ (214,301) |
| DTC | (501,916) | - | (55,467) | (77,055) | - | (74,696) | - | (74,696) |
| RICC | (389,706) | - | (45,046) | (61,557) | - | (56,747) | - | (56,747) |
| APIP-C | (391,360) | - | (47,617) | (57,005) | - | (56,332) | - | (56,332) |
| **Total Hotel Labor Disbursements** | **$ (2,713,145)** | **$ -** | **$ (328,918)** | **$ (396,606)** | **$ -** | **$ (402,076)** | **$ -** | **$ (402,076)** |
| Hotel Operating Disbursements | | | | | | | | |
| LPIP-B | $ (523,651) | $ - | $ - | $ - | $ (179,344) | $ - | $ - | $ - |
| DTC | (133,921) | - | - | - | (53,437) | - | - | - |
| RICC | (220,307) | - | - | - | (72,090) | - | - | - |
| APIP-C | (152,373) | - | - | - | (52,423) | - | - | - |
| **Total Hotel Operating Disbursements** | **$ (1,030,252)** | **$ -** | **$ -** | **$ -** | **$ (357,294)** | **$ -** | **$ -** | **$ -** |
| Overhead Operating Disbursements | | | | | | | | |
| LPIP-B | $ (1,437,919) | $ - | $ - | $ - | $ (518,081) | $ - | $ - | $ - |
| DTC | (372,274) | - | - | - | (137,960) | - | - | - |
| RICC | (446,444) | - | - | - | (144,435) | - | - | - |
| APIP-C | (404,598) | - | - | - | (147,206) | - | - | - |
| **Total Overhead Operating Disbursements** | **$ (2,661,234)** | **$ -** | **$ -** | **$ -** | **$ (947,682)** | **$ -** | **$ -** | **$ -** |
| Management Fee Disbursements | | | | | | | | |
| LPIP-B | $ (142,401) | $ - | $ - | $ - | $ (54,888) | $ - | $ - | $ - |
| DTC | (44,448) | - | - | - | (17,694) | - | - | - |
| RICC | (65,361) | - | - | - | (20,601) | - | - | - |
| APIP-C | (49,483) | - | - | - | (18,424) | - | - | - |
| **Total Management Fee Disbursements** | **$ (301,693)** | **$ -** | **$ -** | **$ -** | **$ (111,607)** | **$ -** | **$ -** | **$ -** |

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **10/5/2026** | **10/12/2026** | **10/19/2026** | **10/26/2026** | **11/2/2026** | **11/9/2026** | **11/16/2026** |
| **Week End Date >>** | **1/3/2027** | **10/11/2026** | **10/18/2026** | **10/25/2026** | **11/1/2026** | **11/8/2026** | **11/15/2026** | **11/22/2026** |
| Forecast Week | | **1** | **2** | **3** | **4** | **5** | **6** | **7** |
| Month | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Non-Operating Disbursements | | | | | | | | |
| LPIP-B | $ (11,646) | $ - | $ - | $ - | $ (3,882) | $ - | $ - | $ - |
| DTC | (37,884) | - | - | - | (12,628) | - | - | - |
| RICC | (4,854) | - | - | - | (1,618) | - | - | - |
| APIP-C | (2,026) | - | - | - | (680) | - | - | - |
| **Total Non-Operating Disbursements** | **$ (56,410)** | **$ -** | **$ -** | **$ -** | **$ (18,808)** | **$ -** | **$ -** | **$ -** |
| Insurance Disbursements | | | | | | | | |
| LPIP-B | $ (469,681) | $ - | $ (117,420) | $ - | $ (117,420) | $ - | $ - | $ - |
| DTC | (13,573) | - | (3,393) | - | (3,393) | - | - | - |
| RICC | (119,520) | - | (29,880) | - | (29,880) | - | - | - |
| APIP-C | (4,697) | - | (1,174) | - | (1,174) | - | - | - |
| **Total Insurance Disbursements** | **$ (607,472)** | **$ -** | **$ (151,868)** | **$ -** | **$ (151,868)** | **$ -** | **$ -** | **$ -** |
| RET Disbursements / Escrow Release | | | | | | | | |
| LPIP-B | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DTC | (20,324) | - | - | - | - | - | - | - |
| RICC | - | - | - | - | - | - | - | - |
| APIP-C | - | - | - | - | - | - | - | - |
| **Total RET Disbursements / Escrow Release** | **$ (20,324)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| CapEx Funding[1] | | | | | | | | |
| LPIP-B | $ (100,000) | $ - | $ - | $ - | $ - | $ (25,000) | $ (25,000) | $ (25,000) |
| DTC | - | - | - | - | - | - | - | - |
| RICC | - | - | - | - | - | - | - | - |
| APIP-C | - | - | - | - | - | - | - | - |
| **Total CapEx Funding** | **$ (100,000)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (25,000)** | **$ (25,000)** | **$ (25,000)** |
| Board Fee Reimbursements | | | | | | | | |
| LPIP-B | $ (53,906) | $ - | $ - | $ - | $ (17,969) | $ - | $ - | $ - |
| DTC | (10,781) | - | - | - | (3,594) | - | - | - |
| RICC | (10,781) | - | - | - | (3,594) | - | - | - |
| APIP-C | (10,781) | - | - | - | (3,594) | - | - | - |
| **Total Board Fee Reimbursements** | **$ (86,250)** | **$ -** | **$ -** | **$ -** | **$ (28,750)** | **$ -** | **$ -** | **$ -** |
| **Property Net Disbursements** | **$ 2,376,716** | **$ 840,051** | **$ 359,265** | **$ 443,445** | **$ (775,958)** | **$ 343,726** | **$ 745,802** | **$ 343,726** |

*Notes:*

*1. Assumes Debtors can use property condition reports prepared by special servicers.*

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **10/5/2026** | **10/12/2026** | **10/19/2026** | **10/26/2026** | **11/2/2026** | **11/9/2026** | **11/16/2026** |
| **Week End Date >>** | **1/3/2027** | **10/11/2026** | **10/18/2026** | **10/25/2026** | **11/1/2026** | **11/8/2026** | **11/15/2026** | **11/22/2026** |
| Forecast Week | | **1** | **2** | **3** | **4** | **5** | **6** | **7** |
| Month | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Net Sale Price | | | | | | | | |
| LPIP-B | $ 48,020,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DTC | 18,130,000 | - | - | - | - | - | - | - |
| RICC | - | - | - | - | - | - | - | - |
| APIP-C | 15,680,000 | - | - | - | - | - | - | - |
| **Total Net Sale Price** | **$ 81,830,000** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| Debt Service | | | | | | | | |
| LPIP-B | $ (45,619,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DTC | (17,223,500) | - | - | - | - | - | - | - |
| RICC | - | - | - | - | - | - | - | - |
| APIP-C | (14,896,000) | - | - | - | - | - | - | - |
| **Total Debt Service** | **$ (77,738,500)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| Restructuring Activity | | | | | | | | |
| LPIP-B | $ (417,896) | $ - | $ - | $ - | $ (226,473) | $ - | $ - | $ - |
| DTC | (221,210) | - | - | - | (69,388) | - | - | - |
| RICC | (86,929) | - | - | - | (88,827) | - | - | - |
| APIP-C | - | - | - | - | - | - | - | - |
| **Total Restructuring Activity** | **$ (726,035)** | **$ -** | **$ -** | **$ -** | **$ (384,688)** | **$ -** | **$ -** | **$ -** |
| **Total Property Cash Activity** | **$ 5,742,182** | **$ 840,051** | **$ 359,265** | **$ 443,445** | **$ (1,160,646)** | **$ 343,726** | **$ 745,802** | **$ 343,726** |

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **10/5/2026** | **10/12/2026** | **10/19/2026** | **10/26/2026** | **11/2/2026** | **11/9/2026** | **11/16/2026** |
| **Week End Date >>** | **1/3/2027** | **10/11/2026** | **10/18/2026** | **10/25/2026** | **11/1/2026** | **11/8/2026** | **11/15/2026** | **11/22/2026** |
| Forecast Week | | **1** | **2** | **3** | **4** | **5** | **6** | **7** |
| Month | 10 | 10 | 10 | 10 | 10 | 11 | 11 | 11 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| REIT Disbursements | | | | | | | | |
| Professional Fee Escrow Funding – REIT I | $ (4,838,420) | (117,500) | (117,500) | (117,500) | (117,500) | (117,500) | (117,500) | (117,500) |
| Professional Fee Escrow Funding – REIT II | (1,352,664) | (17,500) | (17,500) | (17,500) | (17,500) | (17,500) | (17,500) | (17,500) |
| Professional Fee Escrow Release – REIT I | 953,776 | - | - | - | - | - | - | - |
| Professional Fee Escrow Release – REIT II | 301,492 | - | - | - | - | - | - | - |
| REIT Expenses – REIT I | (302,603) | - | (182) | - | (14,557) | - | - | - |
| REIT Expenses – REIT II | (130,103) | - | (182) | - | (14,557) | - | - | - |
| Board Fee Reimbursement From Silos - REIT I | 43,125 | - | - | - | 14,375 | - | - | - |
| Board Fee Reimbursement From Silos - REIT II | 43,125 | - | - | - | 14,375 | - | - | - |
| **Total REIT Disbursements** | **$ (5,282,271)** | **$ (135,000)** | **$ (135,364)** | **$ (135,000)** | **$ (135,364)** | **$ (135,000)** | **$ (135,000)** | **$ (135,000)** |
| **Total Consolidated Cash Activity** | **$ 459,911** | **$ 705,051** | **$ 223,901** | **$ 308,445** | **$ (1,296,009)** | **$ 208,726** | **$ 610,802** | **$ 208,726** |
| **Cash Balance** | | | | | | | | |
| Beginning | $ 453,666 | $ 453,666 | $ 1,158,716 | $ 1,382,617 | $ 1,691,062 | $ 395,052 | $ 603,778 | $ 1,214,580 |
| Cash Activity | 459,911 | 705,051 | 223,901 | 308,445 | (1,296,009) | 208,726 | 610,802 | 208,726 |
| **Ending Balance** | **$ 913,576** | **$ 1,158,716** | **$ 1,382,617** | **$ 1,691,062** | **$ 395,052** | **$ 603,778** | **$ 1,214,580** | **$ 1,423,307** |
| **Professional Fee and UST Fee Escrow** | | | | | | | | |
| Beginning | $ - | $ - | $ 135,000 | $ 270,000 | $ 405,000 | $ - | $ 135,000 | $ 270,000 |
| Funding | 6,191,084 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 |
| Escrow Disbursement | (4,935,816) | - | - | - | (540,000) | - | - | - |
| Escrow Release to REITs | (1,255,268) | - | - | - | - | - | - | - |
| **Ending Balance** | **$ -** | **$ 135,000** | **$ 270,000** | **$ 405,000** | **$ -** | **$ 135,000** | **$ 270,000** | **$ 405,000** |

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **11/23/2026** | **11/30/2026** | **12/7/2026** | **12/14/2026** | **12/21/2026** | **12/28/2026** |
| **Week End Date >>** | **1/3/2027** | **11/29/2026** | **12/6/2026** | **12/13/2026** | **12/20/2026** | **12/27/2026** | **1/3/2027** |
| Forecast Week | | **8** | **9** | **10** | **11** | **12** | **13** |
| Month | 10 | 11 | 11 | 12 | 12 | 12 | 12 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 |
| Operating Receipts | | | | | | | |
| LPIP-B | $ 4,713,458 | $ 377,410 | $ 377,410 | $ 293,470 | $ 293,470 | $ 293,470 | $ 293,470 |
| DTC | 1,455,491 | 103,872 | 103,872 | 100,850 | 100,850 | 100,850 | 100,850 |
| RICC | 2,161,333 | 171,368 | 171,368 | 171,064 | 171,064 | 171,064 | 171,064 |
| APIP-C | 1,623,214 | 118,152 | 118,152 | 119,437 | 119,437 | 119,437 | 119,437 |
| **Total Operating Receipts** | **$ 9,953,496** | **$ 770,802** | **$ 770,802** | **$ 684,821** | **$ 684,821** | **$ 684,821** | **$ 684,821** |
| Hotel Labor Disbursements | | | | | | | |
| LPIP-B | $ (1,430,163) | $ - | $ (214,301) | $ - | $ (202,740) | $ - | $ (202,740) |
| DTC | (501,916) | - | (74,696) | - | (72,653) | - | (72,653) |
| RICC | (389,706) | - | (56,747) | - | (56,431) | - | (56,431) |
| APIP-C | (391,360) | - | (56,332) | - | (58,872) | - | (58,872) |
| **Total Hotel Labor Disbursements** | **$ (2,713,145)** | **$ -** | **$ (402,076)** | **$ -** | **$ (390,697)** | **$ -** | **$ (390,697)** |
| Hotel Operating Disbursements | | | | | | | |
| LPIP-B | $ (523,651) | $ - | $ (175,468) | $ - | $ - | $ - | $ (168,838) |
| DTC | (133,921) | - | (40,908) | - | - | - | (39,576) |
| RICC | (220,307) | - | (74,018) | - | - | - | (74,199) |
| APIP-C | (152,373) | - | (47,307) | - | - | - | (52,643) |
| **Total Hotel Operating Disbursements** | **$ (1,030,252)** | **$ -** | **$ (337,700)** | **$ -** | **$ -** | **$ -** | **$ (335,257)** |
| Overhead Operating Disbursements | | | | | | | |
| LPIP-B | $ (1,437,919) | $ - | $ (496,108) | $ - | $ - | $ - | $ (423,730) |
| DTC | (372,274) | - | (115,908) | - | - | - | (118,405) |
| RICC | (446,444) | - | (148,490) | - | - | - | (153,518) |
| APIP-C | (404,598) | - | (126,444) | - | - | - | (130,949) |
| **Total Overhead Operating Disbursements** | **$ (2,661,234)** | **$ -** | **$ (886,950)** | **$ -** | **$ -** | **$ -** | **$ (826,602)** |
| Management Fee Disbursements | | | | | | | |
| LPIP-B | $ (142,401) | $ - | $ (48,524) | $ - | $ - | $ - | $ (38,990) |
| DTC | (44,448) | - | (13,355) | - | - | - | (13,399) |
| RICC | (65,361) | - | (22,033) | - | - | - | (22,727) |
| APIP-C | (49,483) | - | (15,191) | - | - | - | (15,868) |
| **Total Management Fee Disbursements** | **$ (301,693)** | **$ -** | **$ (99,103)** | **$ -** | **$ -** | **$ -** | **$ (90,983)** |

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **11/23/2026** | **11/30/2026** | **12/7/2026** | **12/14/2026** | **12/21/2026** | **12/28/2026** |
| **Week End Date >>** | **1/3/2027** | **11/29/2026** | **12/6/2026** | **12/13/2026** | **12/20/2026** | **12/27/2026** | **1/3/2027** |
| Forecast Week | | **8** | **9** | **10** | **11** | **12** | **13** |
| Month | 10 | 11 | 11 | 12 | 12 | 12 | 12 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 |
| Non-Operating Disbursements | | | | | | | |
| LPIP-B | $ (11,646) | $ - | $ (3,882) | $ - | $ - | $ - | $ (3,882) |
| DTC | (37,884) | - | (12,628) | - | - | - | (12,628) |
| RICC | (4,854) | - | (1,618) | - | - | - | (1,618) |
| APIP-C | (2,026) | - | (673) | - | - | - | (673) |
| **Total Non-Operating Disbursements** | **$ (56,410)** | **$ -** | **$ (18,801)** | **$ -** | **$ -** | **$ -** | **$ (18,801)** |
| Insurance Disbursements | | | | | | | |
| LPIP-B | $ (469,681) | $ - | $ (117,420) | $ - | $ - | $ - | $ (117,420) |
| DTC | (13,573) | - | (3,393) | - | - | - | (3,393) |
| RICC | (119,520) | - | (29,880) | - | - | - | (29,880) |
| APIP-C | (4,697) | - | (1,174) | - | - | - | (1,174) |
| **Total Insurance Disbursements** | **$ (607,472)** | **$ -** | **$ (151,868)** | **$ -** | **$ -** | **$ -** | **$ (151,868)** |
| RET Disbursements / Escrow Release | | | | | | | |
| LPIP-B | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DTC | (20,324) | - | - | - | - | - | (20,324) |
| RICC | - | - | - | - | - | - | - |
| APIP-C | - | - | - | - | - | - | - |
| **Total RET Disbursements / Escrow Release** | **$ (20,324)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (20,324)** |
| CapEx Funding[1] | | | | | | | |
| LPIP-B | $ (100,000) | $ (25,000) | $ - | $ - | $ - | $ - | $ - |
| DTC | - | - | - | - | - | - | - |
| RICC | - | - | - | - | - | - | - |
| APIP-C | - | - | - | - | - | - | - |
| **Total CapEx Funding** | **$ (100,000)** | **$ (25,000)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** |
| Board Fee Reimbursements | | | | | | | |
| LPIP-B | $ (53,906) | $ - | $ (17,969) | $ - | $ - | $ - | $ (17,969) |
| DTC | (10,781) | - | (3,594) | - | - | - | (3,594) |
| RICC | (10,781) | - | (3,594) | - | - | - | (3,594) |
| APIP-C | (10,781) | - | (3,594) | - | - | - | (3,594) |
| **Total Board Fee Reimbursements** | **$ (86,250)** | **$ -** | **$ (28,750)** | **$ -** | **$ -** | **$ -** | **$ (28,750)** |
| **Property Net Disbursements** | **$ 2,376,716** | **$ 745,802** | **$ (1,154,447)** | **$ 684,821** | **$ 294,124** | **$ 684,821** | **$ (1,178,461)** |

*Notes:*
*1. Assumes Debtors can use property condition reports prepared by special servicers.*

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **11/23/2026** | **11/30/2026** | **12/7/2026** | **12/14/2026** | **12/21/2026** | **12/28/2026** |
| **Week End Date >>** | **1/3/2027** | **11/29/2026** | **12/6/2026** | **12/13/2026** | **12/20/2026** | **12/27/2026** | **1/3/2027** |
| Forecast Week | | **8** | **9** | **10** | **11** | **12** | **13** |
| Month | 10 | 11 | 11 | 12 | 12 | 12 | 12 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 |
| Net Sale Price | | | | | | | |
| LPIP-B | $ 48,020,000 | $ - | $ - | $ - | $ - | $ - | $ 48,020,000 |
| DTC | 18,130,000 | - | - | - | - | - | 18,130,000 |
| RICC | - | - | - | - | - | - | - |
| APIP-C | 15,680,000 | - | - | - | - | - | 15,680,000 |
| **Total Net Sale Price** | **$ 81,830,000** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 81,830,000** |
| Debt Service | | | | | | | |
| LPIP-B | $ (45,619,000) | $ - | $ - | $ - | $ - | $ - | $ (45,619,000) |
| DTC | (17,223,500) | - | - | - | - | - | (17,223,500) |
| RICC | - | - | - | - | - | - | - |
| APIP-C | (14,896,000) | - | - | - | - | - | (14,896,000) |
| **Total Debt Service** | **$ (77,738,500)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (77,738,500)** |
| Restructuring Activity | | | | | | | |
| LPIP-B | $ (417,896) | $ - | $ - | $ - | $ - | $ - | $ (191,422) |
| DTC | (221,210) | - | - | - | - | - | (151,822) |
| RICC | (86,929) | - | - | - | - | - | 1,897 |
| APIP-C | - | - | - | - | - | - | - |
| **Total Restructuring Activity** | **$ (726,035)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (341,347)** |
| **Total Property Cash Activity** | **$ 5,742,182** | **$ 745,802** | **$ (1,154,447)** | **$ 684,821** | **$ 294,124** | **$ 684,821** | **$ 2,571,692** |

**American Hospitality Properties**
**13-Week Cash Flow**
**Confidential**
**Consolidated**

| | Total Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast | Weekly Forecast |
|---|---|---|---|---|---|---|---|
| **Week Start Date >>** | **10/5/2026** | **11/23/2026** | **11/30/2026** | **12/7/2026** | **12/14/2026** | **12/21/2026** | **12/28/2026** |
| **Week End Date >>** | **1/3/2027** | **11/29/2026** | **12/6/2026** | **12/13/2026** | **12/20/2026** | **12/27/2026** | **1/3/2027** |
| Forecast Week | | **8** | **9** | **10** | **11** | **12** | **13** |
| Month | 10 | 11 | 11 | 12 | 12 | 12 | 12 |
| Quarter | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Year | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 | 2026 |
| Number of Days in Period | 91 | 7 | 7 | 7 | 7 | 7 | 7 |
| REIT Disbursements | | | | | | | |
| Professional Fee Escrow Funding – REIT I | $ (4,838,420) | (117,500) | (117,500) | (117,500) | (117,500) | (117,500) | (3,428,420) |
| Professional Fee Escrow Funding – REIT II | (1,352,664) | (17,500) | (17,500) | (17,500) | (17,500) | (17,500) | (1,142,664) |
| Professional Fee Escrow Release – REIT I | 953,776 | - | - | - | - | - | 953,776 |
| Professional Fee Escrow Release – REIT II | 301,492 | - | - | - | - | - | 301,492 |
| REIT Expenses – REIT I | (302,603) | - | (14,557) | - | - | - | (273,307) |
| REIT Expenses – REIT II | (130,103) | - | (14,557) | - | - | - | (100,807) |
| Board Fee Reimbursement From Silos - REIT I | 43,125 | - | 14,375 | - | - | - | 14,375 |
| Board Fee Reimbursement From Silos - REIT II | 43,125 | - | 14,375 | - | - | - | 14,375 |
| **Total REIT Disbursements** | **$ (5,282,271)** | **$ (135,000)** | **$ (135,364)** | **$ (135,000)** | **$ (135,000)** | **$ (135,000)** | **$ (3,661,180)** |
| **Total Consolidated Cash Activity** | **$ 459,911** | **$ 610,802** | **$ (1,289,810)** | **$ 549,821** | **$ 159,124** | **$ 549,821** | **$ (1,089,488)** |
| **Cash Balance** | | | | | | | |
| Beginning | $ 453,666 | $ 1,423,307 | $ 2,034,109 | $ 744,298 | $ 1,294,119 | $ 1,453,243 | $ 2,003,064 |
| Cash Activity | 459,911 | 610,802 | (1,289,810) | 549,821 | 159,124 | 549,821 | (1,089,488) |
| **Ending Balance** | **$ 913,576** | **$ 2,034,109** | **$ 744,298** | **$ 1,294,119** | **$ 1,453,243** | **$ 2,003,064** | **$ 913,576** |
| **Professional Fee and UST Fee Escrow** | | | | | | | |
| Beginning | $ - | $ 405,000 | $ 540,000 | $ (0) | $ 135,000 | $ 270,000 | $ 405,000 |
| Funding | 6,191,084 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 4,571,084 |
| Escrow Disbursement | (4,935,816) | - | (675,000) | - | - | - | (3,720,816) |
| Escrow Release to REITs | (1,255,268) | - | - | - | - | - | (1,255,268) |
| **Ending Balance** | **$ -** | **$ 540,000** | **$ (0)** | **$ 135,000** | **$ 270,000** | **$ 405,000** | **$ -** |

# EXHIBIT B

**Redline**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 26-80071 (SGJ)** |
| | § | |
| **AMERICAN HOSPITALITY PROPERTIES REIT, INC., *et al.*,** | § | **(Chapter 11)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | **Re: Dkt. ~~No~~Nos. 45 & 60** |

**~~FIRST~~SECOND INTERIM ORDER**
**(I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,**
**(II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A**
**FINAL HEARING ON THE MOTION AND (IV) GRANTING RELATED RELIEF**

Upon the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing on the Motion, and (IV) Granting Related Relief* (the "***Cash Collateral Motion***")[2] filed by the above-captioned debtors and debtors in possession (the "***Debtors***"), including Debtors AHP

---

[1] The Debtors in these Chapter 11 Cases (as defined herein) and the last four digits of their respective federal tax identification numbers (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://omniagentsolutions.com/AHPREIT. The location of the Debtors' corporate headquarters is: 14643 Dallas Parkway, Suite 970, Dallas, Texas 75254.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Cash Collateral Motion.

LP7 Fayetteville, LLC; AHP LP7 Bentonville, LLC; AHP LP7 Jonesboro, LLC; AHP LP7 CY Baton Rouge, LLC; AHP LP7 RI Baton Rouge, LLC; AHP LP7 Metairie, LLC; AHP LP7 Ft Myers, LLC (collectively, the "***AHP Debtors***") and PAH Charlotte LLC (the "***PAH Debtor***"), for entry of this second interim order (this "***Second Interim Order***"); and the Court having entered an interim order granting the relief requested in the Cash Collateral Motion on an interim basis [Docket No. 60] (the "***Interim Order***"); and ~~upon the~~a hearing on the Cash Collateral Motion having been held before this Court on October 29, 2026 (the "***Second Interim Hearing***"); and due and sufficient notice of the Second Interim Hearing and the relief requested in the Cash Collateral Motion having been given; and all objections, if any, to the entry of this Second Interim Order having been withdrawn, resolved, or overruled on an interim basis; and upon the record of the Second Interim Hearing and all proceedings held before this Court, and good and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS:**

A. On October 4, 2026 (the "***Petition Date***"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are now operating their businesses and managing their properties as debtors in possession pursuant to § 1107(a) of title 11 of the United States Code (the "***Bankruptcy Code***").[3] No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed. By order entered October 5, 2026 [Docket~~-~~ No. 15], the Debtors' chapter 11 cases are being jointly administered for procedural purposes only under Case No. 26-80071 (SGJ).

[3] Unless otherwise noted, section (§) references are to the Bankruptcy Code.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and the Cash Collateral Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. As supported by the *Amended Declaration of Alan Tantleff in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 20] (, the "***First Day Declaration***")*Declaration of Alan Tantleff in Support of Additional First Day Motions* [Docket No. 53], and the *Declaration of Alan Tantleff in Support of (I) Final Relief Requested in the Debtors' Additional First Day Motions; and (II) Supplemental First Day Motions* [Docket No. 111], an immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their businesses. Without such funds, the Debtors will not be able to pay their direct operating expenses, including wages, salaries, benefits, and other compensation owed to employees and directors (subject to payments to directors being approved at the Final Hearing), and premiums and other amounts due under the Debtors' insurance policies, and obtain goods and services needed to carry on their businesses during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates. At this time, theThe Debtors' ability to use Cash Collateral is vital to the confidence of the Debtors' employees, guests, vendors, and suppliers of goods and services, to the continuation of the insurance coverage required to protect the Properties (as defined below) and the Debtors' estates, and to the preservation and maintenance of the going concern value of the Debtors' estates.

D. The AHP Debtors respectively own the following properties (the "***AHP Properties***"):

| Debtor | Property |
|---|---|
| AHP LP7 Fayetteville, LLC | TownePlace Suites Fayetteville |
| AHP LP7 Bentonville, LLC | aloft Rogers Bentonville |
| AHP LP7 Jonesboro, LLC | Fairfield Inn & Suites Jonesboro |
| AHP LP7 CY Baton Rouge, LLC | Courtyard Baton Rouge Siegen Lane |

| Debtor | Property |
|---|---|
| AHP LP7 RI Baton Rouge, LLC | Residence Inn Baton Rouge Siegen Lane |
| AHP LP7 Metairie, LLC | TownePlace Suites New Orleans Metairie |
| AHP LP7 Ft Myers, LLC | Hampton Inn & Suites Ft. Myers Beach |

The AHP Lender (as defined below) asserts that each of the AHP Properties is encumbered by a *Mortgage, Assignment of Leases and Rents and Security Agreement* to secure repayment of two promissory notes, issued in the amounts of $25,000,000 and $40,000,000 (the "***AHP Loans***"), upon the terms set forth in the promissory notes and the accompanying loan agreement, mortgages, and other loan and security documents (collectively, "***AHP Loan Documents***"). The AHP Lender further asserts that each AHP Debtor is jointly and severally liable for the entire amount of each AHP Loan, and that each AHP Property secures repayment of each of the AHP Loans in their entirety. The AHP Lender asserts that the AHP Loans are held by Wilmington Trust, National Association, as Trustee, for the benefit of the Holders of Deutsche Mortgage & Asset Receiving Corporation, CD 2017-CD6 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-CD6 (the "***AHP Lender***").

E. In addition, the PAH Debtor owns the property known as the Doubletree Charlotte Airport (the "***PAH Property***" and, with the AHP Properties, the "***Properties***"). The PAH Lender (as defined below) asserts that the PAH Property is encumbered by a *Mortgage, Assignment of Leases and Rents and Security Agreement* to secure repayment of a promissory note in the amount of $18,150,000 (the "***PAH Loan***" and, with the AHP Loans, the "***Loans***"), upon the terms set forth in the promissory note and the accompanying loan agreement, mortgages, and other loan and security documents (collectively, "***PAH Loan Documents***" and, with the AHP Loan Documents, the "***Loan Documents***"). The PAH Lender asserts that the PAH Loan is held by Wells Fargo

Bank, National Association, as Trustee, for the benefit of the registered holders of UBS Commercial Mortgage Trust 2018-C11, Commercial Mortgage Pass-Through Certificates, Series 2018-C11 (the "***PAH Lender***" and, with the AHP Lender, the "***Secured Lenders***").

F. Argentic Investment Management, LLC, acting as special servicer for Argentic Services Company LP (as successor-in-interest to LNR Partners LLC), acting as Special Servicer for each of the Secured Lenders (the "***Special Servicer***") asserts that the respective Debtors' obligations under the AHP Loans and the PAH Loan are secured by valid, binding, and enforceable liens on and security interests in substantially all of the applicable AHP Debtors' and PAH Debtor's assets, including the Properties and all Gross Revenue, Rents, room revenues, accounts, accounts receivable, deposit accounts, the Clearing Account, the Deposit Account (each as defined in the applicable Loan Documents), and all reserve and other cash management accounts (as described in the applicable Loan Documents), and the proceeds thereof (the "***Prepetition Collateral***"), and further asserts that all cash and cash equivalents of the AHP Debtors and the PAH Debtor, wherever held, constitute "cash collateral" of the respective Secured Lenders within the meaning of section 363(a) of the Bankruptcy Code. As used in this Order, "***Cash Collateral***" means any cash and cash equivalents of the Debtors, to the extent such cash and cash equivalents constitute "cash collateral" of the Secured Lenders or other parties within the meaning of section 363(a) of the Bankruptcy Code. The Special Servicer further asserts that, under Section 6.1 of the applicable loan agreement included in the Loan Documents, Gross Revenue received by the AHP Debtors or the PAH Debtor or their manager is deemed collateral for the respective Loans, held in trust for the benefit of the respective Secured Lenders, and may not be commingled with other funds. The Debtors have not stipulated to, and this Order does not determine, the validity, extent, perfection, priority, or enforceability of any lien, claim, or security interest asserted in the

Prepetition Collateral, the Cash Collateral, or whether any particular account or funds constitute Cash Collateral.

G. The Debtors have requested immediate entry of this Order pursuant toNotice of the Cash Collateral Motion, the Interim Order, and the Second Interim Hearing was provided in accordance with the Interim Order, Rule 4001(b)(2) and (c)(2d) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and the N.D. Tex. L.B.R., and such notice was good, adequate, and sufficient under the circumstances, and no other or further notice is required for entry of this Second Interim Order. The authority granted herein to allow the Debtors to obtain the use of Cash Collateral on an interim basis pending the Final Hearing (as defined below) is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Second Interim Order is in the Debtors' best interest ofinterests of the Debtors, their estates, and their creditors, as its implementation will, among other things, allow the Debtors to continue operations duringpending the pendency of these casesFinal Hearing.

**THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** as follows:

1. The Cash Collateral Motion is **GRANTED** on a interim basis as set forth herein, pending the Final Hearing. Except as modified herein, the findings contained in this Second Interim Order are adopted herein as if fully restated herein.

2. Authorization to Use Cash Collateral. The Debtors are hereby authorized, on an interim basis pending the Final Hearing, subject to the protections and consideration described in this Order, to use Cash Collateral on an interim basis only in the amounts and only for the purposes specified in the Budget attached hereto as Exhibit A and incorporated herein (as the same may be amended or modified with the express prior written consent of the applicable Secured Lender, the "***Budget***") and shall not, except to the extent permitted in the following sentence, exceed the

aggregate amount of the total cash outflows shown on the Budget. Except as otherwise agreed to in writing by the Special Servicer, the Debtors shall not permit Cash Collateral of the Special Servicer with respect to the AHP Debtors or the PAH Debtor to be used such that: (i) the cumulative total for any individual line item for the AHP Debtors or the PAH Debtor to exceed the projected disbursements for such line item for the AHP Debtors and the PAH Debtor by a variance greater than ten percent (10%) from the amounts set forth in the Budget, and (ii) the cumulative total for all actual disbursements made for the AHP Debtors and the PAH Debtors to exceed the cumulative total for all projected disbursements by a variance of greater than five percent (5%) from the amounts set forth in the Budget for the AHP Debtors and the PAH Debtors (together, the "***Permitted Variances***"). Without limiting the foregoing, the purposes for which Cash Collateral may be used in accordance with the Budget (subject to the Permitted Variances) include (i) the payment of ~~wages, salaries, benefits, payroll taxes, and other compensation of employees who staff and operate the Properties~~payroll, working capital, general corporate purposes, and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases and related proceedings, (ii) the payment ~~of premiums and other amounts due under the Debtors' insurance policies, (iii) the payment of goods and services needed to carry on their businesses, (iv) the payment~~ of fees owed to members of the Debtors' boards of directors ~~(subject to payments to directors being approved at the Final Hearing)~~, and (~~v~~iii) the funding of the Carve-Out Reserves and the Professional Fee Reserve Account in accordance with ~~paragraph~~paragraphs 8 and 9, respectively, of this Second Interim Order. Notwithstanding the foregoing, the Debtors are authorized to use Cash Collateral to pay any fees owed to the Office of the United States Trustee without regard to any amount set forth in the Budget.

3. Replacement Liens. As adequate protection for, but only to the extent of any actual diminution in the value of the interest of the respective Secured Lenders as of the Petition Date in their respective collateral resulting from the use of Cash Collateral pursuant to 11 U.S.C. § 363(c), the imposition of the automatic stay under 11 U.S.C. § 362(a), or otherwise, the Secured Lenders are hereby granted valid, perfected liens and enforceable postpetition replacement liens and security interests (the "***Replacement Liens***"), in each case, subject and subordinate to the Carve-Out (as defined below), the Professional Fee Reserve Account, and any Prior Senior Liens (as defined below), in all property, whether acquired before or after the Petition Date, of either (i) the AHP Debtors or (ii) the PAH Debtor, who benefited from the use of such Cash Collateral; *provided*, *however*, that such Replacement Liens shall not encumber causes of action held by the Debtors' estates under §§ 544, 545, 547, 548, 549, 550, 551, 552, 553, or 558 (or otherwise arising principally under the Bankruptcy Code), or the proceeds thereof; *provided*, *further*, that the Replacement Liens shall secure only the amount of such actual diminution and shall not secure any other claim, damages, or amounts. "***Prior Senior Liens***" means (a) valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or (b) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and the proceeds, products, rents, and profits thereof, whether arising under section 552(b) of the Bankruptcy Code or otherwise.

4. Automatic Perfection. The adequate protection liens granted herein are valid, enforceable and perfected liens, effective as of the Petition Date, and (notwithstanding any provisions of any agreement, lease, instrument, document, the Uniform Commercial Code or any other relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be

required to effect such perfection. The Debtors and the Secured Lenders are hereby authorized, but not required, to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction or take any other action to validate and perfect the liens and security interests granted hereunder. A certified copy of this Second Interim Order may, in the discretion of each Secured Lender, be filed with or recorded in any filing or recording office in addition to or in lieu of such financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), and all filing offices are hereby authorized and directed to accept such certified copy of this Second Interim Order for filing and recording.

5. Taxing Authorities. Nothing herein shall be construed to prime the liens of any taxing authority.

6. Section 507(b) Claim. As further adequate protection, each Secured Lender is hereby granted pursuant to § 507(b) an allowed superpriority claim solely against either (i) the AHP Debtors or (ii) the PAH Debtor, that benefited from the use of Cash Collateral, and not against any other Debtor, in an amount not to exceed such actual diminution (the "***Section 507(b) Claim***") if and to the extent the Replacement Liens are insufficient to provide adequate protection against the actual diminution, if any, in value of such Secured Lender's interest in any collateral resulting from the use of Cash Collateral. The priority of the Section 507(b) Claim shall be senior in priority of payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, except fees owed to the Office of the United States Trustee ~~and~~, the Carve-Out, and the Professional Fee Reserve Account; *provided*, *however*, that the Section

507(b) Claim shall be subject and subordinate only to the Carve-Out and the Professional Fee Reserve Account.

7. Carve-Out. Notwithstanding anything to the contrary in this Second Interim Order, the Prepetition Collateral, the liens and security interests of the Secured Lenders under the AHP Loan Documents and the PAH Loan Documents, the Replacement Liens, and the Section 507(b) Claim shall each be subject and subordinate to the payment of the Carve-Out. As used in this Second Interim Order, the "***Carve-Out***" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under § 726(b) (without regard to the Carve-Out Trigger Notice); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "***Debtor Professionals***") including counsel, financial advisors, investment bankers, and claims and noticing agents, at any time before or on the first business day following delivery by the Special Servicer of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the "***Pre-Trigger Amount***"); and (iv) Allowed Professional Fees of any official committee appointed in these chapter 11 cases (a "***Committee***") pursuant to §§ 328 and 1103 of the Bankruptcy Code up to a maximum of $25,000 (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Professional Persons***"), including counsel and one financial advisor; and (v) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $100,000 incurred after the first business day following delivery by the Special Servicer of the Carve-Out Trigger

Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amount set forth in this clause (v), the "***Post-Trigger Amount***").

8. Carve-Out Trigger Notice; Carve-Out Reserves. For purposes of this Second Interim Order, "***Carve-Out Trigger Notice***" means a written notice delivered by email (or other electronic means) by Special Servicer to the Debtors, their lead restructuring counsel, the Office of the United States Trustee, and counsel to any Committee, which notice may be delivered only following the occurrence and during the continuation of an Event of Default or a Termination Event (each as defined below), stating that the Post-Trigger Amount has been invoked. On the day on which a Carve-Out Trigger Notice is delivered (the "***Termination Declaration Date***"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available Cash Collateral to fund (i) a reserve in an amount equal to the then-unpaid amounts of the Allowed Professional Fees of Debtor Professionals incurred through the Termination Declaration Date, not to exceed the Pre-Trigger Amount (the "***Pre-Carve-Out Trigger Notice Reserve***"), and (ii) a reserve in an amount equal to the Post-Trigger Amount (the "***Post-Carve-Out Trigger Notice Reserve***" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "***Carve-Out Reserves***"), in each case prior to any and all other claims. The Debtors shall deposit and hold the Carve-Out Reserves in ~~a segregated account~~the Professional Fee Reserve Account (as defined below) in trust exclusively to pay such Allowed Professional Fees in accordance with the terms of paragraph 9. Notwithstanding the occurrence of a Termination Event, the Debtors shall be authorized to use Cash Collateral to fund the Carve-Out Reserves, and the Secured Lenders shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Reserves. Any amounts remaining in the Pre-Carve-Out Trigger Notice Reserve after payment in full of all obligations described therein shall be applied to fund the Post-Carve-Out

Trigger Notice Reserve, and any amounts remaining in the Post-Carve-Out Trigger Notice Reserve after payment in full of all obligations described therein shall be distributed to the applicable Secured Lenders in accordance with their respective rights and priorities as of the Termination Declaration Date.

9. Professional Fee Reserve Account. Upon entry of this Second Interim Order, and notwithstanding any other provision of this Second Interim Order or any provision of the Loan Documents, the Debtors are authorized and directed to fund an escrow account for the sole purpose of reserving for and paying unpaid Allowed Professional Fees (the "***Professional Fee Reserve Account***"). The Professional Fee Reserve Account shall be held for the benefit of Professional Persons and shall not be property of the Debtors' estates or subject to the control, lien, security interest, or claims of the Special Servicer, the Secured Lenders, or any other creditor. Upon entry of this Second Interim Order, the Debtors shall fund the Professional Fee Reserve Account in an amount equal to the aggregate fees and expenses of the Professional Persons set forth in the Budget (the "***Budgeted Professional Fees***") for the period beginning on the Petition Date through the end of the week in which this Second Interim Order is entered, to the extent not previously paid. Thereafter, on the first business day of each week commencing with the first full calendar week following entry of this Second Interim Order, the Debtors shall transfer to the Professional Fee Reserve Account cash, including Cash Collateral, in an amount equal to the Budgeted Professional Fees for such week (including, in the event of the closing of any sale, restructuring, financing, or other transaction upon which one or more success or transaction fees is earned by any Professional Person, any amount equal to the sum of all such fees, to the extent such fees are not paid to the Professional Person upon such closing).

10. ~~9.~~ Cash Collateral Accounts. All cash of the AHP Debtors and the PAH Debtor and all Gross Revenue and other collections of such Debtors after the Petition Date shall continue to be deposited into the Debtors' account ending 1566 for AHP Debtors and Debtors' account ending 5802 for PAH Debtor or shall otherwise be deposited in separate debtor in possession accounts maintained solely for such Debtors (the "***Cash Management Accounts***"), and shall not be commingled with the cash or receipts of any other Debtor or non-debtor except as expressly permitted by this Second Interim Order. Nothing herein shall constitute a determination or admission that any Cash Management Account, or any funds deposited therein, constitutes Cash Collateral or is subject to any valid lien or security interest.

11. ~~10.~~ Limitation on Use of Cash Collateral. Notwithstanding any other provision of this Second Interim Order or any other order entered by the Court, no Cash Collateral and no portion of the Carve-Out or the Carve-Out Reserves may be used in connection with (a) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Special Servicer or the Secured Lenders, or (b) attempts to seek to modify any of the rights and remedies granted to the Special Servicer or the Secured Lenders under this Second Interim Order, other than in accordance with this Second Interim Order; *provided*, *however*, that nothing in this paragraph shall restrict the Debtors from contesting whether an Event of Default or a Termination Event has occurred or from seeking to enforce the terms of this Second Interim Order.

12. ~~11.~~ Insurance. During the pendency of this Order, the Debtors will cause to be paid from available Cash Collateral insurance on the Properties consistent with their prepetition practice.

13. 12. Reporting. Starting on October 20, 2026, and continuing on a bi-weekly basis thereafter, the Debtors shall deliver to the Special Servicer and Spirit Realty, LP ("***Spirit Realty***") a detailed report of actual receipts and expenditures for the immediately preceding calendar week as compared to the corresponding amounts and line items set forth in the Budget, together with an explanation of any variances above the projected amounts set forth in the Budget and the Permitted Variances. Except as otherwise agreed by the Special Servicer or a Secured Lender, the Debtors shall not be permitted to make any disbursement except for the purposes, and in the amounts, expressly authorized in this Interim Order and in the Budget.

14. 13. Information Rights. The Debtors shall, within three (3) business days after receipt of any written request, promptly provide:

(a) to Special Servicer or a Secured Lender all other financial information reasonably requested by Special Servicer or a Secured Lender or their counsel, including copies of any STR reports, hotel management reports, and franchisor correspondence relating to the Properties, and all information that is required to be provided by the Debtors to the Secured Lenders under the Loan Documents; and

(b) to Spirit Realty all other financial information requested by Spirit Realty or their counsel including copies of any STR reports, hotel management reports, and franchisor correspondence relating to the Cape Canaveral Property[4] and applicable Debtors and all information that is required to be provided by the Debtors to Spirit Realty under the Lease.[5]

15. 14. Inspections. During the pendency of this Second Interim Order, the Debtors shall reasonably cooperate with Special Servicer and the Secured Lenders and their agents in all inspections of the Properties whether to review their condition or for appraisal purposes. At all

[4] The "***Cape Canaveral Property***" shall mean the Residence Inn by Marriott Cape Canaveral Cocoa Beach.

[5] The "***Lease***" shall mean the Lease Agreement (as amended and assigned), dated March 28, 2019, between Spirit Realty, as Landlord, and AHP Master Lease, LLC, as original tenant.

times, Special Servicer and its agents shall be entitled, upon reasonable notice, to inspect the Properties and review the Debtors' books and records during reasonable business hours.

16. ~~15.~~ No Priming. Except as otherwise provided herein, no claim or lien having a priority superior to or *pari passu* with those granted to any Secured Lender by this Order shall be granted or allowed absent further order of the Court or the express written consent of such Secured Lender.

17. ~~16.~~ Survival. Except as expressly provided in this Second Interim Order, and notwithstanding the occurrence of a Termination Event (hereinafter defined) or the termination otherwise of the Debtors' authority to use Cash Collateral, the ~~Carve Out~~Carve-Out, the Professional Fee Reserve Account, the adequate protection and all other rights and remedies of the Secured Lenders and the Debtors granted by the provisions of this Second Interim Order shall survive, and shall not be modified, impaired or discharged by the entry of an order converting any of these chapter 11 cases to a case under chapter 7, dismissing any of these chapter 11 cases, appointing a chapter 7 or chapter 11 trustee or by any other act or omission, nor shall the ~~Carve Out~~Carve-Out, the Professional Fee Reserve Account, the adequate protection, or any of the other rights and remedies of the Secured Lenders or the Debtors granted by the provisions of this Second Interim Order be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in these chapter 11 cases. If an order converting or dismissing any of these chapter 11 cases is at any time entered, such order shall provide that (i) the ~~Carve Out~~Carve-Out and the Professional Fee Reserve Account shall continue in full force and effect and shall maintain their priorities as provided in this Second Interim Order, (ii) the adequate protection granted to the Secured Lenders pursuant to this Second Interim Order, including the Replacement Liens and the Section 507(b) Claim, shall continue in full force and effect and shall maintain their priorities as

provided in this Second Interim Order until any and all adequate protection obligations shall have been paid and satisfied in full notwithstanding such dismissal, and any court of competent jurisdiction may enforce the claims, liens and security interests or replacement security interests.

18. ~~17.~~ Effect of Modification. If any or all of the provisions of this Second Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (a) the ~~Carve Out~~Carve-Out and the Professional Fee Reserve Account, (b) the validity of any adequate protection obligations incurred prior to the actual receipt of written notice by the Secured Lenders of the effective date of such reversal, stay, modification or vacation or (c) the validity or enforceability of any security interest, lien or priority authorized or created hereby or pursuant to this Second Interim Order with respect to any adequate protection obligations. Notwithstanding any such reversal, stay, modification or vacation, any adequate protection obligations incurred by the Debtors to the Secured Lenders prior to the actual receipt of written notice by the Secured Lenders of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the provisions of this Second Interim Order.

19. ~~18.~~ Termination Events. The use of Cash Collateral under this Second Interim Order shall terminate upon notice from the applicable Secured Lender to the Debtors of the earliest to occur of: (i) conversion to chapter 7 or dismissal of any Debtor's case; (ii) the appointment of a trustee or an examiner with expanded powers in any Debtor's case; (iii) the entry of any order granting any party other than a Secured Lender a lien on or security interest senior or equal in right of priority to any lien or security interest of such Secured Lender in any property of the AHP Debtors' or PAH Debtor's estates without the express prior written consent of the applicable Secured Lender, including any order approving debtor in possession financing secured by any of the Properties or other Prepetition Collateral; (iv) the entry of any order modifying, reversing,

revoking, staying, rescinding, vacating or amending this Second Interim Order without the express prior written consent of the applicable Secured Lender, which consent shall not be implied from any action, inaction, course of conduct or acquiescence by the Special Servicer or a Secured Lender; (v) the entry of any order granting any party other than the Special Servicer or a Secured Lender relief from the automatic stay to the extent it affects the liens on the Properties or other collateral; (vi) the rejection of, or termination of the automatic stay with regard to, any franchise agreement for any Property; (vii) occurrence of any Event of Default by the Debtors under the terms of this Second Interim Order which remains uncured five (5) business days after the receipt of written notice from Special Servicer or a Secured Lender; and (viii) the ~~expiration of thirty (30) days after entry of this Interim Order unless extended by agreement with~~effective date of a confirmed chapter 11 plan in the applicable Debtor's case, unless otherwise agreed by the applicable Secured Lender (any of the foregoing, a "***Termination Event***").

20. ~~19.~~ Events of Default. The occurrence of any one or more of the following events shall constitute an "***Event of Default***" hereunder: (i) the Debtors fail to timely and punctually perform any of their obligations in strict accordance with the terms hereof or otherwise defaults hereunder or breaches any provision hereof, including (a) the use and expense of disbursement of Cash Collateral except as expressly permitted hereunder and in the Budget; (b) the failure to provide any report, document, or information to Special Servicer or a Secured Lender as required hereby; (ii) any person or entity obtains an order permitting the use of Cash Collateral without the Special Servicer's or the applicable Secured Lender's written consent in its sole discretion; or (iii) the Replacement Liens granted to the Secured Lenders pursuant to this Second Interim Order cease to be valid and perfected liens having the priority provided in this Second Interim Order, save and except tax liens that may prime such liens.

21. ~~20.~~ Reservation of Rights. The grant of adequate protection to the Secured Lenders is without prejudice to (i) Special Servicer's or the Secured Lenders' right to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and (ii) the right of any other party in interest to contest any such modification. Nothing contained in this Second Interim Order shall be deemed or construed to be an admission that any Secured Lender is adequately protected. Nothing contained in this Second Interim Order shall be deemed or construed to be an admission or finding by the Debtors or the Court as to the amount, validity, extent, perfection, priority, or enforceability of any claim, lien, or security interest asserted by any Secured Lender or any other party, or as to whether any account, cash, or other property constitutes Cash Collateral, and the Debtors and all other parties in interest reserve all rights to challenge the same. Moreover, except as otherwise expressly set forth in this Second Interim Order, nothing contained herein shall be construed to limit in any way any right by any Secured Lender, including the right to seek relief from the automatic stay, to object to any proposed debtor in possession financing, to seek any other relief in these cases or any related adversary proceeding not directly inconsistent with this Second Interim Order, or to assert any rights under any guaranty against a non-Debtor, including any guaranty against Phoenix American Hospitality, LLC, and W.L. Nelson, and any rights against any non-Debtor entity, all of which are expressly reserved.

22. ~~21.~~ Binding Effect. The provisions of this Second Interim Order shall be binding upon and inure to the benefit of the Special Servicer, the Secured Lenders, and the Debtors. However, nothing herein shall prevent any Secured Lender from seeking any form of relief under the Bankruptcy Code.

23. Objections Overruled. All objections to the entry of this Second Interim Order, to the extent not withdrawn, waived, or resolved, are hereby overruled on an interim basis, without prejudice to the assertion of any such objection at the Final Hearing.

24. ~~22.~~ Final Hearing~~; Objections~~. A final hearing (the "***Final Hearing***") to consider the Cash Collateral Motion will be held on ~~October 29~~[●], 2026, at ~~9:30 a.m.~~ [●] [a.m./p.m.] (Central Time) before the Honorable Stacey G.C. Jernigan in the United States Bankruptcy Court for the Northern District of Texas, 1100 Commerce Street, Dallas, Texas 75242. Any objections to the relief requested in the Cash Collateral Motion on a final basis shall be filed and served so as to be actually received no later than ~~October 26~~[●], 2026, at ~~5:00 p.m.~~ [●] [a.m./p.m.] (Central Time).

25. ~~23.~~ Notice of Second Interim Order and Final Hearing. The Debtors shall, within two (2) business days after entry of this Second Interim Order, mail copies of this Second Interim Order and a notice of the Final Hearing to: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) counsel to Special Servicer; (iii) counsel to William Lee "Perch" Nelson; (iv) counsel to Phoenix American Hospitality, LLC; (v) the Debtors' 20 largest unsecured creditors as set forth in the list filed by the Debtors in these cases; (vi) all known holders of liens on, or equipment leasing interests in, the Debtors' assets; (vii) all applicable government agencies to the extent required by the Bankruptcy Rules or local rules of this Court; and (viii) all parties requesting notice in these cases.

26. ~~24.~~ Immediate Effect. Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Second Interim Order shall be immediately effective and enforceable upon its entry.

27. ~~25.~~ The Court shall retain jurisdiction to interpret, implement and enforce this Second Interim Order.

**# # # END OF ORDER # # #**

**Order submitted by:**

**VINSON & ELKINS LLP**

Bradley R. Foxman (Texas Bar No. 24065243)
William L. Wallander (Texas Bar No. 20780750)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
bfoxman@velaw.com
bwallander@velaw.com

- and -

George R. Howard (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
ghoward@velaw.com

**PROPOSED ATTORNEYS FOR**
**THE DEBTORS AND DEBTORS IN POSSESSION**

**Exhibit A**

**Budget**

| **Budget** | **Amount** |
|---|---|
| Payroll Cycle Ending October 4, 2026 | $391,000.00 |
| Payroll Cycle Ending October 18, 2026 (estimated by hours) | $391,000.00 |
| October Insurance Payment | $152,231.73 |
| November Insurance Payment | $152,231.73 |
| AHP RI Cape Canaveral, LLC October Food and Beverage | $20,846.61 |
| PAH Charlotte, LLC October Food and Beverage | $20,146.62 |
| Lakemore-Phoenix Investment Platform B, LLC October Food and Beverage | $20,846.61 |
| American Hospitality Properties REIT, Inc. November Board Payment[1] | $14,375.00 |
| American Hospitality Properties REIT II, Inc. November Board Payment | $14,375.00 |
| **Total Budget** | **$1,177,053.29** |

[1] The payment of the board fees for REIT I and REIT II is subject to approval at the Final Hearing.